IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

D.A.N. JOINT VENTURE III, L.P.,

        Plaintiff,

    v.

DOROTHEA TOURIS, *et al.*

        Defendants.

Case No.  1:18-cv-00349

## ANSWER AND AFFIRMATIVE DEFENSE OF STUART T. ADLER

Defendant Stuart T. Adler, individually and as trustee of the Stuart T. Adler Revocable Family Trust U/A/D 1/31/92 ("Adler"), by and through his undersigned attorneys and for his Answer and Affirmative Defense to plaintiff D.A.N. Joint Venture III, L.P.'s ("Plaintiff") First Amended Complaint ("Complaint"), states as follows:

### Summary of The Suit

1.     The Debtor, Nicholas S. Gouletas ("Gouletas"), engaged in a complicated scheme to hide, transfer and otherwise shield his assets from the claims of certain of his judgment creditors. And while Gouletas was implementing his fraudulent transfer scheme, he selectively transferred over $2,000,000 in cash and his other assets to his friends, relatives and a select group of creditors, all in violation of state court citation liens prohibiting Gouletas from transferring his assets. On the eve of being held in contempt for violation of one such citation lien, Gouletas sought the sanctuary of bankruptcy through a Chapter 7 bankruptcy filing.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 1.  To the extent any of the allegations set forth in Paragraph 1 relate

specifically to Adler, Adler denies that he received any cash or assets from Gouletas[1] in connection with any "scheme to hide, transfer and otherwise shield his assets from the claims of certain of his judgment creditors" or that Gouletas fraudulently transferred any cash or property to Adler.

2.      While Gouletas' bankruptcy filing may prohibit further collection efforts against Gouletas directly, it does not prohibit fraudulent transfer actions against those to whom Gouletas transferred his assets in derogation of the rights of his other creditors, and in violation of the state court citation liens. This is an action to void Gouletas' fraudulent transfers pursuant to the provisions of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* (the "IUFTA"), and to recover damages from those who conspired with Gouletas in the design, implementation and execution of Gouletas' fraudulent transfer schemes. *See Paloian v. Greenfield (In re Rest. Dev. Group, Inc.)*, 397 B.R. 891, 896-98 (Bankr. N.D. Ill. 2008).

**ANSWER:**

The allegations in Paragraph 2 are not directed at Adler and therefore no response is required.  To the extent a response is required, Adler admits that the provisions of 11 U.S.C. § 362 do not apply to the claim against Adler.  Further responding, to the extent any of the allegations set forth in Paragraph 2 relate specifically to Adler, Adler denies that he received any cash or assets from Gouletas in connection with any "scheme to hide, transfer and otherwise shield his assets from the claims of certain of his judgment creditors" or that Gouletas fraudulently transferred any cash or property to Adler.

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Complaint.

## Jurisdiction and Venue

3.     This Court has jurisdiction under 28 U.S.C. §1334. In addition, this Court has diversity jurisdiction under 28 U.S.C. §1332 because (a) this action is between citizens of different States with the amount in controversy exceeding $75,000, and (b) the assignment of claims from the Bankruptcy Trustee to Plaintiff was not made collusively for the purpose of conferring diversity jurisdiction upon this Court.

**ANSWER:**

Adler denies that this Court has jurisdiction over the claim against Adler pursuant to 28 U.S.C. § 1334. Plaintiff brings a state law clam under 740 ILCS 160/5(a)(1) against Adler. Adler is without knowledge or information sufficient to form a belief as to the truth of the allegation that "this Court has diversity jurisdiction under 28 U.S.C. § 1332 because (a) this action is between citizens of different States, and (b) the assignment of claims from the Bankruptcy Trustee to Plaintiff was not made collusively for the purpose of conferring diversity jurisdiction upon this Court."

4.     Venue is appropriate in this Court pursuant to 28 U.S.C. §§1408 and 1409(a). In addition, pursuant to 28 U.S.C. §1391(b)(2), venue is appropriate in this Court because a substantial portion of the events giving rise to the claims asserted herein occurred in this Judicial District.

**ANSWER:**

Adler admits that venue is appropriate in this Court pursuant to 28 U.S.C. § 1408 and 28 U.S.C. § 1391(b)(2). Adler denies that venue is appropriate in this Court pursuant to 28 U.S.C. § 1409.

## Parties

5.     **Plaintiff**.

5.1.     Plaintiff D.A.N. Joint Venture III, L.P. ("DJV") is an Ohio limited partnership with its principal place of business in Newton Falls, Ohio. The general partner of

DJV is The Cadle Company, an Ohio corporation with its principal place of business in Newton Falls, Ohio. The limited partners of DJV are Daniel C. Cadle and his wife, Ruth Cadle, both of whom are citizens of the State of Ohio.

**ANSWER:**

Adler admits that Plaintiff DJV is an Ohio limited partnership with its principal place of business in Newton Falls, Ohio and that the general partner of DJV is The Cadle Company, an Ohio corporation with its principal place of business in Newton Falls, Ohio. Adler is without knowledge or information sufficient to form a belief as to the truth of the allegation that the limited partners of DJV are Daniel C. Cadle and his wife, Ruth Cadle, both of whom are citizens of the State of Ohio."

5.2. Plaintiff's claims herein are asserted as assignee of Bankruptcy Trustee Richard M. Fogel ("Bankruptcy Trustee"), who is the Bankruptcy Trustee for the Chapter 7 Bankruptcy Estate of Nicholas S. Gouletas, Debtor, which is pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, *In re Nicholas S. Gouletas, Debtor*, No. 16-01335. Pursuant to 11 U.S.C. §544(b)(1), the Bankruptcy Trustee, and thus Plaintiff as assignee, has standing to invoke the provisions of the IUFTA to set aside fraudulent transfers made by the Debtor, Gouletas. *See In re Xonics Photochemical*, 841 F.2d 198, 202 (7th Cir. 1988).

**ANSWER:**

Adler admits that Plaintiff's claims are asserted as assignee of the Bankruptcy Trustee. Adler denies that Plaintiff, as assignee of the Bankruptcy Trustee, has standing to assert the claims brought in the Complaint.

4

6. **Defendants.**

6.1.   Defendant Dorothea Touris ("Touris") is a citizen of the State of Illinois and a close personal friend of Gouletas who conspired with Gouletas to place $826,218.84 of his funds in her checking accounts for the purpose of allowing Gouletas to continue his lavish lifestyle, but all the while evading the state court citation liens prohibiting Gouletas from transferring his assets.

6.2.   Defendant Steven E. Gouletas is a citizen of the State of Illinois and the son of Gouletas.

6.3.   Defendant Natel Matschulat is a citizen of the State of Illinois and the wife of Gouletas.

6.4.   Defendant Home By Invsco, Inc. ("HBI") is an Illinois corporation with its principal place of business in Chicago, Illinois. At all relevant times, HBI was owned and controlled by Gouletas, and was used by Gouletas as a vehicle to conduct his personal affairs and to defraud his creditors.

6.5.   Defendant 800 South Wells Phase II, LLC ("800 SWP") is an Illinois limited liability company with its principal place of business in Chicago, Illinois. At all relevant times, 800 SWP was owned and controlled by Gouletas, and was used by Gouletas as a vehicle to conduct his personal affairs and to defraud his creditors.

6.6.   Defendant Paul Jones is a citizen of the State of Illinois.

6.7.   Defendant James Paul is a citizen of the State of California who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.8.   Defendant Stuart T. Adler is a citizen of the State of Illinois and the Trustee of the Stuart T. Adler Revocable Family Trust, an Illinois trust (collectively, "Adler").

6.9. Defendant George Stray is a citizen of the State of North Carolina who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.10. Defendant George Spanos is a citizen of the State of Illinois.

6.11. Defendant Warady & Davis LLP ("W&D") is an Illinois limited liability partnership with its principal place of business in Chicago, Illinois. None of the partners of W&D is a citizen of the State of Ohio.

6.12. Defendant Beermann Pritikin Mirabelli Swerdlove LLP ("BPMS") is an Illinois limited liability partnership engaged in the practice of law with its principal place of business in Chicago, Illinois. None of the partners of BPMS is a citizen of the State of Ohio.

6.13. Defendant SEG Garvey LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois. None of the partners of SEG Garvey is a citizen of the State of Ohio.

6.14. Defendant NKM Garvey LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois. None of the partners of NKM Garvey LLC is a citizen of the State of Ohio.

6.15. Defendant Irene Gouletas is a citizen of Illinois and the sister of Gouletas.

6.16. Defendant Desiree Witte is a citizen of Illinois and the daughter of Gouletas.

6.17. Defendant Victoria M. Gouletas is a citizen of Connecticut and the daughter of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.18. Defendant Rosalie Gouletas is a citizen of New Mexico and the daughter of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

6

6.19.    Defendant Louis Gouletas is a citizen of Illinois and the grandson of Gouletas.

6.20.    Defendant Michael Gouletas is a citizen of California and the grandson of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.21.    Defendant Brittany Gouletas ("B. Gouletas") is a citizen of Illinois and the granddaughter of Gouletas.

6.22.    Doe Defendants 1-10 are individuals, corporations, LLCs, partnerships and other entities of any nature or form whatsoever who aided and abetted or conspired with Gouletas to design, implement and execute the fraudulent transfer schemes at issue in this suit, or who otherwise aided and abetted Gouletas in his various schemes to hide, transfer or otherwise shield his assets from the claims of certain of Gouletas' creditors. *See Paloian v. Greenfield (In re Rest. Dev. Group, Inc.)*, 397 B.R. 891, 896-98 (Bankr. N.D. Ill. 2008). Doe Defendants 1-10 know who they are, and Plaintiff is of the reasonable belief that they will be informed of the nature of this suit by the other Defendants named herein. Plaintiff will seek to amend this Complaint to identify the specific names of Doe Defendants 1-10 and their role in assisting Gouletas with the design, implementation and execution of the fraudulent transfer schemes set forth herein after that information becomes available to Plaintiff through discovery to be conducted in this case. None of Doe Defendants 1-10 is a citizen of Ohio, and no partner, member, trustee or representative of Doe Defendants 1-10 is a citizen of the State of Ohio.

**ANSWER:**

Adler admits that allegations in Paragraph 6.8.   Upon information and belief, Adler admits that Home By Invsco, Inc. is an Illinois corporation with its principal place of business in

Chicago, Illinois. Adler is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 6.

## Facts

### A. Background.

7. The Debtor, Nicholas S. Gouletas ("Gouletas"), is the owner and control person of a large group of companies generally referred to as "American Invsco", which, for the last 49 years, were involved in condominium conversions and various other real estate developments in more than 40 cities throughout the United States. Gouletas routinely refers to himself as the "Condominium Conversion King".

### ANSWER:

Adler admits that Gouletas has been involved in the real estate development business, and condominium conversions in particular, throughout the United States for many years and that his companies have been referred to as "American Invsco." Adler is without knowledge or information sufficient to form a belief as to the truth of whether Gouletas routinely refers to himself as the "Condominium Conversion King."

8. In a financial statement signed by Gouletas, Gouletas represented that, as of March 31, 2013, he had a net worth of $25,287,560, with "cash" in the amount of $240,000. (Px 1) Thereafter, in a letter that Gouletas sent to Mayor Rahm Emanuel on January 13, 2014, Gouletas represented that "a real estate investor from London [is] in negotiations with us, American Invcso, to purchase a third tower on land we own at 801 S. Wells, for an additional $65 million." (Px 2).

**ANSWER:**

Adler admits that the documents attached to the Complaint as Px 1 and Px 2 contain the statements alleged in Paragraph 8. Adler is without knowledge or information sufficient to form a belief as to the authenticity of those documents or the truth of those statements.

9. Even though Gouletas had a substantial net worth, and was flush with cash, Gouletas would routinely pay only a select group of his creditors, while doing everything within his power to stiff the remainder of his unfavored creditors. Indeed, from October of 2008 to the present, Gouletas was generally not paying all of his debts as they became due, forcing his unfavored creditors to either abandon their claims, or seek collection of those debts through the judicial system.

**ANSWER:**

Adler admits that Gouletas was not paying his debts to Adler as they became due and that Adler was forced to seek collection of that debt through the judicial system by filing suit in 2011 and 2014, and obtaining a judgment and serving citations to discover assets in 2014. Adler is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 9.

   **B.**  **Numerous Judgments Are Entered Against Gouletas**

10. Gouletas was the manager of 800 South Wells Commercial, LLC ("800 SWC"), which owned certain commercial space at the River City Complex located at 800 South Wells Street in Chicago. Gouletas hired one of his companies, Invsco Management Company ("Invsco"), to manage the River City Complex commercial space in exchange for management fees paid by 800 SWC to Gouletas' company, Invsco.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 10.

11.    On March 17, 2011, 800 SWC filed suit against Gouletas in the Circuit Court of Cook County, Illinois, No. 2011-L-2895, for self-dealing and breaching fiduciary duties owed to 800 SWC (the "800 SWC Suit"). Gouletas was represented by counsel in connection with the 800 SWC Suit, and actively participated in pretrial proceedings.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 11.

12.    On August 9, 2013, Gouletas was sued by Karl T. Muth ("Muth"), one of the investors in a Gouletas condominium conversion project, in the Circuit Court of Cook County, Illinois, No. 2013-L-8995, for sums allegedly owed by Gouletas in connection with the investment (the "Muth Suit"). Thereafter, on December 11, 2013, a final judgment was entered in the amount of $761,352.27 against Gouletas (the "Muth Judgment").

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12.

13.    On August 20, 2013, Gouletas was sued by Humberto Alfonso ("Alfonso"), another investor in a Gouletas condominium conversion project, in the Circuit Court of Cook County, Illinois, No. 2013-L-9345, for sums allegedly owed by Gouletas in connection with the investment (the "Alfonso Suit"). Thereafter, on December 11, 2013, a final judgment was entered in the amount of $454,037.93 against Gouletas (the "Alfonso Judgment").

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13.

14.     In the 800 SWC Suit, Gouletas steadfastly refused to sit for his deposition. Because of Gouletas' pattern of discovery abuse, on December 5, 2013, 800 SWC filed a Motion for Sanctions against Gouletas, which was granted by the Court on December 11, 2013. After Gouletas, once again, failed to sit for his deposition, on January 23, 2014 the Court in the 800 SWC Suit entered a final judgment against Gouletas in the amount of $11,550,040.12 (the "800 SWC Judgment").

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14.

15.     Although Gouletas, through counsel at BPMS, appealed the 800 SWC Judgment, filed a Petition under Section 2-1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1401) to set aside the 800 SWC Judgment, and then appealed the trial court's denial of Gouletas' 2-1401 Petition, Gouletas was not successful in setting aside the 800 SWC Judgment.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 15.

**C.     Citation Liens Are Entered Against Gouletas Prohibiting Gouletas From Transferring His Assets**

16.     On December 19, 2013, Citations to Discover Assets were issued against Gouletas in the Muth Suit and the Alfonso Suit, which were served upon Gouletas shortly thereafter. Accordingly, as of the end of December 2013, Gouletas was prohibited from

11

transferring his assets by virtue of the Citations issued in the Muth Suit and the Alfonso Suit. *See* 735 ILCS 5/2-1402(m); *Marcus-Rehtmeyer v. Jacobs*, 784 F.3d 430, 438-39 (7th Cir. 2015).

**<u>ANSWER:</u>**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 16.

17.     Due to Gouletas' failure to pay the amount owed under the 800 SWC Judgment, on June 5, 2014, 800 SWC filed a Citation to Discover Assets against Gouletas (Px 3) (the "Citation") in connection with the 800 SWC Suit (the "Citation Proceedings"). The Citation was served on Gouletas on June 9, 2014. At all times during the Citation Proceedings, Gouletas was represented by Howard Teplinsky, Esq. from BPMS.

**<u>ANSWER:</u>**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 17.

18.     In the Citation, Gouletas was specifically instructed that:

> **YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of . . . any property not exempt from execution . . . belonging to the judgment debtor [Gouletas] <u>or</u> <u>to</u> <u>which</u> <u>the</u> <u>judgment</u> <u>debtor</u> <u>may</u> <u>be</u> <u>entitled</u> or which may be acquired by or become due to the judgment debtor . . ., until further order of Court or termination of the proceedings.

(Px 3 p. 1 (underscoring added) (the "Citation Lien", and, with the Muth Citation and the Alfonso Citation, the "Citation Liens")) Gouletas understood that when he was served with the Citation, he was not to transfer anything after receiving the Citation. Moreover, the Circuit Court Judge presiding over the Citation Proceedings, Judge Alexander White, specifically informed Gouletas, with Gouletas present in open Court, that "[f]rom the time you received the citation [on

June 9, 2014], all your assets were frozen . . .. [T]he citation language speaks for itself. It said you will not transfer any asset."

**ANSWER:**

Adler admits that the form of a citation to discover assets used in Illinois typically contains the language block-quoted in Paragraph 18. Adler without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 18.

### D. In Violation Of The Citation Lien, Gouletas Obtained And Cashed Numerous Cashier's Checks Issued To Himself

19. In the 800 SWC Suit, the Citation was served upon Gouletas on June 9, 2014, which prohibited Gouletas from transferring any of his assets. In violation of the Citation Lien, Gouletas obtained and cashed numerous cashier's checks issued in his name:

(a) On or about July 31, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,530.52 issued to himself (Px 4);

(b) On or about August 1, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $10,000 issued to himself (Px 5);

(c) On or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,500.00 issued to himself (Px 6); and

(d) On or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $2,500.00 issued to himself (Px 7).

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 19.

E.     **The Touris Checking Account Scheme**

20.     Apparently tired of the process of obtaining cashier's checks in his name, Gouletas then turned to a close personal friend, Touris, to assist him with a money laundering scheme that would allow Gouletas to maintain his lavish lifestyle, but all the while evade paying his creditors, and skirt the judicial prohibitions against his transfer of assets imposed by the Citation Liens.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 20.

21.     Touris was a friend of Gouletas for over 40 years. Moreover, she lived in the same condominium building as Gouletas at 111 East Chestnut Street in Chicago, having bought her condominium from one of Gouletas' entities after Gouletas developed that property into condominiums. Further, Touris was the director of design for Gouletas at American Invsco over the last 20 years.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 21.

22.     In January of 2015 (and after the Citation Liens were entered prohibiting Gouletas from transferring his assets), Gouletas requested that Touris deposit his funds into her checking accounts for the payment of Gouletas' expenses. Pursuant to Gouletas' plan, Touris would then take the funds that he had provided to her, put that money in her checking accounts, and then pay Gouletas' bills out of her checking accounts. The funds that Gouletas deposited into Touris'

checking accounts belonged to Gouletas. In essence, Touris acted as a managing agent of Gouletas for the handling and use of Gouletas' funds.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 22.

23.      In late January of 2015, Touris met with Gouletas at his office in Chicago with Gouletas' attorney, Howard Teplinsky from BPMS. At that meeting, Gouletas presented Touris with a check in the amount of $396,218.84. Touris understood that those funds belonged to Gouletas. Gouletas then told Touris that "I would like you [Touris] to deposit this [the $396,218.84 check] in your account. And I want you [Touris] to pay $195,000 to [Gouletas' son] Steven Gouletas and $50,000 to a gentleman [named George Spanos]", with the balance of $150,000 to be kept by Touris as compensation in the form of a purported reimbursement on a Gouletas investment.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 23.

24.      Thereafter, on February 6, 2015 Touris wrote a check from her MB Bank checking account in the amount of $195,000 for a payment by Gouletas to his son, Steven E. Gouletas (Px 8), and a $50,000 payment to Gouletas' friend, George Spanos. (Px 9).

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 24.

25.     On February 17, 2015, Gouletas wire-transferred $15,730 into Touris' checking account at Chase Bank (the "Touris Chase Account"). (Px 10) The $15,730 was money that belonged to Gouletas. Gouletas, however, claims to have "no idea" where the $15,730 came from.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 25.

26.     And then, in March of 2015, Gouletas told Touris that a check for $415,000 was coming to her, which she was to deposit in her account for the payment of Gouletas' expenses. Touris then deposited the $415,000 check into her checking account at Chase Bank. (Px 11) According to Touris, she and Gouletas "talked about it together and he wanted the bills paid, so . . . he asked me [Touris], would you deposit this [$415,000 check] in your account and pay the bills." Although Gouletas claimed that the $415,000 was a "loan" to him from Defendant Paul Jones, he admitted that the $415,000 was his money. The total amount of Gouletas' funds that Gouletas deposited into the Touris Chase Account was in excess of $431,145.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 26.

27.     The account summaries for the Touris Chase Account (Px 12) pertain to the requests that Gouletas made about taking funds that Gouletas had put into Touris' checking account, and that Touris then withdrew from her account at Gouletas' request. As acknowledged by Touris, "those [account summaries reflected by Px 12] are all of the financial transactions that

16

[she] handled for Nick Gouletas with Nick Gouletas' money", and "[e]very single thing was done by [Gouletas] telling me [Touris] to do it."

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 27.

28.     Although the Citation was served on Gouletas on June 9, 2014, and was not suspended until Gouletas filed for bankruptcy herein on January 17, 2016, the account summaries for the Touris Chase Account (Px 12) reflect the regular, continuous and systematic use of that account by Gouletas and Touris from February 17, 2015 when Gouletas made his initial wire transfer of $15,730 into that account, until September 14, 2015 with the payment of Gouletas' credit card bill. (*Id*.)  Some of the more significant withdrawals by Gouletas from the Touris Chase Account -- all in violation of the Citation Liens -- are listed below:

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 2/18/15 | $7,000 | George Stray, friend of Gouletas. (Px 12 #14) |
| 3/16/15 | $5,000 | Cash. (Px 12 #14) |
| 3/17/15 | $5,000 | Cash. (Px 12 #14) |
| 3/20/15 | $10,000 | Transfer to other checking account. (Px 12 #14) |
| 3/20/15 | $10,000 | Wire transfer at Gouletas' request to "Santander, B". (Px 12 #14) |
| 3/20/15 | $20,000 | Cash. (Px 12 #14) |
| 3/20/15 | $5,000 | Cash. (Px 12 #14) |
| 3/20/15 | $90,000 | Loan to Touris. (Px 12 #15) |
| 3/24/15 | $53,000 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $16,000 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $7,200 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $440 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $30,000 | Natel Matschulat, Gouletas' wife. (Px 12 #15) |
| 3/26/15 | $5,512.22 | Condominium assessment. (Px 12 #15) |
| 3/26/15 | $3,436.06 | Payment for assessments on Gouletas' condominium. (Px 12 #15) |

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 3/26/15 | $1,061 | Payment to BOA for mortgage on Gouletas condominium. (Px 12 #15) |
| 3/26/15 | $869.09 | Payment of Gouletas' ComEd bill. (Px 12 #15) |
| 3/27/15 | $2,949.02 | Payment of mortgage. (Px 12 #15) |
| 3/27/15 | $2,788.28 | Payment of assessments for condominiums. (Px 12 #15) |
| 3/27/15 | $1,865.16 | Payment of assessments for condominiums. (Px 12 #15) |
| 4/7/15 | $10,000 | Wire transfer to Luxury Management LLC. (Px 12 #17) |
| 4/9/15 | $3,581.01 | Assessment for Gouletas' condominium. (Px 12 #17) |
| 4/13/15 | $1,391.55 | Payment for Gouletas' condominium on Delaware Street. (Px 12 #17) |
| 4/13/15 | $230 | Assessment for Gouletas' condominium on Delaware Street. (Px 12 #17) |
| 4/14/15 | $22,474.24 | Mortgage for Gouletas' condominium. (Px 12 #17) |
| 4/14/15 | $4,299.75 | Mortgage for Gouletas' condominium. (Px 12 #17) |
| 4/14/15 | $2,634.74 | Payment for assessments on Gouletas' condominium at Delaware Place. (Px 12 #17) |
| 4/14/15 | $1,639.82 | Payment of Gouletas' ComEd bill. (Px 12 #17) |
| 4/14/15 | $125 | Payment of AT&T bill. (Px 12 # 17) |
| 4/15/15 | $4,167.06 | Payment of assessment on Gouletas' condominium. (Px 12 #17) |
| 4/16/15 | $15,150.29 | Unexplained. (Px 12 #17) |
| 4/16/15 | $14,268.31 | Payment of Gouletas' mortgage. (Px 12 #17) |
| 4/16/15 | $2,695.25 | Payment of Gouletas' assessment on condominium. (Px 12 #17) |
| 4/16/15 | $1,275.29 | Payment for Gouletas' parking. (Px 12 #17) |
| 4/27/15 | $10,000 | Gouletas requested payment to Karen Thorton. (Px 12 #18) |
| 4/28/15 | $1,620.10 | Payment for Gouletas' condominium. (Px 12 #18) |
| 4/29/15 | $3,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 12 #18) |
| 4/29/15 | $1,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 12 #18) |
| 4/30/15 | $2,000 | Unexplained. (Px 12 #18) |
| 5/4/15 | $13,000 | Payment to Gouletas' wife, Natel Matschulat. (Px 12 #18) |
| 5/4/15 | $10,000 | Payment to George Spanos. (Px 12 #18) |
| 5/13/15 | $5,000 | Unexplained. (Px 12 #18) |
| 5/14/15 | $10,000 | Transferred to another checking account. (Px 12 #18) |
| 5/21/15 | $1,000 | Unexplained. (Px 12 #18) |
| 5/26/15 | $2,712.05 | Transferred to checking account. (Px 12 #19) |
| 5/28/15 | $10,000 | Gouletas gave the money to Touris. (Px 12 #19) |
| 5/28/15 | $5,000 | Cash.   (Px 12 #19) |
| 5/28/15 | $5,000 | Cash. (Px 12 #19) |
| 5/29/15 | $900 | Payment on Gouletas' credit card. (Px 12 #19) |
| 5/29/15 | $6,500 | Payment on Gouletas' wife's credit card. (Px 12 #19) |
| 6/4/15 | $10,000 | Payment to Vivien. (Px 12 #19) |

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 6/8/15 | $2,171.10 | Payment on Gouletas' credit card. (Px 12 #19) |
| 6/9/15 | $6,178.31 | Payment for Gouletas' condominium. (Px 12 #19) |
| 6/9/15 | $1,000 | Payment to Heather Von Ehr. (Px 12 #19) |
| 6/24/15 | $1,000 | Payment on Gouletas' credit card. (Px 12 #20) |
| 6/24/15 | $5,000 | Unexplained. (Px 12 #20) |
| 7/2/15 | $2,000 | Cash. (Px 12 #20) |
| 7/14/15 | $1,602.60 | Payment for three plane tickets to Atlanta. (Px 12 #21) |

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 28.

29.    From the $826,218.40 that Gouletas deposited into Touris' checking accounts, only $1,368 of Gouletas' funds remained in those accounts as of February 10, 2017.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 29.

**F.    The Garvey Court Scheme**

30.    During the time that the Citations were issued prohibiting Gouletas from transferring his assets, Gouletas was involved in a real estate development project referred to as "Garvey Court" (the "Garvey Court Project"). The Garvey Court Project involved the construction of a mixed use high-rise retail/office/condominium building on properties that Gouletas owned (through entities that he owned and controlled) at Clark and Lake Streets in Chicago.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30.

31.     Basically, in April of 2014, Gouletas placed certain properties that he owned into a new entity -- Garvey Court, LLC -- which would pay off the existing debt on the properties, and then develop the new high-rise on the Gouletas properties. Gouletas' "equity cushion" in the Garvey Court properties was in excess of $3,600,000.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 31.

32.     In the original formulation of the Garvey Court plan, Gouletas was going to retain a 25% interest in the Garvey Court Project. Later in May of 2014, however, and (a) after the Citations were served upon Gouletas in the Muth and Alfonso Suits, and (b) after the 800 SWC Judgment was entered against Gouletas, Gouletas "gifted" his 25% interest in the Garvey Court Project to family members through two newly formed LLCs, SEG Garvey LLC (12%) and NKM Garvey LLC (13%), as follows:

     (a)    SEG Garvey LLC

         (i)     Steven E. Gouletas -- 16.66%
         (ii)    Irene Gouletas -- 16.67%
         (iii)   Desiree Witte -- 16.67%
         (iv)   Victoria M. Gouletas -- 16.67%
         (v)    Rosalie Gouletas -- 16.67%
         (vi)   Louis Gouletas -- 5.53%
         (vii)  Michael Gouletas -- 5.53%
         (viii) Brittany Gouletas -- 5.54%

     (b)    NKM Garvey LLC

         (i)     Natel Matschulat -- 93%
         (ii)    Nicholas Gouletas --7%

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 32.

33.     Accordingly, in late May of 2014, Gouletas gifted away -- in violation of the Citation Liens and in derogation of the rights of his creditors -- virtually all of his "equity cushion" in the Garvey Court Project. As of the time of the Garvey Court transfers, Gouletas' "equity cushion" in the Garvey Court Project exceeded $3,600,000.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 33.

      **G.**     **The Matschulat-CIB Stock Scheme**

34.     Shortly after service of the Citation upon Gouletas on June 9, 2014, Gouletas discovered, quite by accident, that he had, in the distant past, acquired a number of shares of stock in CIB Marine BankShares (the "CIB Stock"), which Gouletas held through a stock brokerage account at TD Ameritrade (the "TDA Account").

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 34.

35.     Although the Citation was served on Gouletas on June 9, 2014, and Gouletas understood that he was thereby prohibited from transferring his assets, on or about September 4, 2014, Gouletas sold his CIB Stock through his TDA Account for just over $51,000 (Px 13), and then, on or about the same date, wire-transferred $51,323.29 from that stock sale into a checking account held in the name of his wife, Natel Matschulat. (*Id.*)

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 35.

36.     After depositing the $51,323.29 in his wife's checking account, Gouletas then proceeded to have his wife, Natel Matschulat, sign checks from that account for the payment of Gouletas' expenses, all in violation of the judicial prohibition against his transfer of assets imposed by the Citation Liens.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 36.

> **H.     The HBI-Parking Lot Scheme**

37.     One of Gouletas' entities, Defendant 800 South Wells Phase II, LLC ("800 SWP"), owned a 1.77 acre 126-space parking lot at 800 South Wells Street in Chicago (the "Parking Lot"), which was next to the River City Complex. Gouletas was the manager, sole member and control person of 800 SWP.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 37.

38.     As of November 1, 2009, there was only one mortgage indebtedness against the Parking Lot, which was in favor of River City Investors, LLC ("RCI") in the original principal amount of $2,000,000 (the "RCI Mortgage"). Since the Parking Lot was worth far in excess of the amount of the RCI Mortgage, on November 1, 2009 Gouletas had another one of his controlled entities, Defendant Home By Invsco, Inc. ("HBI"), place a bogus mortgage against the

Parking Lot in the amount of $2,177,700 (the "HBI Second Mortgage") to protect the equity in the Parking Lot from the claims of Gouletas' creditors. HBI was owned and controlled by Gouletas, and was, in fact, the alter-ego of Gouletas.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 38.

39.   While Gouletas signed the HBI Second Mortgage on November 1, 2009, the internal financial documents of Gouletas' enterprise, American Invsco (which included 800 SWP and HBI), did not reflect any indebtedness supposedly owed to HBI on the HBI Second Mortgage:

(a)   In the "American Invsco Liquidity Action Plan Update" dated November 22, 2011 (Px 14), it was represented that:

> Our debt at the land is $2,500,000. The last appraisal had a value of $14,880,000. CBRE indicates that . . . the market value for the land should be around $12,000,000. We have indicated the urgency to them, and we are going to list it for $13,000,000, anticipating accepting a price around $12,000,000 in the next nine months, again subject to market conditions. Therefore, the net proceeds to the company should be around $9,000,000.

(*Id.* p. 1) No indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(b)   In an "American Invsco Companies Consolidated Balance Sheet" dated December 31, 2012 (Px 15), it was represented that the Parking Lot had a value of $9,500,000, with the sole mortgage on the Parking Lot in favor of RCI in the amount of $2,000,000. (*Id.*) This December 31, 2012 Consolidated Balance Sheet for American Invsco showed that Gouletas had "shareholder equity" in the amount of $10,002,000. (*Id.*) Again, no indebtedness was showed

which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(c)     In a "Balance Sheet" signed by Gouletas (Px 1), Gouletas represented that as of March 31, 2013, the Parking Lot had a value of $11,334,590 (*id.* p. 1), with the sole mortgage owed by 800 SWP on the Parking Lot in the amount of $3,300,000. (*Id.* p. 4) Once again, no indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(d)     In a "Balance Sheet" dated February 28, 2014 (Px 16), Gouletas represented that the Parking Lot was worth $6,500,000, with a "first mortgage" in the amount of $3,300,000. (*Id.*) And, once again, no indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

**ANSWER:**

Adler admits that the documents attached to the Complaint as Px 1, Px 15, and Px 16 contain the statements alleged in Paragraph 39.  Adler is without knowledge or information sufficient to form a belief as to the authenticity of those documents or the truth of those statements.  Adler is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 39(a)-(d).

40.     Further, in connection with Gouletas' efforts to supersede a prior judgment that DJV had obtained against Gouletas for Gouletas' failure to honor his word on a guarantee, on June 29, 2010, Gouletas represented to Illinois Circuit Court Judge Lee Preston, under oath, that:

> The Property [*i.e.*, the Parking Lot] is valued at $14,888,000. . . . The sole mortgage recorded against the Property is in the recorded amount of $2,000,000. Ex. B, p. D-3 ¶6. Therefore, there is equity in the amount of $12,880,000 in the Property to serve as security

for the [$1,000,000] Judgment [that DJV obtained against Gouletas].

(Px 17 p. 2 ¶5). Accordingly, on June 29, 2010, Gouletas verified under oath, and represented to Judge Preston and DJV, that there was no other mortgage indebtedness owed in connection with the Parking Lot other than the RCI Mortgage.

**ANSWER:**

Adler admits that the document attached to the Complaint as Px 17 contains the quote alleged in Paragraph 40. Adler is without knowledge or information sufficient to form a belief as to the truth of those statements. Adler is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 40.

41. In late 2014, Gouletas received a solid offer from a financially sound third party to purchase the Parking Lot for $7,750,000. With the RCI Mortgage and other expenses of the sale totaling approximately $5,711,000, Gouletas, with the assistance of one or more Doe Defendants 1-10, came up with a plan to shield the approximately $2,038,000 in profits from Gouletas' unfavored creditors. Basically, the plan involved the false claim that the HBI Second Mortgage was legitimate, and then Gouletas would have the approximately $2,038,000 in profits from the sale of the Parking Lot (that otherwise would have been paid to Gouletas) distributed to certain preferred creditors and other friends and relatives of Gouletas, with those friends and relatives then funneling a portion of the profits from the sale of the Parking Lot back to Gouletas through Touris' checking accounts.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 41.

42.     By email dated December 19, 2014, Elizabeth Friedgut, Esq., the transactional attorney for Gouletas who was handling the sale of the Parking Lot, inquired of Gouletas' son, Steven Gouletas, as follows: "I need to talk to [Gouletas' accountant, Gerald Zaidman] about your dad's tax liability for river city which we are going to be selling shortly." (Px 18 (emphasis added)) On December 22, 2014, Gouletas' accountant, Mr. Zaidman, responded: "I think it is important if you can defer the closing of the 800 Wells property [*i.e.*, the Parking Lot] owned by Nick personally til 2015. Please call me to discuss ASAP." (Px 19 (emphasis added)).

**ANSWER:**

Adler admits that the document attached to the Complaint as Px 18 contains the quotes alleged in Paragraph 42.   Adler is without knowledge or information sufficient to form a belief as to the authenticity of those documents or the truth of those statements.   Adler is without knowledge or information sufficient to form a belief as to the truth of remaining allegations of Paragraph 42.

43.     The closing on the sale of the Parking Lot occurred on December 29, 2014. The closing statement (Px 20) shows that from the $7,750,000 in sale proceeds, $2,038,703.84 was the balance due to the Seller. (*Id*. p. 2.)  Elizabeth Friedgut signed the settlement statement for and on behalf of 800 SWP. (*Id*.)  800 SWP and HBI were and are the alter-egos of Gouletas, and the $2,038,703.84 in profits from the sale of the Parking Lot legally and equitably belonged to Gouletas.

**ANSWER:**

Adler admits that the document attached to the Complaint as Px 20 contains the figures recited in Paragraph 43 and that the name Elizabeth Friedgut appears under the signature for the Seller.   Adler is without knowledge or information sufficient to form a belief as to the

authenticity of that document, the truth of the information therein, or whether the settlement statement relates to the "Parking Lot." Adler is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 43.

44. As of January 5, 2015, Gouletas still had not decided exactly how to distribute the profits from the sale of the Parking Lot. By email to Gouletas' agent, John Arnold, dated January 5, 2015, Gouletas' attorney at BPMS, Howard Teplinsky, outlined his thoughts on how the profits from the sale of the Parking Lot should be disbursed. (Px 21) Apparently, BPMS (through its partner and agent, Howard Teplinsky) allowed Gouletas to deposit the $2,038,703.84 from the sale of the Parking Lot into the firm's trust account to facilitate the payment of those proceeds as Gouletas directed. (Px 22) In addition, on January 6, 2015, Gouletas had an additional $137,535 wire-transferred into the trust account at BPMS. (Px 23).

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 44.

45. Then on January 20, 2015, Mr. Teplinsky, for and on behalf of BPMS, directed how the remainder of the $1,271,218.84 from the BPMS escrow account was to be distributed. (Px 24.) Of the $396,218.84 paid to Touris (Px 25), Gouletas then had Touris distribute $195,000 of those proceeds to his son, Steven Gouletas, and $50,000 of those proceeds to Gouletas' friend, George Spanos. Further, of the $690,000 distributed to Defendant Paul Jones, $415,000 from those proceeds were then deposited by Paul Jones into Touris' checking account so Gouletas could continue to pay his expenses without those funds being subject to execution by Gouletas' judgment creditors.

**ANSWER:**

Adler admits that the document attached to the Complaint as Px 24 contains the statements alleged in Paragraph 45. Adler is without knowledge or information sufficient to form a belief as to the authenticity of that document or the truth of those statements. Adler is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 45.

46.     At the direction of BPMS' agent, Mr. Teplinsky, on January 13, 2015, $30,020 of the profits from the sale of the Parking Lot were distributed to BPMS for an alleged payment on HBI's legal bills. And then on January 22, 2015, an additional $25,000 of the profits from the sale of the Parking Lot were distributed to BPMS as "finalize entity flat fee charge" for work supposedly done for and on behalf of HBI. On information and belief, these legal fees paid to BPMS reflected legal work that was done, in reality, primarily on behalf of Gouletas, and otherwise constituted excessive legal fees charged to HBI.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 46.

    **I.**      **Gouletas Engaged In Additional Money Laundering Schemes**

47.     Further, on information and belief, from at least 2013 to the present, Gouletas would cause funds that would otherwise be paid to himself, and direct those funds to one or more Doe Defendants 1-10. According to Gouletas' plan, Doe Defendants 1-10 would hold those funds in their own names, and then funnel those funds back to Gouletas either through cashier's checks made payable to Gouletas, or through purported "loans". On information and belief, these

additional money laundering schemes were part of Gouletas' efforts to delay, hinder and defraud his creditors.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 47.

### J.     The Contempt Proceedings Against Gouletas

48.     Based on the numerous violations by Gouletas of the Citation Lien, on April 24, 2015, 800 SWC filed a Motion for Contempt against Gouletas, which was amended on October 9, 2015 (the "Contempt Motion"). The trial court (White, J.) conducted hearings in connection with the Contempt Motion on July 20, 2015, September 2, 2015, and November 24, 2015.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 48.

49.     In connection with the evidence which showed that Gouletas, during the Citation Proceedings, had sold his CIB Stock without obtaining permission from the Court, Judge White stated, with Gouletas still up on the witness stand, that:

> I'm a little bit confused here. We have a citation that says . . . don't transfer assets. And what I'm hearing from the testimony is that apparently [Gouletas' CIB Stock] was sold. The money was forthcoming and was used to buy food, which is a violation of the citation.

Further, Gouletas testified at the contempt hearing that he supposedly had "no idea" why he was going through a series of cashier's checks during the time from and after the Citation was served upon him on June 9, 2014.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 49.

50.     The final day of the contempt hearing was scheduled for January 19, 2016. On the eve of Judge White's decision in connection with the motion to hold Gouletas in contempt, on January 17, 2016 Gouletas filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois. The Citation Liens continued in existence at all times from the date the Citation was filed on June 5, 2014 until the date that Gouletas filed for bankruptcy on January 17, 2016 (*see Marcus-Rehtmeyer v. Jacobs*, 784 F.3d 430, 438-39 & 443 (7th Cir. 2015)), and at all relevant times were in full force and effect.

**ANSWER:**

Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 50.

**K.     The Bankruptcy Trustee Assigns The Litigation Claims And
Alter-Ego Claims To DJV**

51.     The Bankruptcy Trustee attempted to obtain counsel to prosecute avoidance and fraudulent transfer claims for and on behalf of the Bankruptcy Estate on a contingent fee basis, but, despite his diligent efforts, was unable to do so. On July 23, 2017, the Bankruptcy Trustee received an offer from DJV to purchase the Bankruptcy Trustee's litigation claims and alter-ego claims for $15,000. On July 24, 2017, the Bankruptcy Trustee filed in the Bankruptcy Court the Trustee's Motion for Approval of Sale of Interests in Personal Property and for Related Relief (Px 26), which specifically included fraudulent transfer, alter-ego, and common law tort claims of the nature set forth herein. *See* 11 U.S.C. §§363(b)(1) & 544(b)(1). No one offered a higher

bid for those claims, and neither the Debtor, Gouletas, nor any creditor, objected to the Bankruptcy Trustee's Motion or the proposed sale by the Bankruptcy Trustee.

**ANSWER:**

Admitted.

52.    After due notice to all interested parties, and after hearing before the Bankruptcy Court, on August 18, 2017, the Bankruptcy Court presiding over the Gouletas Bankruptcy entered its Order Authorizing Sale of Personal Property. (Px 27) Neither the Debtor, Gouletas, nor any creditor objected to the order of sale, or appealed the order of sale. Thereafter, on September 13, 2017, the Bankruptcy Trustee and the representative of DJV executed the Assignment of Claims and Causes of Action, thereby transferring the Bankruptcy Trustee's litigation claims and alter-ego claims to DJV. (Px 28).

**ANSWER:**

Adler admits that on August 18, 2017, the Bankruptcy Court entered its Order Authorizing Sale of Personal Property and that the Bankruptcy Trustee and the representative of DJV executed the Assignment of Claims and Causes of Action, thereby transferring the Bankruptcy Trustee's litigation claims and alter-ego claims to DJV. Adler is without knowledge or information sufficient to form a belief as to whether any party in interest objected to the sale at the hearing on the Trustee's Motion for Approval of Sale of Interests in Personal Property and for Related Relief.

53.    All conditions precedent to recovery by Plaintiff have been performed or have occurred.

**ANSWER:**

Denied.

54.     Plaintiff realleges all preceding and succeeding paragraphs as the basis for each of the following Counts.

**ANSWER:**

Adler restates and incorporates herein by reference its answers to the allegations set forth in Paragraphs 1 through 53 of the Complaint as though fully set forth herein.

**Count One**
**(Avoidance Of Fraudulent Transfers**
**Pursuant To 740 ILCS 160/5(a)(1))**

55.     The Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq*. (the "IUFTA") at Section 160/5(a) provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . ., if the debtor made the transfer . . .: (1) with actual intent to hinder, delay or defraud any creditor of the debtor . . ..

740 ILCS 160/5(a)(1).

**ANSWER:**

Admitted.

56.     The following transfers of cash (the "Transfers") were made by or on behalf of the Debtor, Gouletas, from funds that, legally and equitably, belonged to Gouletas, with actual intent to hinder, delay or defraud Gouletas' creditors in existence as of the dates of the Transfers, including 800 SWC, Muth and Alfonso.

**ANSWER:**

The term Transfers is not defined as there no "following transfers" set forth in this Paragraph.  Adler assumes the term Transfers refers to the alleged payments referenced in Paragraph 60.  Based thereon, Adler denies the allegations of Paragraph 56 as they relate to the transfer to him (Paragraph 60(f)) because Adler was among Gouletas's judgment creditors in

existence as of the dates of the alleged Transfers. Adler is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 56.

57.     The course of conduct set forth above shows Gouletas' actual intent to hinder, delay or defraud Gouletas' creditors in existence as of the date of the Transfers, including 800 SWC, Muth and Alfonso.   Indeed, a number of the Transfers were to insiders as defined in 740 ILCS 160/2(g)(1), (4) & (5). In that connection, (a) Touris was an "insider" within the meaning of 740 ILCS 160/2(g)(5) because Touris acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas' funds; (b) Steven Gouletas was an "insider" within the meaning of 740 ILCS 160/2(g)(1) & (5) because he is a relative of the Debtor (*i.e.*, Gouletas' son), and acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas' funds; and (c) BPMS was an "insider" within the meaning of 740 ILCS 160/2(g)(5) because BPMS acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas' funds. Further, as to the funds deposited into the checking accounts of Touris, Gouletas retained control over those funds, and the transfers were concealed. In addition, before the Transfers were made, Gouletas had been sued and threatened with further suits, numerous judgments had been entered against him, and Gouletas was insolvent.

**ANSWER:**

Adler admits that before the dates listed for the all the alleged Transfers he had sued Gouletas (in 2011 and 2014), obtained a judgment against Gouletas in 2014, and perfected a citation lien against Gouletas in 2014.  Adler is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 57.

58.     The Transfers were made in violation of 740 ILCS 160/5(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

**ANSWER:**

Denied as to Adler. Adler is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 58.

59. None of the Defendants listed below took the fraudulently transferred funds in good faith because each Defendant knew, must have known, or should have known that numerous judgments had been entered against Gouletas, with outstanding Citation Liens which prohibited Gouletas from transferring his assets. *See For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 560 F.3d 717, 722 (7th Cir. 2009). Indeed, as to Defendant Adler, he had previously filed suit against Gouletas on August 4, 2014 in the Circuit Court of Cook County, Illinois, No. 2014 L 050584, during which Adler was represented by reputable counsel who were highly experienced and very thorough litigators. Accordingly, at the time that Adler took the $850,000 from Gouletas on January 8, 2015, Adler knew, must have known, or should have known about the 800 SWC, Muth and Alfonso judgments against Gouletas and the outstanding Citation Liens that had been entered against Gouletas which prohibited Gouletas from transferring his assets. Moreover, in the December 30, 2014 Release and Settlement Agreement executed between Adler and Gouletas (Px 29), Adler acknowledged that "[i]f for any reason Adler is ordered to return or disgorge the Payment [of $850,000] or any portion thereof, any obligation of Adler hereunder shall be null, void and of no effect . . .." (*Id*. p. 2 ¶2.) Since Adler, through highly experienced and very thorough counsel, knew, must have known, or should have known about the outstanding judgments against Gouletas and the Citation Liens pertaining thereto, Adler did not take the funds from Gouletas in good faith.

**ANSWER:**

Adler admits that he filed suit against Gouletas on August 4, 2014, and that he was represented by reputable counsel who were experienced and thorough litigators. Adler admits that on December 30, 2014, he entered into the Release and Settlement Agreement attached to the Complaint as Px 29 to resolve Gouletas's obligations to him under a judgment (referenced therein), and that the agreement contained a disgorgement provision. Adler denies the remaining allegations of Paragraph 59 as they relate to him. Adler is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 59.

60. Each Defendant listed below is liable to Plaintiff, as the assignee of the claims of the Bankruptcy Trustee, in the amount of the Transfers as follows:

    (a) <u>Defendant Dorothea Touris</u>

        (i)    January 21, 2015 -- $396,218.84
        (ii)   February 17, 2015 -- $15,730
        (iii)  March 17, 2015 -- $415,000
        (iv)  May 28, 2015 -- $10,000

    (b)  <u>Defendant Steven E. Gouletas</u>

        (i)    April 11, 2014 -- $90,586
        (ii)   April 11, 2014 -- $80,324
        (iii)  August 29, 2014 -- $23,200
        (iv)  February 6, 2015 -- $195,000
        (v)   February 6, 2015 -- $190,000
        (vi)  February 6, 2015 -- $5,000
        (vii)  March 24, 2015 -- $7,200
        (viii) March 24, 2015 -- $53,000
        (ix)  March 24, 2015 -- $16,000
        (x)   March 24, 2015 -- $440

    (c)  <u>Defendant Natel Matschulat</u>

        (i)    September 5, 2014 -- $51,323.29
        (ii)   January 8, 2015 -- $100,000
        (iii)  March 24, 2015 -- $30,000
        (iv)  May 4, 2015 -- $13,000

     (d)       <u>Defendant Paul Jones</u>

           (i)       January 21, 2015 -- $690,000

     (e)       <u>Defendant James Paul</u>

           (i)       January 21, 2015 -- $110,000

     (f)       <u>Defendant Adler</u>
           (i)       January 8, 2015 -- $850,000

     (g)       <u>Defendant George Stray</u>

           (i)       January 21, 2015 -- $15,000
           (ii)     February 18, 2015 -- $7,000

     (h)       <u>Defendant George Spanos</u>

           (i)       February 6, 2015 -- $50,000
           (ii)     May 4, 2015 -- $10,000

     (i)       <u>Defendant W&D</u>

           (i)       January 21, 2015 -- $35,000

     (j)       <u>Defendant BPMS</u>

           (i)       January 13, 2015 -- $30,020
           (ii)     January 22, 2015 -- $25,000

**<u>ANSWER:</u>**

Denied as to Adler. Adler is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 60.

**Count Two**
**(Avoidance Of Fraudulent Transfers Pursuant To**
**740 ILCS 160/5(a)(1) -- Garvey Court Transfers)**

Count Two is not directed to Adler, therefore, no response is required. To the extent a response is deemed required, Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Count Two.

**Count Three**
**(Avoidance Of Fraudulent Transfers Pursuant To**
**740 ILCS 160/6(a) -- Garvey Court Transfers)**

Count Three is not directed to Adler, therefore, no response is required. To the extent a response is deemed required, Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Count Three.

**Count Four**
**(Avoidance Of Fraudulent Transfers Pursuant**
**to 740 ILCS 160/6(a) -- Cash Transfers)**

Count Four is not directed to Adler, therefore, no response is required. To the extent a response is deemed required, Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Count Four.

**Count Five**
**(Civil Conspiracy To Commit Fraud)**

Count Five is not directed to Adler, therefore, no response is required. To the extent a response is deemed required, Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Count Five.

## Count Six

### (Aiding And Abetting Fraud)

Count Six not directed to Adler, therefore, no response is required. To the extent a response is deemed required, Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Count Six.

## Count Seven
### (Tortious Interference With Expectancy Of Collection Upon Judgments Against Gouletas)

Count Seven is not directed to Adler, therefore, no response is required. To the extent a response is deemed required, Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Count Seven.

## Count Eight
### (Reimbursement Of Funds Owed To Gouletas Prior To The Time That He Filed For Bankruptcy)

Count Eight is not directed to Adler, therefore, no response is required. To the extent a response is deemed required, Adler is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Count Eight.

WHEREFORE, Stuart T. Adler, individually and as trustee of the Stuart T. Adler Revocable Family Trust U/A/D 1/31/92, respectfully requests this Court to enter judgment in his favor and against D.A.N. Joint Venture III, L.P., award Stuart T. Adler his costs and attorneys' fees to the extent permitted under applicable law, and grant such other relief as is just and equitable.

## AFFIRMATIVE DEFENSE

In addition and without prejudice to his denials of the allegations in the Complaint, and specifically disclaiming any assumption of the burden of proof for any matter which operates as a negative defense rather than an affirmative defense, Adler states as and for his Affirmative

Defense, without waiver to the obligation of Plaintiff to prove each and every element of its claims, and pleading in the alternative, as follows:

FIRST AFFIRMATIVE DEFENSE

To the extent the payment to Adler referenced in the Complaint is deemed fraudulent, Plaintiff is barred by 740 ILCS 160/9(a) from recovering the same because Adler took the alleged transfer in good faith and for value.

Specifically, Adler: (a) was a creditor of Gouletas; (b) was forced to seek collection of that Gouletas's debt to him through the judicial system by filing suit in 2011 and 2014; (c) obtained a judgment against Gouletas in 2014; (d) perfected a citation lien on Gouletas's assets in 2014; and (e) did nothing more than accept partial payment on his judgment against Gouletas.

Under Illinois law, Gouletas's alleged payment of Adler's judgment over other creditors' purported claims is *not* a fraudulent transfer in the first instance. Moreover, even if Adler knew that Gouletas was insolvent, that the collection of the claims of other creditors would be hindered or defeated, that Gouletas intended to defeat the collection of those claims (by paying Adler's judgment), and/or that the alleged other citations were pending, that would not vitiate Adler's good faith acceptance of payment on his judgment. *See, e.g.*, *MedCare HMO, Inc.*, 294 Ill. App. 3d 42, 689 N.E.2d 374 (1st Dist. 1997); *Crawford County State Bank v. Doss*, 174 Ill. App. 3d 574, 528 N.E.2d 436 (4th Dist. 1988); *Am. Nat. Bank v. Wisniewski*, 18 Ill. App. 3d 961, 310 N.E.2d 834, 840 (1st Dist. 1974); *Thompson v. Williams*, 6 Ill. 2d 208, 127 N.E.2d 457 (1955); *Albers v. Zimmerman*, 376 Ill. 306, 33 N.E.2d 452 (1941); *see also B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474 (7th Cir. 2005); *Galesburg 67, LLC v. Nw. Television, Inc.,* 15 C 5650, 2017 WL 3608204 (N.D. Ill. Aug. 22, 2017); *B.E.L.T., Inc. v. LaCrad Int'l Corp.*, 01 C 4296, 2002 WL 31761400 (N.D. Ill. Dec. 10, 2002), *aff'd sub nom. B.E.L.T., Inc. v. Wachovia Corp.*, 403

F.3d 474 (7th Cir. 2005); *N.A.P. Consumer Elecs. Corp. v. Ctr. Video Ctr., Inc.,* 86 C 9847, 1987 WL 18328 (N.D. Ill. Oct. 8, 1987).

Adler, however, was not aware of the status of any other creditor's claim, including whether there were other citations to discover assets (in addition to the citation he served on Gouletas) pending.

WHEREFORE, Stuart T. Adler, individually and as trustee of the Stuart T. Adler Revocable Family Trust U/A/D 1/31/92, respectfully requests this Court to enter judgment in his favor and against D.A.N. Joint Venture III, L.P., award Stuart T. Adler his costs and attorneys' fees to the extent permitted under applicable law, and grant such other relief as is just and equitable.

Dated: April 2, 2018                    Respectfully submitted,

                                        STUART T. ADLER

                                        By:   /s/ John E. Zummo

                                        John E. Zummo, Bar No. 6239693
                                        John E. Zummo Law
                                        233 S. Wacker Dr., Suite 2275
                                        Chicago, IL 60606
                                        (312) 504-1333
                                        jzummo@zummolaw.com

## CERTIFICATE OF SERVICE

I, John E. Zummo, an attorney, certify that on this 2nd day of April 2018, a true and correct copy of the ANSWER AND AFFIRMATIVE DEFENSE OF STUART T. ADLER was filed with the Clerk of the U.S. Bankruptcy Court, Northern District of Illinois, using the CM/ECF filing system, which caused a copy to be electronically mailed to all CM/ECF participants registered to receive electronic notices in the above captioned case.


/s/ John E. Zummo