## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| D.A.N. JOINT VENTURE III, L.P., as Assignee of Bankruptcy Trustee Richard M. Fogel, the Chapter 7 Trustee for the Bankruptcy Estate of Debtor Nicholas S. Gouletas, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | NO. 18 cv 00349 |
| | ) | |
| DOROTHEA TOURIS, STEVEN E. GOULETAS, NATEL MATSCHULAT, HOME BY INVESCO, INC., 800 SOUTH WELLS PHASE II, LLC, PAUL JONES, JAMES PAUL, STUART T. ADLER, Individually and as Trustee of the Stuart T. Adler Revocable Family Trust, GEORGE STRAY, GEORGE SPANOS, WARADY & DAVIS LLP, BEERMAN PRITIKIN MIRABELLI SWERDLOVE LLP, SEG GARVEY LLC, NKM GARVEY LLC, IRENE GOULETAS, DESIREE WITTE, VICTORIA M. GOULETAS, ROSALIE GOULETAS, LOUIS GOULETAS, MICHAEL GOULETAS, BRITTANY GOULETAS, and DOE DEFENDANTS 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT, GEORGE SPANOS' ANSWER TO
## PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendant, George Spanos ("Spanos"), by his attorneys, Michael T. Trucco and John J. Kakacek of Stamos & Trucco LLP, for his Answer to Plaintiff's First Amended Complaint states as follows:

### Summary of the Suit

1.     The Debtor, Nicholas S. Gouletas ("Gouletas") engaged in a complicated scheme to hide, transfer and otherwise shield his assets from the claims of certain of his judgment creditors. And while Gouletas was implementing his fraudulent transfer scheme, he selectively transferred over $2,000,000.00 in cash and his other assets to his friends, relatives and a select group of

creditors, all in violation of state court citation liens prohibiting Gouletas from transferring his assets. On the event of being held in contempt for violation of one such citation lien, Gouletas sought the sanctuary of bankruptcy through a Chapter 7 bankruptcy filing.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 1. Spanos denies any knowing participation in wrongdoing relating to accepting payments from or on behalf of Gouletas that would allow a pre-bankruptcy creditor of Gouletas an action against him for recovery, and he denies that Plaintiff has any lawful right of recovery against him on account of payments he received from or on behalf of Gouletas.

2.     While Gouletas' bankruptcy filing may prohibit further collection efforts against Gouletas directly, it does not prohibit fraudulent transfer actions against those to whom Gouletas transferred his assets derogation of the right of his other creditors, and in violation of the state court citation liens. This is an action to void Gouletas' fraudulent transfers pursuant to the provisions of the Illinois Uniform Fraudulent Transfer Act, 740ILCS 160/1 *et seq.* (the "IUFTA"), and to recover damages from those who conspired with Gouletas in the design, implementation and execution of Gouletas' fraudulent transfer schemes. *See Paloian v. Greenfield (In re Rest. Dev. Group, Inc.)*, 397 B.R. 891, 896-98 (Bankr. N.D. Ill. 2008).

**ANSWER:**

Paragraph 2 is not directed at Spanos, but Spanos admits this action seeks to void Gouletas transfers alleged to violate citation liens or to be fraudulent pursuant to 740 ILCS 160/1 *et seq.* Spanos denies any knowing participation in wrongdoing relating to accepting payments from or on behalf of Gouletas that would allow a pre-bankruptcy creditor of Gouletas an action against him for recovery, and he denies that Plaintiff has any lawful right of recovery against him on account of payments he received from or on behalf of Gouletas.

**Jurisdiction and Venue**

3.     This Court has jurisdiction under 28 U.S.C. §1334. In addition, this Court has diversity jurisdiction under 28 U.S.C. §1332 because (a) this action is between citizens of different states with the amount in controversy exceeding $75,000, and (b) the assignment of claims from

the Bankruptcy Trustee to Plaintiff was not made collusively for the purpose of conferring diversity jurisdiction upon this Court.

**ANSWER:**

Spanos denies that this is an action pursuant to title 11 of the United States Code and he denies that this Court has jurisdiction pursuant to 11 USC 1334. On the allegations in the Amended Complaint, Spanos admits this Court has jurisdiction pursuant to 28 USC 1332.

4.    Venue is proper in this Court pursuant to 28 U.S.C. §§1408 and 1409(a). In addition, pursuant to 28 U.S.C. §1391(b)(2), venue is appropriate in this Court because a substantial portion of the events giving rise to the claims asserted herein occurred in this Judicial District.

**ANSWER:**

Spanos denies that this case arises pursuant to title 11 of the United States Code and he denies venue is proper pursuant to 28 USC 1408 and 1409. On the allegations in the Amended Complaint, Spanos admits venue is appropriate pursuant to 28 USC 1391.

**Parties**

5.    **Plaintiff**.

5.1.    Plaintiff D.A.N. Joint Venture III, L.P. ("DJV") is an Ohio limited partnership with its principal place of business in Newton Falls, Ohio. The general partner of DJV is The Cadle Company, an Ohio corporation with its principal place of business in Newton Falls, Ohio. The limited partnership of DJV are Daniel C. Cadle and his wife, Ruth Cadle, both of whom are citizens of the State of Ohio.

**ANSWER:**

Admit.

5.2.    Plaintiff's claim herein are asserted as assignee of Bankruptcy Trustee Richard M. Fogel ("Bankruptcy Trustee"), who is the Bankruptcy Trustee for the Chapter 7 Bankruptcy Estate of Nicholas S. Gouletas, Debtor, which is pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, *In re Nicholas S. Gouletas, Debtor*, No. 16-01335. Pursuant to 11 U.S.C. §544(b)(1), the Bankruptcy Trustee and thus plaintiff as assignee, has standing to invoke the provisions of the IUFTA to set aside

fraudulent transfers made by the Debtor, Gouletas.  *See, In re Xonics Photochemical*, 841 F.2d 198, 202 (7th Cir. 1988).

**ANSWER:**

Spanos denies that the Trustee can or did confer or assign to Plaintiff any Trustee statutory

rights or powers, but Spanos otherwise admits Paragraph 5.2.

6.      **Defendants**.

6.1      Defendant Dorothea Touris ("Touris") is a citizen of the State of Illinois and a close personal friend of Gouletas who conspired with Gouletas to place $826,218.84 of his funds in her checking accounts for the purpose of allowing Gouletas to continue his lavish lifestyle, but all the while evading the state court citation liens prohibiting Gouletas from transferring his assets.

**ANSWER:**

Spanos admits Touris is a citizen of Illinois but he lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations of Paragraph 6.1.

6.2      Defendant Steven F. Gouletas is a citizen of the State of Illinois and the son of Gouletas.

**ANSWER:**

Admit.

6.3      Defendant Natel Matschulat is a citizen of the State of Illinois and the wife of Gouletas.

**ANSWER:**

Admit.

6.4      Defendant Home by Invesco, Inc. ("HBI") is an Illinois corporation with its principal place of business in Chicago, Illinois  At all relevant times, HBI was owned and controlled by Gouletas and was used by Gouletas as a vehicle to conduct his personal affairs and to defraud his creditors.

**ANSWER:**

Spanos admits the first sentence, but he lacks knowledge or information sufficient to form

a belief as to the truth of the second sentence of Paragraph 6.4.

6.5     Defendant 800 South Wells Phase II, LLC ("800 SWP") is an Illinois limited liability company with its principal place of business in Chicago, Illinois.  At all relevant times, 800 SWP was owned and controlled by Gouletas and was used by Gouletas as a vehicle to conduct his personal affairs and to defraud his creditors.

**ANSWER:**

Spanos admits the first sentence, but he lacks knowledge or information sufficient to form

a belief as to the truth of the second sentence of Paragraph 6.5.

6.6     Defendant Paul Jones is a citizen of the State of Illinois.

**ANSWER:**

Admit.

6.7     Defendant James Paul is a citizen of the State of California who engaged in the wrongful conduct alleged herein within the State of Illinois.

**ANSWER:**

Spanos admits the citizenship of James but lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations of Paragraph 6.7.

6.8     Defendant Stuart T. Adler is a citizen of the State of Illinois and the Trustee of the Stuart T. Adler Revocable Family Trust, an Illinois trust (collectively, "Adler").

**ANSWER:**

Admit.

6.9     Defendant George Stray is a citizen of the State of North Carolina who engaged in the wrongful conduct alleged herein within the State of Illinois.

**ANSWER:**

Spanos admits the citizenship of Stray but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 6.9.

6.10    Defendant George Spanos is a citizen of the State of Illinois.

**ANSWER:**

Admit.

6.11    Defendant Warady & David LLP ("W&D") is an Illinois limited liability partnership with its principal place of business in Chicago, Illinois.  None of the partners of W&D is a citizen of the State of Ohio.

**ANSWER:**

Admit.

6.12    Defendant Beerman Pritikin Mirabelli Swerdlove LLP ("BPMS") is an Illinois limited liability partnership engaged in the practice of law with its principal place of business in Chicago, Illinois.  None of the partners of BPMS is a citizen of the State of Ohio.

**ANSWER:**

Admit.

6.13    Defendant SEG Garvey LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois.  None of the partners of SEG Garvey is a citizen of the State of Ohio.

**ANSWER:**

Admit.

6.14    Defendant NKM Garvey LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois.  None of the partners of NKM Garvey LLC is a citizen of the State of Ohio.

**ANSWER:**

Admit.

6.15    Defendant Irene Gouletas is a citizen of the State of Illinois and the sister of Gouletas.

**ANSWER:**

Admit.

6.16    Defendant Desiree Witte is a citizen of Illinois and the daughter of Gouletas.

**ANSWER:**

Admit.

6.17    Defendant Victoria M. Gouletas is a citizen of Connecticut and the daughter of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

**ANSWER:**

Spanos admits the citizenship of Victoria Gouletas and that she is the daughter of Gouletas but Spanos lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 6.17.

6.18    Defendant Rosalie Gouletas is a citizen of New Mexico and the daughter of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

**ANSWER:**

Spanos admits the citizenship of Rosalie Gouletas and that she is the daughter of Gouletas, but Spanos lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 6.18.

6.19    Defendant Louis Gouletas is a citizen of Illinois and the grandson of Gouletas.

**ANSWER:**

Admit.

6.20    Defendant Michael Gouletas is a citizen of California and the grandson of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

**ANSWER:**

Spanos admits the citizenship of Michael Gouletas and that he is the grandson of Gouletas, but Spanos lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 6.21.

      6.21    Defendant Brittany Gouletas ("B. Gouletas") is a citizen of Illinois and the granddaughter of Gouletas.

**ANSWER:**

Admit.

      6.22    Doe Defendants 1-10 are individuals, corporations, LLCs, partnership and other entities of any nature or form whatsoever who aided and abetted or conspired with Gouletas to design, implement and execute the fraudulent transfer schemes at issue in this suit, or who otherwise aided and abetted Gouletas in his various schemes to hide, transfer or otherwise shield his assets from the claims of certain of Gouletas in his various schemes to hide, transfer or otherwise shield his assets from the claims of certain of Gouletas' creditors. *See Paloian v. Greenfield (In re Rest. Dev. Group, Inc.)* B.R. 891, 896-98 (Bankr. N.D. Ill. 2008). Doe Defendants 1-10 know who they are, and plaintiff is of the reasonable belief that they will be informed of the nature of this suit by the other defendants named herein. Plaintiff will seek to amend this complaint to identify the specific names of Doe Defendants 1-10 and their role in assisting Gouletas with the design, implementation and execution of the fraudulent transfer schemes set forth herein after that information becomes available to plaintiff through discovery to be conducted in this case. None of Doe Defendants 1-10 is a citizen of Ohio and no partner, member, trustee or representative of Doe Defendants 1-10 is a citizen of the State of Ohio.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6.22, other than the self-serving allegations of Plaintiff's intent which Spanos admits as such.

## Facts

### A.   **Background**

      7.    The Debtor, Nicholas S. Gouletas ("Gouletas") is the owner and control person of a large group of companies generally referred to as "American Invesco" which, for the last 49 years, were involved in condominium conversions and various other real estate developments in

more than 40 cities throughout the United States. Gouletas routinely refers to himself as the "Condominium Conversion King."

**ANSWER:**

Admit.

8.     In a financial statement signed by Gouletas, Gouletas represented that, as of March 31, 2013, he had a net worth of $25,287,560, with "cash" in the amount of $240,000. (Px1) Thereafter, in a letter that Gouletas sent to Mayor Rahm Emanuel on January 13, 2014, Gouletas represented that "a real estate investor from London [is] in negotiations with us, American Invsco, to purchase a third tower on land we own at 801 South Wells, for an addition $65 million." (Px 2).

**ANSWER:**

Spanos admits the authenticity of Px 1 and Px 2 but he lacks knowledge sufficient to form

a belief as to the truth of the remaining allegations in Paragraph 8.


9.     Even though Gouletas had a substantial net worth, and was flush with cash, Gouletas would routinely pay only a select group of his creditors, while doing everything within his power to stiff the remainder of his unfavored creditors. Indeed from October of 2008 to the present, Gouletas was generally not paying all of his debts as they became due, forcing his unfavored creditors to either abandon their claims, or seek collection of those debts through the judicial system.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 9, but admits that after April 2013 Gouletas failed to pay his debt to

Spanos when became due.

**B.     Numerous Judgments are Entered Against Gouletas**

10.     Gouletas was the manager of 800 South Wells Commercial LLC ("800 SWC"), which owned certain commercial space at the River City Complex located at 800 South Wells Street in Chicago. Gouletas hired one of his companies, Invsco Management Company ("Invsco") to manage the River City Complex commercial space in exchange for management fees paid by 800 WC to Gouletas' company, Invsco.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 10.

11.    On March 17, 2011, 800 WC filed suit against Gouletas in the Circuit Court of
Cook County, Illinois, No. 2011-L-2895 for self-dealing and breaching fiduciary duties owed to
800 SWC (the "800 SWC Suit").  Gouletas was represented by counsel in connection with the 800
SWC Suit, and actively participated in pretrial proceedings.

**ANSWER:**

Spanos admits the lawsuit by 800 SWC and the alleged matters of record in that case, but

he lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 11.

12.    On August 9, 2013, Gouletas was sued by Karl T. Muth ("Muth) one of the
investors in Gouletas condominium conversion project, in the Circuit Court of Cook County,
Illinois, No. 2013-L-8995 for sums allegedly owed by Gouletas in connection with the investment
(the "Muth Suit").  Thereafter on December 11, 2013, a final judgment was entered in the amount
of $761,352.27 against Gouletas (the "Muth Judgment").

**ANSWER:**

Spanos admits the lawsuit by Muth and the alleged matters of record in that case, but he

lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the

allegations in Paragraph 12.

13.    On August 20, 2013, Gouletas was sued by Humberto Alfonso ("Alfonso"), another
investor in a Gouletas condominium conversion project in the Circuit Court of Cook County,
Illinois, No. 2013 L 9345, for sums allegedly owed by Gouletas in connection with the investment
(the "Alfonso Suit").  Thereafter, on December 11, 2013, a final judgment was entered in the
amount of $454,037.93 against Gouletas (the "Alfonso Judgment").

**ANSWER:**

Spanos admits the lawsuit by Alfonso and the alleged matters of record in that case, but he

lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 13.

14.     In the 800 SWC suit, Gouletas steadfastly refused to sit for his deposition.  Because of Gouletas' pattern of discovery abuse, on December 5, 2013, 800 SWC filed a motion for sanctions against Gouletas which was granted by the Court on December 11, 2013.  After Gouletas, once again, filed to sit for his deposition on January 23, 2014 the court in the 800 SWC Suit filed a final judgment against Gouletas in the amount of $11,550,040.12 (the "800 SWC Judgment").

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 14.

15.     Although Gouletas through counsel as BPMS, appealed the 800 SWC Judgment, filed a Petition under Section 2-1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1401) to set aside the 800 SWC Judgment, and then appealed the trial court's denial of Gouletas' 2-1401 Petition, Gouletas was not successful in setting aside the 800 SWC Judgment.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of Paragraph 15.

### C.     Citation Liens are Entered Against Gouletas Prohibiting Gouletas From Transferring His Assets

16.     On December 19, 2013, Citations to Discovery Assets were issued against Gouletas in the Muth Suit and the Alfonso Suit, which were served upon Gouletas shortly thereafter.  Accordingly, as of the end of December 2013, Gouletas was prohibited from transferring his assets by virtue of the Citations issued in the Muth Suit and the Alfonso Suit.  *See* 735 ILCS 5/2-140(m);*Marcus-Rehtmeyer v. Jacobs*, 784 F.3d 430, 438-39 (7th Cir. 2015).

**ANSWER:**

Spanos admits that Illinois citations may enjoin a judgment debtor from transferring assets

but he lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations of Paragraph 16.

17.     Due to Gouletas' failure to pay the amount owed under the 800 SWC Judgment, on June 5, 2014, 800 SWC filed a Citation to Discovery Assets against Gouletas (Px 3) (the "Citation") in connection with the 800 SWC Suit (the "Citation Proceedings").  The Citation was served on Gouletas on June 9, 2014.  At all times during the Citation Proceedings was represented by Howard Teplinsky, Esq. from BPMS.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of Paragraph 17.

18.     In the Citation, Gouletas was specifically instructed that:

> **YOU ARE PROHIBITED** from making or allowing any transfer or other
> disposition of . . . any property not exempt from execution . . . .belonging to the
> judgment debtor [Gouletas] <u>or to which the judgment debtor may be entitled</u> or
> which may be acquired by or become due to the judgment debtor. . . . until further
> order of Court or termination of the proceedings.

(Px 3 p. 1 (underscoring added) (the "Citation Lien" and with the Muth Citation and the Alfonso
Citation, the "Citation Liens")) Gouletas understood that when he was served with the Citation, he
was not to transfer anything after receiving the Citation.  Moreover, the Circuit Court Judge
presiding over the Citation Proceedings, Judge Alexander White, specifically informed Gouletas,
with Gouletas present in open Court, that "[f]rom the time you received the citation [on June 9,
2014], all of your assets were frozen . . . . [T]he citation language speaks for itself.  It said you will
not transfer any assets."

**ANSWER:**

Spanos admits the authenticity of Px 3, that Illinois citations may enjoin a judgment debtor

from transferring assets, and that citations in Illinois often include language similar to that quoted

in Paragraph 18 and contained in Px 3; Spanos lacks knowledge or information sufficient to form

a belief as to the truth of the remaining allegations of Paragraph 18.

### D.     In Violation of the Citation Lien, Gouletas Obtained and Cashed Numerous Cashier's Checks Issued to Himself

19.     In the 800 SWC Suit, the Citation was served upon Gouletas on June 9, 2014, which
prohibited Gouletas from transferring any of his assets.  In violation of the Citation Lien, Gouletas
obtained and cashed numerous cashier's checks issued in his name:

(a)     On or about July 31, 2014, Gouletas, as the remitter, had a cashier's check
        in the amount of $1,530.52 issued to himself.  (Px 4);

(b)     On or about August 1, 2014, Gouletas, as the remitter had a cashier's check
        in the amount of $10,000 issued to himself (Px 5);

(c)     On or about August 22, 2014, Gouletas as the remitter had a cashier's check
in the amount of $1,500.00 issued to himself (Px 6); and

(d)     On or about August 22, 2014, Gouletas, as the remitter had a cashier's check
in the amount of $2,500.00issued to himself.  (Px 7).

**ANSWER:**

Spanos admits the authenticity of Px 4-7; Spanos lacks knowledge or information sufficient

to form a belief as to the truth of the remaining allegations of Paragraph 19.

E.     **The Touris Checking Account Scheme**

20.     Apparently tired of the process of obtaining cashier's checks in his name, Gouletas
then turned to a close personal friend, Touris, to assist him with a money laundering scheme that
would allow Gouletas to maintain his lavish lifestyle, but all the while evading paying his
cre4ditors, and skirt the judicial prohibitions against his transfer of assets imposed by the Citation
Liens.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of Paragraph 20.

21.     Touris was a friend of Gouletas for over 40 years.  Moreover she lived in the same
condominium building as Gouletas at 111 East Chestnut Street in Chicago, having bought her
condominium from one of Gouletas' entities after Gouletas developed that property into
condominiums.  Further, Touris was the director of design for Gouletas at American Invsco over
the last 20 years.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of Paragraph 21.

22.     In January of 2015 (and after the Citation Liens were entered prohibiting Gouletas
from transferring his assets), Gouletas requested that Touris deposit his funds into her checking
accounts for the payment of Gouletas' expenses.  Pursuant to Gouletas' plan, Touris would then
take the funds that he had provided to her, put that money in her checking accounts, and then pay
Gouletas' bills out of her checking accounts. The funds that Gouletas deposited into Touris'

checking accounts belonged to Gouletas. In essence, Touris acted as a managing agent of Gouletas for the handling and use of Gouletas' funds.

**ANSWER:**

Spanos believes and so admits that in 2015 Touris held and/or paid to Gouletas creditors such as Spanos Gouletas funds, but Spanos lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 21.

23.    In late January of 2015, Touris met with Gouletas at his office in Chicago with Gouletas' attorney, Howard Teplinsky from BPMS. At that meeting, Gouletas presented Touris with a check in the amount of $396,218.84. Touris understood that those funds belonged to Gouletas. Gouletas then told Touris that "I would like you [Touris] to deposit this [the $396,218.84 check] into your account. And I want you [Touris] to pay $195,000 to [Gouletas' son] Steven Gouletas and $50,000 to a gentleman [named George Spanos]," with the balance of $150,000 to be kept by Touris as compensation in the form of a purported reimbursement on a Gouletas investment.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the first and second sentences. Spanos believes and so admits that Touris held Gouletas funds in 2015 and that Gouletas directed Touris to pay Spanos $50,000 as a creditor of Gouletas, but he lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 23.

24.    Thereafter, on February 6, 2015, Touris wrote a check from her MB Bank checking account in the amount of $195,000 for a payment by Gouletas to his son, Steven E. Gouletas (Px 8), and a $50,000 payment to Gouletas' friend, George Spanos. (Px. 9).

**ANSWER:**

Spanos admits the authenticity of Px 8 and Px 9, that Touris wrote checks to make payments to Gouletas creditors such as Spanos for or on behalf of Gouletas, and that Touris paid Spanos $50,000 for or on behalf of Gouletas as reflected on Px. 9; Spanos denies he was a "friend" of Gouletas at the time of the alleged payment.

14

25.     On February 17, 2015, Gouletas wire-transferred $15,730 into Touris' checking account at Chase Bank (the "Touris Chase Account"). (Px 10). The $15,730 was money that belonged to Gouletas. Gouletas, however, claims to have "no idea" where the $15,730 came from.

**ANSWER:**

Spanos admits the authenticity of Px 10 but he lacks knowledge or information sufficient

to form a belief as to the truth of the remaining allegations of Paragraph 25.

26.     And then, in March of 2015, Gouletas told Touris that a check for $415,000 was coming to her, which she was to deposit in her account for payment of Gouletas' expenses. Touris then deposited the $15,000 check into her checking account at Chas Bank. (Px 11) According to Touris, she and Gouletas "talked about it together and he wanted the bills paid, so….he asked me [Touris], would you deposit this [$415,000] in your account and pay the bills." Although Gouletas claimed that the $415,000 was a "loan" to him from Defendant Paul Jones, he admitted that the $415,000 was his money. The total amount of Gouletas' funds that Gouletas deposited into the Touris Chas Account was in excess of $431,145.

**ANSWER:**

Spanos admits the authenticity of Px 11 but lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations of Paragraph 26.

27.     The account summaries for the Touris Chase Account (Px 12) pertain to the request that Gouletas made about taking funds that Gouletas had put into Touris' checking account, and that Touris then withdrew from her account at Gouletas' request. As acknowledged by Touris, "those [account summaries reflected by Px 12] are all of the financial transactions that [she] handled for Nick Gouletas with Nick Gouletas' money", and "[e]very single thing was done by [Gouletas] telling me [Touris] to do it."

**ANSWER:**

Spanos admits the authenticity of Px 12 but he lacks knowledge or information sufficient

to form a belief as to the truth of the remaining allegations of Paragraph 27.

28.     Although the Citation was served on Gouletas on June 9, 2014, and was not suspended until Gouletas filed for bankruptcy herein on January 17, 2016, the account summaries for the Touris Chase Account (Px 12) reflect the regular, continuous and systematic use of that account by Gouletas and Touris from February 17, 2015 when Gouletas made his initial wire transfer of $15,730 into that account, until September 15, 2015 with the payment of Gouletas' credit card bill. (*Id*). Some of the more significant withdrawals by Gouletas from the Touris Chase Account – all in violation of the Citation Liens – are listed below:

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 2/18/15 | $7,000 | George Stray, friend of Gouletas. (Px 12 #14) |
| 3/16/15 | $5,000 | Cash. (Px 12 #14) |
| 3/17/15 | $5,000 | Cash. (Px 12 #14) |
| 3/20/15 | $10,000 | Transfer to other checking account. (Px 12 #14) |
| 3/20/15 | $10,000 | Wire transfer at Gouletas' request to "Santander, B". (Px 12 #14) |
| 3/20/15 | $20,000 | Cash. (Px 12 #14) |
| 3/20/15 | $5,000 | Cash. (Px 12 #14) |
| 3/20/15 | $90,000 | Loan to Touris. (Px 12 #15) |
| 3/24/15 | $53,000 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $16,000 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $7,200 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $440 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $30,000 | Natel Matschulat, Gouletas' wife. (Px 12 #15) |
| 3/26/15 | $5,512.22 | Condominium assessment. (Px 12 #15) |
| 3/26/15 | $3,436.06 | Payment for assessments on Gouletas' condominium. (Px 12 #15) |

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 3/26/15 | $1,061 | Payment to BOA for mortgage on Gouletas condominium. (Px 12 #15) |
| 3/26/15 | $869.09 | Payment of Gouletas' ComEd bill. (Px 12 #15) |
| 3/27/15 | $2,949.02 | Payment of mortgage. (Px 12 #15) |
| 3/27/15 | $2,788.28 | Payment of assessments for condominiums. (Px 12 #15) |
| 3/27/15 | $1,865.16 | Payment of assessments for condominiums. (Px 12 #15) |
| 4/7/15 | $10,000 | Wire transfer to Luxury Management LLC. (Px 12 #17) |
| 4/9/15 | $3,581.01 | Assessment for Gouletas' condominium. (Px 12 #17) |
| 4/13/15 | $1,391.55 | Payment for Gouletas' condominium on Delaware Street. (Px 12 #17) |
| 4/13/15 | $230 | Assessment for Gouletas' condominium on Delaware Street. (Px 12 #17) |
| 4/14/15 | $22,474.24 | Mortgage for Gouletas' condominium. (Px 12 #17) |
| 4/14/15 | $4,299.75 | Mortgage for Gouletas' condominium. (Px 12 #17) |
| 4/14/15 | $2,634.74 | Payment for assessments on Gouletas' condominium at Delaware Place. (Px 12 #17) |
| 4/14/15 | $1,639.82 | Payment of Gouletas' ComEd bill. (Px 12 #17) |
| 4/14/15 | $125 | Payment of AT&T bill. (Px 12 # 17) |
| 4/15/15 | $4,167.06 | Payment of assessment on Gouletas' condominium. (Px 12 #17) |
| 4/16/15 | $15,150.29 | Unexplained. (Px 12 #17) |
| 4/16/15 | $14,268.31 | Payment of Gouletas' mortgage. (Px 12 #17) |
| 4/16/15 | $2,695.25 | Payment of Gouletas' assessment on condominium. (Px 12 #17) |
| 4/16/15 | $1,275.29 | Payment for Gouletas' parking. (Px 12 #17) |
| 4/27/15 | $10,000 | Gouletas requested payment to Karen Thorton. (Px 12 #18) |
| 4/28/15 | $1,620.10 | Payment for Gouletas' condominium. (Px 12 #18) |
| 4/29/15 | $3,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 12 #18) |
| 4/29/15 | $1,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 12 #18) |
| 4/30/15 | $2,000 | Unexplained. (Px 12 #18) |
| 5/4/15 | $13,000 | Payment to Gouletas' wife, Natel Matschulat. (Px 12 #18) |
| 5/4/15 | $10,000 | Payment to George Spanos. (Px 12 #18) |
| 5/13/15 | $5,000 | Unexplained. (Px 12 #18) |
| 5/14/15 | $10,000 | Transferred to another checking account. (Px 12 #18) |
| 5/21/15 | $1,000 | Unexplained. (Px 12 #18) |
| 5/26/15 | $2,712.05 | Transferred to checking account. (Px 12 #19) |
| 5/28/15 | $10,000 | Gouletas gave the money to Touris. (Px 12 #19) |
| 5/28/15 | $5,000 | Cash. (Px 12 #19) |
| 5/28/15 | $5,000 | Cash. (Px 12 #19) |

| | | |
|---|---|---|
| 5/29/15 | $900 | Payment on Gouletas' credit card. (Px 12 #19) |
| 5/29/15 | $6,500 | Payment on Gouletas' wife's credit card. (Px 12 #19) |
| 6/4/15 | $10,000 | Payment to Vivien. (Px 12 #19) |

| Date | Amount | Payee/Explanation |
|---|---|---|
| 6/8/15 | $2,171.10 | Payment on Gouletas' credit card. (Px 12 #19) |
| 6/9/15 | $6,178.31 | Payment for Gouletas' condominium. (Px 12 #19) |
| 6/9/15 | $1,000 | Payment to Heather Von Ehr. (Px 12 #19) |
| 6/24/15 | $1,000 | Payment on Gouletas' credit card. (Px 12 #20) |
| 6/24/15 | $5,000 | Unexplained. (Px 12 #20) |
| 7/2/15 | $2,000 | Cash. (Px 12 #20) |
| 7/14/15 | $1,602.60 | Payment for three plane tickets to Atlanta. (Px 12 #21) |

**ANSWER:**

Spanos admits the authenticity of Px 12 and that he received the $10,000 payment identified as having been made to him on 5/4/15, but Spanos lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 28.

29.    From the $82,218.40 that Gouletas deposited into Touris' checking account, only $1,368 of Gouletas' funds remained in those accounts as of February 10, 2017.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29.

F.    **The Garvey Court Scheme**

30.    During the time that the Citations were issued prohibiting Gouletas from transferring his assets, Gouletas was involved in a real estate development project referred to as "Garvey Court" (the "Garvey Court Project"). The Garvey Court Project involved the construction of a mixed use high-rise retail/office/condominium building on properties that Gouletas owned (through entities that he owned and controlled) at Clark and Lake Streets in Chicago.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30.

18

31.     Basically, in April of 2014, Gouletas placed certain properties that he owned into a new entity – Garvey Court, LLC – which would pay off the existing debt on the properties, and then develop the new high-ise on the Gouletas properties.  Gouletas' "equity cushion" in the Garvey Court properties was in excess of $3,600,000.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 31.

32.     In the original formulation of the Garvey Court plan, Gouletas was going to retain a 25% interest in the Garvey Court Project.  Later in May of 2014, however, and (a) afater the Citations were served upon Gouletas in the Muth and Alfonso Suit, and (b) after the 800 SWC Judgment was entered against Gouletas, Gouletas "gifted" his 25% interest in the Garvey Court Project to family members through two newly formed LLCs, SEG Garvey LLC (12% and NKM Garvey LLC (13%), as follows:

(a)     SEG Garvey LLC

(i)     Steven E. Gouletas – 16.66%
(ii)    Irene Gouletas – 16.67%
(iii)   Desire Witt – 16.67%
(iv)    Victoria M. Gouletas – 16.7%
(v)     Rosalie Gouletas – 16.67%
(vi)    Louis Gouletas – 5.53%
(vii)   Michael Gouletas – 5.54%
(viii)  Brittany Gouletas – 5.54%

(b)     NKM Garvey LLC

(i)     Natel Matschulat – 93%
(ii)    Nicholas GOuletas – 7%

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 32.

33.     Accordingly in late May of 2014, Gouletas gifted away – in violation of the Citation Liens and in derogation of the rights of his creditors – virtually of his "equity cushion" in the Garvey Court Project.  As of the time of the Garvey Court transfers, Gouletas' "equity cushion" in the Garvey Court Project exceeded $3,600,000.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 33.

### G.  The Matschulat-CIB Stock Scheme

34.    Shortly after service of the Citation upon Gouletas on June 9, 2014, Gouletas discovered, quite by accident, that he had, in the distant past, acquired a number of shares of stock in CIB Marine BankShares (the "CIB Stock"), which Gouletas held through a stock brokerage account at TD Ameritrade (the "TDA Account").

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 34.

35.    Although the Citation was served on Gouletas on June 9, 2014, and Gouletas understood that he was thereby prohibited from transferring his assets, on or about September 4, 2014, Gouletas sold his CIB stock through his TDA Account for just over $51,000 (Px 13), and then on or about the same date, wire-transferred $51,323.29 from that stock sale into a checking account held in the name of his wife Natel Matschulat.  *(Id.)*

**ANSWER:**

Spanos admits the authenticity of Px 13; Spanos lacks knowledge or information sufficient

to form a belief as to the truth of the allegations in Paragraph 35.

36.    After depositing the $51,323.29 in his wife's checking account, Gouletas then proceeded to have his wife, Natel Matschulat, sign checks from that account for the payment of Gouletas' expenses, all in violation of the judicial prohibition against his transfer of assets imposed by the Citation Liens.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 36.

### H.    The HBI-Parking Lot Scheme

37.    On or Gouletas' entities, Defendant 800 South Wells Phase II, LLC ("800 SWP") owned a 1.77 acre 126 space parking lot at 800 South Wells Street in Chicago (the "Parking Lot")

which was next to the River City Complex. Gouletas was the manager, sole member and control person of 800 SWP.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 37.

38.     As of November 1, 2009, there was only one mortgage indebtedness against the Parking Lot, which was in favor of River City Investors, LLC ("RCI") in the original principal amount of $2,000,000 (the "RCI Mortgage"). Since the Parking Lot was worth far in excess of the amount of the RCI Mortgage on Noember 1, 2009 Gouletas had another of his controlled entities, Defendant Home by Invsco, Inc "HBI"), place a bogus mortgage against the Parking Lot in the amount of $2,177,700 (the "HBI Second Mortgage") to protect the equity in the Parking Lot from the claims of Gouletas' creditors. HBI was owned and controlled by Gouletas and was, in fact, the alter-ego of Gouletas.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 38.

39.     While Gouletas signed the HBI Second Mortgage on November 1, 2009, the internal financial documents of Gouletas' enterprise, American Invsco (which included 800 SWP and HBI) did not reflect any indebtedness supposedly owed to HBI on the HBI Second Mortgage:

(a) In the "American Invsco Liquidity Plan Update" dated November 22, 2011 (Px 14), it was represented that:

> Our debt at the land is $2,500,000. The last appraisal had a value of $14,880,000. CBRE indicates that ….the market value for the land should be around $12,000,000. We have indicated the urgency to them, and we are going to list it for $13,000,000, anticipating accepting a price around $12,000,000 in the next nine months, again subject to market conditions. Therefore, the net proceeds to the company should be around $9,000,000.

(*Id*. p. 1) No indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(b)     In an "American Invsco Companies Consolidated Balance Sheet" dated December 31, 2012 (Px 15), it was represented that the Parking Lot had a value of $9,500,000, with the sole mortgage on the Parking Lot in favor of RCI in the amount of $2,000,000. (*Id.*) This December 31, 2012 Consolidated Balance Sheet for American Invsco showed that Gouletas had "shareholder equity" in the amount of $10,002.00. (*Id.*) Again, no indebtedness was showed which was

supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(c)     In a "Balance Sheet" signed by Gouletas (Px 1) Gouletas represented that as of March 31, 2013 the Parking Lot had a value of $11,334,590 (*id.* p. 1). Once again, no indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(d)     In a "Balance Sheet" dated February 28, 2014 (Px 16), Gouletas represented that the Parking Lot was worth $6,500,000, with a "first mortgage" in the amount of $3,300,000. (*Id.*) And, once again, no indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

**ANSWER:**

Spanos admits the authenticity of Px1, Px 14, Px 15 and Px 16 but he lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in Paragraph 39.

40.     Further in connection with Gouletas' efforts to supersede a prior judgment that DJV had obtained against Gouletas for Gouletas' failure to honor his word on a guarantee, on June 29, 2010, Gouletas represented to Illinois Circuit Court Judge Lee Preston, under oath, that:

> The Property [i.e., the Parking Lot] is valued at $14,888,000…. The sole mortgage recorded against the Property is in the recorded amount of $2,000,000. Ex B. p. D-3 ¶6. Therefore, there is equity in the amount of $12,880,000 in the Property to serve as security for the [$1,000,000] Judgment [that DJV obtained against Gouletas].

(Px 17, p. 2 ¶5) Accordingly on June 29, 2010 Gouletas verified under oath, and represented to Judge Preston and DJV, that there was no other mortgage indebtedness owed in connection with the Parking Lot other than the RCI Mortgage.

**ANSWER:**

Spanos admits the authenticity of Px 17 but he lacks knowledge or information sufficient

to form a belief as to the truth of the allegations in Paragraph 40.

41.     In late 2014, Gouletas received a solid offer from a financially sound third party to purchase the Parking Lot for $7,750,000. With the RCI Mortgage and other expenses of the sale totaling approximately $5,711,000, Gouletas, with the assistance of one or more Doe Defendants 1-10, came up with a plan to shield the approximately $2,038,000 in profits from Gouletas' unfavored creditors. Basically, the plan involved the false claim that the HBI Second Mortgage was legitimate, and then Gouletas would have the approximately $2,038,000 in profits from the

sale of the Parking Lot (that otherwise would have been paid to Gouletas) distributed to certain preferred creditors and other friends and relatives of Gouletas, with those friends and relatives then funneling a portion of the profits from the sale of the Parking Lot back to Gouletas through Touris' checking account.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 42.

42.     By email dated December 19, 2014, Elizabeth Friedgut, Esq., the transactional attorney for Gouletas who was handling the sale of the Parking Lot, inquired of Gouletas' son, Steven Gouletas, as follows: "I need to talk to [Gouletas' accountant, Gerald Zaidman] about your dad's tax liability for river city which we are going to be selling shortly." (Px 18 (emphasis added)) On December 22, 2014, Gouletas' accountant, Mr. Zaidman, responded: "I think it is important if you can defer the closing of the 800 Wells property [i.e., the Parking Lot] owned by Nick personally til 2015. Please call me to discuss ASAP." (Px 19 (emphasis added))

**ANSWER:**

Spanos admits the authenticity of Px 18 and Px 19 but he lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 42.

43.     The closing on the sale of the Parking Lot occurred on December 29, 2014. The closing statement (Px 20) shows that from the $7,750,000 in sale proceeds, $2,038,703.84 was the balance due to the Seller. (Id. p. 2) Elizabeth Friedgut signed the settlement statement for and on behalf of 800 SWP. (*Id.*) 800 SWP and HBI were and are the alter egos of Gouletas, and the $2,038,703.84 in profits from the sale of the Parking Lot legally and equitably belonged to Gouletas.

**ANSWER:**

Spanos admits the authenticity of Px 20 but he lacks knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in Paragraph 43.

44.     As of January 5, 2015, Gouletas still had not decided exactly how to distribute the profits from the sale of the Parking Lot. By email to Gouletas' agent, John Arnold, dated January 5, 2015, Gouletas' attorney at BPMS, Howard Teplinsky, outlined his thoughts on how the profits from the sale of the Parking Lot should be disbursed. (Px 21) Apparently, BPMS (through its partner and agent, Howard Teplinsky) allowed Gouletas to deposit the $2,038,703.84 from the sale of the Parking Lot into the firm's trust account to facilitate the payment of those proceeds as Gouletas directed. (Px 22) In addition, on January 6, 2015, Gouletas had an additional $137,535 wire-transferred into the trust account at BPMS. (Px 23)

**ANSWER:**

Spanos admits the authenticity of Px 21-23 but he lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 44.

45.     Then on January 20, 2015, Mr. Teplinsky, for and on behalf of BPMS, directed how the remainder of the $1,271,218.84 from the BPMS escrow account was to be distributed. (Px24) Of the $396,218.84 paid to Touris (Px 25), Gouletas then had Touris distribute $195,000 of those proceeds to his son, Steven Gouletas, and $50,000 of the proceeds to Gouletas' friend, George Spanos. Further, of the $690,000 distributed to Defendant Paul Jones, $415,000 from those proceeds were then deposited by Paul Jones into Touris' checking account so Gouletas could continue to pay his expenses without those funds being subject to execution by Gouletas' judgment creditors.

**ANSWER:**

Spanos admits receiving $50,000 from Touris for and on behalf of Gouletas in 2015, admits the authenticity of Px 24 and Px 25, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 45.

46.     At the direction of BPMS' agent, Mr. Teplinsky, on January 13, 2015, $30,020 of the profits from the sale of the Parking Lot were distributed to BPMS for an alleged payment on HBI's legal bills. And then on January 22, 2015, an additional $25,000 of the profits from the sale of the Parking Lot were distributed to BPMS as "final entity flat fee charge" for work supposedly done for and on behalf of HBI. On information and belief, these legal fees paid BPMS reflected legal work that was done, in reality, primarily on behalf of Gouletas, and otherwise constituted excessive legal fees charged to HBI.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 46.

I.      **Gouletas Engaged in Additional Money Laundering Schemes**

47.     Further, on information and belief, from at least 2013 to the present, Gouletas would cause funds that would otherwise be paid to himself, and direct those funds to one or more Doe Defendants 1-10. According to Gouletas' plan, Doe Defendants 1-10 would hold those funds in their own names, and then funnel those back to Gouletas either through cashier's checks made payable to Gouletas, or through purported "loans." On information and belief, these additional money laundering schemes were part of Gouletas' efforts to delay, hinder and defraud his creditors.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegations of Paragraph 47.

### J.    The Contempt Proceedings Against Gouletas

48.    Based on the numerous violations by Gouletas of the Citation Lien, on April 24, 2015, 800 SWC filed a Motion for Contempt against Gouletas, which was amended on October 9, 2015 (the "Contempt Motion"). The trial court (White, J.) conducted hearings in connection with the Contempt Motion on July 20, 2015, September 2, 2015, and November 24, 2015.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegations of Paragraph 48.

49.    In connection with the evidence which showed that Gouletas during the Citation Proceedings, had sold his CIB Stock without obtaining permission from the court, Judge White stated, with Gouletas still up on the witness stand, that:

> I'm a little bit confused here. We have a citation that says ….don't transfer assets. And what I am hearing is that apparently [Gouletas' CIB Stock] was sold. The money was forthcoming and was used to buy food, which is a violation of the citation.

Further, Gouletas testified at the contempt hearing that he supposedly had "no idea" why he was going through a series of cashier's checks during the time from and after the Citation was served upon him on June 9, 2014.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegations of Paragraph 49.

50.    The final day of the contempt hearing was scheduled for January 19, 2016. On the eve of Judge White's decision in connection with the motion to hold Gouletas in contempt, on January 17, 2016 Gouletas filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois. The Citation Liens continued in existence at all times from the date the Citation was filed on June 5, 2014 until the date that Gouletas filed for bankruptcy on January 17, 2016 (*see Marcus-Rehtmeyer v. Jacobs*, 784 F.3d 430, 438-39 & 443 (7th Cir. 2015)), and at all relevant times were in full force and effect.

**ANSWER:**

Spanos admits Gouletas filed for bankruptcy protection on January 17, 2016; Spanos lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations of

Paragraph 50.

      **K.**      **The Bankruptcy Trustee Assigns the Litigation Claims and**
                    **Alter-Ego Claims to DJV**

51.      The Bankruptcy Trustee attempted to obtain counsel to prosecute avoidance and fraudulent transfer claims for and on behalf of the Bankruptcy Estate on a contingent fee basis, but, despite his diligent efforts, was unable to do so.  On July 23, 2017, the Bankruptcy Trustee received an offer f4rom DJV to purchase the Bankruptcy Trustee's litigation claims and alter-ego claims for $15,000.  On July 24, 2017, the Bankruptcy Trustee filed in Bankruptcy Court the Trustee's Motion for Approval of Sale of Interests in Personal Property and for Related Relief (Px. 26), which specifically included fraudulent transfer, alter-ego, and common law tort claims of the nature set forth herein.  *See*, U.S.C. §§363(b)(1) and 544(b)(1).  No one offered a higher bid for those claims, and neither the Debtor, Gouletas, nor any creditor, objected to the Bankruptcy Trustee's Motion or the proposed sale by the Bankruptcy Trustee.

**ANSWER:**

Spanos admits the authenticity of Px 26 but he lacks knowledge or information sufficient

to form a belief as to the truth of the remaining allegations of Paragraph 51.

52.      After due notice to all interested parties, and after hearing before the Bankruptcy Court on August 18, 2017, the Bankruptcy Court presiding over the Gouletas Bankruptcy entered its order authorizing sale of personal property. (Px 27)  Neither the Debtor, Gouletas, nor any creditor objected to the order of sale, or appealed the order of sale.  Thereafter, on September 13, 2017, the Bankruptcy Trustee and the representative of DJV executed the Assignment of Claims and Causes of Action, thereby transferring the Bankruptcy Trustee's litigation claims and alter-ego claims to DJV.  (Px 28)

**ANSWER:**

Spanos admits the authenticity of Px 27 and Px 28 but he lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations of Paragraph 52.

53.    All conditions precedent to recovery by Plaintiff have been performed or have occurred.

**ANSWER:**

Denied.

54.    Plaintiff realleges all preceding and succeeding paragraphs as the basis for each of the following counts.

**ANSWER:**

Spanos realleges all preceding and succeeding answers.

**Count One**
**(Avoidance of Fraudulent Transfers Pursuant to**
**740ILCS 160/5(a)(1))**

55.    The Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq*. (the "IUFTA") at Section 160/5(a) provides that:

> A transfer made….by a debtor is fraudulent as to a creditor, where the creditor's claim arose before or after the transfer was made…., if the debtor made the transfer….:(1) with actual intent to hinder, delay or defraud any creditor of the debtor….

740 ILCS 160/5(a)(1).

**ANSWER:**

Admit.

56.    The following transfers of cash (the "Transfers') were made by or on behalf of the Debtor, Gouletas, from funds that, legally and equitably, belonged to Gouletas, with actual intent to hinder, delay or defraud Gouletas' creditors in existence as of the dates of the Transfers, including 800 SWC, Muth and Alfonso.

**ANSWER:**

Spanos admits receiving funds in 2015 that belonged to Gouletas and/or that were paid

for or on his behalf, and specifically $50,000 on or about January 20, 2015 and $10,000 on or

about May 4, 2015, but at that time Spanos was a creditor of Gouletas and he denies that the

payments made to him were made or accepted with an intent to hinder, delay or defraud Gouletas creditors, which included Spanos, in existence when Spanos received the payments.

57.     The course of conduct set forth above shows Gouletas' actual intent to hinder, delay or defraud Gouletas' creditors as of the date of the Transfers, including 800 SWC, Muth and Alfonso.  Indeed, a number of the transfers were to insiders as defined in 740 ILCS 160/2(g)(1), (4) & (5).  In that connection, (a) Touris was an "insider" within the meaning of 740 ILCS 160/2(g)(5) because Touris acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas' funds; (b) Steven Gouletas was an "insider" within the meaning of 740 ILCS 160/2(g)(1) &(5) because he is a relative of the Debtor (i.e., Gouletas' son), and acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas' funds; and (c) BPMS was an "insider within the meaning of 740 ILCS 160/2(g)(5) because BPMS acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas' funds.  Further, as to the funds deposited into the checking accounts of Touris, Gouletas retained control over those funds, and the transfers were concealed.  In addition, before the transfers were made, Gouletas had been sued and threatened with further suits, numerous judgments had been entered against him, and Gouletas was insolvent.

**ANSWER:**

Spanos denies the allegations of Paragraph 57 with respect to the alleged 2015 payments that were made to Spanos. Spanos denies knowing of the suits and judgments alleged at the time he received the Gouletas payments alleged by Plaintiff.

58.     The transfers were made in violation of 740 ILCS 160/5(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

**ANSWER:**

Spanos denies the allegations of Paragraph 58 with respect Spanos, and specifically with respect to the 2015 payments to Spanos that Plaintiff alleges and that Spanos received.

59.     None of the defendants listed below took the fraudulently transferred funds in good faith because each defendant knew, must have known, or should have known that numerous judgments had been entered against Gouletas, with outstanding Citation Liens which prohibited Gouletas from transferring his assets. *See For Your East Only, Inc. v. Calgon Carbon Corp.*, 560 F.3d 717,722 (7th Cir. 2009).  Indeed, as to defendant Adler, he had previously filed suit against Gouletas on August 4, 2014 in the Circuit Court of Cook County, Illinois No. 2014 L 050584 during which Adler was represented by reputable counsel who were highly experienced and very thorough litigators.  Accordingly, at the time that Adler took the $850,000 from Gouletas on January 8, 2015, Adler knew, must have known, or should have known about the 800 SWC, Muth and Alfonso judgments against Gouletas and the outstanding Citation Liens that had been entered

28

against Gouletas which prohibited Gouletas from transferring his assets. Moreover, in the December 30, 2014 Release and Settlement Agreement executed between Adler and Gouletas (Px 29), Adler acknowledged that "[i]f for any reason Adler is ordered to return or disgorge the Payment [of $850,000] or any portion thereof, any obligation of Adler hereunder shall be null, void and of no effect…." (*Id. p. 2 ¶ 2*) Since Adler, through highly experienced and very thorough counsel, knew, must have known, or should have known about the outstanding judgments against Gouletas and the Citation Liens pertaining thereto, Adler did not take the funds from Gouletas in good faith.

**ANSWER:**

Spanos admits the authenticity of Px 29 but Spanos denies the allegations of Paragraph 59

with respect Spanos, and specifically with respect to the 2015 payments to Spanos that Plaintiff

alleges he received from Gouletas directly or through others.

60. Each Defendant listed below is liable to Plaintiff, as the assignee of the claims of the Bankruptcy Trustee, in the amount of the Transfers as follows:

(a) Defendant Dorothea Touris

(i) January 21, 2015 - $396,218.84
(ii) February 17, 2015 - $15,730
(iii) March 17, 2015 - $415,000
(iv) May 29, 2015

(b) Defendant Steven E. Gouletas

(i) April 11, 2014 - $90,586
(ii) April 11, 2014 - $80,324
(iii) August 29, 2014 - $23,200
(iv) February 6, 2015 - $195,000
(v) February 6, 2015 - $190,000
(vi) February 6, 2015 - $5,000
(vii) March 24, 2015 - $7,200
(viii) March 24, 2015 - $53,000
(ix) March 24, 2015 - $16,000
(x) March 24, 2015 - $440

(c) Defendant Natel Matschulat

(i) September 5, 2014 - $51,323.29
(ii) January 8, 2015 - $100,000
(iii) March 24, 2015 - $30,000

      (iv)     May 4, 2015 - $13,000

(d)    <u>Defendant Paul Jones</u>

      (i)      January 21, 2015 - $690,000

(e)    <u>Defendant, James Paul</u>

      (i)      January 21, 2015 - $110,000

(f)    <u>Defendant Adler</u>

      (i)      January 8, 2015 - $850,000

(g)    <u>Defendant George Stray</u>

      (i)      January 21, 2015 - $15,000
      (ii)    February 18, 2015 - $7,000

(h)    <u>Defendant George Spanos</u>

      (i)      February 6, 2015 - $50,000
      (ii)    May 4, 2015 - $10,000

(i)    <u>Defendant W&D</u>

      (i)      January 21, 2015 - $35,000

(j)    <u>Defendant BPMS</u>

      (i)      January 13, 2015 - $30,020
      (ii)    January 22, 2015 - $25,000

**<u>ANSWER:</u>**

Spanos denies the allegations of Paragraph 60, and specifically denies liability with respect to the 2015 payments to Spanos that Plaintiff alleges in subparagraph (h) and which Spanos admits that he received.

**Count Two**
**(Avoidance of Fraudulent Transfers Pursuant to**
**740 ILCS 160/5(a)(1) – Garvey Court Transfers)**

61.     The Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq*. (the "IUFTA") at Section 160/5(a) provides that:

> A transfer made….by a debtor is fraudulent as to a creditor, where the creditor's claim arose before or after the transfer was made…., if the debtor made the transfer….:(1) with actual intent to hinder, delay or defraud any creditor of the debtor….

740 ILCS 160/5(a)(1).

**ANSWER:**

Admit.

62.     In May of 2014, Gouletas" "equity cushion" in the Garvey Court Project was at least $3,600,000.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 62.

63.     In May of 2014, Gouletas transferred his 25% retained interest in the Garvey Court Project to his family members through Defendants SEG Garvey (12% and NKM Garvey (13%) as follows:

(a)     SEG Garvey LLC

      (i)      Steven E. Gouletas – 16.66%
      (ii)     Irene Gouletas – 16.67%
      (iii)    Desire Witt – 16.67%
      (iv)     Victoria M. Gouletas – 16.7%
      (v)      Rosalie Gouletas – 16.67%
      (vi)     Louis Gouletas – 5.53%
      (vii)    Michael Gouletas – 5.54%
      (viii)   Brittany Gouletas – 5.54%

(b)     NKM Garvey LLC

      (i)      Natel Matschulat – 93%
      (ii)     Nicholas GOuletas – 7%

31

(the "Garvey Court Transfers")

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 63.

64.     The course of conduct set forth above shows Gouletas' actual intent to hinder, delay or defraud Gouletas' creditors in existence as of the date of the Transfers, including 800 SWC, Muth and Alfonso.  At the time of the Garvey Court Transfers, Gouletas was insolvent, or Gouletas became insolvent as a result of the transfers. The Garvey Court Transfers were in violation of the Citation Liens entered against Gouletas prohibiting his transfer of assets and in derogation of the rights of Gouletas' creditors in existence as of the dates of the transfers, including 800 SWC, Muth and Alfonso.  Moreover the Garvey Court Transfers were made to insiders – Gouletas' wife, children and grandchildren.  *See* 740 ILCS 160/5(a)(1).

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 64.

65.     The Garvey Court Transfers were made in violation of 740 ILCS 160/5(a)(1),and are voidable pursuant to 740 ILCS 160/8(a)(1).

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 65.

66.     None of the defendants listed above took the Garvey Court Transfers in good faith because each defendant knew, must have known, or should have known that Gouletas was insolvent, and that numerous judgments had been entered against Gouletas, with outstanding Citation Liens which prohibited Gouletas from transferring his assets.  *See For Your Ease Only, Inc. v. Calgon Carbon Corp*.  560 F.3d 717, 722 (7th Cir. 2009)

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 65.

67.     The Garvey Court Transfers were made in violation of 740 ILCS 160/5(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 67.

68.     The Defendants listed in this Count Two are liable to Plaintiff for their percentage of the value of Gouletas' 25% retained interest in the Garvey Court Project, as of the date of the Garvey Court Transfers, in the percentage of each Defendant's interest as set forth above.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 68.

**Count Three**
**(Avoidance of Fraudulent Transfers Pursuant to**
**740 ILCS 160/6(a) – Garvey Court Transfers)**

69.     The Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq*. (the "IUFTA") at Section 160/5(a) provides that:

> A transfer made….by a debtor is fraudulent as to a creditor, where the creditor's claim arose before or after the transfer was made…., if the debtor made the transfer….:(1) with actual intent to hinder, delay or defraud any creditor of the debtor….

740 ILCS 160/5(a)(1).

**ANSWER:**

Admit.

70.     In May of 2014, Gouletas" "equity cushion" in the Garvey Court Project was at least $3,600,000.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 70.

71.    In May of 2014, Gouletas transferred his 25% retained interest in the Garvey Court Project to his family members through Defendants SEG Garvey (12% and NKM Garvey (13%) as follows:

(a)    SEG Garvey LLC

(i)    Steven E. Gouletas – 16.66%
(ii)    Irene Gouletas – 16.67%
(iii)    Desire Witt – 16.67%
(iv)    Victoria M. Gouletas – 16.7%
(v)    Rosalie Gouletas – 16.67%
(vi)    Louis Gouletas – 5.53%
(vii)    Michael Gouletas – 5.54%
(viii)    Brittany Gouletas – 5.54%

(b)    NKM Garvey LLC

(i)    Natel Matschulat – 93%
(ii)    Nicholas Gouletas – 7%

(the "Garvey Court Transfers")

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 61.

72.    At the time of the Garvey Court Transfers, Gouletas was solvent, or Gouletas became insolvent as a result of the transfers.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 72.

73.    The Garvey Court Transfers were made in violation of 740 ILCS 160/5(a)(1),and are voidable pursuant to 740 ILCS 160/8(a)(1).

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 73.

74.     Gouletas did not receive reasonably equivalent value in exchange for the Garvey Court Transfers.  Indeed, Gouletas' 25% retained interest in the Garvey Court Project was "gifted" by Gouletas to his family members in the percentages set forth above.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 74.

75.     The Garvey Court Transfers were made in violation of 740 ILCS 160/6(a)(1),and are voidable pursuant to 740 ILCS 160/8(a)(1).

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 75.

76.     The Defendants listed in this Count Three are liable to Plaintiff for their percentage of the value of Gouletas' 25% retained interest in the Garvey Court Project, as of the date of Garvey Court Transfers, in the percentage of each Defendant's interest as set forth above.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 76.

### Count Four
### (Avoidance of Fraudulent Transfers Pursuant to
### 740 ILCS 160/6(a) – Cash Transfers)

77.     The Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq*. (the "IUFTA") at Section 160/5(a) provides that:

> A transfer made….by a debtor is fraudulent as to a creditor, where the creditor's claim arose before or after the transfer was made…., if the debtor made the transfer….:(1) with actual intent to hinder, delay or defraud any creditor of the debtor….

740 ILCS 160/5(a)(1).

**ANSWER:**

Admit.

78.     The following transfer of cash (the "Cash Transfer") were made by or on behalf of the Debtor, Gouletas from funds that, legally and equitably belong to Gouletas.

**ANSWER:**

Admit.

79.     Gouletas made the Cash Transfers without receiving a reasonably equivalent value in exchange for the transfers.

**ANSWER:**

Spanos denies this allegation with respect to the payments Plaintiff alleges were made to

Spanos.

80.     Gouletas was insolvent at the time of the Cash Transfer or became insolvent as a result of the Cash Transfer.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 80.

81.     The Cash Transfers were in violation of the Citation Liens entered against Gouletas prohibiting his transfer of assets and in derogation of the rights of Gouletas' creditors in existence of the dates of the Cash Transfers, including 800 SWC, Muth and Alfonso.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 81.

82.     The transfers were made in violation of 740 ILCS 160/5(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

**ANSWER:**

Spanos denies this allegations with respect to the payments Plaintiff alleges were made to

Spanos.

83.     Each Defendant listed below is liable to Plaintiff, as the assignee of the claims of
the Bankruptcy Trustee, in the amount of the Transfers as follows:

(a)     Defendant Dorothea Touris

(i)     January 21, 2015 - $396,218.84
(ii)    February 17, 2015 - $15,730
(iii)   March 17, 2015 - $415,000
(iv)    May 29, 2015

(b)     Defendant Steven E. Gouletas

(i)     April 11, 2014 - $90,586
(ii)    April 11, 2014 - $80,324
(iii)   August 29, 2014 - $23,200
(iv)    February 6, 2015 - $195,000
(v)     February 6, 2015 - $190,000
(vi)    February 6, 2015 - $5,000
(vii)   March 24, 2015 - $7,200
(viii)  March 24, 2015 - $53,000
(ix)    March 24, 2015 - $16,000
(x)     March 24, 2015 - $440

(c)     Defendant Natel Matschulat

(i)     September 5, 2014 - $51,323.29
(ii)    January 8, 2015 - $100,000
(iii)   March 24, 2015 - $30,000
(iv)    May 4, 2015 - $13,000

(d)     Defendant Paul Jones

(i)     January 21, 2015 - $690,000

(e)     Defendant, James Paul

(i)     January 21, 2015 - $110,000

     (f)      <u>Defendant Adler</u>

          (i)      January 8, 2015 - $850,000

     (g)      <u>Defendant George Stray</u>

          (i)      January 21, 2015 - $15,000
          (ii)     February 18, 2015 - $7,000

     (h)      <u>Defendant George Spanos</u>

          (i)      February 6, 2015 - $50,000
          (ii)     May 4, 2015 - $10,000

     (i)      <u>Defendant W&D</u>

          (i)      January 21, 2015 - $35,000

     (j)      <u>Defendant BPMS</u>

          (i)      January 13, 2015 - $30,020
          (ii)     January 22, 2015 - $25,000

**<u>ANSWER:</u>**

Spanos denies this allegation with respect to the payments made to Spanos, and specifically

the payments to Spanos alleged in subparagraph (h).

### <u>Count Five</u>
### <u>(Civil Conspiracy to Commit Fraud)</u>

     84.     As set forth in detail above, Gouletas and Defendants Touris, 800 SWP, HBI and Doe Defendants 1-10 entered into an agreement for the purpose of accomplishing, by concerted action, the unlawful purpose of hiding, shielding or otherwise transferring Gouletas' assets in violation of the Citation Liens that prohibited Gouletas from transferring his assets, and otherwise in derogation of the rights of Gouletas' creditors, including 800 SWC, Muth and Alfonso, as part of the scheme to delay, hinder or defraud Gouletas' creditors.

**<u>ANSWER:</u>**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 84.

85.     The course of conduct set forth above conduct set forth above constitutes a civil conspiracy to commit fraud, which proximately caused harm and damage to Gouletas' credito in that amount that Gouletas' creditors, including 800 SWC, Muth and Alfonso, would have been able to collect on the indebtedness owed by Gouletas, but were prevented from doing so because of those Defendants' wrongful conduct. *See Paloian v. Greenfield (In re Rest. Dev. Group, Inc.)*, 397 B.R. 891, 896-97 (Bankr. N.D. Ill. 20880).  Accordingly, Defendants, Touris, 800 SWP, HBI and Doe Defendants 1-10 are jointly and severally liable to plaintiff for the harm and damage caused by their civil conspiracy with Gouletas in the fraud committed upon Gouletas' creditors.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 85.

### Count Six
### (Aiding and Abetting Fraud)

86.     As set forth in detail above, (a) Gouletas engaged in numerous schemes to fraudulently transfer his assets in an effort to delay, hinder and defraud his creditors, which injured the ability of Gouletas' creditors (including judgment creditors 800 SWC, Muth and Alfonso) to collect on the amount of indebtedness owed to them by Gouletas; (b) Defendants Touris, 800 SWP, HBI and Doe Defendants 1-10 were aware of their roles in Gouletas' fraudulent transfer schemes when they provided assistance to Gouletas in the accomplishment of his fraudulent transfer scheme; and (c) Defendant Touris, 800 SWP, HBI and Doe Defendants 1-10 provided knowing and substantial assistance to Gouletas in the implementation and execution of Gouletas' fraudulent transfer scheme.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 86.

87.     Accordingly, Defendants Touris, 800 SWP, HBI and Doe Defendants 1-10 knowingly induced, participated and assisted in actively defrauding Gouletas' creditors through the implementation and execution of Gouletas' fraudulent transfer scheme in orer to assist Gouletas in his efforts to hinder, delay and defraud Gouletas' creditors.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 87.

88.     The course of conduct set forth above constitutes aiding and abetting a fraud on Gouletas' creditors, which proximately caused harm and damage to Gouletas' creditors in the amount that Gouletas' creditors, including 800 SWC, Muth and Alfonso would have been able to collect on the indebtedness owed by Gouletas, but were prevented from doing so because of those Defendants' wrongful conduct.  *See Paloian v. Greenfield (In re Rest.Dev. Group, Inc.*, 397 B.R. 891, 897-98 (Bankr. N.D. Ill. 2008).  Accordingly, Defendants Touris, 800 SWP, HBI and Doe Defendants 1-10 are jointly and severally liable to Plaintiff for the harm and damage caused by their aiding and abetting Gouletas in the fraud committed upon Gouletas' creditors.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 88.

**Count Seven**
**(Tortious Interference with Expectancy of**
**Collection Upon Judgments Against Gouletas)**

89.     As set forth in detail above, (a) judgment creditors 800 SWC, Muth and Alfonso had an expectancy that they would have been able to collect on their judgments against Gouletas (see Px 1); (b) Defendants Touris, 800 SWP, HBI and Doe Defendants 1-10 intentionally interfered with that expectancy; (c)Defendants Touris, 800 SWP, HBI and Doe Defendants 1-10 engaged in tortious conduct in an effort to further Gouletas' goal of defeating the ability of Judgment creditors 800 SWC, Muth and Alfonso to collect on their judgments against Gouletas; (d) there was a reasonable certainty that judgment creditors 800 SWC, Muth and Alfonso would have been able to recover on their judgments against Gouletas but for the interference by Defendants Touris, 800 SWP, HBI and Doe Defendants 1-10; and € as a proximate result of the wrongful conduct of Defendants Touris, 800 SWP, HBI and Doe Defendants 1-10, 800 SWC, Muth and Alfonso thereby were not able to collect on their judgments against Gouletas.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 89.

90.     Defendants Touris, 800 SWP, HBI and Doe Defendants 1-10 tortiously interfered with the rights of judgment creditors 800 SWC, Muth and Alfonso to execute upon Gouletas' non-exempt assets toward satisfaction of their judgments against Gouletas, which proximately caused harm and damage in the amount that judgment creditors 800 SWC, Muth and Alfonso would have been able to collect on their judgments against Gouletas, but were prevented from doing so because of the wrongful conduct of Defendants Touris, 800 SWP, HBI and Doe Defendants 1-10 as set forth above.  The course of conduct set forth above constitutes tortious interference by Defendants Touris, 800 SWP, HBI and Doe Defendants 1-10 as set forth above.  The course of conduct set forth above constitutes tortious interference by Defendants Touris, 800 SWP, HBI and Doe

Defendants 1-10 with the rights of judgment creditors 800 SWC, Muth and Alfonso to enforce, and realize the benefits from their judgments against Gouletas. Accordingly, Defendants Touris,800 SWP, HBI and Doe Defendants 1-10 are jointly and severally liable to plaintiff for the harm and damage caused by their tortious interference with the rights of judgment creditors 800 SWC, Muth and Alfonso to enforce and realize the benefits from, their judgments against Gouletas.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 90.


**Count Eight**
**(Reimbursement of Funds Owed to Gouletas Prior to**
**the Time That He filed for Bankruptcy0**

91.     In March of 2015, Gouletas loaned $90,000 to Touris, of which only $50,000 was repaid, leaving a balance owed by Touris on that loan in the amount of $40,000.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 91.

92.     In addition, on March 28, 2015, Gouletas loaned an additional $10,000 to Touris, which Touris never repaid.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 92.

93.     Finally, on February 10, 2015, there was $1,368 f Gouletas' funds which remained in the Touris Chase Account.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the

allegation in Paragraph 93.

94.     Accordingly, Touris is liable to the Bankruptcy Trustee and thus to Plaintiff for $51,368 that she owed to Gouletas at the time that Gouletas filed for bankruptcy.

**ANSWER:**

Spanos lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 94.

**AFFIRMATIVE DEFENSES**

If payments made to Spanos are deemed to violate paragraph (1) of subsection (a) of Section 5 of the fraudulent on account of wrongful purpose, motive or intent of Gouletas, Plaintiff is barred by 740 ILCS 160/9(a) from recovering the same against Spanos. Spanos was not an insider of Gouletas, he received the payments alleged in good faith as a bona fide creditor of Gouletas on an antecedent debt owed by Gouletas, and Gouletas received equivalent value for each payment Spanos received on the antecedent debt that Gouletas owed to Spanos.

1.      On April 28, 2013, as "President" of "AIGL Real Estate Company", Gouletas signed a Promissory Note in the amount of $250,000.00 payable to Spanos. Attached as Exhibit A is a true and correct copy of that Note. The Note was signed to further a real estate deal Gouletas was pursuing.

2.      On April 29, 2013, Spanos wired $250,000 to an account per Gouletas instructions. On information and belief, Gouletas controlled that account.

3.      Almost a year before the Note/loan transaction, on May 11, 2012, AIGL Real Estate Company, an Illinois corporation, was involuntarily dissolved by the Illinois Secretary of State. It was never reinstated. Before dissolution of AIGL Real Estate Company, Gouletas had served as its President.

4.      By reason of its dissolution, AIGL Real Estate Company did not exist in April 2013 when Gouletas signed the Note and accepted Spanos' $250,000.00 as "President" of the dissolved corporation.

5.      One who operates the business of a non-existent or unincorporated entity as "its" President is personally liable for the debts incurred in the name of the non-existent (unincorporated) entity. *See Affiliated Capital Corp. v. Buck*, 886 F. Supp. 647 (N.D. Illinois 1995); *Cardem, Inc. v. Marketron International, Ltd*. 322 Ill. App.3d 131 (2nd Dist. 2001); *Gonnella Baking Co. v. Clara's Pasta DiCasa, Ltd.*, 337 Ill. App.3d 385 (1st Dist. 2003).

6.      At the time Plaintiff alleges Gouletas directed payments to Spanos in 2015, the Note had an outstanding balance greater than the payments made to Spanos against that Note.

7.      With each alleged Gouletas payment Spanos received in 2015, Spanos reduced the amount owed on the Note by the amount of the payment and Gouletas received equivalent value for each payment in the form of a dollar for dollar reduction of his personal liability to Spanos under the Note.  In addition, the payments caused Spanos to forbear pursuing litigation against on the Note.

WHEREFORE, Defendant George Spanos prays that Plaintiff's claims against him be dismissed or that judgment on Plaintiff's claims against him be entered in his favor.

Respectfully submitted,


 /s/ John J. Kakacek
One of the Attorneys
for George Spanos

Michael T. Trucco (ARDC #06183389)
John J. Kakacek (ARDC #06187663)
Stamos & Trucco LLP
One East Wacker Drive
Suite 300
Chicago, Illinois 60601
Telephone: (312) 630-7979
Facsimile:  (312) 630-1183
mtrucco@stamostrucco.com
jkakacek@stamostrucco.com

AIGL REAL ESTATE COMPANY
*182 West Lake Street, Suite 200*
*(312) 595-4800*

~Copy

## PROMISSORY NOTE

$250,000.00          Issue Date: April 28, 2013
         Chicago, Illinois

FOR VALUE RECEIVED, the undersigned, AIGL Real Estate Company, an Illinois corporation, with an address of 182 West Lake St., Suite 200, Chicago, Illinois 60601 ("AIGL"), promises to pay to the order of George Spanos, an individual with an address of 250 N Washtenaw Avenue ("Payee"), the principal sum of $250,000.00 (Two Hundred and Fifty Thousand U.S. Dollars) within ninety (90) days of the Issue Date, at such place as Payee may designate ("Payment Date").

The undersigned further promises to pay to the order of Payee interest for the ninety (90) day term in the amount of Fifty Cents ($.50) for every One Dollar ($1.00) of principal. Therefore, the Payee will receive interest on the Payment Date in the amount of $125,000.00 (One Hundred Twenty Five Thousand U.S. Dollars) on the aggregate unpaid principal amount outstanding within ninety (90) days of the Issue Date, at such place as Payee may designate ("Payment Date"). AIGL may prepay the principal balance and accrued interest due under this Promissory Note, in whole or in part at any time without penalty.

AIGL shall be responsible for costs, if any, related to collection on this Note. Payments received from AIGL in payment of this Promissory Note shall be applied, as follows: first, to any unpaid principal balance of this Promissory Note, second, to the accrued interest due thereunder, and, finally, to any unpaid costs of collections related to this Promissory Note including, without limitation, reasonable attorney fees and court costs.

At the option of Payee, any or all of the obligations of AIGL hereunder shall become immediately due and payable without notice or demand, upon the occurrence of any of the following events of default: (a) failure in payment of any obligations of AIGL hereunder to the Payee; (b) a filing of a proceeding under the any bankruptcy, insolvency or similar law by or against AIGL; or (c) an assignment by AIGL for the benefit of creditors.

The undersigned waives presentment, protest and demand and notice of presentment, protest of nonpayment of Promissory Note.

No delay on the part of the Payee in the exercise of any right or remedy hereunder shall operate as a waiver hereof, and no single or partial exercise by the Payee of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

This Promissory Note has been delivered at Payee's address and shall be governed by and construed in accordance with the internal laws, and not the choice of laws, of the State of Illinois. Whenever possible, each provision of this Promissory Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Promissory Note shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision, or of the remaining provisions of this Promissory Note.

This note has been delivered prior to the receipt of funds from Payee and is conditioned on the receipt by AIGL of $250,000 (Two Hundred Fifty Thousand U.S. Dollars).

LENDER          BORROWER
George Spanos          AIGL Real Estate Company,
         an Illinois corporation

*[signature]*   4-28-2013    *[signature]*   4-28-2013
George Spanos    Date      By: Nicholas S. Gouletas, President    Date

EXHIBIT
A

## <u>CERTIFICATE OF ATTORNEY</u>

John J. Kakacek, an attorney certifies that he caused a copy of **Defendant, George Spanos, Answer to Plaintiff's Amended Complaint and Affirmative Defenses** to be served upon counsel of record below electronically:

F. Dean Armstrong,
Armstrong Law Firm, P.C.,
23353 S. 88th Avenue
Frankfort, Illinois 60423
([armstronglaw@sbcglobal.net](mailto:armstronglaw@sbcglobal.net))

this 13th day of April, 2018.

/s/ John J. Kakacek _____