# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| DAN JOINT VENTURE III, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-349 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| DORETHA TOURIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons set forth below, the motion to dismiss filed by Defendant James Paul [30] is granted; the motion to dismiss filed by Defendant George Strat [46] is denied; the motion to dismiss or, in the alternative, the motion for a more definite statement filed by Defendant Paul Jones [61] is granted in part and denied in part; the motion to dismiss filed by Defendant Natel Matschulat [68] is denied; and the motion to dismiss filed by Defendant Dorothea Touris [79] is granted in part and denied in part. Plaintiff is given until April 19, 2019 to file a second amended complaint. This case is set for further status hearing set for April 24, 2019 at 9:00 a.m.

## I. Background[1]

Plaintiff D.A.N. Joint Venture III, L.P. ("DJV" or "Plaintiff") contends that Nicholas S. Gouletas ("Gouletas" or the "Debtor") engaged in a complicated scheme to hide, transfer, and otherwise shield his assets from the claims of certain of his judgment creditors by transferring more than $2,000,000 in cash and other assets to his friends, relatives, and a select group of

---

[1] For purposes of the motion to dismiss, the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

creditors. [11, at ¶ 1.] Plaintiff brings state-law claims of (i) avoidance of fraudulent transfers pursuant to 740 ILCS 160/5(a)(1); (ii) avoidance of fraudulent transfers pursuant to 740 ILCS 160/6(a); (iii) civil conspiracy to commit fraud; (iv) aiding and abetting fraud; (v) tortious interference with expectancy of collection upon judgments; and (vi) reimbursement of funds owed to Gouletas prior to the time that he filed for bankruptcy.

Gouletas is the owner and control person of a large group of companies generally referred to as "American Invsco" that were involved in condominium conversions and various other real estate developments in more than 40 cities throughout the United States. [11, at ¶ 7.] On December 19, 2013, citations to discover assets were issued against Gouletas in connection with two lawsuits against him. [*Id*. at ¶ 16.] As of late December 2013, Gouletas was prohibited from transferring his assets by virtue of the citations issued against him. [*Id*.] In another citation to discover assets dated June 5, 2014, Gouletas was instructed:

> YOU ARE PROHIBITED from making or allowing any transfer or other disposition of * * * any property not exempt from execution * * * belonging to the judgment debtor [Gouletas] or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor * * *, until further order of Court or termination of the proceedings.

[*Id*. at ¶ 18.] Plaintiff challenges numerous actions Gouletas allegedly took to improperly transfer assets after these citations were issued against him.

A.      **Transfers to Touris Checking Accounts**

In January 2015, Gouletas requested that his close friend of over 40 years Defendant Dorothea Touris deposit funds belonging to Gouletas into her checking accounts for the payment of Gouletas's expenses. [*Id*. at ¶¶ 6.1, 20-22.] Pursuant to Gouletas's plan, Touris would take the funds that he had provided to her, put the money into her checking accounts, and then pay Gouletas's bills out of her checking accounts. [*Id*. at ¶ 22.] The funds that Gouletas deposited

into Touris's checking accounts belonged to Gouletas. [*Id.*] In late January of 2015, Touris met with Gouletas at his office in Chicago with Gouletas's attorney Howard Teplinsky, an attorney at Beermann Pritikin Mirabelli Swerdlove LLP ("BPMS"). [*Id.* at ¶ 23.] At that meeting, Gouletas presented Touris with a check in the amount of $396,218.84. [*Id.*] Gouletas told Touris to deposit the check into her account and to pay $195,000 to Steven Gouletas (Gouletas's son) and $50,000 to George Spanos (Gouletas's friend), with the balance of $150,000 to be kept by Touris as compensation in the form of a purported reimbursement on a Gouletas investment.[2] [*Id.*] On February 6, 2015, Touris paid $195,000 to Gouletas's son and $50,000 to George Spanos, as directed by Gouletas. [*Id.* at ¶ 24.]

On February 17, 2015, Gouletas wire-transferred $15,730 into Touris's checking account at Chase Bank. [*Id.* at ¶ 25.] The $15,730 was money that belonged to Gouletas. [*Id.*] However, Gouletas claimed to have "no idea" from where the $15,730 came. [*Id.*] In March of 2015, Gouletas told Touris that a check for $415,000 was coming to her, which she was to deposit into her account for the payment of Gouletas's expenses. [*Id.* at ¶ 26.] Touris deposited the $415,000 check into her checking account at Chase Bank. [*Id.*] According to Touris, Gouletas asked her to deposit the check into her account to pay his bills. [*Id.*] Although Gouletas claimed that the $415,000 was a "loan" to him from Defendant Dr. Paul Jones, at some point he admitted that the $415,000 was his money. [*Id.*] In total, Gouletas deposited more than $431,145 into Touris's checking account at Chase. [*Id.*] As Exhibit 12 to the amended complaint, Plaintiff includes account summaries showing financial transactions that Touris admits that she handled for Gouletas

---

[2] It is unclear from the amended complaint whether Plaintiff contends that the $150,000 paid to Touris actually was a reimbursement relating to a Gouletas investment or falsely was represented as such. The distinction has no bearing on the resolution of the pending motions to dismiss.

with his own money.  [11-1, at 38-46; 11, at ¶ 27.]  All of the transactions were done at the direction of Gouletas.  [11, at ¶ 27.]

### B.    Garvey Court Project Transfers

Gouletas was involved in a real estate development project referred to as "Garvey Court" (the "Garvey Court Project") that involved the construction of a high-rise retail/office/condominium building on properties that Gouletas owned (through entities that he owned and controlled).  [*Id*. at ¶ 30.]  Gouletas "gifted" his 25% interest in the Garvey Court Project to family members through two newly formed LLCs, SEG Garvey LLC and NKM Garvey LLC. [3]  [*Id*. at ¶ 32.]  Plaintiff estimates that the value of Gouletas's interest in the Garvey Court Project at the time of these transfers exceeded $3,600,000.  [*Id*. at ¶ 33.]

### C.    Stock Transfers

On June 9, 2014, Gouletas discovered that he had acquired a number of shares of stock in CIB Marine BankShares (the "CIB Stock"), which he held through a stock brokerage account at TD Ameritrade (the "TDA Account").  [*Id*. at ¶ 34.]  Gouletas sold his CIB Stock through his TDA Account for just over $51,000 and wire-transferred $51,323.29 from that stock sale into a checking account held in the name of his wife, Defendant Natel Matschulat.  [*Id*. at ¶ 35.]  Gouletas then proceeded to have his wife sign checks from that account for the payment of Gouletas's expenses. [*Id*. at ¶ 36.]

---

[3] Specifically, Plaintiff alleges that Gouletas used SEG Garvey LLC to transfer portions of his interest in the Garvey Court Project to Steven E. Gouletas, Irene Gouletas, Desiree Witte, Victoria M. Gouletas, Rosalie Gouletas, Louis Gouletas, Michael Gouletas, Brittany Gouletas.  [*Id*. at ¶ 32.]  Plaintiff further alleges that Gouletas used NKM Garvey LLC to transfer portions of his interest in the Garvey Court Project to Natel Matschulat and Nicholas Gouletas.  [*Id*.]

### D. HBI-Parking Lot Mortgage

Defendant 800 South Wells Phase II, LLC ("800 SWP") owned a 1.77 acre, 126-space parking lot at 800 South Wells Street in Chicago (the "Parking Lot"). [*Id*. at ¶ 37.] Gouletas was the manager, sole member, and control person of 800 SWP. [*Id*.] As of November 1, 2009, there was only one mortgage against the Parking Lot, which was in favor of River City Investors, LLC ("RCI") in the original principal amount of $2,000,000.00 (the "RCI Mortgage"). [*Id*. at ¶ 38.] In November 2009, Gouletas had another entity he controlled—Defendant Home By Invsco, Inc. ("HBI")—place a false mortgage against the Parking Lot in the amount of $2,177,700 (the "HBI Second Mortgage"). [*Id*.] HBI was owned and controlled by Gouletas. [*Id*.] While Gouletas signed the HBI Second Mortgage on November 1, 2009, the internal financial documents of Gouletas's enterprise—American Invsco, which included 800 SWP and HBI—did not reflect any indebtedness supposedly owed to HBI on the HBI Second Mortgage. [*Id*. at ¶¶ 39-40.]

In late 2014, a third party offered to purchase the Parking Lot for $7,750,000. [*Id*. at ¶ 41.] With the RCI Mortgage and other expenses of the sale totaling approximately $5,711,000, Gouletas (with the assistance of one or more Doe Defendants 1-10) came up with a plan to shield approximately $2,038,000 in profits from Gouletas's disfavored creditors. [*Id*.] The plan involved the false claim that the HBI Second Mortgage was legitimate, which allowed Gouletas to distribute the approximately $2,038,000 in profits from the sale of the Parking Lot (that otherwise would have been paid to Gouletas) to certain preferred creditors and other friends and relatives of Gouletas, with those friends and relatives then funneling a portion of the profits from the sale of the Parking Lot back to Gouletas through Touris's checking accounts. [*Id*.] The closing on the sale of the Parking Lot occurred on December 29, 2014. [*Id*. at ¶ 43.] The closing statement shows that from the $7,750,000 in sale proceeds, $2,038,703.84 was the balance due to the Seller 800

SWP. [*Id*.] Elizabeth Friedgut, the transactional attorney who was handling the sale of the Parking Lot for Gouletas, signed the settlement statement for and on behalf of 800 SWP. [*Id*.] The balance due to 800 SWP (*i.e.*, $2,038,703.84) was transferred into a trust account at BPMS to facilitate the payment of the proceeds as Gouletas directed. [*Id*. at ¶ 44.] On January 6, 2015, Gouletas had an additional $137,535 wire-transferred into the trust account at BPMS. [*Id*.]

In January 2015, Mr. Teplinsky (for and on behalf of BPMS) directed how the $1,271,218.84 from the BPMS escrow account was to be distributed, which included $396,218.84 paid to Touris and $690,000 distributed to Defendant Jones. [*Id*. at ¶ 45.] As discussed above, of the $396,218.84 paid to Touris, Gouletas had Touris distribute $195,000 to his son Steven Gouletas and $50,000 to his friend Mr. Spanos. [*Id*.] Of the $690,000 distributed to Jones, $415,000 was deposited into Touris's checking account so Gouletas could continue to pay his expenses without those funds being subject to execution by Gouletas's judgment creditors. [*Id*.] On January 13, 2015, Mr. Teplinsky also directed that $30,020 of the profits from the sale of the Parking Lot be distributed to BPMS, purportedly for the payment of HBI's legal bills. [*Id*. at ¶ 46.] On January 22, 2015, an additional $25,000 of the profits from the sale of the Parking Lot were distributed to BPMS as a "finalize entity flat fee charge," again for work purportedly done for and on behalf of HBI. [*Id*.] Plaintiff alleges—on information and belief—that the fees paid to BPMS reflected legal work that was done primarily on behalf of Gouletas or that otherwise constituted excessive legal fees charged to HBI. [*Id*.]

### E. Bankruptcy Proceedings

On January 17, 2016, Gouletas filed for Chapter 7 bankruptcy in the Northern District of Illinois. [*Id*. at ¶ 50.] The relevant citations remained in effect until the date that Gouletas filed for bankruptcy. [*Id*.] The Bankruptcy Trustee attempted to obtain counsel to prosecute avoidance

and fraudulent transfer claims for and on behalf of the bankruptcy estate on a contingent fee basis, but, despite his diligent efforts, was unable to do so. [*Id.* at ¶ 51.] On July 23, 2017, the Bankruptcy Trustee received an offer from Plaintiff to purchase the litigation claims and alter-ego claims for $15,000. [*Id.*] On July 24, 2017, the Bankruptcy Trustee filed in the bankruptcy court the Trustee's Motion for Approval of Sale of Interests in Personal Property and for Related Relief [11-1, at 78-87], which specifically included fraudulent transfer, alter-ego, and common law tort claims of the nature set forth in the amended complaint. No party offered a higher bid for those claims. [11, at ¶ 51.] Neither the Debtor (*i.e.*, Gouletas) nor any creditor, objected to the Bankruptcy Trustee's motion or the proposed sale. [*Id.*]

After notice to all interested parties and after hearing before the bankruptcy court, the bankruptcy court entered its Order Authorizing Sale of Personal Property on August 18, 2017. [11, at ¶ 52; 11-1, at 88-90.] Again, neither the Debtor nor any creditor objected to the order of sale or appealed the order of sale. [11, at ¶ 52.] On September 13, 2017, the Bankruptcy Trustee and a representative of Plaintiff executed the Assignment of Claims and Causes of Action, thereby purporting to transfer the Bankruptcy Trustee's litigation claims and alter-ego claims to Plaintiff. [11-1, at 91-94.] All conditions precedent to recovery by Plaintiff have been performed or have occurred. [11, at ¶ 53.]

## II.    Legal Standard

To survive a Federal Rule of Civil Procedure ("Rule") 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly,* 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). However, "[t]o survive a motion to dismiss, the well-pleaded facts of the complaint must allow the court to infer more than the mere possibility of misconduct." *Langworthy v. Honeywell Life & Acc. Ins. Plan*, 2009 WL 3464131, at *2 (N.D. Ill. Oct. 22, 2009) (citing *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011)). Evaluating whether a "claim is sufficiently plausible to survive a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *McCauley*, 671 F.3d at 616).

Furthermore, claims sounding in fraud are subject to Rule 9(b)'s heightened pleading standard. *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2005). Under Rule 9(b), a plaintiff alleging fraud "'must state with particularity the circumstances constituting fraud or mistake.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting Fed. R. Civ. P. 9(b)). Ordinarily, the plaintiff "must describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *Id.*

(quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)); *see also Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (Rule 9(b) requires the plaintiff to state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." (quoting *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992)). While providing this broad guidance, "[t]he Seventh Circuit has shied away from a rigid, formulaic approach to Rule 9(b) and noted that '[t]he twin demands of detail and flexibility, though in tension with one another, make sense in light of the competing purposes of the federal rules.'" *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 815 (N.D. Ill. 2013) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011)).

## III. Analysis

### A. Standing

Defendants[4] move to dismiss Counts I-IV—Plaintiff's state-law avoidance actions—for lack of standing. Plaintiff claims to have standing to bring these claims under Section 544(b)(1) of the Bankruptcy Code as the assignee of the Bankruptcy Trustee. Defendants respond that the Bankruptcy Trustee lacked authority to assign his rights and powers to avoid and recover alleged fraudulent transfers under that Section of the Bankruptcy Code. Section 544(b)(1) of the Bankruptcy Code provides that "*the trustee* may avoid any transfer of interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable

---

[4] Defendant Natel Matshculat first moved to dismiss Plaintiff's claims on this basis. However, other Defendants adopted the argument. [See 80; 108; 109.] Although not all Defendants adopted the argument, the same argument would apply for all Defendants.

only under section 502(e) of this title." 11 U.S.C. § 544(b)(1) (emphasis added). According to Defendants, the plain language of Section 544 establishes that a bankruptcy trustee cannot assign his rights and powers to avoid and recover alleged fraudulent transfers because the statute specifically grants the power to "the trustee."

The Seventh Circuit has not addressed the issue, on which courts are split. Some courts have held that fraudulent transfer claims are property of the estate and therefore can be sold pursuant to Section 363 of the Bankruptcy Code. See, *e.g., In re Moore*, 608 F.3d 253, 262 (5th Cir. 2010). Other courts—persuaded by the plain language argument advanced by Defendants here—have held that a bankruptcy trustee cannot assign avoidance actions brought under the Bankruptcy Code. See, *e.g., In re Boyer*, 372 B.R. 102, 105 (D. Conn. 2007), aff'd, 328 F. App'x 711 (2d Cir. 2009); *In re Carragher*, 249 B.R. 817, 820 (Bankr. N.D. Ga. 2000). Defendants rely on the latter category of cases to argue that Plaintiff lacks standing to pursue the state-law actions that it seeks to bring in this case. These courts reason that because the Bankruptcy Code confers authority to avoid transfers on the bankruptcy trustee alone, there is no statutory authority for allowing assignees to bring avoidance actions.

The Court takes no position on this split of authority at this time, as Defendants have not established that the Court has jurisdiction collaterally to review the bankruptcy court's order approving the assignment of Plaintiff's claims as a sale under Section 363 of the Bankruptcy Court. The bankruptcy court already approved the assignment of the fraudulent transfer claims at issue pursuant to Section 363. [11-1.] An "order approving a bankruptcy sale is a judicial order and can be attacked collaterally only within the tight limits that Fed. R. Civ. P. 60(b) imposes on collateral attacks on civil judgments." *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 286 (7th Cir. 2002). Defendants have not identified any authority for this Court to collaterally review the

order of the bankruptcy court. If Defendants believe the Court has such authority in this case or Defendants contend that the Court can reach the issue without collaterally reviewing the bankruptcy court sale order, they may again move for dismissal. However, given the case law limiting the ability to collaterally attack a bankruptcy sale order, the Court denies Defendants' motion to dismiss for lack of standing.

### B. Fraudulent Intent of Transferees

Defendants James Paul and Dr. Paul Jones argue that Plaintiff fails to state a claim under Section 5(a)(1) of Illinois's Uniform Fraudulent Transfer Act ("IUFTA") because Plaintiff fails to allege that they were knowing participants in Gouletas's alleged fraud. [32, at 2; 62, at 3-5.] Plaintiff challenges the transfers to Defendants Paul and Jones under Section 5(a)(1) of the IUFTA, which is the "fraud in fact" provision. "'Fraud in fact' occurs when a debtor makes a transfer 'with the intent to hinder, delay, or defraud creditors.'" *In re Spatz*, 222 B.R. 157, 160 (N.D. Ill. 1998) (quoting 740 ILCS 160/5(a)(1)). Although Defendants may be able to assert an affirmative defense under Section 9 of the IUFTA if they can establish that they acted in good faith and provided a reasonably equivalent value, *In re Zeigler*, 320 B.R. 362, 374 (Bankr. N.D. Ill. 2005) ("Courts have recognized that a defense under § 9 of the UFTA consists of two elements: good faith and reasonably equivalent value."), Plaintiff "need not anticipate and overcome affirmative defenses."[5] *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 492 (7th Cir. 2017) (quoting *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009)). Other than citing to general pleading standards for fraud claims, Defendants do not cite any cases indicating that a plaintiff must allege fraudulent intent on the part of the transferee in order to state

---

[5] Paul also argues that Plaintiff fails to satisfy Rule 9(b)'s heightened pleading standard with respect to the knowledge and/or intent of Paul. However, given that Plaintiff need not anticipate defenses at all, Plaintiff need not allege facts sufficient to satisfy Rule 9(b) with respect to that issue.

a claim under Section 5(a)(1). Defendant Paul does cite to *Alan Drey Co., Inc. v. Generation, Inc.*, 317 N.E.2d 673, 680 (Ill. App. Ct. 1974), but that case preceded the passage of the IUFTA in Illinois and therefore does not call into question cases recognizing that Section 9 of the IUFTA is a defense to a claim under Section 5(a). The Court therefore denies the motion to dismiss Plaintiff's Section 5(a)(1) claims for failure to allege fraudulent intent on the part of the transferees.

## C.     Fraudulent Intent of Debtor

Defendants Paul, Jones, and Touris move to dismiss Plaintiff's fraud in fact claims under Section 5(a)(1) of the IUFTA for failure to allege that Gouletas acted with the requisite fraudulent intent. As discussed above, "fraud in fact" under Section 5(a)(1) occurs when a debtor makes a transfer "with the intent to hinder, delay, or defraud creditors." *In re Spatz*, 222 B.R. at 160 (quoting 740 ILCS 160/5(a)(1)) (internal quotation marks omitted). Rule 9(b)'s heightened pleading standard applies to Section 5(a)(1) claims.[6] *RBS Citizens v. Gammonley*, 2013 WL 5753783, at *3 (N.D. Ill. Oct. 23, 2013). Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

"In determining whether a transfer is made with actual intent to defraud, the [IUFTA] sets forth several factors—also known as the 'badges of fraud'—from which an inference of fraudulent intent may be drawn." *In re Zeigler*, 320 B.R. at 373. These factors include whether "(1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before

---

[6] Although Plaintiff argues that Rule 9(b) does not apply to claims brought under Section 5(a)(c), The cases cited by Plaintiff do not support that assertion. For example, Plaintiff cites to *Mamacita, Inc. v. Colborne Acquisition Co., LLC*, 2011 WL 881654, at *7 (N.D. Ill. Mar. 11, 2011), which indicated that the pleading standard set forth in *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074 (7th Cir.1997), applied to claims brought under the IUFTA. Because *General Electric* preceded *Twombly* and *Iqbal*, its discussion of the relevant pleading standard is of limited persuasiveness. Regardless, *General Electric* actually did apply Rule 9(b) to a claim brought under the IUFTA.

the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." 740 Ill. Comp. Stat. Ann. 160/5(b).

"The badges are not additive and do not have equal weight, nor is there a set number which must be present to demonstrate fraud." *In re Ruvalcaba*, 2018 WL 2317682, at *7 (Bankr. N.D. Ill. May 17, 2018) (citing *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 419 F.3d 594, 600 (7th Cir. 2005)). "The intent to defraud 'will be found if the circumstances indicate that the main or only purpose of the transfer was to prevent a lawful creditor from collecting a debt.'" *Radio One, Inc. v. Direct Media Power, Inc.*, 2018 WL 4685470, at *6 (N.D. Ill. Sept. 28, 2018) (quoting *King v. Ionization Int'l, Inc.*, 825 F.2d 1180, 1186 (7th Cir. 1987)). Defendants Paul, Jones, and Touris have moved to dismiss Plaintiff's Section 5(a) claims for failure sufficiently to allege enough badges of fraud to plausibly raise an inference of fraud.

i.      *Paul*

In his Reply, Paul argues that Plaintiff fails sufficiently to allege that Gouletas acted with fraudulent intent in relation to his transfer to Paul. Although Paul raised this argument for the first time in his reply, Plaintiff preemptively addressed the argument in his response brief. The Court therefore will address the argument now. The Court agrees that Plaintiff has not sufficiently alleged that Gouletas acted with fraudulent intent in relation to the transfer to Paul. As noted by

Defendants, allegations of fraud must be plead with particularity. The only allegations in the amended complaint relating to Paul or any transfer to Paul are (1) that Paul is a citizen of the State of California who engaged in the wrongful conduct within the State of Illinois [11, at ¶ 6.7]; and (2) that he is liable to Plaintiff for a $110,000 transfer on January 21, 2015 [*id.* at ¶¶ 60(e), 83(d)].

Plaintiff argues that he has alleged each badge of fraud. However, he does not do so with respect to Paul and the challenged transfer to Paul. For example, although Plaintiff alleges that there were a number of transfers to insiders, Plaintiff does not allege that Paul was an insider. By way of another example, although Plaintiff alleges that Gouletas maintained possession and control over the money in Touris's checking accounts, Plaintiff does not allege that Gouletas maintained possession and control over the money transferred to Paul. Although Plaintiff alleges that Gouletas had been sued before the subject transfers to Paul and that Gouletas was insolvent or became insolvent shortly after the transfer was made, the specific factual allegations relating to Defendant Paul do not indicate that the main or only purpose of the transfer was to prevent a lawful creditor from collecting a debt. Accordingly, the Court grants Defendant Paul's motion to dismiss Plaintiff's fraudulent transfer claim (Count I) against him without prejudice.

  *ii.*  *Jones*

Plaintiff sufficiently has alleged that Gouletas acted with fraudulent intent in relation to the challenged transfers to Jones.[7] Although Plaintiff does not allege that Jones was an insider, Gouletas did retain control over the property transferred to Jones and was able to direct how Jones used the transferred property (*i.e.*, directing Jones to deposit $415,000 in Touris's account). Gouletas concealed that the money transferred to Jones was his by funneling the money through

---

[7] Plaintiff also has identified additional factual allegations regarding the transfers to Defendant Jones that Plaintiff contends he could add to any second amended complaint. If Plaintiff elects to file a second amended complaint, Plaintiff may do so.

800 SWP.[8]  Although Gouletas represented that the transfer to Jones was for a previous debt, Plaintiff alleges that was not true.  And Gouletas had been sued before the transfer to Jones. Finally, as discussed below, Gouletas was insolvent at the time of the alleged transfer.  Although Plaintiff has not alleged all of the relevant badges of fraud, making all reasonable inferences in Plaintiff's favor, Plaintiff has alleged enough badges of fraud to establish that Gouletas acted with the actual intent to hinder, delay, or defraud the creditors with respect to his transfers to Jones.

      *iii.*    *Touris*

Plaintiff also sufficiently alleges that Gouletas acted with fraudulent intent in relation to the challenged transfers to Touris.  The parties dispute whether Touris was an insider.[9]  However, Plaintiff sufficiently has alleged enough other badges of fraud irrespective of the insider factor to establish that Gouletas acted with the actual intent to hinder, delay, or defraud the creditors in relation to the challenged transfers to Touris.  As with the property transferred to Jones, Gouletas retained control over the property transferred to Touris and was able to direct how Touris used the transferred property (*e.g.*, to pay Gouletas's expenses, to pay Gouletas's son, etc.).  Gouletas

---

[8] Jones also argues that Plaintiff fails sufficiently to allege that Gouletas was the one who made the transfer to him, citing to his argument that Plaintiff's Section 6(a) claim should be dismissed for failure sufficiently to allege alter ego liability.  However, as discussed below, Jones has not met his burden—as the party moving for dismissal—of proving that no alter ego claim has been stated.  Jones is free to raise this argument again in any future dispositive motion.  However, if Jones chooses to do so, he should cite to the relevant legal standard for establishing alter ego liability.

[9] Plaintiff alleges that Touris is a "close and personal friend of Gouletas" for over 40 years who "acted as a 'managing agent' of Gouletas for the handling, use and distribution of his funds[.]"  [11, at ¶¶ 6, 57.]  Touris argues that these allegations are insufficient to establish that she was an "insider" as defined in the IUFTA. The IUFTA defines "insider" to include "a managing agent of the debtor."  740 Ill. Comp. Stat. Ann. 160/2(g)(5).  Touris argues that such a relationship only can exist in the formal corporate or partnership context.  However, Touris does not cite to any cases discussing what it means to be an "insider" under the IUFTA.  The definition of the term "insider" under the IUFTA does include categories of parties that qualify as insiders depending on whether the debtor is "an individual," "a corporation," or "a partnership."  740 Ill. Comp. Stat. Ann. 160/2(g)(1), (2), (3).  But there is no indication that "a managing agent" only can be an insider for one of those types of debtors.  The Court need not decide the issue, however, as Plaintiff has alleged other badges of fraud sufficient to establish that Gouletas acted with the actual intent to hinder, delay, or defraud the creditors with respect to his transfers to Touris.

concealed that the money transferred to Touris was his bye funneling the money through other parties (*i.e.*, 800 SWP and Jones). Gouletas had been sued before the transfers to Touris. And Gouletas was insolvent at the time of the alleged transfers. Although Plaintiff has not alleged all of the relevant badges of fraud, making all reasonable inferences in Plaintiff's favor, Plaintiff has alleged enough badges of fraud to establish that Gouletas acted with the actual intent to hinder, delay, or defraud the creditors with respect to his transfers to Touris.

### C.  SECTION 6(a) CLAIM

Defendants Touris and Jones also move to dismiss Plaintiff's Section 6(a) claim for failure to state a claim. "The elements of a cause of action under § 6(a) of the [IUFTA] are: (1) a transfer was made by the debtor; (2) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transferred property; and (3) the debtor either was insolvent at the time of the transfer or became insolvent as a result of the transfer." *In re Zeigler*, 320 B.R. at 375 (citations omitted). The IUFTA provides that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 ILCS 160/3(a). The IUFTA further provides that "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent." 740 ILCS 160/3(b). Jones concedes that Plaintiff sufficiently has alleged the third element, but argues that Plaintiff fails sufficiently to allege the first and second elements of its Section 6(a) claim. Although Jones concedes that Plaintiff sufficiently has alleged the third element, Touris argues that Plaintiff fails sufficiently to allege that Gouletas was insolvent at the time of the transfers to her or that Gouletas became insolvent as a result of those transfers.

With respect to the first element, Jones argues that Plaintiff cannot establish that Gouletas made the transfer to him because Plaintiff has not sufficiently alleged that 800 SWP—which received the funds from the sale of the Parking Lot—was the alter ego of Gouletas. However,

Jones fails to cite to any cases indicating what allegations are necessary to establish alter ego liability at the motion to dismiss stage (or what is necessary to establish alter ego liability at any stage).[10] "It is not the obligation of this court to research and construct the legal arguments open to the parties, especially when they are represented by counsel." *United States v. Kinzer*, 13 F. App'x 399, 402 (7th Cir. 2001) (quoting *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. 1986)) (internal quotation marks omitted). Plaintiff alleges that 800 SWP was owned and controlled by Gouletas and that Gouletas used it as a vehicle to conduct his personal affairs. [11, at ¶ 6.5.] Plaintiff further alleges that Gouletas was able to divert funds from 800 SWP ultimately to be used by Gouletas. Although Plaintiff does not allege that Gouletas himself transferred funds to Jones, the IUFTA does not require a direct transfer. The IUFTA defines "transfer" as meaning "every mode, *direct or indirect*, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." 740 Ill. Comp. Stat. Ann. 160/2(l) (emphasis added); see also *Gregg v. SR Inv'rs, Ltd.*, 966 F. Supp. 746, 750 (N.D. Ill. 1997) (recognizing that an asset can be transferred indirectly). Without any case law supporting Jones's argument that Plaintiff has not sufficiently alleged an indirect transfer, the Court denies Defendant Jones's motion to dismiss Plaintiff's Section 6(a) claim on that basis.

Still, Plaintiff fails sufficiently to allege that the debtor (*i.e.*, Gouletas) made the transfer to Jones without receiving a reasonably equivalent value in exchange for the transferred property. Although Plaintiff alleges that "Gouletas made the Cash Transfers without receiving a reasonably equivalent value in exchange for the transfers[,]" [11 at ¶ 79], such conclusory allegations are

---

[10]Jones faults Plaintiff for not adequately responding to his argument that Plaintiff has not sufficiently alleged alter ego liability. However, "[t]he party moving for dismissal bears the burden of proving that no claim has been stated." *One World Techs., Ltd. v. Robert Bosch Tool Corp.*, 2004 WL 1576696, at *1 (N.D. Ill. July 13, 2004).

insufficient to survive a motion to dismiss. "The Seventh Circuit has held that, in order to evaluate whether a transfer is fraudulent under the IUFTA, a court should 'determine the value of what was transferred and * * * compare it to what was received.'" *Id.* (quoting *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 947 (7th Cir. 2007)). Without more factual allegations from Plaintiff, the Court is unable to engage in such an analysis. To the extent that Plaintiff contends that the challenged transfers were provided in exchange for nothing, Plaintiff should so allege. Because Plaintiff has not done so, however, the Court grants Defendant Jones's motion to dismiss Plaintiff's Section 6(a) claim against him without prejudice.

That leaves Defendant Touris's argument that Plaintiff fails sufficiently to allege that Gouletas was insolvent at the time of the transfers to her or that he became insolvent as a result of the transfers to her. Under the IUFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 Ill. Comp. Stat. Ann. 160/3(a). Furthermore, under the IUFTA, "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent." 740 Ill. Comp. Stat. Ann. 160/3(b). Generally, insolvency is a fact-intensive intensive not properly resolved on a motion to dismiss.[11] *In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 858 (Bankr. D. Del. 2018).

Plaintiff alleges that—before the challenged transfers were made—"Gouletas had been sued and threatened with further suits, numerous judgments had been entered against him, and [he] was insolvent."[12] [11, at ¶ 23.] Furthermore, attached to Plaintiff's amended complaint is a

---

[11] Indeed, it is notable that Touris does not cite to any cases granting a motion to dismiss for failure sufficiently to allege insolvency under the IUFTA.

[12] Touris argues that the February 28, 2014 balance sheet cannot trump inconsistent facts in the amended complaint. Specifically, Touris argues that the negative net worth of $(12,132,646) reflected on the February 28, 2014 balance sheet is inconsistent with Plaintiff's allegation that Gouletas had a positive net worth of $25,287,560 as of March 31, 2013, as reflected on a balance sheet signed by Gouletas. However, Plaintiff explains part of that substantial decrease in net worth—the over $12,000,000 judgments against

balance sheet purporting to represent the Gouletas's net worth as of February 28, 2014, indicating that Gouletas had a negative net worth of $(12,132,646).[13] [11-1, at 54-55.] Touris argues that the Court should not consider the exhibit because it is cited in the amended complaint in reference to Gouletas's representation regarding the value of the Parking Lot and any related indebtedness. However, under Rule 10(c), "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Accordingly, the Court can consider the exhibit in ruling on Touris's motion to dismiss.

Touris also challenges the import of the February 28, 2014 balance sheet. Specifically, Touris argues that the fact that Gouletas was insolvent on February 28, 2014 does not mean that Gouletas was insolvent when he made the challenged transfers to Touris in 2015. Although the Court recognizes that possibility, drawing all reasonable inferences in Plaintiff's favor, Plaintiff sufficiently has alleged that Gouletas was insolvent at the time he made the challenged transfers to Touris. Plaintiff alleges that Gouletas became insolvent before the challenged transfers. [11, at ¶ 23.] The February 28, 2014 balance sheet indicating that Gouletas had a negative net worth of $(12,132,646) supports that assertion. [11-1, at 54-55.] Although it is possible that Gouletas was able to again become solvent by 2015, the Court finds that unlikely given his January 16, 2017

---

Gouletas. Regardless, there are numerous explanations as to why Gouletas's net worth decreased. For example, the amended complaint references anticipated real estate deals. Perhaps a substantial real estate deal fell through, causing a substantial decrease in Gouletas's net worth. Touris further can explore this issue through discovery.

[13] Plaintiff also alleges that, "from October of 2008 to the present, Gouletas was generally not paying all of his debts as they became due, forcing his unfavored creditors to either abandon their claims, or seek collection of those debts through the judicial system." [*Id.* at ¶ 9.] Plaintiff argues that this allegation is sufficient to invoke the presumption that a debtor is insolvent found in 740 Ill. Comp. Stat. Ann. 160/3(b). Although that provision provides that "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent," it is not clear to the Court that the presumption still would apply even though the amended complaint also alleges that the debtor "had a substantial net worth" during the same time period. [11, at ¶ 9.] Still, Plaintiff otherwise has alleged that Gouletas was insolvent at the time of the challenged transfers.

bankruptcy filing. In light of these facts—and Plaintiff's allegations that Gouletas was hiding assets through the alleged schemes through the time he filed for bankruptcy—it is reasonable to infer that Gouletas remained insolvent from February 28, 2014 until he filed for bankruptcy. And because insolvency is a fact-intensive issue not properly resolved on a motion to dismiss, the Court concludes that Plaintiff sufficiently has alleged that Gouletas was insolvent at the time of the challenged transfers. The Court therefore denies Touris's motion to dismiss Plaintiff's Section 6(a) claim for failure sufficiently to allege insolvency.

## D. AIDING AND ABETTING FRAUD

Defendant Touris moves for dismissal of Plaintiff's aiding and abetting fraud claim against her. "Under Illinois law, to state a claim for aiding and abetting, one must allege (1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant was aware of his role when he provided the assistance, and (3) the defendant knowingly and substantially assisted the violation." *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (citing *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. 2003)). Touris argues that Plaintiff fails sufficiently to allege that Touris acted with the requisite knowledge and intent. The Court disagrees. Plaintiff alleges that Touris (and 800 SWP, HBI, and Does 1-10) "were aware of their roles in" Gouletas's scheme. Although this allegation recites the second element of Plaintiff's aiding and abetting claim, as discussed above, "[m]alice, intent, knowledge, and other conditions of a person's mind" can be alleged generally. Fed. R. Civ. P. 9(b). Furthermore, Plaintiff alleges that Touris allowed hundreds of thousands of dollars to be deposited into her checking accounts for payment of a friend's expenses. It is unclear how such conduct is consistent with lawful conduct on the part of Gouletas. Under such circumstances, it is reasonable to infer that Touris

knew of her role in Gouletas's scheme when she provided the assistance. The Court therefore denies Touris's motion to dismiss Plaintiff's aiding and abetting claim against her.

### E.   CIVIL CONSPIRACY

Defendant Touris also moves for dismissal of Plaintiff's civil conspiracy claim against her. "Under Illinois law the elements of a civil conspiracy are (1) a combination of two or more persons (2) for the purpose of accomplishing, by some concerted action, either an unlawful purpose or a lawful purpose by unlawful means, (3) in furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Martinez v. Freedom Mortg. Team, Inc.*, 527 F. Supp. 2d 827, 839 (N.D. Ill. 2007) (citing *Fritz v. Johnston,* 807 N.E.2d 461, 470 (Ill. 2004)). "Civil conspiracy is an intentional tort and requires proof that a defendant 'knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner.'" *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (citing *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888 (Ill. 1994)). "Accidental, inadvertent, or negligent participation in a common scheme does not amount to conspiracy." *Id*. (citation omitted).

Touris argues that Plaintiff fails sufficiently to allege the first two elements of its civil conspiracy claim. With respect to the first element—the existence of an agreement or combination of two or more persons—Plaintiff alleges that Touris agreed to pay Gouletas's expenses at his direction with money he had deposited into her checking accounts. These allegations are sufficient to establish the combination between Gouletas and Touris.

With respect to the second element—the intent to accomplish an unlawful purpose or a lawful purpose by unlawful means—Plaintiff alleges that Touris "knew, must have known, or should have known that numerous judgments had been entered against Gouletas[.]" [11, at ¶ 59.] This allegation leaves open the possibility that Touris did not know about the numerous judgments

entered against Gouletas, and Plaintiff does not allege facts from which the Court could infer that Touris should have known about the numerous judgments that had been entered against Gouletas. Still, Plaintiff alleges facts from which the Court can infer that Touris acted with the requisite intent. "A conspiracy, by nature, is secretive, and therefore the agreement is rarely established by direct proof." *Farwell v. Senior Servs. Assocs., Inc.,* 970 N.E.2d 49, 58 (Ill. App. Ct. 2012). "It is usually established 'from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances.'" *In re Hearthside Baking Co., Inc.*, 402 B.R. 233, 251-52 (Bankr. N.D. Ill. 2009) (quoting *Adcock*, 645 N.E.2d at 895). As discussed above, it is reasonable to infer that Touris was aware that Gouletas's was engaging in illicit behavior when Gouletas asked Touris to allow him to deposit hundreds of thousands of dollars into her checking accounts to pay his expenses. It is unclear how such conduct is consistent with lawful conduct on the part of Gouletas. Thus, Touris's actions do not simply amount to accidental, inadvertent, or negligent participation in a common scheme. Furthermore, even though civil conspiracy claims are subject to Rule 9(b)'s heightened pleading standard, "[m]alice, intent, knowledge, and other conditions of a person's mind" can be alleged generally. Fed. R. Civ. P. 9(b). Because Plaintiff sufficiently has alleged that Touris acted knowingly and voluntarily, the Court denies Touris's motion to dismiss Plaintiff's civil conspiracy claim against her.

### F. TORTIOUS INTERFERENCE

Defendant Touris also moves for dismissal of Plaintiff's tortious interference with a prospective economic advantage claim against her.[14] "To succeed in an action for tortious

---

[14] Count VII of the amended complaint is titled "Tortious Interference With Expectancy of Collection Upon Judgments Against Gouletas." [11, at 33.] Touris characterized Plaintiff's claim as a claim for tortious interference with a prospective economic advantage. Defendant does not contest this characterization.

interference with prospective economic advantage under Illinois law, the plaintiff must prove: (1) the plaintiff's reasonable expectation of a future business relationship; (2) the defendant's knowledge of that expectation; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectations from ripening; and (4) damages." *Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007) (citing *Fellhauer v. City of Geneva,* 568 N.E.2d 870, 877-78 (Ill. 1991)). Touris argues that Plaintiff fails to allege that (1) Touris had knowledge of any judgments or citations against Gouletas and (2) that Touris purposefully interfered with a legitimate expectation to collect judgments of which she was not even aware.[15] [80, at 18-19.] In response, Plaintiff fails to point to any factual allegations establishing that Touris had knowledge of any judgments or citations against Gouletas. Accordingly, Plaintiff's tortious interference claim against Defendant Touris is dismissed without prejudice.

## G.    MISCELLANEOUS ARGUMENTS

Defendants make a number of miscellaneous arguments that can be addressed briefly. First, Defendant Jones moves for dismissal of Plaintiff's amended complaint under Rule 12(e), which allows the Court to order a more definitive statement when a complaint is "so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). "Rule 12(e) motions are 'generally disfavored.'" *Thakkar v. Ocwen Loan Servicing, LLC*, 2017 WL 3895596, at *7 (N.D. Ill. Sept. 6, 2017) (quoting *Direct Commc'ns, Inc. v. Horizon Retail Constr., Inc.*, 387 F. Supp. 2d 828, 833 (N.D. Ill. 2005)). "Such a motion will only be granted 'if the complaint is so unintelligible that the defendant cannot draft responsive pleading.'" *Id.* (quoting *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915 (N.D. Ill. 2016)).

---

[15] It is unclear to the Court whether Touris contends that Rule 9(b)'s heightened pleading standard applies to Plaintiff's tortious interference claim. Regardless, Plaintiff has not even alleged sufficient facts to satisfy Rule 8's notice pleading requirements.

Defendant Jones argues that dismissal under Rule 12(e) is appropriate because he is unable to determine which specific counts are directed against which defendants. [62, at 12-13.] However, Defendant Jones already has answered the complaint and correctly determined which claims Plaintiff seeks to bring against him. [See 64.] Other Defendants similarly have been able to answer the amended complaint. Because the amended complaint is sufficiently intelligible for Defendants to draft responsive pleadings, the Court denies Defendant Jones's motion under Rule 12(e).

Second, in his reply, Defendant Paul argues that payment of an antecedent debt is not a fraudulent transfer. [73, at 1-2.] Because Paul raised the argument for the first time in his reply brief, the argument is waived. *West v. MeadWestvaco Corp.*, 81 F. App'x 74, 75 (7th Cir. 2003) ("[A]rguments presented for the first time in a reply brief are waived." (citation omitted)). Furthermore, the amended complaint indicates that the transfer to Paul falsely was characterized as a loan and was not for a payment of an antecedent debt. Thus, the argument also fails as a factual matter.

Third, Defendant Touris asks that the Court strike Plaintiff's request for attorney's fees from its general prayer for relief, noting that attorneys' fees are not recoverable under the IUFTA. Because Plaintiff stipulates that it is not seeking attorneys' fees under the IUFTA, no further action is necessary.

Fourth, numerous Defendants argue generally that Plaintiff fails to satisfy Rule 9(b)'s heightened pleading standards. The Court has addressed those arguments when raised in connection with Defendants' arguments for dismissal of specific claims. To the extent that Defendants argue that the amended complaint fails to satisfy Rule 9 without reference to any specific element of a claim, however, Defendants' argument does not warrant any further

discussion. Rule 9 sets forth the pleading standard that applies to certain elements of certain claims. It is not a stand-alone pleading requirement.

Finally, Defendant George Strat filed a motion to dismiss [46] indicating that he could not afford to hire an attorney. However, Strat did not identify any substantive basis for dismissing Plaintiff's claims against him. Accordingly, his motion to dismiss [46] is denied.

## IV.  Conclusion

For the reasons explained above, the motion to dismiss filed by Defendant James Paul [30] is granted; the motion to dismiss filed by Defendant George Strat [46] is denied; the motion to dismiss or, in the alternative, the motion for a more definite statement filed by Defendant Paul Jones [61] is granted in part and denied in part; the motion to dismiss filed by Defendant Natel Matschulat [68] is denied; and the motion to dismiss filed by Defendant Dorothea Touris [79] is granted in part and denied in part. Plaintiff is given until April 19, 2019 to file a second amended complaint. This case is set for further status hearing set for April 24, 2019 at 9:00 a.m.

Dated: March 19, 2019

Robert M. Dow, Jr.
United States District Judge