## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| D.A.N. JOINT VENTURE III, L.P., <br> as Assignee of Bankruptcy Trustee <br> Richard M. Fogel, the Chapter 7 Trustee <br> for the Bankruptcy Estate of Debtor <br> Nicholas S. Gouletas, <br><br>         Plaintiff, <br><br> vs. <br><br> DOROTHEA TOURIS; STEVEN E. <br> GOULETAS; NATEL MATSCHULAT; <br> PAUL JONES; JAMES PAUL; <br> STUART T. ADLER, Individually and as <br> Trustee of the Stuart T. Adler Revocable <br> Family Trust; GEORGE STRAY; <br> GEORGE SPANOS; WARADY & <br> DAVIS LLP; BEERMANN PRITIKIN <br> MIRABELLI SWERDLOVE LLP; <br> IRENE GOULETAS; DESIREE <br> WITTE; VICTORIA M. GOULETAS; <br> ROSALIE GOULETAS; LOUIS <br> GOULETAS; MICHAEL GOULETAS; <br> and BRITTANY GOULETAS, <br><br>         Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | No. 1:18-cv-00349 |

## <u>SECOND AMENDED COMPLAINT AND JURY DEMAND</u>

F. Dean Armstrong
ARMSTRONG LAW FIRM, P.C.
23353 S. 88th Avenue
Frankfort, IL 60423
815/464-3243
Fax: 815/464-3449
armstronglaw@sbcglobal.net

**Attorney for Plaintiff**
**D.A.N. Joint Venture III, L.P.**

## <u>TABLE OF CONTENTS</u>

**Page**

**Summary Of The Suit**…………………………………………………………………1

**Jurisdiction And Venue**……………………………………………………………..2

**Parties**………………………………………………………………….....................3

     Plaintiff.……………………………………………………………….............3

     Defendants.…………………………………………………………………4

**Facts**………………………………………………………………………………5

     A.     Background.…………………………………………………………5

     B.     Numerous Judgments Are Entered Against Gouletas………………………6

     C.     Citation Liens Are Entered Against Gouletas Prohibiting Gouletas From Transferring His Assets…………………………………………7

     D.     In Violation Of The Citation Lien, Gouletas Obtained And Cashed Numerous Cashier's Checks Issued To Himself…………………………8

     E.     The Touris Checking Account Scheme…………………………………9

     F.     The Garvey Court Scheme…………………………………………13

     G.     The Matschulat-CIB Stock Scheme……………………………………14

     H.     The HBI-Parking Lot Scheme…………………………………………15

     I.     The Contempt Proceedings Against Gouletas…………………………...23

     J.     The Bankruptcy Trustee Assigns The Litigation Claims And Alter-Ego Claims To DJV…………………………………......................24

**Count One** (Avoidance Of Fraudulent Transfers Pursuant To 740 ILCS 160/5(a)(1)).………………………………………………......................25

**Count Two** (Avoidance Of Fraudulent Transfers Pursuant To 740 ILCS 160/5(a)(1) -- Garvey Court Transfers)……………………………………29

## <u>TABLE OF CONTENTS</u>

**Page**

**Count Three** (Avoidance Of Fraudulent Transfers Pursuant To
740 ILCS 160/6(a) -- Garvey Court Transfers)……………………………………………………31

**Count Four** (Avoidance Of Fraudulent Transfers Pursuant
to 740 ILCS 160/6(a) -- Cash Transfers) …………………………………………………… 32

**Count Five** (Civil Conspiracy To Commit Fraud)………………………………………………34

**Count Six** (Aiding And Abetting Fraud)…………………………………………………………...35

**Count Seven** (Refund Of Funds Owed By W&D To The
Bankruptcy Trustee)…………………………………………………………………………36

**Count Eight** (Reimbursement Of Funds Owed To Gouletas Prior
To The Time That He Filed For Bankruptcy)…………………………………………………36

**PRAYER**………………………………………………………………………………...37

**JURY DEMAND**………………………………………………………………......................37

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| D.A.N. JOINT VENTURE III, L.P., | ) | |
| as Assignee of Bankruptcy Trustee | ) | |
| Richard M. Fogel, the Chapter 7 Trustee | ) | |
| for the Bankruptcy Estate of Debtor | ) | |
| Nicholas S. Gouletas, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | No. 1:18-cv-00349 |
| | ) | |
| DOROTHEA TOURIS; STEVEN E. | ) | |
| GOULETAS; NATEL MATSCHULAT; | ) | |
| PAUL JONES; JAMES PAUL; | ) | |
| STUART T. ADLER, Individually and as | ) | |
| Trustee of the Stuart T. Adler Revocable | ) | |
| Family Trust; GEORGE STRAY; | ) | |
| GEORGE SPANOS; WARADY & | ) | |
| DAVIS LLP; BEERMANN PRITIKIN | ) | |
| MIRABELLI SWERDLOVE LLP; | ) | |
| IRENE GOULETAS; DESIREE | ) | |
| WITTE; VICTORIA M. GOULETAS; | ) | |
| ROSALIE GOULETAS; LOUIS | ) | |
| GOULETAS; MICHAEL GOULETAS; | ) | |
| and BRITTANY GOULETAS, | ) | |
| | ) | |
| **Defendants.** | ) | |

## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiff complains of Defendants as follows:

## Summary Of The Suit

1.     In this fraudulent transfer suit, the Debtor, Nicholas S. Gouletas ("Gouletas"), with

the knowing and substantial assistance of a number of the Defendants named herein, engaged in a

complicated scheme to hide, transfer and otherwise shield Gouletas's assets from the claims of

certain of his unfavored judgment creditors. And while Gouletas was implementing his fraudulent

transfer scheme, he selectively transferred over $2,000,000 in cash and his other assets to his

friends, relatives and a select group of creditors, all in violation of state court citation liens which prohibited Gouletas from transferring his assets. On the eve of being held in contempt for violation of one such citation lien, Gouletas sought the sanctuary of bankruptcy through a Chapter 7 bankruptcy filing.

2.      While Gouletas's bankruptcy filing prohibited further collection efforts against Gouletas directly, it does not prohibit fraudulent transfer actions against those to whom Gouletas transferred his assets in derogation of the rights of his other creditors, and in violation of the state court citation liens. This is an action to void Gouletas's fraudulent transfers pursuant to the provisions of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* (the "IUFTA"), and to recover damages from those who conspired with Gouletas in the design, implementation and execution of Gouletas's fraudulent transfer schemes. *See Paloian v. Greenfield (In re Rest. Dev. Group, Inc.)*, 397 B.R. 891, 896-98 (Bankr. N.D. Ill. 2008).

## Jurisdiction And Venue

3.      This Court has jurisdiction under 28 U.S.C. §1334. In addition, this Court has diversity jurisdiction under 28 U.S.C. §1332 because (a) this action is between citizens of different States with the amount in controversy exceeding $75,000, and (b) the assignment of the claims to Plaintiff as asserted herein was not made collusively for the purpose of conferring diversity jurisdiction upon this Court.

4.      Venue is appropriate in this Court pursuant to 28 U.S.C. §§1408 and 1409(a). In addition, pursuant to 28 U.S.C. §1391(b)(2), venue is appropriate in this Court because a substantial portion of the events giving rise to the claims asserted herein occurred in this Judicial District.

## Parties

5. **Plaintiff**.

5.1.    Plaintiff D.A.N. Joint Venture III, L.P. ("DJV") is an Ohio limited partnership with its principal place of business in Newton Falls, Ohio. The general partner of DJV is The Cadle Company, an Ohio corporation with its principal place of business in Newton Falls, Ohio. The limited partners of DJV are Daniel C. Cadle and his wife, Ruth Cadle, both of whom are citizens of the State of Ohio.

5.2.    Plaintiff's claims herein are asserted as assignee of Bankruptcy Trustee Richard M. Fogel ("Bankruptcy Trustee"), who is the Bankruptcy Trustee for the Chapter 7 Bankruptcy Estate of Nicholas S. Gouletas, Debtor, which is pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, *In re Nicholas S. Gouletas, Debtor*, No. 16-01335. Pursuant to 11 U.S.C. §544(b)(1), the Bankruptcy Trustee, and thus Plaintiff as assignee, has standing to invoke the provisions of the IUFTA to set aside the fraudulent transfers made by the Debtor, Gouletas. *See In re Xonics Photochemical*, 841 F.2d 198, 202 (7th Cir. 1988).

5.3.    In the event it is determined that the Bankruptcy Court's August 18, 2017 Order (Px 27) authorizing the Trustee's assignment of fraudulent transfer claims to Plaintiff is subject to collateral attack, and thereafter it is determined that the Trustee lacked authority to assign his state-law fraudulent transfer claims to Plaintiff, Plaintiff's claims herein are asserted in the alternative as the assignee of the fraudulent transfer claims held by judgment creditor 800 South Wells Commercial, LLC ("800 SWC") which, on January 23, 2014, obtained a Final Judgment against Gouletas in the amount of $11,550,040.12 (the "800 SWC Judgment").

6.    **Defendants.**

6.1.    Defendant Dorothea Touris ("Touris") is a citizen of the State of Illinois and a close personal friend of Gouletas who conspired with Gouletas to place $826,218.84 of his funds in her checking accounts for the purpose of allowing Gouletas to continue his lavish lifestyle, but all the while evading the state court citation liens prohibiting Gouletas from transferring his assets.

6.2.    Defendant Steven E. Gouletas is a citizen of the State of Illinois and the son of Gouletas.

6.3.    Defendant Natel Matschulat is a citizen of the State of Illinois and the wife of Gouletas.

6.4.    Defendant Paul Jones is a citizen of the State of Illinois.

6.5.    Defendant James Paul is a citizen of the State of California who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.6.    Defendant Stuart T. Adler is a citizen of the State of Illinois and the Trustee of the Stuart T. Adler Revocable Family Trust, an Illinois trust (collectively, "Adler").

6.7.    Defendant George Stray is a citizen of the State of North Carolina who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.8.    Defendant George Spanos is a citizen of the State of Illinois.

6.9.    Defendant Warady & Davis LLP ("W&D") is an Illinois limited liability partnership with its principal place of business in Chicago, Illinois. None of the partners of W&D is a citizen of the State of Ohio.

6.10.    Defendant Beermann Pritikin Mirabelli Swerdlove LLP ("BPMS") is an Illinois limited liability partnership engaged in the practice of law with its principal place of business in Chicago, Illinois. None of the partners of BPMS is a citizen of the State of Ohio.

4

6.11.   Defendant Irene Gouletas is a citizen of Illinois and the sister of Gouletas.

6.12.   Defendant Desiree Witte is a citizen of Illinois and the daughter of Gouletas.

6.13.   Defendant Victoria M. Gouletas is a citizen of Connecticut and the daughter of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.14.   Defendant Rosalie Gouletas is a citizen of New Mexico and the daughter of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.15.   Defendant Louis Gouletas is a citizen of Illinois and the grandson of Gouletas.

6.16.   Defendant Michael Gouletas is a citizen of California and the grandson of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.17.   Defendant Brittany Gouletas is a citizen of Illinois and the granddaughter of Gouletas.

**Facts**

A.   **Background.**

7.   The Debtor, Nicholas S. Gouletas ("Gouletas"), is the owner and control person of a large group of companies generally referred to as "American Invsco" which, for the last 49 years, were involved in condominium conversions and various other real estate developments in more than 40 cities throughout the United States. Gouletas routinely refers to himself as the "Condominium Conversion King".

8.   In a financial statement signed by Gouletas in the Spring of 2013, Gouletas represented that, as of March 31, 2013, he had a net worth of $25,287,560, with "cash" in the amount of $240,000. (Px 1) Thereafter, in a letter that Gouletas sent to Chicago Mayor Rahm Emanuel on January 13, 2014, Gouletas represented that "a real estate investor from London [is]

5

in negotiations with us, American Invsco, to purchase a third tower on land we own at 801 S. Wells, for an additional $65 million." (Px 2)

9.     Even though Gouletas, in mid-2013, had a substantial net worth and was flush with cash, Gouletas would routinely pay only a select group of his creditors, while doing everything within his power to stiff the remainder of his unfavored creditors. Indeed, from mid-2013 to the present, Gouletas was generally not paying all of his debts as they became due, and was thereby forcing his unfavored creditors to either abandon their claims, or seek collection of those debts through the judicial system.

**B.     Numerous Judgments Are Entered Against Gouletas**

10.     Gouletas was the manager of 800 South Wells Commercial, LLC ("800 SWC"), which owned certain commercial space at the River City Complex located at 800 South Wells Street in Chicago. Gouletas hired one of his companies, Invsco Management Company ("Invsco"), to manage the River City Complex commercial space in exchange for management fees paid by 800 SWC to Gouletas's company, Invsco.

11.     On March 17, 2011, 800 SWC filed suit against Gouletas in the Circuit Court of Cook County, Illinois, No. 2011-L-2895, for self-dealing and breaching fiduciary duties owed to 800 SWC (the "800 SWC Suit"). Gouletas was represented by counsel in connection with the 800 SWC Suit, and actively participated in pretrial proceedings.

12.     On August 9, 2013, Gouletas was sued by Karl T. Muth ("Muth"), one of the investors in a Gouletas condominium conversion project, in the Circuit Court of Cook County, Illinois, No. 2013-L-8995, for sums allegedly owed by Gouletas in connection with the investment (the "Muth Suit"). Thereafter, on December 11, 2013, a final judgment was entered in the amount of $761,352.27 against Gouletas (the "Muth Judgment").

13.     On August 20, 2013, Gouletas was sued by Humberto Alfonso ("Alfonso"), another investor in a Gouletas condominium conversion project, in the Circuit Court of Cook County, Illinois, No. 2013-L-9345, for sums allegedly owed by Gouletas in connection with the investment (the "Alfonso Suit"). Thereafter, on December 11, 2013, a final judgment was entered in the amount of $454,037.93 against Gouletas (the "Alfonso Judgment").

14.     In the 800 SWC Suit, Gouletas steadfastly refused to sit for his deposition. Because of Gouletas's pattern of discovery abuse, on December 5, 2013, 800 SWC filed a Motion for Sanctions against Gouletas, which was granted by the Court on December 11, 2013. After Gouletas, once again, failed to sit for his deposition, on January 23, 2014 the Court in the 800 SWC Suit entered a final judgment against Gouletas in the amount of $11,550,040.12 (the "800 SWC Judgment").

15.     Although Gouletas, through counsel at BPMS, appealed the 800 SWC Judgment, filed a Petition under Section 2-1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1401) to set aside the 800 SWC Judgment, and then appealed the trial court's denial of Gouletas's 2-1401 Petition, Gouletas was not successful in setting aside the 800 SWC Judgment.

**C.      Citation Liens Are Entered Against Gouletas Prohibiting Gouletas From Transferring His Assets**

16.     On December 19, 2013, Citations to Discover Assets were issued against Gouletas in the Muth Suit and the Alfonso Suit, which were served upon Gouletas shortly thereafter. Gouletas was represented by Howard Teplinsky, Esq. from Defendant BPMS in connection with the Muth and Alfonso citation proceedings. Accordingly, as of the end of December, 2013, Mr. Teplinsky knew that Gouletas was prohibited from transferring his assets by virtue of the Citations issued in the Muth and Alfonso Suits. *See* 735 ILCS 5/2-1402(m); *Marcus-Rehtmeyer v. Jacobs*, 784 F.3d 430, 438-39 (7th Cir. 2015).

7

17.     Due to Gouletas's failure to pay the amount owed under the 800 SWC Judgment, on June 5, 2014, 800 SWC filed a Citation to Discover Assets against Gouletas (Px 3) (the "Citation") in connection with the 800 SWC Suit (the "Citation Proceedings"). The Citation was served on Gouletas on June 9, 2014. At all times during the Citation Proceedings, Gouletas was represented by Mr. Teplinsky from BPMS.

18.     In the Citation, Gouletas was specifically instructed that:

> **YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of . . . any property not exempt from execution . . . belonging to the judgment debtor [Gouletas] <u>or</u> <u>to</u> <u>which</u> <u>the</u> <u>judgment</u> debtor <u>may</u> <u>be</u> <u>entitled</u> or which may be acquired by or become due to the judgment debtor . . ., until further order of Court or termination of the proceedings.

Px 3 p. 1 (underscoring added) (the "Citation Lien", and, with the Muth Citation and the Alfonso Citation, the "Citation Liens"). Gouletas and his counsel, Mr. Teplinsky, understood that when Gouletas was served with the Citation, he was not to transfer anything after receiving the Citation, and was "**PROHIBITED** from making or allowing any transfer or other disposition of . . . any [cash] to which [Gouletas] may be entitled or which may . . . become due to [Gouletas]." (*Id.*) Moreover, the Circuit Court Judge presiding over the Citation Proceedings, Judge Alexander White, specifically informed Gouletas, with Gouletas and Mr. Teplinsky present in open Court, that "[f]rom the time you received the citation [on June 9, 2014], all your assets were frozen . . .. [T]he citation language speaks for itself. It said you will not transfer any asset."

> **D.     In Violation Of The Citation Lien, Gouletas Obtained And Cashed Numerous Cashier's Checks Issued To Himself**

19.     In the 800 SWC Suit, the Citation was served upon Gouletas on June 9, 2014, which prohibited Gouletas from transferring any of his assets. In violation of the Citation Lien, Gouletas obtained and cashed numerous cashier's checks issued in his name:

(a)     On or about July 31, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,530.52 issued to himself (Px 4);

(b)     On or about August 1, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $10,000 issued to himself (Px 5);

(c)     On or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,500.00 issued to himself (Px 6); and

(d)     On or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $2,500.00 issued to himself (Px 7).

**E.     The Touris Checking Account Scheme**

20.     Apparently tired of the process of obtaining cashier's checks in his name, Gouletas then turned to a close personal friend, Defendant Touris, to assist him with a money laundering scheme that would allow Gouletas to maintain his lavish lifestyle, but all the while evade paying his unfavored judgment creditors, and skirt the judicial prohibitions against his transfer of assets imposed by the Citation Liens.

21.     Touris was a close personal friend of Gouletas for over 40 years. Moreover, Touris lived in the same condominium building as Gouletas at 111 East Chestnut Street in Chicago, having bought her condominium from one of Gouletas's entities after Gouletas developed that property into condominiums. Further, Touris was the director of design for Gouletas at American Invsco over the last 20 years.

22.     In January of 2015 (and after the Citation Liens were entered prohibiting Gouletas from transferring his assets), Gouletas, at a meeting with Mr. Teplinsky at Gouletas's office in Chicago, requested that Touris deposit Gouletas's funds into her checking accounts for the payment of Gouletas's expenses. Pursuant to Gouletas's plan, Touris would then take the funds that he had provided to her, put that money in her checking accounts, and then pay Gouletas's bills out of her checking accounts. The funds that Gouletas deposited into Touris's checking accounts belonged to

Gouletas. In essence, Touris acted as a managing agent of Gouletas for the handling and use of Gouletas's funds.

23. At the January 2015 meeting at Gouletas's office, Gouletas, at the direction of Mr. Teplinsky, presented Touris with a check in the amount of $396,218.84 drawn on the BPMS trust account. (Px 25) Touris understood that those funds belonged to Gouletas. Gouletas then told Touris that "I would like you [Touris] to deposit this [the $396,218.84 BPMS check] in your account. And I want you [Touris] to pay $195,000 to [Gouletas's son] Steven Gouletas and $50,000 to a gentleman [named George Spanos]", with the balance of $150,000 to be kept by Touris as a purported "reimbursement" on a Gouletas investment. Based on the context of what was discussed at this meeting, Touris knew, must have known, or should have known that she was being asked to handle Gouletas's funds in this manner because Gouletas, personally, was in a difficult financial situation, and was, with the guidance and assistance of Mr. Teplinsky, trying to hide, transfer and otherwise shield Gouletas's income from the claims of his unfavored judgment creditors.

24. Thereafter, on February 6, 2015 Touris wrote a check from her MB Bank checking account in the amount of $195,000 for a payment by Gouletas to his son, Steven E. Gouletas (Px 8), and a $50,000 payment to Gouletas's friend, George Spanos. (Px 9)

25. On February 17, 2015, Gouletas wire-transferred $15,730 into Touris's checking account at Chase Bank (the "Touris Chase Account"). (Px 10) The $15,730 was money that belonged to Gouletas. Gouletas, however, claims to have "no idea" where the $15,730 came from.

26. And then in March of 2015, Gouletas told Touris that an additional check for $415,000 was coming to her, which she was to deposit in her account for the payment of Gouletas's expenses. Touris then deposited the $415,000 check from Defendant Jones (Px 35) into her checking account at Chase Bank. (Px 11) According to Touris, she and Gouletas "talked about it

together and he [Gouletas] wanted the bills paid, so . . . he asked me [Touris], would you deposit this [$415,000 check from Defendant Jones, Px 35] in your account and pay the bills." Although Gouletas claimed that the $415,000 was a "loan" to him from Defendant Jones (but with the check made payable to Touris), he admitted that the $415,000 was his money. The total amount of Gouletas's funds that Gouletas deposited into the Touris Chase Account was in excess of $431,145.

27.     The account summaries for the Touris Chase Account (Px 12) pertain to the requests that Gouletas made about taking funds that Gouletas had put into Touris's Chase checking account, and that Touris then withdrew from her account at Gouletas's request, all during the time that Gouletas was prohibited from transferring his cash pursuant to the Citation Liens. As acknowledged by Touris, "those [account summaries reflected by Px 12] are all of the financial transactions that [she] handled for Nick Gouletas with Nick Gouletas's money", and "[e]very single thing was done by [Gouletas] telling me [Touris] to do it."

28.     Although the Citation was served on Gouletas on June 9, 2014, and was not suspended until Gouletas filed for bankruptcy on January 17, 2016, the account summaries for the Touris Chase Account (Px 12) reflect the regular, continuous and systematic use of that account by Gouletas and Touris from February 17, 2015 when Gouletas made his initial wire transfer of $15,730 into that account, until September 14, 2015 with the payment of Gouletas's credit card bill. (*Id.*) Some of the more significant withdrawals by Gouletas from the Touris Chase Account -- all in violation of the Citation Liens -- are listed below:

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 2/18/15 | $7,000 | George Stray, friend of Gouletas. (Px 12 #14) |
| 3/16/15 | $5,000 | Cash. (Px 12 #14) |
| 3/17/15 | $5,000 | Cash. (Px 12 #14) |
| 3/20/15 | $10,000 | Transfer to other checking account. (Px 12 #14) |
| 3/20/15 | $10,000 | Wire transfer at Gouletas's request to "Santander, B". (Px 12 #14) |

11

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 3/20/15 | $20,000 | Cash. (Px 12 #14) |
| 3/20/15 | $5,000 | Cash. (Px 12 #14) |
| 3/20/15 | $90,000 | Loan to Touris. (Px 12 #15) |
| 3/24/15 | $53,000 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $16,000 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $7,200 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $440 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $30,000 | Natel Matschulat, Gouletas's wife. (Px 12 #15) |
| 3/26/15 | $5,512.22 | Condominium assessment. (Px 12 #15) |
| 3/26/15 | $3,436.06 | Payment for assessments on Gouletas's condominium. (Px 12 #15) |
| 3/26/15 | $1,061 | Payment to BOA for mortgage on Gouletas condominium. (Px 12 #15) |
| 3/26/15 | $869.09 | Payment of Gouletas's ComEd bill. (Px 12 #15) |
| 3/27/15 | $2,949.02 | Payment of mortgage. (Px 12 #15) |
| 3/27/15 | $2,788.28 | Payment of assessments for condominiums. (Px 12 #15) |
| 3/27/15 | $1,865.16 | Payment of assessments for condominiums. (Px 12 #15) |
| 4/7/15 | $10,000 | Wire transfer to Luxury Management LLC. (Px 12 #17) |
| 4/9/15 | $3,581.01 | Assessment for Gouletas's condominium. (Px 12 #17) |
| 4/13/15 | $1,391.55 | Payment for Gouletas's condominium on Delaware Street. (Px 12 #17) |
| 4/13/15 | $230 | Assessment for Gouletas's condominium on Delaware Street. (Px 12 #17) |
| 4/14/15 | $22,474.24 | Mortgage for Gouletas's condominium. (Px 12 #17) |
| 4/14/15 | $4,299.75 | Mortgage for Gouletas's condominium. (Px 12 #17) |
| 4/14/15 | $2,634.74 | Payment for assessments on Gouletas's condominium at Delaware Place. (Px 12 #17) |
| 4/14/15 | $1,639.82 | Payment of Gouletas's ComEd bill. (Px 12 #17) |
| 4/14/15 | $125 | Payment of AT&T bill. (Px 12 # 17) |
| 4/15/15 | $4,167.06 | Payment of assessment on Gouletas's condominium. (Px 12 #17) |
| 4/16/15 | $15,150.29 | Unexplained. (Px 12 #17) |
| 4/16/15 | $14,268.31 | Payment of Gouletas's mortgage. (Px 12 #17) |
| 4/16/15 | $2,695.25 | Payment of Gouletas's assessment on condominium. (Px 12 #17) |
| 4/16/15 | $1,275.29 | Payment for Gouletas's parking. (Px 12 #17) |
| 4/27/15 | $10,000 | Gouletas requested payment to Karen Thorton. (Px 12 #18) |
| 4/28/15 | $1,620.10 | Payment for Gouletas's condominium. (Px 12 #18) |
| 4/29/15 | $3,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 12 #18) |
| 4/29/15 | $1,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 12 #18) |
| 4/30/15 | $2,000 | Unexplained. (Px 12 #18) |

12

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 5/4/15 | $13,000 | Payment to Gouletas's wife, Natel Matschulat. (Px 12 #18) |
| 5/4/15 | $10,000 | Payment to George Spanos. (Px 12 #18) |
| 5/13/15 | $5,000 | Unexplained. (Px 12 #18) |
| 5/14/15 | $10,000 | Transferred to another checking account. (Px 12 #18) |
| 5/21/15 | $1,000 | Unexplained. (Px 12 #18) |
| 5/26/15 | $2,712.05 | Transferred to checking account. (Px 12 #19) |
| 5/28/15 | $10,000 | Gouletas gave the money to Touris. (Px 12 #19) |
| 5/28/15 | $5,000 | Cash.  (Px 12 #19) |
| 5/28/15 | $5,000 | Cash. (Px 12 #19) |
| 5/29/15 | $900 | Payment on Gouletas's credit card. (Px 12 #19) |
| 5/29/15 | $6,500 | Payment on Gouletas's wife's credit card. (Px 12 #19) |
| 6/4/15 | $10,000 | Payment to Vivien. (Px 12 #19) |
| 6/8/15 | $2,171.10 | Payment on Gouletas's credit card. (Px 12 #19) |
| 6/9/15 | $6,178.31 | Payment for Gouletas's condominium. (Px 12 #19) |
| 6/9/15 | $1,000 | Payment to Heather Von Ehr. (Px 12 #19) |
| 6/24/15 | $1,000 | Payment on Gouletas's credit card. (Px 12 #20) |
| 6/24/15 | $5,000 | Unexplained. (Px 12 #20) |
| 7/2/15 | $2,000 | Cash. (Px 12 #20) |
| 7/14/15 | $1,602.60 | Payment for three plane tickets to Atlanta. (Px 12 #21) |

29. From the $826,218.40 that Gouletas deposited into Touris's checking accounts, only $1,368 of Gouletas's funds remained in those accounts as of February 10, 2017.

**F.     The Garvey Court Scheme**

30.     During the time that the Citations were issued prohibiting Gouletas from transferring his assets, Gouletas was involved in a real estate development project referred to as "Garvey Court" (the "Garvey Court Project"). The Garvey Court Project involved the construction of a mixed use high-rise retail/office/condominium building on properties that Gouletas owned (through entities that he owned and controlled) at Clark and Lake Streets in Chicago.

31.     Basically, in April of 2014, Gouletas placed certain properties that he owned into a new entity -- Garvey Court, LLC -- which would pay off the existing debt on the properties, and then develop the new high-rise on the Gouletas properties. Gouletas's "equity cushion" in the Garvey Court properties was in excess of $3,600,000.

32.     In the original formulation of the Garvey Court plan, Gouletas was going to retain a 25% interest in the Garvey Court Project. Later in May of 2014, however, and (a) after the Citations were served upon Gouletas in the Muth and Alfonso Suits; (b) after the 800 SWC Judgment was entered against Gouletas; and (c) after Gouletas met and conferred with Mr. Teplinsky about the proposed Garvey Court transaction, Gouletas "gifted" his 25% interest in the Garvey Court Project to family members through two newly formed LLCs, SEG Garvey LLC (12%) and NKM Garvey LLC (13%), as follows:

      (a)     SEG Garvey LLC

           (i)     Steven E. Gouletas -- 16.66%
           (ii)    Irene Gouletas -- 16.67%
           (iii)   Desiree Witte -- 16.67%
           (iv)   Victoria M. Gouletas -- 16.67%
           (v)    Rosalie Gouletas -- 16.67%
           (vi)   Louis Gouletas -- 5.53%
           (vii)  Michael Gouletas -- 5.53%
           (viii) Brittany Gouletas -- 5.54%

      (b)     NKM Garvey LLC

           (i)     Natel Matschulat -- 93%
           (ii)    Nicholas Gouletas --7%

33.     Accordingly, in late May of 2014, Gouletas, after conferring with Mr. Teplinsky from BPMS about the Garvey Court plan, gifted away -- in violation of the Citation Liens and in derogation of the rights of his creditors -- virtually all of his "equity cushion" in the Garvey Court Project. As of the time of the Garvey Court transfers, Gouletas's "equity cushion" in the Garvey Court Project exceeded $3,600,000.

      **G.**     **The Matschulat-CIB Stock Scheme**

34.     Shortly after service of the Citation upon Gouletas on June 9, 2014, Gouletas discovered, quite by accident, that he had, in the distant past, acquired a number of shares of stock

14

in CIB Marine BankShares (the "CIB Stock"), which Gouletas held through a stock brokerage account at TD Ameritrade (the "TDA Account").

35.     Although the Citation was served on Gouletas on June 9, 2014, and Gouletas understood that he was thereby prohibited from transferring his assets, on or about September 4, 2014, Gouletas sold his CIB Stock through his TDA Account for just over $51,000 (Px 13), and then, on or about the same date, wire-transferred $51,323.29 from that stock sale into a checking account held in the name of his wife, Natel Matschulat. (*Id.*)

36.     After depositing the $51,323.29 in his wife's checking account, Gouletas then proceeded to have his wife, Natel Matschulat, sign checks from that account for the payment of Gouletas's expenses, all in violation of the judicial prohibition against his transfer of assets imposed by the Citation Liens.

**H.     The HBI-Parking Lot Scheme**

37.     One of Gouletas's entities, 800 South Wells Phase II, LLC ("800 SWP"), owned a 1.77 acre 126-space parking lot at 800 South Wells Street in Chicago (the "Parking Lot"), which was next to the River City Complex. Gouletas was the manager, sole member and control person of 800 SWP.

38.     As of November 1, 2009, there was only one mortgage indebtedness against the Parking Lot, which was in favor of River City Investors, LLC ("RCI") in the original principal amount of $2,000,000 (the "RCI Mortgage"). Since the Parking Lot was worth far in excess of the amount of the RCI Mortgage, on November 1, 2009 Gouletas had another one of his controlled entities, Home By Invsco, Inc. ("HBI"), place a bogus mortgage against the Parking Lot in the amount of $2,177,700 (the "HBI Second Mortgage") to protect the equity in the Parking Lot from

the claims of Gouletas's creditors. HBI was owned and controlled by Gouletas, and was, in fact, the alter-ego of Gouletas.

39.     While Gouletas signed the HBI Second Mortgage on November 1, 2009, the internal financial documents of Gouletas's enterprise, American Invsco (which included 800 SWP and HBI), did not reflect any indebtedness supposedly owed to HBI on the HBI Second Mortgage:

(a)     In the "American Invsco Liquidity Action Plan Update" dated November 22, 2011 (Px 14), it was represented that:

> Our debt at the land is $2,500,000. The last appraisal had a value of $14,880,000. CBRE indicates that . . . the market value for the land should be around $12,000,000. We have indicated the urgency to them, and we are going to list it for $13,000,000, anticipating accepting a price around $12,000,000 in the next nine months, again subject to market conditions. Therefore, the net proceeds to the company should be around $9,000,000.

(*Id*. p. 1) No indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(b)     In an "American Invsco Companies Consolidated Balance Sheet" dated December 31, 2012 (Px 15), it was represented that the Parking Lot had a value of $9,500,000, with the sole mortgage on the Parking Lot in favor of RCI in the amount of $2,000,000. (*Id*.) This December 31, 2012 Consolidated Balance Sheet for American Invsco showed that Gouletas had "shareholder equity" in the amount of $10,002,000. (*Id*.) Again, no indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(c)     In a "Balance Sheet" signed by Gouletas (Px 1), Gouletas represented that as of March 31, 2013, the Parking Lot had a value of $11,334,590 (*id*. p. 1), with the sole mortgage owed by 800 SWP on the Parking Lot in the amount of $3,300,000. (*Id*. p. 4) Once again, no

indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second

Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

        (d)    In a "Balance Sheet" dated February 28, 2014 (Px 16), Gouletas represented

that the Parking Lot was worth $6,500,000, with a "first mortgage" in the amount of $3,300,000.

(*Id*.) And, once again, no indebtedness was showed which was supposedly owed by 800 SWP to

HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800

SWP to HBI.

        40.    Further, in connection with Gouletas's efforts to supersede a prior judgment that

DJV had obtained against Gouletas for Gouletas's failure to honor his word on a guarantee, on

June 29, 2010, Gouletas represented to Illinois Circuit Court Judge Lee Preston, under oath, that:

> The Property [*i.e.*, the Parking Lot] is valued at $14,888,000. . . .
> The sole mortgage recorded against the Property is in the recorded
> amount of $2,000,000. Ex. B, p. D-3 ¶6. Therefore, there is equity
> in the amount of $12,880,000 in the Property to serve as security for
> the [$1,000,000] Judgment [that DJV obtained against Gouletas].

(Px 17 p. 2 ¶5) Accordingly, on June 29, 2010, Gouletas verified under oath, and represented to

Judge Preston and DJV, that there was no other mortgage indebtedness owed in connection with

the Parking Lot other than the RCI Mortgage.

        41.    In late 2014, Gouletas received a solid offer from a financially sound third party to

purchase the Parking Lot for $7,750,000. With the RCI Mortgage and other expenses of the sale

totaling approximately $5,711,000, Gouletas and Mr. Teplinsky from BPMS came up with a plan

to shield the approximately $2,038,000 in profits from Gouletas's unfavored judgment creditors.

Basically, the plan involved the false claim that the HBI Second Mortgage was legitimate, and

then Gouletas would have the approximately $2,038,000 in profits from the sale of the Parking

Lot (that otherwise would have been paid to Gouletas) deposited into BPMS's trust account,

thereby shielding Gouletas's funds from the ongoing execution efforts by judgment creditor 800 SWC. The Gouletas funds deposited into the BPMS trust account would then be distributed to certain preferred creditors and other friends and relatives of Gouletas, with those friends and relatives then funneling a portion of the profits from the sale of the Parking Lot back to Gouletas through Touris's checking accounts.

42.     By email dated December 19, 2014, Elizabeth Friedgut, Esq., the transactional attorney for Gouletas who was working with Mr. Teplinsky on the sale of the Parking Lot, inquired of Gouletas's son, Steven Gouletas, as follows: "I need to talk to [Gouletas's accountant, Gerald Zaidman] about your dad's tax liability for river city which we are going to be selling shortly." (Px 18 (emphasis added)) On December 22, 2014, Gouletas's accountant, Mr. Zaidman, responded: "I think it is important if you can defer the closing of the 800 Wells property [*i.e.*, the Parking Lot] owned by Nick personally til 2015. Please call me to discuss ASAP." (Px 19 (emphasis added))

43.     The closing on the sale of the Parking Lot occurred on December 29, 2014. The closing statement (Px 20) shows that from the $7,750,000 in sale proceeds, $2,038,703.84 was the balance due to the Seller. (*Id*. p. 2) Elizabeth Friedgut signed the settlement statement for and on behalf of 800 SWP. (*Id*.)

44.     800 SWP and HBI were and are the alter-egos of Gouletas, and the $2,038,703.84 in profits from the sale of the Parking Lot legally and equitably belonged to Gouletas:

(a)     In connection with the matters set forth herein, 800 SWP was used by Gouletas to perpetuate and carry out the HBI-Parking Lot Scheme. Gouletas was the sole owner of 800 SWP, and, throughout the years, Gouletas conducted the affairs of 800 SWP without observing required corporate formalities. In that connection, there was the failure to maintain adequate corporate

records; a comingling of 800 SWP's funds with other Gouletas-related entities; and the failure to maintain arm's-length relationships with other Gouletas-related entities.

(b)     In connection with the matters set forth herein, HBI was used by Gouletas to perpetuate and carry out the HBI-Parking Lot Scheme. Further, Gouletas was the sole owner of HBI, and, throughout the years, Gouletas conducted the affairs of HBI without observing required corporate formalities. In that connection, there was the failure to hold regular corporate meetings; the non-functioning of other officers and directors; the failure to maintain adequate corporate records; a commingling of HBI's  funds with other Gouletas-related entities; and the failure to maintain arm's-length relationships with other Gouletas-related entities.

45.     As of January 5, 2015, Gouletas and Mr. Teplinsky still had not decided exactly how to distribute the profits from the sale of the Parking Lot. By email to Gouletas's agent, John Arnold, dated January 5, 2015, Gouletas's attorney at BPMS, Howard Teplinsky, outlined his thoughts on how the profits from the sale of the Parking Lot should be disbursed. (Px 21) Based on information and belief, it was Mr. Teplinksy from BPMS who advised Gouletas to place the $2,038,703.84 in profits from the sale of the Parking Lot into BPMS's trust account so as to shield Gouletas's cash from the ongoing execution efforts by 800 SWC. (Px 22) After accepting Mr. Teplinsky's recommendation, in January of 2015 Gouletas and Mr. Teplinsky then came up with a number of plans as to how those profits should be distributed so as to best serve Gouletas's personal financial needs, while still shielding Gouletas's income from the claims of his unfavored judgment creditors.  In addition, on January 6, 2015, Gouletas, at the direction of Mr. Teplinsky, had an additional $137,535 wire-transferred into the trust account at BPMS. (Px 23)

46.     Then on January 20, 2015, Mr. Teplinsky, for and on behalf of BPMS, directed how the remainder of the $1,271,218.84 from the BPMS escrow account was to be distributed. (Px 24)

Of the $396,218.84 paid to Touris (Px 25), Gouletas then had Touris distribute $195,000 of those proceeds to his son, Steven Gouletas, and $50,000 of those proceeds to Gouletas's friend, George Spanos. Further, of the $690,000 distributed to Defendant Paul Jones, $415,000 from those proceeds (Px 35) were then deposited by Defendant Jones into Touris's checking account (Px 11) so Gouletas could continue to pay his expenses without those funds being subject to execution by Gouletas's judgment creditors.

47. The $690,000 payment by Gouletas to Defendant Jones on January 21, 2015 was without fair and adequate consideration, and was not paid by Gouletas in the ordinary course of business. Indeed, the $690,000 that supposedly was owed by Gouletas was, in fact, owed by one of Gouletas's companies, AIGL Real Estate Company ("AIGL"), pursuant to a promissory note (Px 30) whereby Defendant Jones charged AIGL with interest at a rate in excess of 200%. Moreover, Defendant Jones has admitted that (a) he "wasn't certain what [the $415,000 check, Px 35] pertained to"; (b) the $690,000 payment to him by Gouletas was "kind of strange"; that he didn't know "what it pertained to"; that he didn't know "where the money came from"; and that Gouletas simply said "deposit this, $690,000, but then I need you to pay [the $415,000] to Dorothea Touris; that's the only way I [Gouletas] can get my money out of this"; (c) he "had no idea" why he wrote a check to Touris for $415,000; (d) he didn't even know Touris, and never spoke with her; (e) Gouletas "never explained why he [Gouletas] didn't just write a check to Dorothea Touris himself"; and (f) while Defendant Jones supposedly "lost a ton of money investing with Gouletas", "helping him [Gouletas] out was the only way [Defendant Jones] could get some of [his] money back." Accordingly, Defendant Jones knew not only of Gouletas's difficult financial condition, but also knew, must have known, or should have known of Gouletas's money laundering and fraudulent transfer scheme.

20

48.     The $110,000 payment by Gouletas to Defendant James Paul on January 21, 2015 was without fair and adequate consideration, and was not paid by Gouletas in the ordinary course of business. Indeed, the $110,000 that supposedly was owed by Gouletas was, in fact, owed by one of Gouletas's companies, AIGL, pursuant to a promissory note (Px 31) whereby Defendant Paul charged AIGL with interest at a rate of 200%.

49.     The $60,000 in payments by Gouletas to Defendant George Spanos in February and May of 2015 were without fair and adequate consideration, and were not paid by Gouletas in the ordinary course of business. Indeed, the $60,000 that supposedly was owed by Gouletas was, in fact, owed by one of Gouletas's companies, AIGL, pursuant to a promissory note (Px 32) whereby Defendant Spanos charged AIGL with interest at a rate of 200%.

50.     The $35,000 payment by Gouletas to Defendant Warady & Davis LLP ("W&D") on January 21, 2015 was without fair and adequate consideration, and was not paid by Gouletas in the ordinary course of business. Although $25,000 of those funds was represented by Mr. Teplinsky to be for "engagement of accountant for HBI's returns" (Px 21), the real purpose for the placement of those funds in W&D's trust account was so that W&D could use and disburse Gouletas's funds as Gouletas and Mr. Teplinsky directed, and thereby shield Gouletas's funds from the claims of Gouletas's unfavored judgment creditors. Indeed, the $35,000 deposited by Mr. Teplinsky into W&D's trust account on January 21, 2015 was highly suspicious, and should have alerted W&D that something improper was afoot in connection with Mr. Teplinsky's handling of Gouletas's income:

(a)     The $35,000 "retainer" did not come from the prospective client, but rather from an attorney's trust account, and was excessive under the circumstances.

21

(b)     Further, shortly after Gouletas filed for bankruptcy, on January 28, 2016, the partner in charge at W&D, Richard M. Franklin, was contacted by Mr. Teplinsky to write a check from W&D's trust account in the amount of $10,000 for payment of Gouletas's personal legal fees.

(c)     In addition, in the first quarter of 2016, W&D was informed by Mr. Teplinsky that the approximately $51,000 in proceeds from the sale of the CIB bank stock belonged to Gouletas, but Gouletas had placed those funds in his wife's checking account.

(d)     In spite of the above, at no time did W&D or Mr. Teplinsky inform the Bankruptcy Court, the Bankruptcy Trustee, or Gouletas's creditors that the $35,000 that Mr. Teplinsky parked in W&D's trust account did, in fact, belong to Gouletas.

(e)     And finally, on November 1, 2016, W&D attempted to cover-up the placement of Gouletas's funds in its trust account by invoicing "Home by Invsco Howard Teplinsky c/o Beerman Pritikin Mirabelli Swerdlove LLP" (Px 33), even though the accounting work was not, in fact, performed for HBI, but rather for Gouletas, personally.

(f)     Accordingly, W&D took affirmative steps toward furtherance of the scheme to delay, hinder or defraud Gouletas's creditors, and W&D was a knowing and active participant in the scheme to hide Gouletas's cash from the claims of Gouletas's creditors.

51.     At the direction of BPMS's agent, Mr. Teplinsky, on January 13, 2015, $30,020 of the profits from the sale of the Parking Lot were distributed to BPMS for an alleged payment on HBI's legal bills. And then on January 22, 2015, an additional $25,000 of the profits from the sale of the Parking Lot were distributed to BPMS as "finalize entity flat fee charge" for work supposedly done for and on behalf of HBI. On information and belief, these "legal fees" paid to

BPMS reflected work by Mr. Teplinsky that was done, in reality, primarily on behalf of Gouletas, and otherwise constituted excessive fees charged by BPMS to HBI.

## I.     **The Contempt Proceedings Against Gouletas**

52.     Based on the numerous violations by Gouletas of the Citation Lien, on April 24, 2015, 800 SWC filed a Motion for Contempt against Gouletas, which was amended on October 9, 2015 (the "Contempt Motion"). The trial court (White, J.) conducted hearings in connection with the Contempt Motion on July 20, 2015, September 2, 2015, and November 24, 2015.

53.     In connection with the evidence which showed that Gouletas, during the Citation Proceedings, had sold his CIB Stock without obtaining permission from the Court, Judge White stated, with Gouletas still up on the witness stand, that:

> I'm a little bit confused here. We have a citation that says . . . don't transfer assets. And what I'm hearing from the testimony is that apparently [Gouletas's CIB Stock] was sold. The money was forthcoming and was used to buy food, which is a violation of the citation.

Further, Gouletas testified at the contempt hearing that he supposedly had "no idea" why he was going through a series of cashier's checks during the time from and after the Citation was served upon him on June 9, 2014.

54.     The final day of the contempt hearing was scheduled for January 19, 2016. On the eve of Judge White's decision in connection with the motion to hold Gouletas in contempt, on January 17, 2016 Gouletas filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois. The Citation Liens continued in existence at all times from the date the Muth and Alfonso Citations were served on Gouletas in December of 2013 until the date that Gouletas filed for bankruptcy on January 17, 2016 (*see Marcus-Rehtmeyer v. Jacobs*, 784 F.3d 430, 438-39 & 443 (7th Cir. 2015)), and at all relevant times were in full force and effect.

**J.    The Bankruptcy Trustee Assigns The Litigation Claims And Alter-Ego Claims To DJV**

55.    Upon  Gouletas's filing of bankruptcy on January 17, 2016, all fraudulent transfer claims that a creditor held against Gouletas became the exclusive property of the Bankruptcy Trustee for the two-year period following the bankruptcy filing, with the creditors divested of the ability to prosecute any such fraudulent transfer claims for the two-year period of exclusivity accorded to the Bankruptcy Trustee. Pursuant to 11 U.S.C. §546(a)(1)(A), when the two-year limitation on the Bankruptcy Trustee's fraudulent transfer claims expired on January 17, 2018, those state-law fraudulent transfer claims, absent prior effective sale and assignment of those claims by the Bankruptcy Trustee, automatically revert back to the creditors which held the fraudulent transfer claims prior to Gouletas's bankruptcy filing. *See Klingman v. Levinson*, 158 B.R. 109, 113 (N.D. Ill. 1993).

56.    The Bankruptcy Trustee attempted to obtain counsel to prosecute avoidance and fraudulent transfer claims for and on behalf of the Bankruptcy Estate on a contingent fee basis, but, despite his diligent efforts, was unable to do so. On July 23, 2017, the Bankruptcy Trustee received an offer from DJV to purchase the Bankruptcy Trustee's litigation claims and alter-ego claims for $15,000. On July 24, 2017, the Bankruptcy Trustee filed in the Bankruptcy Court the Trustee's Motion for Approval of Sale of Interests in Personal Property and for Related Relief (Px 26), which specifically included fraudulent transfer, alter-ego, and common law tort claims of the nature set forth herein. *See* 11 U.S.C. §§363(b)(1) & 544(b)(1). No one offered a higher bid for those claims, and neither the Debtor, Gouletas, nor any creditor, objected to the Bankruptcy Trustee's Motion or the proposed sale by the Bankruptcy Trustee.

57.    After due notice to all interested parties, and after hearing before the Bankruptcy Court, on August 18, 2017, the Bankruptcy Court presiding over the Gouletas Bankruptcy entered

its Order Authorizing Sale of Personal Property. (Px 27) Neither the Debtor, Gouletas, nor any creditor objected to the order of sale, or appealed the order of sale. Thereafter, on September 13, 2017, the Bankruptcy Trustee and the representative of DJV executed an Assignment of Claims and Causes of Action, thereby transferring the Bankruptcy Trustee's fraudulent transfer claims, litigation claims and alter-ego claims to DJV. (Px 28)

58.     On April 17, 2019, 800 SWC assigned all of its fraudulent transfer claims -- to the extent any such fraudulent transfer claims were not previously effectively assigned to DJV by the Trustee -- to Plaintiff. (Px 34)

59.     All conditions precedent to recovery by Plaintiff have been performed or have occurred.

60.     Plaintiff realleges all preceding and succeeding paragraphs as the basis for each of the following Counts.

### Count One
### (Avoidance Of Fraudulent Transfers
### Pursuant To 740 ILCS 160/5(a)(1))

61.     The Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq*. (the "IUFTA") at Section 160/5(a) provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether
> the creditor's claim arose before or after the transfer was made . . .,
> if the debtor made the transfer . . .: (1) with actual intent to hinder,
> delay or defraud any creditor of the debtor . . ..

740 ILCS 160/5(a)(1).

62.     The following transfers of cash (the "Transfers") were made by or on behalf of the Debtor, Gouletas, from funds that, legally and equitably, belonged to Gouletas, with actual intent to hinder, delay or defraud Gouletas's unfavored judgment creditors in existence as of the dates of the Transfers.

63.     The course of conduct set forth above shows Gouletas's actual intent to hinder, delay or defraud Gouletas's unfavored judgment creditors in existence as of the date of the Transfers. Indeed, a number of the Transfers were to insiders as defined in 740 ILCS 160/2(g)(1), (4) & (5). In that connection, (a) Touris was an "insider" within the meaning of 740 ILCS 160/2(g)(5) because Touris acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas's funds; (b) Steven Gouletas was an "insider" within the meaning of 740 ILCS 160/2(g)(1) & (5) because he is a relative of the Debtor (*i.e.*, Gouletas's son), and acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas's funds; and (c) BPMS was an "insider" within the meaning of 740 ILCS 160/2(g)(5) because BPMS acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas's funds. Further, as to Gouletas's funds deposited into (a) the trust account at BPMS;  (b) the checking account for W&D; and (c) the checking accounts of Touris, Gouletas retained control over those funds, and the transfers were concealed. In addition, before the Transfers were made, Gouletas had been sued and threatened with further suits, numerous judgments had been entered against him, and he was insolvent. Finally, in connection with the Transfers, Gouletas intended to prefer the interests of the following Defendants above the interests of judgment creditors 800 SWC, Muth and Alfonso.

64.     The Transfers were made in violation of 740 ILCS 160/5(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

65.     None of the Defendants listed below took the fraudulently transferred funds in good faith because each Defendant knew, must have known, or should have known that numerous judgments had been entered against Gouletas, with outstanding Citation Liens which prohibited Gouletas from transferring his assets. *See For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 560 F.3d 717, 722 (7th Cir. 2009). Indeed, as to Defendant Adler, he previously had filed suit against

Gouletas on August 4, 2014 in the Circuit Court of Cook County, Illinois, No. 2014 L 050584, during which Adler was represented by reputable counsel who were highly experienced and very thorough litigators. Accordingly, at the time that Adler took the $850,000 from Gouletas on January 8, 2015, Adler knew, must have known, or should have known about the 800 SWC, Muth and Alfonso judgments against Gouletas and the outstanding Citation Liens that had been entered against Gouletas which prohibited Gouletas from transferring his assets. Moreover, in the December 30, 2014 Release and Settlement Agreement executed between Adler and Gouletas (Px 29), Adler acknowledged that "[i]f for any reason Adler is ordered to return or disgorge the Payment [of $850,000] or any portion thereof, any obligation of Adler hereunder shall be null, void and of no effect . . .." (*Id.* p. 2 ¶2) Since Adler, through highly experienced and very thorough counsel, knew, must have known, or should have known about the outstanding judgments against Gouletas and the Citation Liens pertaining thereto, Adler did not take the funds from Gouletas in good faith.

66.    At the time that Gouletas made the following payments to the following Defendants, Gouletas recently had come into possession of over $2,000,000 in cash, which Gouletas, through Mr. Teplinsky at BPMS, wanted to shield from Gouletas's unfavored judgment creditors. Thus, the main purpose of the following transfers was to not only favor certain of Gouletas's friends and relatives over his unfavored judgment creditors, but also to prevent Gouletas's unfavored judgment creditors from collecting on their judgments against Gouletas.

67.    Each Defendant listed below is liable to Plaintiff in the amount of the Transfers as follows:

(a)  Defendant Dorothea Touris

(i)    January 21, 2015 -- $396,218.84
(ii)   February 17, 2015 -- $15,730

(iii)   March 17, 2015 -- $415,000

(iv)   May 28, 2015 -- $10,000

(b)   <u>Defendant Steven E. Gouletas</u>

(i)     April 11, 2014 -- $90,586

(ii)   April 11, 2014 -- $80,324

(iii)  August 29, 2014 -- $23,200

(iv)  February 6, 2015 -- $195,000

(v)   February 6, 2015 -- $190,000

(vi)  February 6, 2015 -- $5,000

(vii) March 24, 2015 -- $7,200

(viii) March 24, 2015 -- $53,000

(ix)  March 24, 2015 -- $16,000

(x)   March 24, 2015 -- $440

(c)   <u>Defendant Natel Matschulat</u>

(i)     September 5, 2014 -- $51,323.29

(ii)   January 8, 2015 -- $100,000

(iii)  March 24, 2015 -- $30,000

(iv)  May 4, 2015 -- $13,000

(d)   <u>Defendant Paul Jones</u>

(i)     January 21, 2015 -- $690,000

(e)   <u>Defendant James Paul</u>

(i)     January 21, 2015 -- $110,000

(f)   <u>Defendant Adler</u>

(i)     January 8, 2015 -- $850,000

(g)   <u>Defendant George Stray</u>

(i)     January 21, 2015 -- $15,000

(ii)   February 18, 2015 -- $7,000

(h)   <u>Defendant George Spanos</u>

(i)     February 6, 2015 -- $50,000

(ii)   May 4, 2015 -- $10,000

    (i)    <u>Defendant W&D</u>

        (i)    January 21, 2015 -- $35,000

    (j)    <u>Defendant BPMS</u>

        (i)    January 13, 2015 -- $30,020
        (ii)    January 22, 2015 -- $25,000

**<u>Count Two</u>**
**(Avoidance Of Fraudulent Transfers Pursuant To**
**740 ILCS 160/5(a)(1) -- Garvey Court Transfers)**

68.    Section 160/5(a) of the IUFTA provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . ., if the debtor made the transfer . . .: (1) with actual intent to hinder, delay or defraud any creditor of the debtor . . ..

740 ILCS 160/5(a)(1).

69.    In May of 2014, Gouletas's "equity cushion" in the Garvey Court Project was at least $3,600,000.

70.    In May of 2014, Gouletas transferred his 25% retained interest in the Garvey Court Project to his family members through Defendants SEG Garvey (12%) and NKM Garvey (13%) as follows:

    (a)    <u>Defendant SEG Garvey</u>

        (i)    Defendant Steven E. Gouletas -- 16.66%
        (ii)    Defendant Irene Gouletas -- 16.67%
        (iii)    Defendant Desiree Witte -- 16.67%
        (iv)    Defendant Victoria M. Gouletas -- 16.67%
        (v)    Defendant Rosalie Gouletas -- 16.67%
        (vi)    Defendant Louis Gouletas -- 5.53%
        (vii)    Defendant Michael Gouletas -- 5.53%
        (viii)    Defendant Brittany Gouletas -- 5.54%

    (b)    <u>Defendant NKM Garvey</u>

        (i)    Defendant Natel Matschulat -- 93%

(ii)     Debtor Nicholas Gouletas --7%

(the "Garvey Court Transfers").

71.     The course of conduct set forth above shows  Gouletas's actual intent to hinder, delay or defraud Gouletas's creditors in existence as of the date of the Garvey Court Transfers, including 800 SWC, Muth and Alfonso. At the time of the Garvey Court Transfers, Gouletas was insolvent, or Gouletas became insolvent as a result of the transfers. The Garvey Court Transfers were in violation of the Citation Liens entered against Gouletas prohibiting his transfer of assets and in derogation of the rights of Gouletas's unfavored judgment creditors in existence as of the dates of the transfers. Moreover, the Garvey Court Transfers were made to insiders -- Gouletas's wife, children and grandchildren. *See* 740 ILCS 160/2(g)(1).

72.     The Garvey Court Transfers were made in violation of 740 ILCS 160/5(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

73.     None of the Defendants listed above took the Garvey Court Transfers in good faith because each Defendant knew, must have known, or should have known that Gouletas was insolvent, and that numerous judgments had been entered against Gouletas, with outstanding Citation Liens which prohibited Gouletas from transferring his assets. *See For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 560 F.3d 717, 722 (7th Cir. 2009).

74.     The Garvey Court Transfers were made in violation of 740 ILCS 160/5(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

75.     The Defendants listed in this Count Two are liable to Plaintiff for their percentage of the value of Gouletas's 25% retained interest in the Garvey Court Project, as of the date of the Garvey Court Transfers, in the percentage of each Defendant's interest as set forth above.

**Count Three**
**(Avoidance Of Fraudulent Transfers Pursuant To**
**740 ILCS 160/6(a) -- Garvey Court Transfers)**

76.     Section 160/6(a) of the IUFTA provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . ..

740 ILCS 160/6(a).

77.     In May of 2014, Gouletas's "equity cushion" in the Garvey Court Project was at least $3,600,000.

78.     In May of 2014, Gouletas transferred his 25% retained interest in the Garvey Court Project to his family members through Defendants SEG Garvey (12%) and NKM Garvey (13%) as follows:

     (a)     Defendant SEG Garvey

         (i)     Defendant Steven E. Gouletas -- 16.66%
         (ii)    Defendant Irene Gouletas -- 16.67%
         (iii)   Defendant Desiree Witte -- 16.67%
         (iv)    Defendant Victoria M. Gouletas -- 16.67%
         (v)     Defendant Rosalie Gouletas -- 16.67%
         (vi)    Defendant Louis Gouletas -- 5.53%
         (vii)   Defendant Michael Gouletas -- 5.53%
         (viii)  Defendant Brittany Gouletas -- 5.54%

     (b)     Defendant NKM Garvey

         (i)     Defendant Natel Matschulat -- 93%
         (ii)    Debtor Nicholas Gouletas --7%

(the "Garvey Court Transfers").

79.     At the time of the Garvey Court Transfers, Gouletas was insolvent, or Gouletas became insolvent as a result of the transfers.

80.     The Garvey Court Transfers were in violation of the Citation Liens entered against Gouletas prohibiting his transfer of assets and in derogation of the rights of Gouletas's unfavored judgment creditors in existence as of the dates of the transfers.

81.     Gouletas did not receive reasonably equivalent value in exchange for the Garvey Court Transfers. Indeed, Gouletas's 25% retained interest in the Garvey Court Project was "gifted" by Gouletas to his family members in the percentages set forth above.

82.     The Garvey Court Transfers were made in violation of 740 ILCS 160/6(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

83.     The Defendants listed in this Count Three are liable to Plaintiff for their percentage of the value of Gouletas's 25% retained interest in the Garvey Court Project, as of the date of the Garvey Court Transfers, in the percentage of each Defendant's interest as set forth above.

**Count Four**
**(Avoidance Of Fraudulent Transfers Pursuant**
**to 740 ILCS 160/6(a) -- Cash Transfers)**

84.     Section 160/6(a) of IUFTA provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . ..

740 ILCS 160/6(a).

85.     The following transfers of cash (the "Cash Transfers") were made by or on behalf of the Debtor, Gouletas, from funds that, legally and equitably, belong to Gouletas.

86.     Gouletas made the Cash Transfers without receiving a reasonably equivalent value in exchange for the transfers.

87.     Gouletas was insolvent at the time of the Cash Transfers or became insolvent as a result of the Cash Transfers.

88.     The Cash Transfers were in violation of the Citation Liens entered against Gouletas prohibiting his transfer of assets and in derogation of the rights of Gouletas's unfavored judgment creditors in existence as of the dates of the Cash Transfers.

89.     The Cash Transfers were made in violation of 740 ILCS 160/6(a), and are voidable pursuant to 740 ILCS 160/8(a)(1).

90.     Each Defendant listed below is liable to Plaintiff in the amount of the Cash Transfers as follows:

      (a)  <u>Defendant Dorothea Touris</u>

          (i)     January 21, 2015 -- $396,218.84
          (ii)    February 17, 2015 -- $15,730
          (iii)   March 17, 2015 -- $415,000
          (iv)   May 28, 2015 -- $10,000

      (b)  <u>Defendant Steven E. Gouletas</u>

          (i)     April 11, 2014 -- $90,586
          (ii)    April 11, 2014 -- $80,324
          (iii)   August 29, 2014 -- $23,200
          (iv)   February 6, 2015 -- $195,000
          (v)    February 6, 2015 -- $190,000
          (vi)   February 6, 2015 -- $5,000
          (vii)  March 24, 2015 -- $7,200
          (viii) March 24, 2015 -- $53,000
          (ix)   March 24, 2015 -- $16,000
          (x)    March 24, 2015 -- $440

      (c)  <u>Defendant Natel Matschulat</u>

          (i)     September 5, 2014 -- $51,323.29
          (ii)    January 8, 2015 -- $100,000
          (iii)   March 24, 2015 -- $30,000
          (iv)   May 4, 2015 -- $13,000

    (d)    <u>Defendant Paul Jones</u>

        (i)    January 21, 2015 -- $690,000

    (e)    <u>Defendant George Stray</u>

        (i)    January 21, 2015 -- $15,000
        (ii)    February 18, 2015 -- $7,000

    (f)    <u>Defendant George Spanos</u>

        (i)    February 6, 2015 -- $50,000
        (ii)    May 4, 2015 -- $10,000

    (g)    <u>Defendant W&D</u>

        (i)    January 21, 2015 -- $35,000

    (h)    <u>Defendant BPMS</u>

        (i)    January 13, 2015 -- $30,020
        (ii)    January 22, 2015 -- $25,000

**<u>Count Five</u>**
**(Civil Conspiracy To Commit Fraud)**

91.    Defendants Touris, BPMS (through Mr. Teplinsky), Jones and W&D knowingly and voluntarily participated in a common scheme with Gouletas to commit an unlawful act -- to assist Gouletas in delaying, hindering or defrauding Gouletas's creditors. Defendants Touris, BPMS (through Mr. Teplinsky), Jones and W&D understood the general objectives of Gouletas's conspiratorial scheme, accepted them, and agreed (implicitly, at least) to do their part to further those objectives.

92.    As set forth in detail above, Gouletas and Defendants Touris, BPMS (through Mr. Teplinsky), Jones and W&D entered into an agreement for the purpose of accomplishing, by concerted action, the unlawful purpose of hiding, transferring or otherwise shielding Gouletas's assets in violation of the Citation Liens that prohibited Gouletas from transferring his assets, and

otherwise in derogation of the rights of Gouletas's unfavored judgment creditors, as part of the scheme to delay, hinder or defraud Gouletas's unfavored judgment creditors.

93.     The course of conduct set forth above constitutes a civil conspiracy to commit fraud on Gouletas's unfavored judgment creditors, which proximately caused harm and damage to Gouletas's unfavored judgment creditors in the amount of Gouletas's assets that were fraudulently transferred. *See Paloian v. Greenfield (In re Rest. Dev. Group, Inc.)*, 397 B.R. 891, 896-97 (Bankr. N.D. Ill. 2008). Accordingly, Defendants Touris, BPMS, Jones and W&D are jointly and severally liable to Plaintiff for the harm and damage caused by their civil conspiracy with Gouletas in the fraud committed upon Gouletas's unfavored judgment creditors.

## Count Six
### (Aiding And Abetting Fraud)

94.     As set forth in detail above, (a) Gouletas engaged in numerous schemes to fraudulently transfer his assets in an effort to delay, hinder or defraud his creditors, which injured the ability of Gouletas's unfavored judgment creditors to collect on the amount of indebtedness owed to them by Gouletas; (b) Defendants Touris, BPMS (through Mr. Teplinsky), Jones and W&D were aware of their roles in  Gouletas's fraudulent transfer schemes when they provided assistance to Gouletas in the accomplishment of those schemes; and (c) Defendants Touris, BPMS (through Mr. Teplinsky), Jones and W&D provided knowing and substantial assistance to Gouletas in the implementation and execution of Gouletas's fraudulent transfer schemes.

95.     Accordingly, Defendants Touris, BPMS (through Mr. Teplinsky), Jones and W&D knowingly induced, participated and assisted in actively defrauding Gouletas's unfavored judgment creditors through the implementation and execution of Gouletas's fraudulent transfer schemes in order to assist Gouletas in his efforts to delay, hinder or defraud his creditors.

96.     The course of conduct set forth above constitutes aiding and abetting a fraud on Gouletas's unfavored judgment creditors, which proximately caused harm and damage to Gouletas's unfavored judgment creditors in the amount of Gouletas's assets that were fraudulently transferred. *See Paloian v. Greenfield (In re Rest. Dev. Group, Inc.)*, 397 B.R. 891, 897-98 (Bankr. N.D. Ill. 2008). Accordingly, Defendants Touris, BPMS, Jones and W&D are jointly and severally liable to Plaintiff for the harm and damage caused by their aiding and abetting Gouletas in the fraud committed upon Gouletas's unfavored judgment creditors.

**Count Seven**
**(Refund Of Funds Owed By W&D To**
**The Bankruptcy Trustee)**

97.     In the event that the full amount of the $35,000 deposited by Mr. Teplinsky into W&D's trust account is not set aside as a fraudulent transfer, there remains in W&D's trust account a balance of $12,595.35 in funds that belonged to Gouletas, and thus, upon Gouletas's bankruptcy filing, became the property of the Bankruptcy Trustee. (Px 33)

98.     Accordingly, W&D is liable to the Bankruptcy Trustee, and thus to Plaintiff, for $12,595.35 in funds that legally and equitably belong to the Bankruptcy Trustee.

**Count Eight**
**(Reimbursement Of Funds Owed By Touris To Gouletas Prior**
**To The Time That Gouletas Filed For Bankruptcy)**

99.     In March of 2015, Gouletas loaned $90,000 to Touris, of which only $50,000 was repaid, leaving a balance owed by Touris on that loan in the amount of $40,000.

100.     In addition, on March 28, 2015, Gouletas loaned an additional $10,000 to Touris, which Touris never repaid.

101.     Finally, on February 10, 2015, there was $1,368 of Gouletas's funds which remained in the Touris Chase Account.

102.    Accordingly, Touris is liable to the Bankruptcy Trustee, and thus to Plaintiff, for $51,368 that she owed to Gouletas at the time that Gouletas filed for bankruptcy.

## PRAYER

Plaintiff respectfully requests:

(1)    that the Court enter judgment against the Defendants for (a) Plaintiff's actual damages as set forth in each Count above; (b) punitive damages in an amount not less than three times Plaintiff's actual damages for the Defendants' intentional wrongful conduct as alleged in Counts Five and Six; and (c) pre- and post-judgment interest at the highest lawful rate; and

(2)    that the Court grant Plaintiff its court costs and such other and further relief to which Plaintiff may be entitled.

## JURY DEMAND

Plaintiff requests a trial by jury.

Respectfully submitted,

ARMSTRONG LAW FIRM, P.C.

DATED: April 17, 2019.        By    *F. Dean Armstrong*
                                     F. Dean Armstrong, Esq.
                                ARDC #6199894
                                23353 S. 88th Avenue
                                Frankfort, IL  60423
                                815/464-3243
                                Fax: 815/464-3449
                                armstronglaw@sbcglobal.net
                                **Attorney for Plaintiff**
                                **D.A.N. Joint Venture III, L.P.**

**<u>Certificate of Service</u>**

The undersigned certifies that a true and correct copy of the foregoing pleading was served upon all parties receiving CM/ECF noticing on this 17th day of April, 2019. Parties not part of the CM/ECF system were served via United States Mail.

*/s/F. Dean Armstrong*
F. Dean Armstrong
