# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| D.A.N. JOINT VENTURE III, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-349 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| DORETHA TOURIS, et al.., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons set forth below, Defendant Berman Pritikin Mirabelli Swerdlove LLP's ("BPMS") motion to dismiss [130] the claims against it in the second amended complaint is denied in part (as to Count I and IV) and granted in part (as to Counts V and VI). This case is set for further status on April 24, 2020 at 9:00 a.m. Counsel are requested to file a joint status report no later than April 21, 2020.

## I. Background[1][2]

Plaintiff D.A.N. Joint Venture III, L.P. ("DJV" or "Plaintiff") brings claims as the assignee of Chapter 7 Trustee Richard M. Fogel. Plaintiff contends that Nicholas S. Gouletas ("Gouletas" or the "Debtor") engaged in a complicated scheme to hide, transfer, and otherwise shield his assets from the claims of certain of his judgment creditors by transferring more than $2,000,000 in cash

---

[1] For purposes of ruling on Defendant's motions to dismiss, the Court accepted as true all of Plaintiff's well-pleaded factual allegations and drew all reasonable inferences in Plaintiff's favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

[2] The second amended complaint alleges multiple schemes to defraud creditors with a variety of participants. In this order, the Court provides only the allegations and facts relevant to resolving BPMS's motion to dismiss.

and other assets to his friends, relatives, and a select group of creditors. [120, at ¶ 1.] Plaintiff brings claims for (i) avoidance of fraudulent transfers pursuant to 740 ILCS 160/5(a)(1); (ii) avoidance of fraudulent transfers pursuant to 740 ILCS 160/6(a); (iii) civil conspiracy to commit fraud; (iv) aiding and abetting fraud; (v) refund of funds owed to the Chapter 7 Trustee; and (vi) reimbursement of funds owed to Gouletas prior to the time that he filed for bankruptcy.

Gouletas is the owner and control person of a large group of companies generally referred to as "American Invsco" that were involved in condominium conversions and various other real estate developments in more than 40 cities throughout the United States. [120, at ¶ 7.] On December 19, 2013, citations to discover assets were issued to Gouletas in connection with two lawsuits against him. [*Id*. at ¶ 16.] As of late December 2013, Gouletas was prohibited from transferring his assets by virtue of the citations issued against him. [*Id*.] In another citation to discover assets dated June 5, 2014, Gouletas was instructed:

> YOU ARE PROHIBITED from making or allowing any transfer or other disposition of * * * any property not exempt from execution * * * belonging to the judgment debtor [Gouletas] <u>or to which the judgment debtor may be entitled</u> or which may be acquired by or become due to the judgment debtor * * *, until further order of Court or termination of the proceedings.

[*Id*. at ¶ 18.] Plaintiff challenges numerous actions Gouletas allegedly took to improperly transfer assets after these citations were issued against him.

Defendant Beermann Pritikin Mirabelli Swerdlove LLP ("BPMS") is an Illinois limited liability partnership engaged in the practice of law with its principal place of business in Chicago, Illinois. [*Id*. at ¶ 6.10.] Howard Teplinsky, who was a partner at BPMS, represented Gouletas in several of the transactions at issue in this case. [*Id*. at ¶ 16.] BPMS is a defendant as to Counts I and IV seeking to avoid fraudulent transfers, Count V seeking to impose liability for civil conspiracy, and Count VI seeking to impose aider-and-abettor liability.

A.  **HBI-Parking Lot Mortgage**

Defendant 800 South Wells Phase II, LLC ("800 SWP") owned a 1.77 acre, 126-space parking lot at 800 South Wells Street in Chicago (the "Parking Lot"). [*Id*. at ¶ 37.] Gouletas was the manager, sole member, and control person of 800 SWP. [*Id*.] As of November 1, 2009, there was only one mortgage against the Parking Lot, which was in favor of River City Investors, LLC ("RCI") in the original principal amount of $2,000,000.00 (the "RCI Mortgage"). [*Id*. at ¶ 38.] In November 2009, Gouletas had another entity he controlled—Defendant Home By Invsco, Inc. ("HBI")—place a false mortgage against the Parking Lot in the amount of $2,177,700 (the "HBI Second Mortgage"). [*Id*.] HBI was owned and controlled by Gouletas. [*Id*.] While Gouletas signed the HBI Second Mortgage on November 1, 2009, the internal financial documents of Gouletas's enterprise—American Invsco, which included 800 SWP and HBI—did not reflect any indebtedness supposedly owed to HBI on the HBI Second Mortgage. [*Id*. at ¶¶ 39-40.]

In late 2014, a third party offered to purchase the Parking Lot for $7,750,000. [*Id*. at ¶ 41.] With the RCI Mortgage and other expenses of the sale totaling approximately $5,711,000, Gouletas and Teplinsky came up with a plan to shield approximately $2,038,000 in profits from Gouletas's disfavored creditors. [*Id*.] The plan involved the false claim that the HBI Second Mortgage was legitimate, which allowed Gouletas to distribute the approximately $2,038,000 in profits from the sale of the Parking Lot (that otherwise would have been paid to Gouletas) to certain preferred creditors and other friends and relatives of Gouletas, with those friends and relatives then funneling a portion of the profits from the sale of the Parking Lot back to Gouletas through Touris's checking accounts. [*Id*.] The closing on the sale of the Parking Lot occurred on December 29, 2014. [*Id*. at ¶ 43.] The closing statement shows that from the $7,750,000 in sale proceeds, $2,038,703.84 was the balance due to the Seller 800 SWP. [*Id*.] Elizabeth Friedgut, the

transactional attorney who was handling the sale of the Parking Lot for Gouletas, signed the settlement statement for and on behalf of 800 SWP. [*Id.*] 800 SWP and HBI were and are the alter-egos of Gouletas, and the $2,038,703.84 in profits from the sale of the Parking Lot legally and equitably belonged to Gouletas. [*Id.* at ¶ 44.]

On Plaintiff's information and belief, Teplinsky advised Gouletas to place the $2,038,703.84 in profits from the sale of the Parking Lot into BPMS's trust account so as to shield Gouletas's cash from the ongoing execution efforts by 800 SWC. [*Id.* at ¶ 45; 120-1, at 68-71.] After accepting Teplinsky's recommendation, in January of 2015 Gouletas and Teplinsky then came up with a number of plans as to how those profits should be distributed so as to best serve Gouletas's personal financial needs, while still shielding Gouletas's income from the claims of his unfavored judgment creditors. [120 at ¶ 45.] On January 6, 2015, Gouletas, at the direction of Teplinsky, had an additional $137,535 wire-transferred into the trust account at BPMS. [*Id.*]

On January 20, 2015, Teplinsky (for and on behalf of BPMS) directed how the $1,271,218.84 from the BPMS escrow account was to be distributed, which included $396,218.84 paid to Touris and $690,000 distributed to Defendant Jones. [*Id.* at ¶ 46.] Of the $396,218.84 paid to Touris, Gouletas had Touris distribute $195,000 to his son Steven Gouletas and $50,000 to his friend George Spanos. [*Id.*] Of the $690,000 distributed to Jones, $415,000 was deposited into Touris's checking account so Gouletas could continue to pay his expenses without those funds being subject to execution by Gouletas's judgment creditors. [*Id.*] Gouletas made a variety of other payments on January 1, 2015 that Plaintiff alleges were without fair and adequate consideration. [*Id.* at ¶ 50.]

On January 13, 2015, Teplinsky also directed that $30,020 of the profits from the sale of the Parking Lot be distributed to BPMS, purportedly for the payment of HBI's legal bills. [*Id.* at

[¶ 51.] On January 22, 2015, an additional $25,000 of the profits from the sale of the Parking Lot were distributed to BPMS as a "finalize entity flat fee charge," again for work purportedly done for and on behalf of HBI. [*Id*.] Plaintiff alleges—on information and belief—that the fees paid to BPMS reflected legal work that was done primarily on behalf of Gouletas or that otherwise constituted excessive legal fees charged to HBI. [*Id*.]

### B. Transfers to Touris Checking Accounts

In January 2015, Gouletas requested that his close friend of over 40 years, Defendant Dorothea Touris, deposit funds belonging to Gouletas into her checking accounts for the payment of Gouletas's expenses. [*Id*. at ¶¶ 6.1, 20-22.] Pursuant to Gouletas's plan, Touris would take the funds that he had provided to her, put the money into her checking accounts, and then pay Gouletas's bills out of her checking accounts. [*Id*. at ¶ 22.] The funds that Gouletas deposited into Touris's checking accounts belonged to Gouletas. [*Id*.] In late January of 2015, Touris met with Gouletas at his office in Chicago with Teplinsky also present. [*Id*. at ¶ 23.] At that meeting, Gouletas presented Touris with a check in the amount of $396,218.84. [*Id*.] Gouletas told Touris to deposit the check into her account and to pay $195,000 to Steven Gouletas (Gouletas's son) and $50,000 to George Spanos (Gouletas's friend), with the balance of $150,000 to be kept by Touris as compensation in the form of a purported reimbursement on a Gouletas investment.[3] [*Id*.] On February 6, 2015, Touris paid $195,000 to Gouletas's son and $50,000 to George Spanos, as directed by Gouletas. [*Id*. at ¶ 24.]

On February 17, 2015, Gouletas wire-transferred $15,730 into Touris's checking account at Chase Bank. [*Id*. at ¶ 25.] The $15,730 was money that belonged to Gouletas. [*Id*.] However,

---

[3] It is unclear from the amended complaint whether Plaintiff contends that the $150,000 paid to Touris actually was a reimbursement relating to a Gouletas investment or falsely was represented as such. The distinction has no bearing on the resolution of the pending motions to dismiss.

Gouletas claimed to have "no idea" from where the $15,730 came. [*Id*.] In March of 2015, Gouletas told Touris that a check for $415,000 was coming to her, which she was to deposit into her account for the payment of Gouletas's expenses. [*Id*. at ¶ 26.] Touris deposited the $415,000 check into her checking account at Chase Bank. [*Id*.] According to Touris, Gouletas asked her to deposit the check into her account to pay his bills. [*Id*.] Although Gouletas claimed that the $415,000 was a "loan" to him from Defendant Dr. Paul Jones, at some point he admitted that the $415,000 was his money. [*Id*.] In total, Gouletas deposited more than $431,145 into Touris's checking account at Chase. [*Id*.] As Exhibit 12 to the amended complaint, Plaintiff includes account summaries showing financial transactions that Touris admits that she handled for Gouletas with his own money. [120-1, at 38-46; 120, at ¶ 27.] Plaintiff alleges that all of these transactions were undertaken at the direction of Gouletas. [120, at ¶ 27.]

### C. Bankruptcy Proceedings

On January 17, 2016, Gouletas filed for relief under Chapter 7 of the Bankruptcy Code in the Northern District of Illinois. [*Id*. at ¶ 54.] The relevant citations remained in effect until the date that Gouletas filed for bankruptcy. [*Id*.] The Chapter 7 Trustee attempted to obtain counsel to prosecute avoidance and fraudulent transfer claims for and on behalf of the bankruptcy estate on a contingent fee basis, but, despite his diligent efforts, was unable to do so. [*Id*. at ¶ 51.] On July 23, 2017, the Chapter 7 Trustee received an offer from Plaintiff to purchase the litigation claims and alter-ego claims for $15,000. [*Id*. at ¶ 56] On July 24, 2017, the Chapter 7 Trustee filed in the bankruptcy court the Trustee's Motion for Approval of Sale of Interests in Personal Property and for Related Relief [120-1, at 78-87], which specifically included fraudulent transfer, alter-ego, and common law tort claims of the nature set forth in the amended complaint. No party

offered a higher bid for those claims. [120, at ¶ 56.] Neither the Debtor (*i.e.*, Gouletas) nor any creditor objected to the Chapter 7 Trustee's motion or the proposed sale. [*Id.*]

After notice to all interested parties and after hearing before the bankruptcy court, the bankruptcy court entered its Order Authorizing Sale of Personal Property on August 18, 2017. [120, at ¶ 57; 120-1, at 88-90.] Again, neither the Debtor nor any creditor objected to the order of sale or appealed the order of sale. [120, at ¶ 57.] On September 13, 2017, the Chapter 7 Trustee and a representative of Plaintiff executed the Assignment of Claims and Causes of Action, thereby transferring the Chapter 7 Trustee's litigation claims and alter-ego claims to Plaintiff. [120-1, at 91-94.] All conditions precedent to recovery by Plaintiff have been performed or have occurred. [120, at ¶ 59.]

## II. Legal Standard

To survive a Federal Rule of Civil Procedure ("Rule") 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim

of entitlement to relief." *Twombly,* 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). However, "[t]o survive a motion to dismiss, the well-pleaded facts of the complaint must allow the court to infer more than the mere possibility of misconduct." *Langworthy v. Honeywell Life & Acc. Ins. Plan*, 2009 WL 3464131, at *2 (N.D. Ill. Oct. 22, 2009) (citing *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011)). Evaluating whether a "claim is sufficiently plausible to survive a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *McCauley*, 671 F.3d at 616).

Furthermore, claims sounding in fraud are subject to Rule 9(b)'s heightened pleading standard. *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2005). Under Rule 9(b), a plaintiff alleging fraud "'must state with particularity the circumstances constituting fraud or mistake.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting Fed. R. Civ. P. 9(b)). Ordinarily, the plaintiff "must describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *Id*. (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)); see also *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (Rule 9(b) requires the plaintiff to state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." (quoting *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992)). While providing this broad guidance, "[t]he Seventh Circuit has shied away from a rigid, formulaic approach to Rule 9(b) and noted that '[t]he twin demands of detail and flexibility,

though in tension with one another, make sense in light of the competing purposes of the federal rules.'" *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 815 (N.D. Ill. 2013) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011)).

## III.  Analysis

### A.  Statute of Limitations

The parties disagree on which statute of limitations applies to the claims against BPMS and hence whether those claims are time-barred. Defendant argue for application of the two-year statute of limitations applying to actions against attorneys, 735 ILCS 5/13-214.3(b). Plaintiff counters that Section 214.3(b) does not apply because it is limited to "[a]n action * * * against an attorney arising out of an act or omission *in the performance of professional services*" (735 ILCS 5/13- 214.3(b) (emphasis added)), which Plaintiff argues does not cover Teplinsky's allegedly intentional and wrongful conduct. Instead, Plaintiff says its Illinois Uniform Fraudulent Transfer Act ("Illinois UFTA") claims are governed by the four-year statute of limitations set forth in §10(a) and (b) of the Illinois UFTA. 740 ILCS 160/10.

Defendant has the better of the argument concerning which statute of limitations applies. The Illinois Supreme Court has interpreted the "arising out of" language in 214.3(b) very broadly. Section 13-214.3 applies "'to all claims against attorneys concerning their provision of professional services,' including both tort and contract claims, such as breach of fiduciary duty or legal malpractice." *White v. Richert*, 2016 WL 3582083, at *4 (N.D. Ill. June 28, 2016) (quoting *Evanston Ins. Co. v. Riseborough,* 5 N.E.3d 158, 166 (Ill. 2014)). The rule's coverage is not limited to claims brought by a client against a retained attorney or to claims of malpractice; instead, it applies to "all claims against attorneys concerning their provision of professional services,"

9

whether rendered to the plaintiff or not. *Sanders v. JGWPT Holdings, Inc.*, 2016 WL 4009941, at *8 (N.D. Ill. July 26, 2016) (quoting *Evanston Ins. Co.*, 5 N.E.3d at 166). Moreover, courts have found that section 13-214.3(b) applies where law firms are alleged to have aided and abetted their client's malfeasance, see *Shrock v. Ungaretti & Harris Ltd.*, 2019 WL 4673919, at *5–6 (Ill. App. Ct. Sept. 25, 2019) (appeal pending), and where law firms are alleged to have acted fraudulently, see *Salon Grp., Inc. v. Salberg*, 2002 WL 1058120, at *2 (N.D. Ill. Mar. 29, 2002) (claim based on law firm's submission of allegedly fraudulent applications for visas was subject to two-year limitation under section 13-214.3(b)); see also *Kroll v. Cozen O'Connor*, 2020 WL 919005, at *4 (N.D. Ill. Feb. 26, 2020) (claims against law firm for malpractice, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and fraudulent concealment were subject to two-year limitation under section 13-214.3(b)). Accordingly, the Court concludes that the two-year statute of limitations under section 13-214.3(b) governs Plaintiff's claims against BPMS here.

However, while BPMS is right on the law, it is too early to say whether it is right on the facts. Generally, "[d]ismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (citation omitted). Dismissal on this basis "is appropriate only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Id.* Indeed, if there is any "conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Id.* It is possible that the facts, once fully developed, will support an estoppel or tolling argument that would allow Plaintiff to avoid the

10

statute of limitations. It also is possible that further factual development will not aid Plaintiff. The Court expresses no opinion on the matter at this point. The Court declines to dismiss the claims against BPMS on statute of limitations grounds at this time and will address the issue, if the parties raise it, once there is a more complete factual record. Defendant's motion to dismiss Plaintiff's claims on statute of limitations grounds is denied.

### B. The Illinois Uniform Fraudulent Transfer Act

#### i. *Aiding and Abetting and Civil Conspiracy under the Illinois UFTA*

Count V alleges that alleges BPMS, acting through Teplinsky, conspired with Gouletas to hide funds from his "unfavored creditors" by way of fraudulent transfers. [120, at ¶ 91-93]. Count VI alleges that BPMS, again through Teplinsky, aided and abetted Gouletas in executing fraudulent transfers in an effort to delay, hinder, or defraud his creditors. [120, at ¶ 94-96]. Counts I through IV, claims for fraudulent transfers, are all brought under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5(a)(1) and 160/6(a).

BPMS argues that neither civil conspiracy to commit fraudulent transfer nor aiding and abetting fraudulent transfer is a valid claim under the Illinois UFTA.[4] Plaintiffs disagree, asserting that:

> "Illinois common law 'allows for a cause of action for conspiracy to commit fraud' (*Paloian v. Greenfield (In re Rest. Dev. Group., Inc.*), 397 B.R. 891, 896 (Bankr. N.D. Ill. 2008)), and nothing within the IUFTA purports to limit any such common law cause of action. Moreover, §11 of the IUFTA provides that the Act may be supplemented by Illinois common law: 'Unless displaced by the provisions of this Act, the principles of law and equity, including * * * the law relating to * * * fraud * * *, supplement [the Act's] provisions.' 740 ILCS 160/11."

[137, at 7.] Defendant responds by citing *Gierum v. Glick (In re Glick)*, 568 B.R. 634, 677–78 (Bankr. N.D. Ill. 2017), for the proposition that "there is no such thing as a claim for aiding and

---

[4] Though the parties address conspiracy and aiding and abetting separately, the core arguments and cited cases are the same for both issues, so the Court takes them together.

11

abetting a fraudulent transfer," and, by extension, for conspiracy to commit fraudulent transfer. [131, at 12-14.]

*Gierum* criticizes the *Paloian* decision on several grounds, including its interpretation of the Illinois UFTA. Specifically, the *Gierum* court wrote:

> "*Paloian* cited section 11 of the IUFTA, saying it 'supplement[ed] applicable aider-abettor state law.' *Paloian*, 397 B.R. at 897–98. That section provides: "Unless displaced by the provisions of this Act, the principles of law and equity * * * supplement its provisions.' 740 ILCS 160/11 (2014). The difficulty in relying on section 11 as a basis for applying aiding and abetting liability principles is that another section of the IUFTA has displaced them. Section 8 specifies the remedies a creditor 'may obtain' in 'an action for relief against a transfer or obligation under this Act.' 740 ILCS 160/8 (2014). An award of damages against an aider-and-abettor is not one of them."

*Gierum*, 568 B.R. at 677–78.

As the foregoing citations suggest, there is a split of authority on the viability of civil conspiracy and aiding and abetting claims in this context. Compare *A.L. Dougherty Real Estate Mgmt. Co., LLC v. Su Chin Tsai*, 2017 IL App (1st) 161949, ¶ 19 (noting circuit court findings that the defendant had aided and abetted a fraudulent transfer under the Illinois UFTA and had conspired with others in an attempt to make a fraudulent transfer, neither of which was appealed); *FirstMerit Bank, N.A. v. Hosseini*, 2015 WL 4243484, at *10–11 (N.D. Ill. July 13, 2015) (denying motion to dismiss conspiracy and aiding and abetting claims based on alleged violations of the Illinois UFTA); *GoHealth, LLC v. Simpson,* 2014 WL 2866222, at *6 (N.D. Ill. June 24, 2014) (concluding that an alleged violation of the Illinois UFTA may serve as the substantive claim underlying a conspiracy claim); *Colman v. Greenfield*, 2005 WL 2592538, at *3 (N.D. Ill. Oct. 11, 2005) (declining to dismiss, among others, a claim for aiding and abetting allegedly fraudulent transfers under the Illinois UFTA because "a cause of action exists under Illinois law for aiding and abetting"); *Rubbermaid Inc. v. Robert Bosch Tool Corp.,* 2010 WL 3834410, at *5 (C.D. Ill.

Sept. 23, 2010) ("The [Illinois] UFTA does not specifically provide for a conspiracy cause of action; however, the [Illinois] UFTA may be supplemented by applicable state law claims such as conspiracy and aiding and abetting. Illinois state law does recognize a cause of action for conspiracy to commit fraud. Similarly, while "aiding and abetting" is not a separate tort, aiding and abetting fraud is a separate actionable claim. * * * Furthermore, Illinois courts have recognized civil conspiracy claims as well as aiding and abetting claims against non-transferee defendants where transfers were made as part of a scheme to defraud, hinder, or delay creditors.") (citations omitted) with *Audette v. Kasemir (In re Concepts Am., Inc.)*, 2018 WL 1174900, at *12 (Bankr. N.D. Ill. Mar. 1, 2018) (dismissing aiding and abetting fraudulent transfers claim based on 11 U.S.C. § 550 and the Illinois UFTA, and citing *Gierum*); *Gierum*, 568 B.R. at 676-77 (collecting cases); *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 591 (Bankr. N.D. Ill. 2005) (determining that there is no aiding and abetting liability for fraudulent transfers because "fraudulent transfer recovery is a form of disgorgement, so that no recovery can be had from parties who participated in a fraudulent transfer but did not benefit from it"); see also *Mack v. Newton*, 737 F.2d 1343, 1357 (5th Cir. 1984) ("one who did not actually receive any of the property fraudulently transferred * * * will not be liable for its value, even though he may have participated or conspired in the making of the fraudulent transfer"); *GATX Corp. v. Addington*, 879 F.Supp.2d 633, 643 (E.D. Ky. 2012) (noting that "courts generally do not recognize aiding and abetting a fraudulent conveyance as a viable cause of action against a non-transferee"); *Baker O'Neal Holdings, Inc. v. Ernst & Young LLP*, 2004 WL 771230, at *14 (S.D. Ind. Mar. 24, 2004) ("Accessory liability for fraudulent transfers cannot be supported by either the Bankruptcy Code or the [Indiana UFTA]"); *Miller v. Greenwich Capital Fin. Prods., Inc. (In re American Bus. Fin. Servs., Inc.)*, 457 B.R. 314, 324 (Bankr. D. Del. 2011) ("Aiding and abetting a fraudulent transfer

is not a valid claim under state or federal law where a trustee is bringing the claim."); *Ray v. Garland (In re Martin)*, 2011 WL 6130422, at *5 (Bankr. E.D. Tenn. Dec. 8, 2011) ("[C]ourts have consistently held that there is no such thing as liability for aiding and abetting a fraudulent conveyance ... as a matter of federal law under the Code" (internal quotation omitted)).

The key question on which the resolution of this dispute rests is the proper characterization of Plaintiff's claims. By its own acknowledgment in paragraph 5.2 of the operative second amended complaint, "Plaintiff's claims herein are asserted as assignee of the Bankruptcy Trustee." [120 at 6.] As such, (1) "[p]ursuant to 11 U.S.C. § 544(b)(1) * * * Plaintiff as assignee" invokes the provisions of the Illinois UFTA to set aside the allegedly fraudulent transfers and (2) Plaintiff stands in the shoes of the Chapter 7 Trustee, holding no more or no fewer rights than the Trustee would possess if he had advanced on the claims rather than assigning them to Plaintiff. To piece together the scope of the rights held by Plaintiff, the Court looks to four decisions of the bankruptcy court in this district—authored by Judges Wedoff, Schmetterer, Goldgar, and Hollis, respectively, in chronological order.

In the first of these relevant decisions, *Baldi v. Lynch (In re McCook Metals)*, 319 B.R. 570, 586 (Bankr. N.D. Ill. 2005), Judge Wedoff explained the overarching principles reflected in the Bankruptcy Code and Illinois UFTA provisions through which a bankruptcy trustee—or by extension, a trustee's assignee—"may recover property that the debtor transferred in an improper manner." As Judge Wedoff explained, section 548 of the Code and section 5 of the UFTA set out the modern formulations of the "ancient principle" allowing avoidance of fraudulent transfers, with the major difference being the "longer limitations period" under the UFTA. *Id*. at 587. As Plaintiff asserts [see 120, at 6], both remedies are available to the trustee (or assignee) under section 544 of the Code. "If a transfer is fraudulent under § 548 or § 5 of the UFTA, a trustee may recover

the value of the property transferred either from the transferee or from 'the entity for whose benefit such transfer was made,' pursuant to § 550(a)(1) of the Code." *Baldi*, 319 B.R. at 587.

In *Baldi*, one of the parties against whom recovery was sought, an individual named Lynch, "did not directly receive any part of the McCook contract rights" that were transferred to another party. 319 B.R. at 590. Yet the trustee sought recovery from Lynch as a "transfer beneficiary." *Id*. Stressing the "well-established rule that fraudulent transfer recovery is a form of disgorgement, so that no recovery can be had from parties who participated in a fraudulent transfer but did not benefit from it," Judge Wedoff concluded that "an actual benefit rather than a merely intended one must be received in order for the beneficiary to be liable under § 550(a)(1)." *Id*. at 591. Judge Wedoff also pointed to the "disgorgement-based requirement of actual receipt" in determining that "an award of 'value' against a transfer beneficiary should not be based on value that the beneficiary did not receive." *Id*. at 592-93. And, significantly for present purposes, in support of his conclusions, Judge Wedoff cited case law "finding no cause of action under New York [law] against a person assisting in a fraudulent transfer" and "finding no cause of action under Texas law or under the Bankruptcy Act of 1898 for conspiring in a fraudulent transfer." *Id*. at 591 (citing *FDIC v. Porco*, 75 N.Y.S.2d 840, 841 (1990), and *Mack v. Newton*, 737 F.2d 1343, 1356-57 (5th Cir. 1984)).

The next case in this line is *Paloian v. Greenfield (In re Restaurant Development Group, Inc.)*, 397 B.R. 891 (Bankr. N.D. Ill. 2008). In that case, on which Plaintiff heavily relies, Judge Schmetterer concluded that the Illinois UFTA permitted a trustee's claim for aiding and abetting a fraudulent transfer. *Id*. at 897-98 (citing 740 ILCS 160/5(a)(1)). Judge Schmetterer reasoned that "the UFTA supplements applicable aided-abettor state law" and cited Illinois state and federal cases recognizing aiding and abetting liability for fraudulent conveyances. *Id*.

15

The third case, *Gierum v. Glick (In re Glick)*, 568 B.R. 634, 677 (Bankr. N.D. Ill. 2017), found *Paloian* "unpersuasive," noting specifically that "[r]ather than consider the obstacle that section 550(a) poses to aiding and abetting claims under sections 548(a) and 544(b)," *Paloian* "analyzed Illinois law." As Judge Goldgar noted, "Section 550(a) specifically describes what a trustee can recover on a fraudulent transfer claim—and from whom." *Id*. at 676. He further observed that "whether the trustee is suing under section 548(a) or under section 544(b) and the Illinois UFTA, the trustee can only recover 'the property transferred or, if the court so orders, the value of the property.'" *Id*. And "[t]hat recovery can come only from the initial transferee of such transfer or the entity for whose benefit such transfer was made' or from 'any immediate or mediate transferee of such transferee.'" *Id*. Tracking Judge Wedoff's analysis in *Baldi*, Judge Goldgar next explained that "[b]ecause the recovery under section 550(a) 'is a form of disgorgement' * * * parties who neither received transferred property nor benefitted from a fraudulent transfer in some other way are not subject to liability." *Id*. (citing *Baldi*, 319 B.R. at 591). And commenting that "[o]verwhelmingly, courts have concluded that parties cannot be held liable for a fraudulent transfer if all they have done is participate in it," Judge Goldgar rejected any notion of a claim for damages on an aiding and abetting theory under either the Bankruptcy Code or the Illinois UFTA. *Id*. at 677 (citing cases).

In the final case, *Audette v. Kasemir (In re Concepts America, Inc.)*, 2018 WL 1174900, at *12 (Bankr. N.D. Ill. Mar. 1, 2018), Judge Hollis followed Judge Goldgar's analysis and conclusion, dismissing the trustee's claim on the ground that "there is no such thing as a claim for aiding and abetting a fraudulent transfer." She reached that conclusion after determining that the party in question "was neither a transferee of any fraudulent transfer nor the immediate or mediate transferee." *Id*.

16

Here, the second amended complaint alleges that BPMS was the direct transferee of $55,020 of the more than $2 million that Plaintiff alleges was fraudulently transferred over the entire time period encompassed within the lawsuit. Plaintiff's effort to tag BPMS with liability beyond the amount that it actually received by pursuing civil conspiracy and aiding-and-abetting theories runs contrary to the proper analysis, set out in *Baldi*, *Glick*, and *Audette*, for claims arising under the authority of bankruptcy trustees to set aside fraudulent transfers under the Section 544 of the Code and the Illinois UFTA. As an assignee of the Chapter 7 Trustee, Plaintiff must proceed on the "disgorgement" model set out by Judge Wedoff and followed by Judges Goldgar and Hollis, even if that model might be at odds with some of the Illinois state and federal cases cited in Judge Schmetterer's decision in *Paloian*, 397 B.R. at 898. For these reasons, BPMS's motion to dismiss Counts V (civil conspiracy) and VI (aiding and abetting) is granted.

## IV. Conclusion

For the reasons set forth above, Defendant Berman Pritikin Mirabelli Swerdlove LLP's ("BPMS") motion to dismiss [130] the claims against it in the second amended complaint is denied in part (as to Count I and IV) and granted in part (as to Counts V and VI). This case is set for further status on April 24, 2020 at 9:00 a.m. Counsel are requested to file a joint status report no later than April 21, 2020.

Dated: March 25, 2020

Robert M. Dow, Jr.
United States District Judge