## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **D.A.N. JOINT VENTURE III, L.P.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | No. 1:18-cv-00349 |
| | ) | |
| **DOROTHEA TOURIS; STEVEN E.** | ) | |
| **GOULETAS; NATEL MATSCHULAT;** | ) | |
| **PAUL JONES; JAMES PAUL;** | ) | |
| **STUART T. ADLER, Individually and as** | ) | |
| **Trustee of the Stuart T. Adler Revocable** | ) | |
| **Family Trust; GEORGE STRAY;** | ) | |
| **GEORGE SPANOS; BEERMANN** | ) | |
| **PRITIKIN MIRABELLI SWERDLOVE** | ) | |
| **LLP; IRENE GOULETAS; DESIREE** | ) | |
| **WITTE; VICTORIA M. GOULETAS;** | ) | |
| **ROSALIE GOULETAS; LOUIS** | ) | |
| **GOULETAS; MICHAEL GOULETAS;** | ) | |
| **and BRITTANY GOULETAS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <mark>THIRD</mark> AMENDED COMPLAINT AND JURY DEMAND

Plaintiff complains of Defendants as follows:

## Summary Of The Suit

1.      In this fraudulent transfer suit, the Debtor, Nicholas S. Gouletas ("Gouletas"), with

the knowing and substantial assistance of a number of the Defendants named herein, engaged in a

complicated scheme to hide, transfer and otherwise shield Gouletas's assets from the claims of

certain of his unfavored judgment creditors. And while Gouletas was implementing his fraudulent

transfer scheme, he selectively transferred over $2,000,000 in cash and his other assets to his

friends, relatives and a select group of creditors, all in violation of state court citation liens which

prohibited Gouletas from transferring his assets. On the eve of being held in contempt for violation

of one such citation lien, Gouletas sought the sanctuary of bankruptcy through a Chapter 7 bankruptcy filing.

2.      While Gouletas's bankruptcy filing prohibited further collection efforts against Gouletas directly, it does not prohibit fraudulent transfer actions against those to whom Gouletas transferred his assets in derogation of the rights of his other creditors, and in violation of the state court citation liens. This is an action to void Gouletas's fraudulent transfers pursuant to the provisions of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* (the "IUFTA"), and to recover damages from those who conspired with Gouletas in the design, implementation and execution of Gouletas's fraudulent transfer schemes. *See Tareco Properties, Inc. v. Morriss,* 196 Fed. App'x. 358, 363 & 365 (6th Cir. 2006)*See Paloian v. Greenfield (In re Rest. Dev. Group, Inc.), 397 B.R. 891, 896-98 (Bankr. N.D. Ill. 2008).*

**Jurisdiction And Venue**

3.      This Court has jurisdiction under 28 U.S.C. 1334. In addition, this Court has diversity jurisdiction under 28 U.S.C. §1332 because (a) this action is between citizens of different States with the amount in controversy exceeding $75,000, and (b) the assignment of the claims to Plaintiff as asserted herein was not made collusively for the purpose of conferring diversity jurisdiction upon this Court.

4.      Venue is appropriate in this Court pursuant to 28 U.S.C. §§1408 and 1409(a). In addition, pursuant to 28 U.S.C. §1391(b)(2), venue is appropriate in this Court because a substantial portion of the events giving rise to the claims asserted herein occurred in this Judicial District.

**Parties**

5.      **Plaintiff.**

5.1.      Plaintiff D.A.N. Joint Venture III, L.P. ("DJV") is an Ohio limited partnership with its principal place of business in Newton Falls, Ohio. The general partner of DJV

is The Cadle Company, an Ohio corporation with its principal place of business in Newton Falls, Ohio. The limited partners of DJV are Daniel C. Cadle and his wife, Ruth Cadle, both of whom are citizens of the State of Ohio.

5.2.    Plaintiff's claims herein are asserted as assignee of Bankruptcy Trustee Richard M. Fogel ("Bankruptcy Trustee"), who is the Bankruptcy Trustee for the Chapter 7 Bankruptcy Estate of Nicholas S. Gouletas, Debtor, which is pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, *In re Nicholas S. Gouletas, Debtor*, No. 16-01335. Pursuant to 11 U.S.C. §544(b)(1), the Bankruptcy Trustee, and thus Plaintiff as assignee, has standing to invoke the provisions of the IUFTA to set aside the fraudulent transfers made by the Debtor, Gouletas. *See In re Xonics Photochemical*, 841 F.2d 198, 202 (7th Cir. 1988).

5.3.    In the event it is determined that the Bankruptcy Court's August 18, 2017 Order (Px 27) authorizing the Trustee's assignment of fraudulent transfer claims to Plaintiff is subject to collateral attack, and thereafter it is determined that the Trustee lacked authority to assign his state-law fraudulent transfer claims to Plaintiff, Plaintiff's claims herein are asserted in the alternative as the assignee of the fraudulent transfer claims held by judgment creditor 800 South Wells Commercial, LLC ("800 SWC") which, on January 23, 2014, obtained a Final Judgment against Gouletas in the amount of $11,550,040.12 (the "800 SWC Judgment").

6.    **Defendants.**

6.1.    Defendant Dorothea Touris ("Touris") is a citizen of the State of Illinois and a close personal friend of Gouletas who conspired with Gouletas to place $826,218.84 of his funds in her checking accounts for the purpose of allowing Gouletas to continue his lavish lifestyle, but all the while evading the state court citation liens prohibiting Gouletas from transferring his assets.

6.2.    Defendant Steven E. Gouletas is a citizen of the State of Illinois and the son of Gouletas.

6.3.    Defendant Natel Matschulat is a citizen of the State of Illinois and the wife of Gouletas.

6.4.    Defendant Paul Jones is a citizen of the State of Illinois.

6.5.    Defendant James Paul is a citizen of the State of California who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.6.    Defendant Stuart T. Adler is a citizen of the State of Illinois and the Trustee of the Stuart T. Adler Revocable Family Trust, an Illinois trust (collectively, "Adler").

6.7.    Defendant George Stray is a citizen of the State of North Carolina who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.8.    Defendant George Spanos is a citizen of the State of Illinois.

6.9.    [Deleted.]

6.10.   Defendant Beermann Pritikin Mirabelli Swerdlove LLP ("BPMS") is an Illinois limited liability partnership engaged in the practice of law with its principal place of business in Chicago, Illinois. None of the partners of BPMS is a citizen of the State of Ohio.

6.11.   Defendant Irene Gouletas is a citizen of Illinois and the sister of Gouletas.

6.12.   Defendant Desiree Witte is a citizen of Illinois and the daughter of Gouletas.

6.13.   Defendant Victoria M. Gouletas is a citizen of Connecticut and the daughter of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.14.   Defendant Rosalie Gouletas is a citizen of New Mexico and the daughter of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.15.   Defendant Louis Gouletas is a citizen of Illinois and the grandson of Gouletas.

6.16.   Defendant Michael Gouletas is a citizen of California and the grandson of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

6.17.   Defendant Brittany Gouletas is a citizen of Illinois and the granddaughter of Gouletas.

## Facts

### A.   Background.

7.   The Debtor, Nicholas S. Gouletas ("Gouletas"), is the owner and control person of a large group of companies generally referred to as "American Invsco" which, for the last 49 years, were involved in condominium conversions and various other real estate developments in more than 40 cities throughout the United States. Gouletas routinely refers to himself as the "Condominium Conversion King".

8.   In a financial statement signed by Gouletas in the Spring of 2013, Gouletas represented that, as of March 31, 2013, he had a net worth of $25,287,560, with "cash" in the amount of $240,000. (Px 1) Thereafter, in a letter that Gouletas sent to Chicago Mayor Rahm Emanuel on January 13, 2014, Gouletas represented that "a real estate investor from London [is] in negotiations with us, American Invsco, to purchase a third tower on land we own at 801 S. Wells, for an additional $65 million." (Px 2)

9.   Even though Gouletas, in mid-2013, had a substantial net worth and was flush with cash, Gouletas would routinely pay only a select group of his creditors, while doing everything within his power to stiff the remainder of his unfavored creditors. Indeed, from mid-2013 to the present, Gouletas was generally not paying all of his debts as they became due, and was thereby

5

forcing his unfavored creditors to either abandon their claims, or seek collection of those debts through the judicial system.

**B.    Numerous Judgments Are Entered Against Gouletas**

10.    Gouletas was the manager of 800 South Wells Commercial, LLC ("800 SWC"), which owned certain commercial space at the River City Complex located at 800 South Wells Street in Chicago. Gouletas hired one of his companies, Invsco Management Company ("Invsco"), to manage the River City Complex commercial space in exchange for management fees paid by 800 SWC to Gouletas's company, Invsco.

11.    On March 17, 2011, 800 SWC filed suit against Gouletas in the Circuit Court of Cook County, Illinois, No. 2011-L-2895, for self-dealing and breaching fiduciary duties owed to 800 SWC (the "800 SWC Suit"). Gouletas was represented by counsel in connection with the 800 SWC Suit, and actively participated in pretrial proceedings.

12.    On August 9, 2013, Gouletas was sued by Karl T. Muth ("Muth"), one of the investors in a Gouletas condominium conversion project, in the Circuit Court of Cook County, Illinois, No. 2013-L-8995, for sums allegedly owed by Gouletas in connection with the investment (the "Muth Suit"). Thereafter, on December 11, 2013, a final judgment was entered in the amount of $761,352.27 against Gouletas (the "Muth Judgment").

13.    On August 20, 2013, Gouletas was sued by Humberto Alfonso ("Alfonso"), another investor in a Gouletas condominium conversion project, in the Circuit Court of Cook County, Illinois, No. 2013-L-9345, for sums allegedly owed by Gouletas in connection with the investment (the "Alfonso Suit"). Thereafter, on December 11, 2013, a final judgment was entered in the amount of $454,037.93 against Gouletas (the "Alfonso Judgment").

14. In the 800 SWC Suit, Gouletas steadfastly refused to sit for his deposition. Because of Gouletas's pattern of discovery abuse, on December 5, 2013, 800 SWC filed a Motion for Sanctions against Gouletas, which was granted by the Court on December 11, 2013. After Gouletas, once again, failed to sit for his deposition, on January 23, 2014 the Court in the 800 SWC Suit entered a final judgment against Gouletas in the amount of $11,550,040.12 (the "800 SWC Judgment").

15. Although Gouletas, through counsel at BPMS, appealed the 800 SWC Judgment, filed a Petition under Section 2-1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1401) to set aside the 800 SWC Judgment, and then appealed the trial court's denial of Gouletas's 2-1401 Petition, Gouletas was not successful in setting aside the 800 SWC Judgment.

### C. Citation Liens Are Entered Against Gouletas Prohibiting Gouletas From Transferring His Assets

16. On December 19, 2013, Citations to Discover Assets were issued against Gouletas in the Muth Suit and the Alfonso Suit, which were served upon Gouletas shortly thereafter. Gouletas was represented by Howard Teplinsky, Esq. from Defendant BPMS in connection with the Muth and Alfonso citation proceedings. Accordingly, as of the end of December, 2013, Mr. Teplinsky knew that Gouletas was prohibited from transferring his assets by virtue of the Citations issued in the Muth and Alfonso Suits. *See* 735 ILCS 5/2-1402(m); *Marcus-Rehtmeyer v. Jacobs*, 784 F.3d 430, 438-39 (7th Cir. 2015).

17. Due to Gouletas's failure to pay the amount owed under the 800 SWC Judgment, on June 5, 2014, 800 SWC filed a Citation to Discover Assets against Gouletas (Px 3) (the "Citation") in connection with the 800 SWC Suit (the "Citation Proceedings"). The Citation was served on Gouletas on June 9, 2014. At all times during the Citation Proceedings, Gouletas was represented by Mr. Teplinsky from BPMS.

18.     In the Citation, Gouletas was specifically instructed that:

> **YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of . . . any property not exempt from execution . . . belonging to the judgment debtor [Gouletas] <u>or to which the judgment debtor may be entitled</u> or which may be acquired by or become due to the judgment debtor . . ., until further order of Court or termination of the proceedings.

Px 3 p. 1 (underscoring added) (the "Citation Lien", and, with the Muth Citation and the Alfonso Citation, the "Citation Liens"). Gouletas and his counsel, Mr. Teplinsky, understood that when Gouletas was served with the Citation, he was not to transfer anything after receiving the Citation, and was "**PROHIBITED** from making or allowing any transfer or other disposition of . . . any [cash] to which [Gouletas] may be entitled or which may . . . become due to [Gouletas]." (*Id.*) Moreover, the Circuit Court Judge presiding over the Citation Proceedings, Judge Alexander White, specifically informed Gouletas, with Gouletas and Mr. Teplinsky present in open Court, that "[f]rom the time you received the citation [on June 9, 2014], all your assets were frozen . . . . [T]he citation language speaks for itself. It said you will not transfer any asset."

### D.     In Violation Of The Citation Lien, Gouletas Obtained And Cashed Numerous Cashier's Checks Issued To Himself

19.     In the 800 SWC Suit, the Citation was served upon Gouletas on June 9, 2014, which prohibited Gouletas from transferring any of his assets. In violation of the Citation Lien, Gouletas obtained and cashed numerous cashier's checks issued in his name:

(a)     On or about July 31, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,530.52 issued to himself (Px 4);

(b)     On or about August 1, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $10,000 issued to himself (Px 5);

(c)     On or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,500.00 issued to himself (Px 6); and

8

(d)     On or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $2,500.00 issued to himself (Px 7).

**E.     The Touris Checking Account Scheme**

20.     Apparently tired of the process of obtaining cashier's checks in his name, Gouletas then turned to a close personal friend, Defendant Touris, to assist him with a money laundering scheme that would allow Gouletas to maintain his lavish lifestyle, but all the while evade paying his unfavored judgment creditors, and skirt the judicial prohibitions against his transfer of assets imposed by the Citation Liens.

21.     Touris was a close personal friend of Gouletas for over 40 years. Moreover, Touris lived in the same condominium building as Gouletas at 111 East Chestnut Street in Chicago, having bought her condominium from one of Gouletas's entities after Gouletas developed that property into condominiums. Further, Touris was the director of design for Gouletas at American Invsco over the last 20 years.

22.     In January of 2015 (and after the Citation Liens were entered prohibiting Gouletas from transferring his assets), Gouletas, at a meeting with Mr. Teplinksy at Gouletas's office in Chicago, requested that Touris deposit Gouletas's funds into her checking accounts for the payment of Gouletas's expenses. Pursuant to Gouletas's plan, Touris would then take the funds that he had provided to her, put that money in her checking accounts, and then pay Gouletas's bills out of her checking accounts. The funds that Gouletas deposited into Touris's checking accounts belonged to Gouletas. In essence, Touris acted as a managing agent of Gouletas for the handling and use of Gouletas's funds.

23.     At the January 2015 meeting at Gouletas's office, Gouletas, at the direction of Mr. Teplinsky, presented Touris with a check in the amount of $396,218.84 drawn on the BPMS trust account. (Px 25) Touris understood that those funds belonged to Gouletas. Gouletas then told

Touris that "I would like you [Touris] to deposit this [the $396,218.84 BPMS check] in your account. And I want you [Touris] to pay $195,000 to [Gouletas's son] Steven Gouletas and $50,000 to a gentleman [named George Spanos]", with the balance of $150,000 to be kept by Touris as a purported "reimbursement" on a Gouletas investment. Based on the context of what was discussed at this meeting, Touris knew, must have known, or should have known that she was being asked to handle Gouletas's funds in this manner because Gouletas, personally, was in a difficult financial situation, and was, with the guidance and assistance of Mr. Teplinsky, trying to hide, transfer and otherwise shield Gouletas's income from the claims of his unfavored judgment creditors.

24.     Thereafter, on February 6, 2015 Touris wrote a check from her MB Bank checking account in the amount of $195,000 for a payment by Gouletas to his son, Steven E. Gouletas (Px 8), and a $50,000 payment to Gouletas's friend, George Spanos. (Px 9)

25.     On February 17, 2015, Gouletas wire-transferred $15,730 into Touris's checking account at Chase Bank (the "Touris Chase Account"). (Px 10) The $15,730 was money that belonged to Gouletas. Gouletas, however, claims to have "no idea" where the $15,730 came from.

26.     And then in March of 2015, Gouletas told Touris that an additional check for $415,000 was coming to her, which she was to deposit in her account for the payment of Gouletas's expenses. Touris then deposited the $415,000 check from Defendant Jones (Px 35) into her checking account at Chase Bank. (Px 11) According to Touris, she and Gouletas "talked about it together and he [Gouletas] wanted the bills paid, so . . . he asked me [Touris], would you deposit this [$415,000 check from Defendant Jones, Px 35] in your account and pay the bills." Although Gouletas claimed that the $415,000 was a "loan" to him from Defendant Jones (but with the check made payable to Touris), he admitted that the $415,000 was his money. The total amount of Gouletas's funds that Gouletas deposited into the Touris Chase Account was in excess of $431,145.

27.     The account summaries for the Touris Chase Account (Px 12) pertain to the requests that Gouletas made about taking funds that Gouletas had put into Touris's Chase checking account, and that Touris then withdrew from her account at Gouletas's request, all during the time that Gouletas was prohibited from transferring his cash pursuant to the Citation Liens. As acknowledged by Touris, "those [account summaries reflected by Px 12] are all of the financial transactions that [she] handled for Nick Gouletas with Nick Gouletas's money", and "[e]very single thing was done by [Gouletas] telling me [Touris] to do it."

28.     Although the Citation was served on Gouletas on June 9, 2014, and was not suspended until Gouletas filed for bankruptcy on January 17, 2016, the account summaries for the Touris Chase Account (Px 12) reflect the regular, continuous and systematic use of that account by Gouletas and Touris from February 17, 2015 when Gouletas made his initial wire transfer of $15,730 into that account, until September 14, 2015 with the payment of Gouletas's credit card bill. (*Id.*) Some of the more significant withdrawals by Gouletas from the Touris Chase Account -- all in violation of the Citation Liens -- are listed below:

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 2/18/15 | $7,000 | George Stray, friend of Gouletas. (Px 12 #14) |
| 3/16/15 | $5,000 | Cash. (Px 12 #14) |
| 3/17/15 | $5,000 | Cash. (Px 12 #14) |
| 3/20/15 | $10,000 | Transfer to other checking account. (Px 12 #14) |
| 3/20/15 | $10,000 | Wire transfer at Gouletas's request to "Santander, B". (Px 12 #14) |
| 3/20/15 | $20,000 | Cash. (Px 12 #14) |
| 3/20/15 | $5,000 | Cash. (Px 12 #14) |
| 3/20/15 | $90,000 | Loan to Touris. (Px 12 #15) |
| 3/24/15 | $53,000 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $16,000 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $7,200 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $440 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $30,000 | Natel Matschulat, Gouletas's wife. (Px 12 #15) |
| 3/26/15 | $5,512.22 | Condominium assessment. (Px 12 #15) |

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 3/26/15 | $3,436.06 | Payment for assessments on Gouletas's condominium. (Px 12 #15) |
| 3/26/15 | $1,061 | Payment to BOA for mortgage on Gouletas condominium. (Px 12 #15) |
| 3/26/15 | $869.09 | Payment of Gouletas's ComEd bill. (Px 12 #15) |
| 3/27/15 | $2,949.02 | Payment of mortgage. (Px 12 #15) |
| 3/27/15 | $2,788.28 | Payment of assessments for condominiums. (Px 12 #15) |
| 3/27/15 | $1,865.16 | Payment of assessments for condominiums. (Px 12 #15) |
| 4/7/15 | $10,000 | Wire transfer to Luxury Management LLC. (Px 12 #17) |
| 4/9/15 | $3,581.01 | Assessment for  Gouletas's condominium. (Px 12 #17) |
| 4/13/15 | $1,391.55 | Payment for Gouletas's condominium on Delaware Street. (Px 12 #17) |
| 4/13/15 | $230 | Assessment for Gouletas's condominium on Delaware Street. (Px 12 #17) |
| 4/14/15 | $22,474.24 | Mortgage for Gouletas's condominium. (Px 12 #17) |
| 4/14/15 | $4,299.75 | Mortgage for Gouletas's condominium. (Px 12 #17) |
| 4/14/15 | $2,634.74 | Payment for assessments on Gouletas's condominium at Delaware Place. (Px 12 #17) |
| 4/14/15 | $1,639.82 | Payment of Gouletas's ComEd bill. (Px 12 #17) |
| 4/14/15 | $125 | Payment of AT&T bill. (Px 12 # 17) |
| 4/15/15 | $4,167.06 | Payment of assessment on Gouletas's condominium. (Px 12 #17) |
| 4/16/15 | $15,150.29 | Unexplained. (Px 12 #17) |
| 4/16/15 | $14,268.31 | Payment of Gouletas's mortgage. (Px 12 #17) |
| 4/16/15 | $2,695.25 | Payment of Gouletas's assessment on condominium. (Px 12 #17) |
| 4/16/15 | $1,275.29 | Payment for Gouletas's parking. (Px 12 #17) |
| 4/27/15 | $10,000 | Gouletas requested payment to Karen Thorton. (Px 12 #18) |
| 4/28/15 | $1,620.10 | Payment for Gouletas's condominium. (Px 12 #18) |
| 4/29/15 | $3,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 12 #18) |
| 4/29/15 | $1,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 12 #18) |
| 4/30/15 | $2,000 | Unexplained. (Px 12 #18) |
| 5/4/15 | $13,000 | Payment to Gouletas's wife, Natel Matschulat. (Px 12 #18) |
| 5/4/15 | $10,000 | Payment to George Spanos. (Px 12 #18) |
| 5/13/15 | $5,000 | Unexplained. (Px 12 #18) |
| 5/14/15 | $10,000 | Transferred to another checking account. (Px 12 #18) |
| 5/21/15 | $1,000 | Unexplained. (Px 12 #18) |
| 5/26/15 | $2,712.05 | Transferred to checking account. (Px 12 #19) |
| 5/28/15 | $10,000 | Gouletas gave the money to Touris. (Px 12 #19) |
| 5/28/15 | $5,000 | Cash.   (Px 12 #19) |
| 5/28/15 | $5,000 | Cash. (Px 12 #19) |
| 5/29/15 | $900 | Payment on Gouletas's credit card. (Px 12 #19) |

| Date | Amount | Payee/Explanation |
| --- | --- | --- |
| 5/29/15 | $6,500 | Payment on Gouletas's wife's credit card. (Px 12 #19) |
| 6/4/15 | $10,000 | Payment to Vivien. (Px 12 #19) |
| 6/8/15 | $2,171.10 | Payment on Gouletas's credit card. (Px 12 #19) |
| 6/9/15 | $6,178.31 | Payment for Gouletas's condominium. (Px 12 #19) |
| 6/9/15 | $1,000 | Payment to Heather Von Ehr. (Px 12 #19) |
| 6/24/15 | $1,000 | Payment on Gouletas's credit card. (Px 12 #20) |
| 6/24/15 | $5,000 | Unexplained. (Px 12 #20) |
| 7/2/15 | $2,000 | Cash. (Px 12 #20) |
| 7/14/15 | $1,602.60 | Payment for three plane tickets to Atlanta. (Px 12 #21) |

29. From the $826,218.40 that Gouletas deposited into Touris's checking accounts, only $1,368 of Gouletas's funds remained in those accounts as of February 10, 2017.

### F.   The Garvey Court Scheme

30.   During the time that the Citations were issued prohibiting Gouletas from transferring his assets, Gouletas was involved in a real estate development project referred to as "Garvey Court" (the "Garvey Court Project"). The Garvey Court Project involved the construction of a mixed use high-rise retail/office/condominium building on properties that Gouletas owned (through entities that he owned and controlled) at Clark and Lake Streets in Chicago.

31.   Basically, in April of 2014, Gouletas placed certain properties that he owned into a new entity -- Garvey Court, LLC -- which would pay off the existing debt on the properties, and then develop the new high-rise on the Gouletas properties. Gouletas's "equity cushion" in the Garvey Court properties was in excess of $3,600,000.

32.   In the original formulation of the Garvey Court plan, Gouletas was going to retain a 25% interest in the Garvey Court Project. Later in May of 2014, however, and (a) after the Citations were served upon Gouletas in the Muth and Alfonso Suits; (b) after the 800 SWC Judgment was entered against Gouletas; and (c) after Gouletas met and conferred with Mr. Teplinsky about the proposed Garvey Court transaction, Gouletas "gifted" his 25% interest in the

Garvey Court Project to family members through two newly formed LLCs, SEG Garvey LLC (12%) and NKM Garvey LLC (13%), as follows:

    (a)    SEG Garvey LLC

        (i)       Steven E. Gouletas -- 16.66%
        (ii)      Irene Gouletas -- 16.67%
        (iii)     Desiree Witte -- 16.67%
        (iv)     Victoria M. Gouletas -- 16.67%
        (v)       Rosalie Gouletas -- 16.67%
        (vi)     Louis Gouletas -- 5.53%
        (vii)    Michael Gouletas -- 5.53%
        (viii)   Brittany Gouletas -- 5.54%

    (b)    NKM Garvey LLC

        (i)       Natel Matschulat -- 93%
        (ii)      Nicholas Gouletas --7%

33.    Accordingly, in late May of 2014, Gouletas, after conferring with Mr. Teplinsky from BPMS about the Garvey Court plan, gifted away -- in violation of the Citation Liens and in derogation of the rights of his creditors -- virtually all of his "equity cushion" in the Garvey Court Project. As of the time of the Garvey Court transfers, Gouletas's "equity cushion" in the Garvey Court Project exceeded $3,600,000.

    **G.**    **The Matschulat-CIB Stock Scheme**

34.    Shortly after service of the Citation upon Gouletas on June 9, 2014, Gouletas discovered, quite by accident, that he had, in the distant past, acquired a number of shares of stock in CIB Marine BankShares (the "CIB Stock"), which Gouletas held through a stock brokerage account at TD Ameritrade (the "TDA Account").

35.    Although the Citation was served on Gouletas on June 9, 2014, and Gouletas understood that he was thereby prohibited from transferring his assets, on or about September 4, 2014, Gouletas sold his CIB Stock through his TDA Account for just over $51,000 (Px 13), and

then, on or about the same date, wire-transferred $51,323.29 from that stock sale into a checking account held in the name of his wife, Natel Matschulat. (*Id.*)

36.     After depositing the $51,323.29 in his wife's checking account, Gouletas then proceeded to have his wife, Natel Matschulat, sign checks from that account for the payment of Gouletas's expenses, all in violation of the judicial prohibition against his transfer of assets imposed by the Citation Liens.

**H.     The HBI-Parking Lot Scheme**

37.     One of Gouletas's entities, 800 South Wells Phase II, LLC ("800 SWP"), owned a 1.77 acre 126-space parking lot at 800 South Wells Street in Chicago (the "Parking Lot"), which was next to the River City Complex. Gouletas was the manager, sole member and control person of 800 SWP.

38.     As of November 1, 2009, there was only one mortgage indebtedness against the Parking Lot, which was in favor of River City Investors, LLC ("RCI") in the original principal amount of $2,000,000 (the "RCI Mortgage"). Since the Parking Lot was worth far in excess of the amount of the RCI Mortgage, on November 1, 2009 Gouletas had another one of his controlled entities, Home By Invsco, Inc. ("HBI"), place a bogus mortgage against the Parking Lot in the amount of $2,177,700 (the "HBI Second Mortgage") to protect the equity in the Parking Lot from the claims of Gouletas's creditors. HBI was owned and controlled by Gouletas, and was, in fact, the alter-ego of Gouletas.

39.     While Gouletas signed the HBI Second Mortgage on November 1, 2009, the internal financial documents of Gouletas's enterprise, American Invsco (which included 800 SWP and HBI), did not reflect any indebtedness supposedly owed to HBI on the HBI Second Mortgage:

(a)     In the "American Invsco Liquidity Action Plan Update" dated November 22, 2011 (Px 14), it was represented that:

> Our debt at the land is $2,500,000. The last appraisal had a value of $14,880,000. CBRE indicates that . . . the market value for the land should be around $12,000,000. We have indicated the urgency to them, and we are going to list it for $13,000,000, anticipating accepting a price around $12,000,000 in the next nine months, again subject to market conditions. Therefore, the net proceeds to the company should be around $9,000,000.

(*Id*. p. 1) No indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(b)     In an "American Invsco Companies Consolidated Balance Sheet" dated December 31, 2012 (Px 15), it was represented that the Parking Lot had a value of $9,500,000, with the sole mortgage on the Parking Lot in favor of RCI in the amount of $2,000,000. (*Id*.) This December 31, 2012 Consolidated Balance Sheet for American Invsco showed that Gouletas had "shareholder equity" in the amount of $10,002,000. (*Id*.) Again, no indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(c)     In a "Balance Sheet" signed by Gouletas (Px 1), Gouletas represented that as of March 31, 2013, the Parking Lot had a value of $11,334,590 (*id*. p. 1), with the sole mortgage owed by 800 SWP on the Parking Lot in the amount of $3,300,000. (*Id*. p. 4) Once again, no indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(d)     In a "Balance Sheet" dated February 28, 2014 (Px 16), Gouletas represented that the Parking Lot was worth $6,500,000, with a "first mortgage" in the amount of $3,300,000. (*Id*.) And, once again, no indebtedness was showed which was supposedly owed by 800 SWP to

HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

40. Further, in connection with Gouletas's efforts to supersede a prior judgment that DJV had obtained against Gouletas for Gouletas's failure to honor his word on a guarantee, on June 29, 2010, Gouletas represented to Illinois Circuit Court Judge Lee Preston, under oath, that:

> The Property [*i.e.*, the Parking Lot] is valued at $14,888,000. . . .
> The sole mortgage recorded against the Property is in the recorded
> amount of $2,000,000. Ex. B, p. D-3 ¶6. Therefore, there is equity
> in the amount of $12,880,000 in the Property to serve as security for
> the [$1,000,000] Judgment [that DJV obtained against Gouletas].

(Px 17 p. 2 ¶5) Accordingly, on June 29, 2010, Gouletas verified under oath, and represented to Judge Preston and DJV, that there was no other mortgage indebtedness owed in connection with the Parking Lot other than the RCI Mortgage.

41. In late 2014, Gouletas received a solid offer from a financially sound third party to purchase the Parking Lot for $7,750,000. With the RCI Mortgage and other expenses of the sale totaling approximately $5,711,000, Gouletas and Mr. Teplinsky from BPMS came up with a plan to shield the approximately $2,038,000 in profits from Gouletas's unfavored judgment creditors. Basically, the plan involved the false claim that the HBI Second Mortgage was legitimate, and then Gouletas would have the approximately $2,038,000 in profits from the sale of the Parking Lot (that otherwise would have been paid to Gouletas) deposited into BPMS's trust account, thereby shielding Gouletas's funds from the ongoing execution efforts by judgment creditor 800 SWC. The Gouletas funds deposited into the BPMS trust account would then be distributed to certain preferred creditors and other friends and relatives of Gouletas, with those friends and relatives then funneling a portion of the profits from the sale of the Parking Lot back to Gouletas through Touris's checking accounts.

42.     By email dated December 19, 2014, Elizabeth Friedgut, Esq., the transactional attorney for Gouletas who was working with Mr. Teplinsky on the sale of the Parking Lot, inquired of Gouletas's son, Steven Gouletas, as follows: "I need to talk to [Gouletas's accountant, Gerald Zaidman] about your dad's tax liability for river city which we are going to be selling shortly." (Px 18 (emphasis added)) On December 22, 2014, Gouletas's accountant, Mr. Zaidman, responded: "I think it is important if you can defer the closing of the 800 Wells property [*i.e.*, the Parking Lot] owned by Nick personally til 2015. Please call me to discuss ASAP." (Px 19 (emphasis added))

43.     The closing on the sale of the Parking Lot occurred on December 29, 2014. The closing statement (Px 20) did not list any indebtedness owed to HBI. Rather, the closing statement showeds that from the $7,750,000 in sale proceeds, $2,038,703.84 was the balance due to the Seller, 800 SWP. (*Id.* p. 2.) Elizabeth Friedgut signed the settlement statement for and on behalf of 800 SWP. (*Id.*) Shortly after the closing, Mr. Teplinsky directed the title company to not pay the balance of the sale proceeds, $2,038,703.84, to the "Seller" as listed on the closing statement, but rather to deposit those funds into BPMS's trust account. Accordingly, at the direction of Mr. Teplinsky, on January 7, 2015, $2,038,703.84 in proceeds from the sale of the Paking Lot was transferred by the title company into BPMS's trust account, with BPMS thereby exercising dominion over those funds. Mr. Teplinsky and his law firm, BPMS, were not engaged in the rendition of professional services when they took dominion over the $2,038,703.84 in profits from the sale of the Parking Lot.

44.     800 SWP and HBI were and are the alter-egos of Gouletas, and the $2,038,703.84 in profits from the sale of the Parking Lot legally and equitably belonged to Gouletas:

(a)     In connection with the matters set forth herein, 800 SWP was used by Gouletas to perpetuate and carry out the HBI-Parking Lot Scheme. Gouletas was the sole owner of 800 SWP,

and, throughout the years, Gouletas conducted the affairs of 800 SWP without observing required corporate formalities. In that connection, there was the failure to maintain adequate corporate records; a comingling of 800 SWP's funds with other Gouletas-related entities; and the failure to maintain arm's-length relationships with other Gouletas-related entities.

(b)    In connection with the matters set forth herein, HBI was used by Gouletas to perpetuate and carry out the HBI-Parking Lot Scheme. Further, Gouletas was the sole owner of HBI, and, throughout the years, Gouletas conducted the affairs of HBI without observing required corporate formalities. In that connection, there was the failure to hold regular corporate meetings; the non-functioning of other officers and directors; the failure to maintain adequate corporate records; a commingling of HBI's  funds with other Gouletas-related entities; and the failure to maintain arm's-length relationships with other Gouletas-related entities. Indeed, long before the December 29, 2014 closing on the sale of the Parking Lot, HBI's corporate charter was involuntarily dissolved by the Illinois Secretary of State's Office on April 11, 2014.

45.    As of January 5, 2015, Gouletas and Mr. Teplinsky still had not decided exactly how to distribute the profits from the sale of the Parking Lot. By email to Gouletas's agent, John Arnold, dated January 5, 2015, Gouletas's attorney at BPMS, Howard Teplinsky, outlined his thoughts on how the profits from the sale of the Parking Lot should be disbursed. (Px 21) Based on information and belief, it was Mr. Teplinksy from BPMS who advised Gouletas to place the $2,038,703.84 in profits from the sale of the Parking Lot into BPMS's trust account so as to shield Gouletas's cash from the ongoing execution efforts by 800 SWC. (Px 22) After accepting Mr. Teplinsky's recommendation, in January of 2015 Gouletas and Mr. Teplinsky then came up with a number of plans as to how those profits should be distributed so as to best serve Gouletas's personal financial needs, while still shielding Gouletas's income from the claims of his unfavored

judgment creditors. In addition, on January 6, 2015, Gouletas, at the direction of Mr. Teplinsky, had an additional $137,535 wire-transferred into the trust account at BPMS. (Px 23)

46.     Then on January 20, 2015, Mr. Teplinsky, for and on behalf of BPMS, directed how the remainder of the $1,271,218.84 from the BPMS escrow account was to be distributed. (Px 24) Of the $396,218.84 paid to Touris (Px 25), Gouletas then had Touris distribute $195,000 of those proceeds to his son, Steven Gouletas, and $50,000 of those proceeds to Gouletas's friend, George Spanos. Further, of the $690,000 distributed to Defendant Paul Jones, $415,000 from those proceeds (Px 35) were then deposited by Defendant Jones into Touris's checking account (Px 11) so Gouletas could continue to pay his expenses without those funds being subject to execution by Gouletas's judgment creditors.

47.     The $690,000 payment by Gouletas to Defendant Jones on January 21, 2015 was without fair and adequate consideration, and was not paid by Gouletas in the ordinary course of business. Indeed, the $690,000 that supposedly was owed by Gouletas was, in fact, owed by one of Gouletas's companies, AIGL Real Estate Company ("AIGL"), pursuant to a promissory note (Px 30) whereby Defendant Jones charged AIGL with interest at a rate in excess of 200%. Moreover, Defendant Jones has admitted that (a) he "wasn't certain what [the $415,000 check, Px 35] pertained to"; (b) the $690,000 payment to him by Gouletas was "kind of strange"; that he didn't know "what it pertained to"; that he didn't know "where the money came from"; and that Gouletas simply said "deposit this, $690,000, but then I need you to pay [the $415,000] to Dorothea Touris; that's the only way I [Gouletas] can get my money out of this"; (c) he "had no idea" why he wrote a check to Touris for $415,000; (d) he didn't even know Touris, and never spoke with her; (e) Gouletas "never explained why he [Gouletas] didn't just write a check to Dorothea Touris himself"; and (f) while Defendant Jones supposedly "lost a ton of money investing with Gouletas",

20

"helping him [Gouletas] out was the only way [Defendant Jones] could get some of [his] money back." Accordingly, Defendant Jones knew not only of Gouletas's difficult financial condition, but also knew, must have known, or should have known of Gouletas's money laundering and fraudulent transfer scheme.

48.     The $110,000 payment by Gouletas to Defendant James Paul on January 21, 2015 was without fair and adequate consideration, and was not paid by Gouletas in the ordinary course of business. Indeed, the $110,000 that supposedly was owed by Gouletas was, in fact, owed by one of Gouletas's companies, AIGL, pursuant to a promissory note (Px 31) whereby Defendant Paul charged AIGL with interest at a rate of 200%.

49.     The $60,000 in payments by Gouletas to Defendant George Spanos in February and May of 2015 were without fair and adequate consideration, and were not paid by Gouletas in the ordinary course of business. Indeed, the $60,000 that supposedly was owed by Gouletas was, in fact, owed by one of Gouletas's companies, AIGL, pursuant to a promissory note (Px 32) whereby Defendant Spanos charged AIGL with interest at a rate of 200%.

50.     The $35,000 payment by Gouletas to Defendant Warady & Davis LLP ("W&D") on January 21, 2015 was without fair and adequate consideration, and was not paid by Gouletas in the ordinary course of business. Although $25,000 of those funds was represented by Mr. Teplinsky to be for "engagement of accountant for HBI's returns" (Px 21), the real purpose for the placement of those funds in W&D's trust account was so that W&D could use and disburse Gouletas's funds as Gouletas and Mr. Teplinsky directed, and thereby shield Gouletas's funds from the claims of Gouletas's unfavored judgment creditors. Indeed, the $35,000 deposited by Mr. Teplinsky into W&D's trust account on January 21, 2015 was highly suspicious, and should have

alerted W&D that something improper was afoot in connection with Mr. Teplinsky's handling of Gouletas's income:

      (a)     The $35,000 "retainer" did not come from the prospective client, but rather from an attorney's trust account, and was excessive under the circumstances.

      (b)     Further, shortly after Gouletas filed for bankruptcy, on January 28, 2016, the partner in charge at W&D, Richard M. Franklin, was contacted by Mr. Teplinsky to write a check from W&D's trust account in the amount of $10,000 for payment of Gouletas's personal legal fees.

      (c)     In addition, in the first quarter of 2016, W&D was informed by Mr. Teplinsky that the approximately $51,000 in proceeds from the sale of the CIB bank stock belonged to Gouletas, but Gouletas had placed those funds in his wife's checking account.

      (d)     In spite of the above, at no time did W&D or Mr. Teplinsky inform the Bankruptcy Court, the Bankruptcy Trustee, or Gouletas's creditors that the $35,000 that Mr. Teplinsky parked in W&D's trust account did, in fact, belong to Gouletas.

      (e)     And finally, on November 1, 2016, W&D attempted to cover-up the placement of Gouletas's funds in its trust account by invoicing "Home by Invsco Howard Teplinsky c/o Beerman Pritikin Mirabelli Swerdlove LLP" (Px 33), even though the accounting work was not, in fact, performed for HBI, but rather for Gouletas, personally.

      (f)     Accordingly, W&D took affirmative steps toward furtherance of the scheme to delay, hinder or defraud Gouletas's creditors, and W&D was a knowing and active participant in the scheme to hide Gouletas's cash from the claims of Gouletas's creditors.

      51.     At the direction of BPMS's agent, Mr. Teplinsky, on January 13, 2015, $30,020 of the profits from the sale of the Parking Lot were distributed to BPMS for an alleged payment on

HBI's legal bills. And then on January 22, 2015, an additional $25,000 of the profits from the sale of the Parking Lot were distributed to BPMS as "finalize entity flat fee charge" for work supposedly done for and on behalf of HBI. On information and belief, these "legal fees" paid to BPMS reflected work by Mr. Teplinsky that was done, in reality, primarily on behalf of Gouletas, and otherwise constituted excessive fees charged by BPMS to HBI.

51.1.   Finally, on April 15, 2016, the Chapter 7 Bankruptcy Trustee, Richard Fogel, Esq., inquired of 800 SWP's closing attorney, Elizabeth Friedgut, why the $2,038,703.84 in net sale proceeds was paid to the "Seller", 800 SWP (Px 20), rather than the purported second mortgagee, HBI. Mr. Teplinsky then quickly intervened to cut off further inquiry by contacting the Chapter 7 Trustee and representing to him that since HBI "was no longer operating and didn't have any bank accounts",  "the title company held the amount used to pay the [HBI] lien in escrow", with the $2,038,703.84 in escrowed funds eventually transferred, at Mr. Teplinsky's direction, to the BPMS trust account for the supposed purpose of paying HBI's creditors.

## I.     The Contempt Proceedings Against Gouletas

52.     Based on the numerous violations by Gouletas of the Citation Lien, on April 24, 2015, 800 SWC filed a Motion for Contempt against Gouletas, which was amended on October 9, 2015 (the "Contempt Motion"). The trial court (White, J.) conducted hearings in connection with the Contempt Motion on July 20, 2015, September 2, 2015, and November 24, 2015.

53.     In connection with the evidence which showed that Gouletas, during the Citation Proceedings, had sold his CIB Stock without obtaining permission from the Court, Judge White stated, with Gouletas still up on the witness stand, that:

> I'm a little bit confused here. We have a citation that says . . . don't transfer assets. And what I'm hearing from the testimony is that apparently [Gouletas's CIB Stock] was sold. The money was

> forthcoming and was used to buy food, which is a violation of the
> citation.

Further, Gouletas testified at the contempt hearing that he supposedly had "no idea" why he was going through a series of cashier's checks during the time from and after the Citation was served upon him on June 9, 2014.

54. The final day of the contempt hearing was scheduled for January 19, 2016. On the eve of Judge White's decision in connection with the motion to hold Gouletas in contempt, on January 17, 2016 Gouletas filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois. The Citation Liens continued in existence at all times from the date the Muth and Alfonso Citations were served on Gouletas in December of 2013 until the date that Gouletas filed for bankruptcy on January 17, 2016 (*see Marcus-Rehtmeyer v. Jacobs*, 784 F.3d 430, 438-39 & 443 (7th Cir. 2015)), and at all relevant times were in full force and effect.

## J.    The Bankruptcy Trustee Assigns The Litigation Claims And Alter-Ego Claims To DJV

55. Upon Gouletas's filing of bankruptcy on January 17, 2016, all fraudulent transfer claims that a creditor held against Gouletas became the exclusive property of the Bankruptcy Trustee for the two-year period following the bankruptcy filing, with the creditors divested of the ability to prosecute any such fraudulent transfer claims for the two-year period of exclusivity accorded to the Bankruptcy Trustee. Pursuant to 11 U.S.C. §546(a)(1)(A), when the two-year limitation on the Bankruptcy Trustee's fraudulent transfer claims expired on January 17, 2018, those state-law fraudulent transfer claims, absent prior effective sale and assignment of those claims by the Bankruptcy Trustee, automatically revert back to the creditors which held the fraudulent transfer claims prior to Gouletas's bankruptcy filing. *See Klingman v. Levinson*, 158 B.R. 109, 113 (N.D. Ill. 1993).

56.     The Bankruptcy Trustee attempted to obtain counsel to prosecute avoidance and fraudulent transfer claims for and on behalf of the Bankruptcy Estate on a contingent fee basis, but, despite his diligent efforts, was unable to do so. On July 23, 2017, the Bankruptcy Trustee received an offer from DJV to purchase the Bankruptcy Trustee's litigation claims and alter-ego claims for $15,000. On July 24, 2017, the Bankruptcy Trustee filed in the Bankruptcy Court the Trustee's Motion for Approval of Sale of Interests in Personal Property and for Related Relief (Px 26), which specifically included fraudulent transfer, alter-ego, and common law tort claims of the nature set forth herein. *See* 11 U.S.C. §§363(b)(1) & 544(b)(1). No one offered a higher bid for those claims, and neither the Debtor, Gouletas, nor any creditor, objected to the Bankruptcy Trustee's Motion or the proposed sale by the Bankruptcy Trustee.

57.     After due notice to all interested parties, and after hearing before the Bankruptcy Court, on August 18, 2017, the Bankruptcy Court presiding over the Gouletas Bankruptcy entered its Order Authorizing Sale of Personal Property. (Px 27) Neither the Debtor, Gouletas, nor any creditor objected to the order of sale, or appealed the order of sale. Thereafter, on September 13, 2017, the Bankruptcy Trustee and the representative of DJV executed an Assignment of Claims and Causes of Action, thereby transferring the Bankruptcy Trustee's fraudulent transfer claims, litigation claims and alter-ego claims to DJV. (Px 28)

58.     On April 17, 2019, 800 SWC assigned all of its fraudulent transfer claims -- to the extent any such fraudulent transfer claims were not previously effectively assigned to DJV by the Trustee -- to Plaintiff. (Px 34)

59.     All conditions precedent to recovery by Plaintiff have been performed or have occurred.

60.     Plaintiff realleges all preceding and succeeding paragraphs as the basis for each of the following Counts.

### Count One
**(Avoidance Of Fraudulent Transfers**
**Pursuant To 740 ILCS 160/5(a)(1))**

61.     The Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq*. (the "IUFTA") at Section 160/5(a) provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . ., if the debtor made the transfer . . .: (1) with actual intent to hinder, delay or defraud any creditor of the debtor . . ..

740 ILCS 160/5(a)(1).

62.     The following transfers of cash (the "Transfers") were made by or on behalf of the Debtor, Gouletas, from funds that, legally and equitably, belonged to Gouletas, with actual intent to hinder, delay or defraud Gouletas's unfavored judgment creditors in existence as of the dates of the Transfers.

63.     The course of conduct set forth above shows Gouletas's actual intent to hinder, delay or defraud Gouletas's unfavored judgment creditors in existence as of the date of the Transfers. Indeed, a number of the Transfers were to insiders as defined in 740 ILCS 160/2(g)(1), (4) & (5). In that connection, (a) Touris was an "insider" within the meaning of 740 ILCS 160/2(g)(5) because Touris acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas's funds; (b) Steven Gouletas was an "insider" within the meaning of 740 ILCS 160/2(g)(1) & (5) because he is a relative of the Debtor (*i.e.*, Gouletas's son), and acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas's funds; and (c) BPMS was an "insider" within the meaning of 740 ILCS 160/2(g)(5) because BPMS acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas's funds. Further,

26

as to Gouletas's funds deposited into (a) the trust account at BPMS; (b) the checking account for W&D; and (c) the checking accounts of Touris, Gouletas retained control over those funds, and the transfers were concealed. In addition, before the Transfers were made, Gouletas had been sued and threatened with further suits, numerous judgments had been entered against him, and he was insolvent. Finally, in connection with the Transfers, Gouletas intended to prefer the interests of the following Defendants above the interests of judgment creditors 800 SWC, Muth and Alfonso.

64.     The Transfers were made in violation of 740 ILCS 160/5(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

65.     None of the Defendants listed below took the fraudulently transferred funds in good faith because each Defendant knew, must have known, or should have known that numerous judgments had been entered against Gouletas, with outstanding Citation Liens which prohibited Gouletas from transferring his assets. *See For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 560 F.3d 717, 722 (7th Cir. 2009). Indeed, as to Defendant Adler, he previously had filed suit against Gouletas on August 4, 2014 in the Circuit Court of Cook County, Illinois, No. 2014 L 050584, during which Adler was represented by reputable counsel who were highly experienced and very thorough litigators. Accordingly, at the time that Adler took the $850,000 from Gouletas on January 8, 2015, Adler knew, must have known, or should have known about the 800 SWC, Muth and Alfonso judgments against Gouletas and the outstanding Citation Liens that had been entered against Gouletas which prohibited Gouletas from transferring his assets. Moreover, in the December 30, 2014 Release and Settlement Agreement executed between Adler and Gouletas (Px 29), Adler acknowledged that "[i]f for any reason Adler is ordered to return or disgorge the Payment [of $850,000] or any portion thereof, any obligation of Adler hereunder shall be null, void and of no effect . . .." (*Id*. p. 2 ¶2) Since Adler, through highly experienced and very thorough

counsel, knew, must have known, or should have known about the outstanding judgments against Gouletas and the Citation Liens pertaining thereto, Adler did not take the funds from Gouletas in good faith.

66.     At the time that Gouletas made the following payments to the following Defendants, Gouletas recently had come into possession of over $2,000,000 in cash, which Gouletas, through Mr. Teplinsky at BPMS, wanted to shield from Gouletas's unfavored judgment creditors. Thus, the main purpose of the following transfers was to not only favor certain of Gouletas's friends and relatives over his unfavored judgment creditors, but also to prevent Gouletas's unfavored judgment creditors from collecting on their judgments against Gouletas.

67.     Each Defendant listed below is liable to Plaintiff in the amount of the Transfers as follows:

    (a)  <u>Defendant Dorothea Touris</u>

        (i)      January 21, 2015 -- $396,218.84
        (ii)     February 17, 2015 -- $15,730
        (iii)    March 17, 2015 -- $415,000
        (iv)    May 28, 2015 -- $10,000

    (b)  <u>Defendant Steven E. Gouletas</u>

        (i)      April 11, 2014 -- $90,586
        (ii)     April 11, 2014 -- $80,324
        (iii)    August 29, 2014 -- $23,200
        (iv)    February 6, 2015 -- $195,000
        (v)     February 6, 2015 -- $190,000
        (vi)    February 6, 2015 -- $5,000
        (vii)   March 24, 2015 -- $7,200
        (viii)  March 24, 2015 -- $53,000
        (ix)    March 24, 2015 -- $16,000
        (x)     March 24, 2015 -- $440

    (c)    <u>Defendant Natel Matschulat</u>

        (i)      September 5, 2014 -- $51,323.29
        (ii)     January 8, 2015 -- $100,000
        (iii)    March 24, 2015 -- $30,000
        (iv)    May 4, 2015 -- $13,000

    (d)    <u>Defendant Paul Jones</u>

        (i)      January 21, 2015 -- $690,000

    (e)    <u>Defendant James Paul</u>

        (i)      January 21, 2015 -- $110,000

    (f)    <u>Defendant Adler</u>

        (i)      January 8, 2015 -- $850,000

    (g)    <u>Defendant George Stray</u>

        (i)      January 21, 2015 -- $15,000
        (ii)     February 18, 2015 -- $7,000

    (h)    <u>Defendant George Spanos</u>

        (i)      February 6, 2015 -- $50,000
        (ii)     May 4, 2015 -- $10,000

    (i)    [Deleted.]   ~~Defendant W&D~~

        ~~(i)      January 21, 2015 -- $35,000~~

    (j)    <u>Defendant BPMS</u>

        (i)      January 6, 2015 -- $137,535.00
        (ii)     January 7, 2015 -- $2,038,704.84
        (iii)    January 13, 2015 -- $30,020
        (iv~i~)   January 22, 2015 -- $25,000

**Count Two**
**(Avoidance Of Fraudulent Transfers Pursuant To**
**740 ILCS 160/5(a)(1) -- Garvey Court Transfers)**

68.    Section 160/5(a) of the IUFTA provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . ., if the debtor made the transfer . . .: (1) with actual intent to hinder, delay or defraud any creditor of the debtor . . . .

740 ILCS 160/5(a)(1).

69.     In May of 2014, Gouletas's "equity cushion" in the Garvey Court Project was at least $3,600,000.

70.     In May of 2014, Gouletas transferred his 25% retained interest in the Garvey Court Project to his family members through Defendants SEG Garvey (12%) and NKM Garvey (13%) as follows:

(a)     Defendant SEG Garvey

(i)     Defendant Steven E. Gouletas -- 16.66%
(ii)    Defendant Irene Gouletas -- 16.67%
(iii)   Defendant Desiree Witte -- 16.67%
(iv)    Defendant Victoria M. Gouletas -- 16.67%
(v)     Defendant Rosalie Gouletas -- 16.67%
(vi)    Defendant Louis Gouletas -- 5.53%
(vii)   Defendant Michael Gouletas -- 5.53%
(viii)  Defendant Brittany Gouletas -- 5.54%

(b)     Defendant NKM Garvey

(i)     Defendant Natel Matschulat -- 93%
(ii)    Debtor Nicholas Gouletas --7%

(the "Garvey Court Transfers").

71.     The course of conduct set forth above shows  Gouletas's actual intent to hinder, delay or defraud Gouletas's creditors in existence as of the date of the Garvey Court Transfers, including 800 SWC, Muth and Alfonso. At the time of the Garvey Court Transfers, Gouletas was insolvent, or Gouletas became insolvent as a result of the transfers. The Garvey Court Transfers were in violation of the Citation Liens entered against Gouletas prohibiting his transfer of assets and in derogation of the rights of Gouletas's unfavored judgment creditors in existence as of the

dates of the transfers. Moreover, the Garvey Court Transfers were made to insiders -- Gouletas's wife, children and grandchildren. *See* 740 ILCS 160/2(g)(1).

72.     The Garvey Court Transfers were made in violation of 740 ILCS 160/5(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

73.     None of the Defendants listed above took the Garvey Court Transfers in good faith because each Defendant knew, must have known, or should have known that Gouletas was insolvent, and that numerous judgments had been entered against Gouletas, with outstanding Citation Liens which prohibited Gouletas from transferring his assets. *See For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 560 F.3d 717, 722 (7th Cir. 2009).

74.     The Garvey Court Transfers were made in violation of 740 ILCS 160/5(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

75.     The Defendants listed in this Count Two are liable to Plaintiff for their percentage of the value of Gouletas's 25% retained interest in the Garvey Court Project, as of the date of the Garvey Court Transfers, in the percentage of each Defendant's interest as set forth above.

### Count Three
### (Avoidance Of Fraudulent Transfers Pursuant To
### 740 ILCS 160/6(a) -- Garvey Court Transfers)

76.     Section 160/6(a) of the IUFTA provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . ..

740 ILCS 160/6(a).

77.     In May of 2014, Gouletas's "equity cushion" in the Garvey Court Project was at least $3,600,000. ____

_____78.    In May of 2014, Gouletas transferred his 25% retained interest in the Garvey Court Project to his family members through Defendants SEG Garvey (12%) and NKM Garvey (13%) as follows:

      (a)    <u>Defendant SEG Garvey</u>

           (i)      Defendant Steven E. Gouletas -- 16.66%
           (ii)    Defendant Irene Gouletas -- 16.67%
           (iii)   Defendant Desiree Witte -- 16.67%
           (iv)   Defendant Victoria M. Gouletas -- 16.67%
           (v)    Defendant Rosalie Gouletas -- 16.67%
           (vi)   Defendant Louis Gouletas -- 5.53%
           (vii)  Defendant Michael Gouletas -- 5.53%
           (viii) Defendant Brittany Gouletas -- 5.54%

      (b)    <u>Defendant NKM Garvey</u>

           (i)      Defendant Natel Matschulat -- 93%
           (ii)    Debtor Nicholas Gouletas --7%

(the "Garvey Court Transfers").

79.    At the time of the Garvey Court Transfers, Gouletas was insolvent, or Gouletas became insolvent as a result of the transfers.

80.    The Garvey Court Transfers were in violation of the Citation Liens entered against Gouletas prohibiting his transfer of assets and in derogation of the rights of Gouletas's unfavored judgment creditors in existence as of the dates of the transfers.

81.    Gouletas did not receive reasonably equivalent value in exchange for the Garvey Court Transfers. Indeed, Gouletas's 25% retained interest in the Garvey Court Project was "gifted" by Gouletas to his family members in the percentages set forth above.

82.    The Garvey Court Transfers were made in violation of 740 ILCS 160/6(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

83.     The Defendants listed in this Count Three are liable to Plaintiff for their percentage of the value of Gouletas's 25% retained interest in the Garvey Court Project, as of the date of the Garvey Court Transfers, in the percentage of each Defendant's interest as set forth above.

**Count Four**
**(Avoidance Of Fraudulent Transfers Pursuant**
**to 740 ILCS 160/6(a) -- Cash Transfers)**

84.     Section 160/6(a) of IUFTA provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . ..

740 ILCS 160/6(a).

85.     The following transfers of cash (the "Cash Transfers") were made by or on behalf of the Debtor, Gouletas, from funds that, legally and equitably, belong to Gouletas.

86.     Gouletas made the Cash Transfers without receiving a reasonably equivalent value in exchange for the transfers.

87.     Gouletas was insolvent at the time of the Cash Transfers or became insolvent as a result of the Cash Transfers.

88.     The Cash Transfers were in violation of the Citation Liens entered against Gouletas prohibiting his transfer of assets and in derogation of the rights of Gouletas's unfavored judgment creditors in existence as of the dates of the Cash Transfers.

89.     The Cash Transfers were made in violation of 740 ILCS 160/6(a), and are voidable pursuant to 740 ILCS 160/8(a)(1).

90.     Each Defendant listed below is liable to Plaintiff in the amount of the Cash Transfers as follows:

(a)  <u>Defendant Dorothea Touris</u>

        (i)      January 21, 2015 -- $396,218.84
        (ii)     February 17, 2015 -- $15,730
        (iii)   March 17, 2015 -- $415,000
        (iv)   May 28, 2015 -- $10,000

(b)   <u>Defendant Steven E. Gouletas</u>

        (i)      April 11, 2014 -- $90,586
        (ii)     April 11, 2014 -- $80,324
        (iii)   August 29, 2014 -- $23,200
        (iv)   February 6, 2015 -- $195,000
        (v)     February 6, 2015 -- $190,000
        (vi)   February 6, 2015 -- $5,000
        (vii)  March 24, 2015 -- $7,200
        (viii) March 24, 2015 -- $53,000
        (ix)   March 24, 2015 -- $16,000
        (x)    March 24, 2015 -- $440

(c)   <u>Defendant Natel Matschulat</u>

        (i)      September 5, 2014 -- $51,323.29
        (ii)     January 8, 2015 -- $100,000
        (iii)   March 24, 2015 -- $30,000
        (iv)    May 4, 2015 -- $13,000

(d)   <u>Defendant Paul Jones</u>

        (i)      January 21, 2015 -- $690,000

(e)   <u>Defendant George Stray</u>

        (i)      January 21, 2015 -- $15,000
        (ii)     February 18, 2015 -- $7,000

(f)   <u>Defendant George Spanos</u>

        (i)      February 6, 2015 -- $50,000
        (ii)     May 4, 2015 -- $10,000

(g)   [Deleted.~~Defendant W&D~~]

~~(i)    January 21, 2015 -- $35,000~~

    (h)    <u>Defendant BPMS</u>

        (i)    January 6, 2015 -- $137, 535.00
        (ii)    January 7, 2015 -- $2,038,703.84
        (iii)    January 13, 2015 -- $30,020
        (iv~~i~~)    January 22, 2015 -- $25,000

<u>**Count Five**</u>
**(Civil Conspiracy To Commit Fraud)**

91.    Defendants Touris, BPMS (through Mr. Teplinsky), and Jones ~~and W&D~~ knowingly and voluntarily participated in a common scheme with Gouletas to commit an unlawful act -- to assist Gouletas in delaying, hindering or defrauding Gouletas's creditors. Defendants Touris, BPMS (through Mr. Teplinsky), Jones and W&D understood the general objectives of Gouletas's conspiratorial scheme, accepted them, and agreed (implicitly, at least) to do their part to further those objectives.

92.    As set forth in detail above, Gouletas and Defendants Touris, BPMS (through Mr. Teplinsky), and Jones ~~and W&D~~ entered into an agreement for the purpose of accomplishing, by concerted action, the unlawful purpose of hiding, transferring or otherwise shielding Gouletas's assets in violation of the Citation Liens that prohibited Gouletas from transferring his assets, and otherwise in derogation of the rights of Gouletas's unfavored judgment creditors, as part of the scheme to delay, hinder or defraud Gouletas's unfavored judgment creditors.

93.    The course of conduct set forth above constitutes a civil conspiracy to commit fraud on Gouletas's unfavored judgment creditors, including 800 SWC, which proximately caused harm and damage to 800 SWC ~~to Gouletas's unfavored judgment creditors~~ in the amount of Gouletas's assets that were fraudulently transferred. ~~*See Paloian v. Greenfield (In re Rest. Dev. Group, Inc.)*, 397 B.R. 891, 896-97 (Bankr. N.D. Ill. 2008).~~ Accordingly, Plaintiff, in its capacity as the assignee

of the claims of judgment creditor 800 SWC, and not in its capacity as the assignee of the Chapter 7 Trustee, hereby asserts civil conspiracy claims against Defendants Touris, BPMS, and Jones, who and W&D are jointly and severally liable to Plaintiff for the harm and damage caused by their civil conspiracy with Gouletas in the fraud committed upon on Gouletas's unfavored judgment creditor, 800 SWCs.

## Count Six
### (Aiding And Abetting Fraud)

94.     As set forth in detail above, (a) Gouletas engaged in numerous schemes to fraudulently transfer his assets in an effort to delay, hinder or defraud his creditors, which injured the ability of Gouletas's unfavored judgment creditors to collect on the amount of indebtedness owed to them by Gouletas; (b) Defendants Touris, BPMS (through Mr. Teplinsky), and Jones and W&D were aware of their roles in  Gouletas's fraudulent transfer schemes when they provided assistance to Gouletas in the accomplishment of those schemes; and (c) Defendants Touris, BPMS (through Mr. Teplinsky), and Jones and W&D provided knowing and substantial assistance to Gouletas in the implementation and execution of Gouletas's fraudulent transfer schemes.

95.     Accordingly, Defendants Touris, BPMS (through Mr. Teplinsky), and Jones and W&D knowingly induced, participated and assisted in actively defrauding Gouletas's unfavored judgment creditors, including 800 SWC, through the implementation and execution of Gouletas's fraudulent transfer schemes in order to assist Gouletas in his efforts to delay, hinder or defraud his creditors, including 800 SWC.

96.     The course of conduct set forth above constitutes aiding and abetting a fraud on Gouletas's unfavored judgment creditors, including 800 SWC, which proximately caused harm and damage to 800 SWC Gouletas's unfavored judgment creditors in the amount of Gouletas's assets that were fraudulently transferred. *See Paloian v. Greenfield (In re Rest. Dev. Group, Inc.),*

397 B.R. 891, 897-98 (Bankr. N.D. Ill. 2008). Accordingly, Plaintiff, in its capacity as the assignee of the claims of judgment creditor 800 SWC, and not in its capacity as the assignee of the Chapter 7 Trustee, hereby asserts these aiding and abetting claims against Defendants Touris, BPMS, and Jones, who and W&D are jointly and severally liable to Plaintiff for the harm and damage caused by their aiding and abetting Gouletas in the fraud committed upon Gouletas's unfavored judgment creditors.

### Count Seven
### [Deleted.](Refund Of Funds Owed By W&D To The Bankruptcy Trustee)

97.    [Deleted.]In the event that the full amount of the $35,000 deposited by Mr. Teplinsky into W&D's trust account is not set aside as a fraudulent transfer, there remains in W&D's trust account a balance of $12,595.35 in funds that belonged to Gouletas, and thus, upon Gouletas's bankruptcy filing, became the property of the Bankruptcy Trustee. (Px 33)

98.    [Deleted.]Accordingly, W&D is liable to the Bankruptcy Trustee, and thus to Plaintiff, for $12,595.35 in funds that legally and equitably belong to the Bankruptcy Trustee.

### Count Eight
### (Reimbursement Of Funds Owed By Touris To Gouletas Prior To The Time That Gouletas Filed For Bankruptcy)

99.    In March of 2015, Gouletas loaned $90,000 to Touris, of which only $50,000 was repaid, leaving a balance owed by Touris on that loan in the amount of $40,000.

100.    In addition, on March 28, 2015, Gouletas loaned an additional $10,000 to Touris, which Touris never repaid.

101.    Finally, on February 10, 2015, there was $1,368 of Gouletas's funds which remained in the Touris Chase Account.

102.   Accordingly, Touris is liable to the Bankruptcy Trustee, and thus to Plaintiff, for $51,368 that she owed to Gouletas at the time that Gouletas filed for bankruptcy.

## PRAYER

Plaintiff respectfully requests:

(1)   that the Court enter judgment against the Defendants for (a) Plaintiff's actual damages as set forth in each Count above; (b) punitive damages in an amount not less than three times Plaintiff's actual damages for the Defendants' intentional wrongful conduct as alleged in Counts Five and Six; and (c) pre- and post-judgment interest at the highest lawful rate; and

(2)   that the Court grant Plaintiff its court costs and such other and further relief to which Plaintiff may be entitled.

## JURY DEMAND

Plaintiff requests a trial by jury.

Respectfully submitted,

ARMSTRONG LAW FIRM, P.C.

DATED: July 1April 17, 202019.          By    *F. Dean Armstrong*
　　　　　　　　　　　　　　　　　　　　　F. Dean Armstrong, Esq.
　　　　　　　　　　　　　　　　　　　　　ARDC #6199894
　　　　　　　　　　　　　　　　　　　　　23353 S. 88th Avenue
　　　　　　　　　　　　　　　　　　　　　Frankfort, IL  60423
　　　　　　　　　　　　　　　　　　　　　815/464-3243
　　　　　　　　　　　　　　　　　　　　　Fax: 815/464-3449
　　　　　　　　　　　　　　　　　　　　　armstronglaw@sbcglobal.net
　　　　　　　　　　　　　　　　　　　　　**Attorney for Plaintiff**
　　　　　　　　　　　　　　　　　　　　　**D.A.N. Joint Venture III, L.P.**

## **Certificate of Service**

The undersigned certifies that a true and correct copy of the foregoing pleading was served upon all parties receiving CM/ECF noticing on this 1st ~~17th~~ day of July~~April~~, 20~~20~~19. Parties not part of the CM/ECF system were served via United States Mail.


_____*/s/F. Dean Armstrong*_____
F. Dean Armstrong

# Px 1

# Nicholas S. Gouletas
# Balance Sheet
# As of March 31, 2013
(Unaudited)

### Assets

| | |
|---|---:|
| Cash | $ 240,000 |
| Interest in American Invsco Group Ltd. | 5,105,938 |
| Interest in Invsco Holding LLC | 7,947,485 |
| Interest in 800 South Wells Ph II LLC | 11,334,590 |
| Interest in American Invsco Realty, LLC | 659,550 |
| Goodwill - See Footnote 1 | - |
| Total Assets | $ 25,287,563 |

### Liabilities and Net Worth

| | |
|---|---:|
| Liabilities | None |
| Net Worth | $ 25,287,563 |
| Total Liabilities and Net Worth | $ 25,287,563 |

**Note 1**
The goodwill or trade value of the company is
This valuation is based on an analysis completed in
2007 by the then outstanding shareholders of the
company.

$45,000,000

By Nicholas S. Gouletas



PLAINTIFF'S EXHIBIT NO. /

# American Invsco Group, Ltd.
# Balance Sheet
# As of March 31, 2013
## (Unaudited)

| Assets | Appraised Current Value | Historical Cost |
|---|---|---|
| Tax and Assessment Escrow | S  428,237 | $  428,237 |
| Buildings, Net of Accumulated Depreciation | 6,090,000 | 1,572,045 |
| Deferred Loan Costs, net | 19,801 | 19,801 |
| Net Advances to Affiliates | 2,600,189 | 2,600,189 |
| Total Assets | $ 9,138,227 | $ 4,620,272 |

### Liabilities and Member's Equity

| | Appraised Current Value | Historical Cost |
|---|---|---|
| Liabilities: | | |
| Assessments Payable | $  520,073 | S  520,073 |
| Accounts Payable | 33,099 | 33,099 |
| Accrued Real Estate Taxes | 133,306 | 133,306 |
| Mortgage Payable | 1,345,811 | 1,345,811 |
| Notes Payable | 2,000,000 | 2,000,000 |
| Total Liabilities | 4,032,289 | 4,032,289 |
| Member's Equity | 5,105,938 | 587,983 |
| Total Liabilities and Member's Equity | $ 9,138,227 | $ 4,620,272 |

# Invsco Holdings, LLC
# Balance Sheet
# As of March 31, 2013
## (Unaudited)

|  | Appraised Current Value | Historical Cost |
|---|---|---|
| **Assets** | | |
| Cash (Restricted) | 147,667 | 147,667 |
| Accounts Receivable | 39,044 | 39,044 |
| Real Property | 11,870,000 | 6,462,082 |
| Deferred Loan Costs | 280,448 | 280,448 |
| Total Assets | $ 12,337,159 | $ 6,945,353 |
| | | |
| **Liabilities and Member's Equity** | | |
| Liabilities: | | |
| Accounts Payable | $ 73,349 | $ 73,349 |
| Accrued Real Estate Taxes | 111,371 | 111,371 |
| Other Liabilities | 53,708 | 53,708 |
| Mortgages Payable | 3,851,246 | 3,851,246 |
| Notes Payable | 300,000 | 300,000 |
| Total Liabilities | 4,389,674 | 4,389,674 |
| Member's Equity | 7,947,485 | 2,555,679 |
| Total Liabilities and Member's Equity | $ 12,337,159 | $ 6,945,353 |

# 800 South Wells Phase II, LLC
## Balance Sheet
## As of March 31, 2013
## (Unaudited)

| | Appraised Current Value | Historical Cost |
|---|---|---|
| **Assets** | | |
| Accounts Receivable | $ 3,184 | $ 3,184 |
| Real Property | 14,880,000 | 2,177,700 |
| Total Assets | $ 14,883,184 | $ 2,180,884 |
| | | |
| **Liabilities and Member's Equity** | | |
| Liabilities: | | |
| Accrued Real Estate Taxes | $ 248,594 | $ 248,594 |
| Mortgage Payable | 3,300,000 | 3,300,000 |
| Total Liabilities | 3,548,594 | 3,548,594 |
| Member's Equity | 11,334,590 | (1,367,710) |
| Total Liabilities and Member's Equity | $ 14,883,184 | $ 2,180,884 |

P:\ACCTDATA\River - 800 S. Wells Phase 1&2\800 S Wells Ph2 Bal Sheet 033113.xls

# American Invsco Realty LLC
# Balance Sheet
# As of March 31, 2013
## (Unaudited)

### Assets

| | | |
|---|---:|---:|
| Cash Restricted - Earnest Money | | $ 4,200 |
| Commission Due from 2520 North Lakeview | | 234,500 |
| Net Advances to Affiliates | | 425,050 |
| Investment in The Acquest Group, LLC | | |
|     Contributions | $ 48,494 | |
|     Net Income (Loss) to Date | (48,494) | |
|       Net Investment in The Acquest Group, LLC | | - |
| | | |
| Total Assets | | $ 663,750 |

### Liabilities and Members' Equity

Liabilities:

| | |
|---|---:|
| Earnest Money Deposit | $ 4,200 |
|     Total Liabilities | 4,200 |
| Members' Equity | 659,550 |
| | |
| Total Liabilities and Members' Equity | $ 663,750 |

P:\ACCTDATA\AIR LLC\AIR LLC 033113 bal sht.xls

# The Acquest Group, LLC
# Balance Sheet
# As of March 31, 2013
## (Unaudited)

### Member's Equity

| | | |
|---|---|---:|
| Member's Contributions | $ | 48,744 |
| Net income (loss) to date | | (48,744) |
| | | |
| Total Member's Equity | $ | - |

Px 2



*The Nation's Leading Condominium Developer*
## AMERICAN INVSCO®

Honorable Rahm Emanuel, Mayor                                      January 13, 2014
121 N. LaSalle Street
Chicago City Hall, 5th Floor
Chicago, IL 60602

Re: Investor Visa Endorsement

Dear Honorable Mayor Emanuel:

Thank you for taking time to consider our request.

 We are currently in negotiations with a real estate investor from London that intends to invest approximately $200 million in Chicago with the purchase of three new condominium towers. They are purchasing two condominium towers at 1333 and 1345 S. Wabash from CMK Development totaling $137 million. They are also in negotiations with us, American Invsco, to purchase a third tower on land we own at 801 S. Wells, for an additional $65 million. This is a total investment of $202 million in new, or about to be built, condominiums in Chicago.

 Our client, Andrea Cassandro, the COO of the Investin company, has requested but been denied a B1 visa from the American embassy in London. He has a second interview at the embassy in London tomorrow to make another request for a one week visa to complete these business transactions. Andrea Cassandro has received a letter from US Senator, Dick Durbin, requesting the Counsel General in London give every consideration to Andrea to approve the noted visa. Additionally, Andrea's attorney has advised him that a letter from you, Mayor Emanuel, would have significant impact on him being granted the visa to complete these transactions in Chicago.

 We believe his investment would have a very positive and significant impact on the Chicago real estate market by creating jobs and increasing the tax revenue of the City with the addition of nearly 700 new condominiums. Attached are supporting documents for your review and consideration.

We thank you for your time and consideration on our client's behalf.

Best Regards,

Nicholas S. Gouletas
Chairman & CEO

Encls.



PLAINTIFF'S
EXHIBIT
NO. 2

# Px 3

*This is an attempt to collect a debt and any information obtained will be used for that purpose.*

## IN THE CIRCUIT COURT OF COOK COUNTY
### COUNTY DEPARTMENT – LAW DIVISION

| | |
|---|---|
| 800 SOUTH WELLS COMMERCIAL LLC, | Case No. 2011-L-002895 |
| Plaintiff, | Judgment Amount: $11,550,040.12 plus accruing statutory interest |
| v. | Date of Judgment: January 23, 2014 |
| NICHOLAS S. GOULETAS and INVSCO MANAGEMENT COMPANY, INC. (d/b/a American Invesco), | Judge WHITE; Room 2503; Calendar 5 |
| Defendants. | Return Date: JULY 10 , 2014<br>Return Time: 9:30 a.m. |

### SECOND AMENDED CITATION TO DISCOVER ASSETS

TO: **NICHOLAS S. GOULETAS; SEE ATTACHED SERVICE LIST**

**YOU ARE COMMANDED** to appear before Judge **WHITE**, or any Judge sitting in his stead in **Courtroom 2503** of the Richard J. Daley Center, Chicago, IL 60692 on **JULY 10**, 2014, at 9:30 a.m. to be examined under oath to discover assets or income not exempt from the enforcement of the judgment.

Judgment was entered **on January 23, 2014** in the Circuit Court of Cook County, Law Division, in favor of Plaintiff **800 SOUTH WELLS COMMERCIAL LLC and against Defendants NICHOLAS S. GOULETAS and INVSCO MANAGEMENT COMPANY, INC. (d/b/a American Invesco), in the sum of $11,550,040.12, plus accruing *per diem* statutory interest. Further sums may become due as costs and interest accrued.**

**YOU ARE COMMANDED** to produce at the examination: **See Exhibit "A" and Rider "A" attached hereto and made a part hereof,** along with all books, papers or records in your possession or control which may contain information concerning the property or income of, or indebtedness due judgment debtor.

**YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further order of Court or termination of the proceedings. You are not required to withhold the payment of any money beyond double the amount of the judgment.

**WARNING: IF YOU FAIL TO APPEAR AS DIRECTED IN THIS NOTICE, YOU MAY BE ARRESTED AND BROUGHT BEFORE THE COURT TO ANSWER TO A CHARGE OF CONTEMPT OF COURT, WHICH MAY BE PUNISHABLE BY IMPRISONMENT IN THE COUNTY JAIL. 735 ILCS 5/2-1402.**

| | |
|---|---|
| F. Dean Armstrong<br>Armstrong Law Firm<br>1324 Dartmouth Road<br>Flossmoor, Illinois 60422<br>(708) 798-1599<br>Attorney No. 36232 | JUN 05 201... DOROTHY BROWN CLERK OF CIRCUIT COURT<br>Clerk of the Court<br><br>Deputy Clerk |



## CERTIFICATE OF ATTORNEY

Note: This citation must be accompanied at the time of service by either a copy of the underlying judgment or a certification by either the clerk that entered the judgment or the attorney for the judgment creditor setting forth:

1.  Judgment in the amount: $11,550,040.12, plus accruing statutory *per diem* interest;
2.  Name of the Court:   Circuit Court of Cook County, Illinois, County Department, Law Division; and
3.  Case No. 2011 L 002895.

I, the undersigned, certify under penalties as provided by law pursuant to 735 ILCS 5/1-109 to the Court that the foregoing information is true and correct.

_____
F. Dean Armstrong

## CERTIFICATE OF SERVICE

Under penalties of perjury as provided by law pursuant to 735 ILCS 5/1-109, I, F. Dean Armstrong, hereby certify and state under oath that:

I am over 21 years of age and not a party to this case.  Pursuant to the Court's JUNE 5 , 2014 Order Granting Plaintiff's Motion Pursuant to Special Order, I served the citation to discover assets on **NICHOLAS S. GOULETAS** by (a) having  the  process  server serve a copy of the Amended Citation to Discover Assets and related Citation proceeding papers upon Defendant Gouletas through the doorman at 111 E. Chestnut Street, Chicago, Illinois, with a directive to deliver these papers to Defendant Gouletas' condominium unit at Suite 28K; (b) having the process server serve a copy of an Amended Citation to Discover Assets and related Citation proceedings upon Defendant Gouletas by taping these pleadings to the door at Gouletas' office address at 182 W. Lake Street, Suite 200, Chicago, Illinois 60601; and (c) mailing by certified mail, return receipt requested, a copy of the Amended Citation to Discover Assets and related Citation proceeding papers to Defendant Gouletas' counsel, Katharine M. Grosh, Esq. at Beermann Pritikin Mirabelli Swerdlove LLP, 161 North Clark Street, Suite 2600, Chicago, IL 60601.

_____
Signature of Attorney

F. Dean Armstrong
Armstrong Law Firm
1324 Dartmouth Road
Flossmoor, Illinois  60422
(708) 798-1599
Attorney No. 36232

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned, **NICHOLAS S. GOULETAS** ("Deponent" or "Judgment Debtor"), hereby certifies and states that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such, the undersigned certifies as aforesaid that (s)he verily believes the same to be true.

Name:

Social Security and/or Tax I.D. Number:

Residence Address and Telephone Number:

Business Address and Telephone Number:

Name of Business/Businesses and/or interest in same for the two (2) years preceding the date of this request, and address of same:

Dependents:

Stocks, Bonds or other Negotiable Instruments, and where they are located:

Automobile(s)- Make, Model, Year, V.I.N., whether the same are insured and by whom (i.e. proof of insurance):

Real Property Owned and how property is held:

Name of your Bank:

Checking Account Number(s):

Savings Account Number(s):

Certificates of Deposit:

Other Personal Property Owned:

Household Goods:

Money and Jewelry on Person:

Any other title or interest and any other property, real or personal, not listed or described above:

By: _____

Printed
Name: _____
         **NICHOLAS S. GOULETAS**

<u>**RIDER A**</u>

## I.  GENERAL DOCUMENT REQUEST

All books, papers, documents, computer generated or computer readable media possessed or controlled by you, your agent, your fiduciary, your representative or other persons known to you that directly or indirectly relate to your income or assets or interest in assets held within the last seven (7) years and those documents relating to any income or interest in other assets that you (the "Judgment Debtor" or "Deponent") expects to receive in the future, including moneys or assets expected to be received from any individual, group of individuals, partnerships or corporate entities or government entities.  These documents should include but should not be limited to the following:

A.  State and Federal income tax returns, and gift tax returns, for 2002-2013.

B.  All drafts and final versions of any and all personal financial statements (by whatever name known), whether or not distributed to any third party, including, but not limited to, the "draft financial statement" that was referenced at ¶18 of Gouletas' March 24, 2014 affidavit.

C.  All documents evidencing any account held with a brokerage firm, stock firm, investment firm, bank, savings and loan or other financial institution.

D.  All documents evidencing any safe deposit box, storage locker or other secured storage area.

E.  All documents evidencing ownership of or any interest or beneficial interest in real estate or other real property within the last 7 years.

F.  All documents evidencing any trust, including land trusts, in which the judgment debtor has any interest or over which the judgment debtor holds any power whatsoever.

G.  All certificates of deposit or similar deposit instruments in which the judgment debtor has an interest.

H.  All treasury bills, savings bonds or other instruments evidencing indebtedness to the judgment debtor by the federal, state or local government.

I.  All insurance policies insuring any interest the judgment debtor may possess or annuities or similar interests owing to the judgment debtor as a beneficiary.

J.  All stock certificates, bonds, commodity accounts or any evidence regarding ownership of or power of attorney over same.

-1-

K.  All documents in your possession or control pertaining to any loan to which the judgment debtor is a party.

L.  All promissory notes or other evidence of indebtedness to the judgment debtor in your possession and control.

M.  All books of account of any business enterprise in which the judgment debtor holds an interest, including, but not limited to, a Profit/Loss Statement, and all Accounts Receivables and Accounts Payable

N.  All titles to automobiles, planes, boats or other vehicles or modes of transportation, including, but not limited to, a 1971 Mercedes Benz CP280, VIN #11102712003878; 1993 Cadillac Sedan Touring 4 Seville STS, VIN #1G6KY5298PU834808; and 1959 Merz. 4D, VIN #300D9500105, including any appraisals of these forms of transportation.

O.  All documents evidencing any pension plan or other tax-deferred plan or account.

P.  Copies of all pleadings involving actions in which the judgment debtor seeks a money judgment in his favor or in which any business or other entity in which the judgment debtor holds a financial interest seeks a money judgment in its favor.

Q.  All documents evidencing any winnings from a state lottery or lawfully acquired winnings through other forms of gambling, including horse racing and games of chance.

R.  All documents evidencing any interest in horses, livestock or other perishable commodities.

## II.  BANK RECORDS

A.  Any and all documents and records of checking, savings, or any other type of account, foreign or domestic, maintained by deponent with any type of financial institution during the last five years, including but not limited to monthly account statements, checks, check registers, check stubs, cancelled checks, and deposit slips.

B.  All documents that refer to, relate to, reflect or concern any transfers made to or from any financial account held for the benefit of deponent, by any third party, for the last five years.

C.  Any and all signature cards that name deponent as an authorized signatory on any financial account, for any entity or other third party, for the past five years.

D.  Any and all financial statements, credit applications or other documents submitted to any financial institution, or any other person or entity, by deponent, for any loan,

credit, extension or advance, in any capacity (borrower, guarantor, or surety) for the past five years.

E.  Any and all documents concerning any interest in, or claimed title to, any certificates of deposit, letters of credit, money orders, cashier's checks, traveler's checks, bank deposits or escrow funds owned or held be deponent in the past five years.

F.  Any and all documents related to any account in which any of deponent's earnings or other income has been deposited into in the past five years, whether deponent continued to have an interest in it or not.

G.  Any and all documents evidencing deponent having authority to access any safe deposit box or other bank-secured area, for the last five years.

H.  Any and all documents evidencing any application signed by deponent or on behalf of deponent or deponent's wife and/or children, to open a foreign or offshore financial account in the name of deponent or any other entity.

I.  Copies of IRA contracts for all IRAs that you currently have.

J.  Copies of any IRA or 401K's that were "rolled over".

K.  Complete contribution and distribution records for any current or previous IRAs or 401Ks.

L.  Copies of any and all bills or living expenses paid for with your IRA or 401K distributions.

M.  Copies of any loans taken against your IRA or 401K.

III.  **REAL PROPERTY**

A.  Any and all documents that refer to, reflect, or relate to any real property owned by deponent in the past five years.

B.  Any and all documents that refer to, reflect, or relate to encumbrances on any real property owned by deponent.

C.  Any and all documents evidencing ownership of real property in which deponent currently enjoys a direct or indirect beneficial interest.

D.  Any and all checks, receipts, deeds or other evidence of the sale or transfer of any real property in which you had a legal or equitable ownership interest in, within the past five years.

E. Any and all lease agreements for real property in which deponent is the landlord, or has a beneficial interest in.

F. Any and all lease agreements for real property in which the deponent is the lessor or lessee.

G. Any and all documents that evidence deponent's name being on any real property tax records, as payor or trustee for the past five years.

H. Any and all deeds that title any real property to deponent as trustee for any other person or entity.

I. Any and all deeds of trust or mortgages held in favor of deponent at present or owned during the last five years.

J. Any and all documents evidencing any time-shares that deponent enjoys the use of.

K. Copies of any appraisals or other forms of valuation for any property that you have an interest in or had an interest within the past five years.

L. Promissory Notes or Mortgages you signed during the past six years.

M. Copies of all deeds/mortgages to which you hold property as tenants by the entireties, tenants in common or joint tenants.

N. Copies of any and all deeds, leases, tax statements and all utility bills (including, but not limited to, gas, electric, water and cable bills) for any place that you have resided from January 1, 2002 to the present, including, but not limited to 111 E. Chestnut Street, Suite 28J and/or 28K, Chicago, Illinois.

## IV.    PERSONAL PROPERTY

A. Certificates of title or other evidence of ownership of any boat, automobile, truck, watercraft, motorcycle, four-wheeler, recreational vehicle, go-kart, aircraft, agricultural equipment, or construction equipment owned by or in possession of deponent, whether owned by deponent or entity that deponent is affiliated with, or held in trust by deponent.

B. Any and all note receivables, pledges or security interests in favor of deponent now, and in the past five years.

C. Copies of all homeowner's insurance policies and any other insurance policies or riders that have insured any property that deponent owns or has the benefit of use of, for the past five years.

D. List of household furnishings and fixtures that have been purchased within the last year that had a purchase price of $999 or more, including all cell phones, computers and iPads/tablets, as well as copies of all documents pertaining to the acquisition thereof, as well as copies of all telephone, cable and internet bills for the last five years.

E. Copies of all dock slips or other documentation evidencing the right to dock any watercraft, whether deponent has a legal or beneficial interest in.

F. Any and all documents that refer to or reflect any horses or livestock owned by deponent within the past five years.

G. List and valuation of all collectibles (i.e. stamps, coins, sports cards, etc) that deponent now owns or has owned within the past five years.

H. Any and all documents that refer to, or relate to any guns, jewelry, antiques, art, paintings or other similar assets owned by deponent or in deponents possession within the past five years.

I. Any and all documents evidencing any interest deponent may have in any patents, trademarks, copyrights, franchises, royalties of any kind, oil and gas rights, timber rights, or mineral rights.

V. **BUSINESS INTERESTS/EMPLOYMENT**

A. All documents that identify the name and addresses of any person or entity that has employed deponent within the past five years.

B. All documents that identify any person or entity that deponent has acted as an independent contractor for in the past five years.

C. All documents referring in any way, directly or indirectly, to any and all businesses in which deponent is a stockholder, partner, officer, director, owner, member, manager or registered agent.

D. Any and all corporate charters, minutes of stockholders meetings, operating agreements, resolutions, or recorded evidence of any kind relating to the affairs of any corporation or LLC owned or controlled by deponent, or any subsidiary or other entity in which such corporation or LLC holds an ownership interest during the past five years.

E. Lists of all customers, clients, etc. of any kind with which the corporation (or any other business entity owned or controlled by deponent) does business or has done business during the past five years.

F. All local, state and federal tax returns filed by deponent in the past five years, including all attachments, schedules, W-2's, K-1's, 1099 and 1098 forms, and any information regarding any tax refunds or claims for tax refunds.

G. All documents referring, relating or pertaining to any records of salaries, commissions, bonuses, income from employment, wages, pay stubs, dividends, royalties, allowances, expenses or other sums of money paid to deponent within the past five years.

H. Any and all employment contracts that deponent has had in the past five years.

## VI.   INVESTMENTS

A. Any and all documents and records of stocks, ownership units, membership units, bonds, mutual funds, debentures, certificates of deposit or any other investment vehicle owned or held for the benefit of deponent.

B. Any and all documents relating to any retirement accounts or annuities, whether individual or employer sponsored, that are owned by deponent, or held for the benefit of deponent.

C. Any and all rent rolls for all properties in which deponent has had an ownership interest in for the past five years.

D. Copies of all K-1s, 1099-D's or 1099-I's issued to deponent within the past five years.

E. Any and all documents referring to any stock options or profit-sharing plans held by deponent or for the benefit of deponent.

F. Any and all documents that evidence a cash value in any life insurance policy of deponent and copies of all policies whether term, whole life or universal

## VII.   MISCELLANEOUS

A. All documents evidencing any trusts or amendments to trusts in which the deponent is a grantor, settlor, trustee, or beneficiary.

B. All documents evidencing any and all trusts or amendments to trusts that the deponent has directly or indirectly contributed any assets to within the past ten years.

C. Copies of all pre and post-nuptial agreements, to include the list of assets and liabilities to be held separately.

D. Copies of all separate property agreements, to include the list of assets and liabilities to be held separate.

E. Copy of any Wills including all amendments in which deponent is or was named as a beneficiary.

F. All passports for travel outside of the United States.

G. Copies of any and all credit card statements, for all cards in which deponent is an authorized user, for the past two years.

H. All documents referring or reflecting the name and address of any storage facility or mini-warehouse to which deponent has access.

I. Copies of any and all financial statements that deponent has prepared for any lender, creditor, court or any other person or entity in the past five years.

J. Copies of any and all professional licenses that are held by deponent.

K. Copies of all driver's licenses.

L. Copy of birth certificate.

M. Copies of all divorce decrees and any affidavits submitted in those proceedings.

N. Copies of documents pertaining to any advances and/or retainers paid to any lawyer and/or law firm by you or any other person or entity for or on your behalf.

O. Copies of all corporate books and records for 800 South Wells Phase II LLC, including all documents pertaining to the sale, transfer, pledging and/or encumbrance of the vacant land located at 800 South Wells Street, Chicago, Illinois 60605, Permanent Index Nos. 17-16-401-013 and 17-16-401-014.

P. Copies of all documents in any way pertaining to any cash, gold, investment securities, partnership interests, real estate or any other asset of any form or nature whatsoever that any person or entity holds or controls for or on your behalf or for your use, enjoyment or benefit.

Q. Please provide your affidavit of completeness, verifying under oath that you have produced all documents within your possession, custody and control responsive to each of the categories set forth in all parts of §§I-VII above.

Px 4



BOFD:71006486 Date:08/01/2014 HostAccount:0000000171401908 Account:171401908 Amount:$1,530.62
Serial:171000166 HostTranCode:481 TranCode:0 TR:71001180 Sequence:7483520690 DbCr:D Canadian:-





Px 5



SOFD:21000089 Date:08/04/2014 HostAccount:0000000171401908 Account:171401908 Amount:$10,000.00
Serial:171000167 HostTranCode:481 TranCode:0 TR:71001180 Sequence:2706825920 DbCr:D Canadian:-





Px 6



CASHIER'S CHECK

C 171000175

Date August 22, 2014

Remitter    Nicholas Gouletas

Pay to the
Order of    Nicholas Gouletas                    $ 1,500.00

ONE THOUSAND FIVE HUNDRED DOLLARS AND ZERO CENTS                dollars

Republic Bank
of Chicago    MEMO

⑈171000175⑈ ⑈071006680⑈ 171401908⑈8⑈

BOFD:71006486 Date:06/25/2014 HostAccount:0000000171401908 Account:171401908 Amount:$1,500.00
Serial:171000175 HostTranCode:481 TranCode:0 TR:71001180 Sequence:2735927400 DbCr:D Canadian:-





PLAINTIFF'S
EXHIBIT

NO. 6

# Px 7



 HASE

## Terms and Conditions (Remitter and Payee):

* Please keep this copy for your record of the transaction
* The laws of a specific state will consider these funds to be "abandoned"
  if the Cashier's Check is not cashed by a certain time
    - Please cash/deposit this Cashier's Check as soon as possible to
      prevent this from occurring
    - In most cases, the funds will be considered "abandoned"
      before the "Void After" Date
* Placing a Stop Payment on a Cashier's Check
    - Stop Payment can only be placed if the Cashier's Check
      is lost, stolen, or destroyed
    - We may not re-issue or refund the funds after the stop payment has
      been placed until 90 days after the original check was issued
* Please visit a Chase branch to report a lost, stolen, or destroyed Cashier's Check
  or for any other information about this item

FOR YOUR PROTECTION SAVE THIS COPY          Customer Copy
**CASHIER'S CHECK**                          9488626643

08/22/2014
Void after 7 years

Remitter:    NICHOLAS S GOULETAS

$** 2,500.00 **

'ay To The   NICHOLAS S. GOULETAS
Irder Of:

lemo:_____          Drawer JPMORGAN CHASE BANK, N.A.
ote: For information only. Comment has no effect on bank's payment.   **NON NEGOTIABLE**



PLAINTIFF'S
EXHIBIT
NO. 7

Px 8

2/6/15

DOROTHEA A. TOURIS
8391 N. KNOX AVE
CHICAGO, IL 60646

134

Date 2/6/15

Pay to the order of STEVEN G. GOULETAS    $ 195,000.00

One hundred ninety-five thousand dollars and 20 cents

mb financial bank

Dorothy A. Touri

⑆071001737⑆ 2200015968⑈ 0134

#134 PD 2/9/2015 $195,000.00

#134 PD 2/9/2015 $195,000.00



PLAINTIFF'S
EXHIBIT
NO. 8

7

Px 9

2/6/15



#135 PD 2/9/2015 $50,000.00

Seq: 31
Batch: 558887
Date: 02/07/15

#135 PD 2/9/2015 $50,000.00



PLAINTIFF'S
EXHIBIT
NO. 9

# Px 10

Page 1 of 1

## Transaction History

**Customer:** DOROTHEA A TOURIS
**Account:** IL Checking #XXXXX2032

*required field

| Current Balance | Present Balance | Available Less Overdraft | Available Balance | Calendar |
|---|---|---|---|---|
| $9,736.54 | $9,736.54 | $9,736.54 | $445,329.91 | |

*denotes end of day balance

| Date Posted | Tran Type | Description | $ Debits(-) | $ Credits(+) $ | Balance |
|---|---|---|---|---|---|
| 02/18/2015 | Check | CHECK # 123 | -7,000.00 | | 9,736.54 * |
| 02/17/2015 | Wire Transfer | FEDWIRE CREDIT VIA: THE PRIVAT | | 15,730.00 | 16,736.54 * |
| 01/23/2015 | Interest | INTEREST PAYMENT | | 0.01 | 1,006.54 * |
| 12/19/2014 | Interest | INTEREST PAYMENT | | 0.01 | 1,006.53 * |
| 11/24/2014 | Interest | INTEREST PAYMENT | | 0.01 | 1,006.52 * |
| 10/31/2014 | Misc. Credit | SERVICE FEE REVERSAL | | 25.00 | 1,006.51 * |
| 10/22/2014 | Interest | INTEREST PAYMENT | | 0.01 | 981.51 * |
| 09/24/2014 | Misc. Credit | SERVICE FEE REVERSAL | | 25.00 | 981.50 * |
| 09/22/2014 | Fee | SERVICE FEE | -25.00 | | 956.50 * |
| 09/22/2014 | Interest | INTEREST PAYMENT | | 0.01 | 981.50 |
| 09/08/2014 | ACH Debit | CITI CARD ONLINE PAYMENT 13 | -26.15 | | 981.49 * |
| 08/21/2014 | Fee | SERVICE FEE | -25.00 | | 1,007.64 * |
| 08/21/2014 | Interest | INTEREST PAYMENT | | 0.01 | 1,032.64 |
| 08/20/2014 | ACH Debit | American Express ACH PMT | -148.00 | | 1,032.63 * |
| 08/01/2014 | Misc. Credit | SERVICE FEE REVERSAL | | 25.00 | 1,180.63 * |
| 07/22/2014 | Fee | SERVICE FEE | -25.00 | | 1,155.63 * |
| | | | | | Older |

*(handwritten notes:)*

$15,730.00
415.00
415,000.00
431,145.00 TOTAL



PLAINTIFF'S EXHIBIT NO. 10

DT 0012

http://chase360-cdc1-1.jpmchase.net/ca/demandDepositTransactionHistoryPrintFriendly-fl...    2/20/2015

JPM160112-002925 Additional Details Received          Page 1 of 1

## JPM160112-002925 Additional Details Received

usd.prpcemail@globalcustomercare.jpmchase.com
Sent: Tuesday, January 12, 2016 4:26 PM
To: Peterson, Stephen L

Hi Stephen,
This is with reference to
Case
JPM160112-002925.

Transaction Details:

Sending Bank: THE PRIVATEBANK AND TRUST COMPANY ABA/071006486.

Credit Party: DOROTHEA A TOURIS DDA/xxxxxx2032.

Transaction Date: 2/17/2015

Transaction reference: 6877309048FF .

Amount: 15,730.00/USD.

We see you as the assigned banker for our client DOROTHEA A TOURIS. Please be advised of
the query received from THE PRIVATEBANK AND TRUST COMPANY as they are unable to apply
and need the following details:

Quote....
YOUR REFERENCE JPM160112-002925 TO OUR IMAD DATED 2/17/15 NUMBER 000798 FOR
USD15,730.00. THE REMITTER OF THIS PMNT IS 800 S WELLS PHASE II, LLC, CHI CAGO, IL.
OUR REF PVTB 11948-12JAN 16WH.
Unquote....

Please advise the client accordingly. We appreciate your help.

Regards,
USD WIRE INVESTIGATIONS OUR
REFERENCE
JPM160112-002925
JPMORGAN GLOBAL SOLUTIONS CENTER
(866) 223-0359

DT 0013

Px 11

i-ARC!

Page 1 of 1

JPMORGAN CHASE & CO.   i-ARC!



PLAINTIFF'S
EXHIBIT
NO. 11

DT 0011

# Px 12



| Date Posted | TranType | Description | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|---|
| 03/24/2015 | Check | CHECK # 1161 | -16,000.00 | | 310,151.58 * |
| 03/24/2015 | Check | CHECK # 1160 | -63,000.00 | | 267,161.58 * |
| 03/20/2015 | Misc. Debit | Transfer to SAV XXXXXX5061 | -51,000.00 | | 730,151.58 * |
| 03/20/2015 | Withdrawal | WITHDRAWAL # 554772727 | -5,000.00 | | 371,151.96 * |
| 03/20/2015 | Withdrawal | WITHDRAWAL # 554772728 | -90,000.00 | | 375,151.58 * |
| 03/20/2015 | Wire Transfer | WIRE TRANSFER VIA: | -20,000.00 | | 1395,151.58 |
| | | SANTANDER B | | | |
| 03/20/2015 | Misc. Debit | Transfer to Chk XXXXXX5547 | -10,000.00 | | 405,151.58 * |
| 03/17/2015 | Withdrawal | WITHDRAWAL # 572411406 | -5,000.00 | | 415,151.58 * |
| | | DESCRIPTION NUMBER | | | |
| 03/16/2015 | Withdrawal | WITHDRAWAL # 574511264 | -5,000.00 | | 420,151.58 * |
| 03/12/2015 | Misc. Debit | Debit for $414,585.00, an item | -414,585.00 | | 5,151.58 * |
| 03/06/2015 | Deposit | DEPOSIT ID NUMBER 811306 # | | 415,000.00 | 101,151.58 * |
| | | 14 | | | |
| 02/27/2015 | Interest | INTEREST PAYMENT | | 0.04 | 424,736.58 * |
| 02/18/2015 | Check | CHECK # 123 | -7,000.00 | | 9,736.58 * |
| 02/02/2015 | Wire Transfer | FEDWIRE CREDIT VIA: THE | | 16,736.54 * | 16,736.54 * |
| | | PRIVAT | | | |
| 01/23/2015 | Interest | INTEREST PAYMENT | | 0.01 | 1,0061.541 Older |

PLAINTIFF'S
EXHIBIT
NO. 12

| Date Posted | Item Type | Description | Debit(-) | Credit(+) | Balance | (handwritten) |
|---|---|---|---|---|---|---|
| 03/27/2015 | Check | CHECK #2152 AT&T Service | -57.25 | | 159,829.99 * | Teev |
| | Check | CHECK #2156 | -1,865.16 | | 157,964.83 | 33 Deductible |
| | Check | CHECK #2157 | -2,798.28 | | 154,992.28 | 33 Deductible |
| 03/26/2015 | Check | CHECK #2154 OCWEN LOCKBO | -2,949.02 | | 157,780.57 | Mortgage |
| 03/26/2015 | Check | CHECK #2153 | -869.09 | | 160,729.59 * | COA ③ |
| 03/26/2015 | Check | CHECK #2155 | -1,061.00 | | 161,598.68 | ③ OF A. Mortgage |
| 03/26/2015 | Check | CHECK #2158 | -3,436.06 | | 162,659.68 | |
| 03/26/2015 | Check | CHECK #2159 | -5,512.22 | | 166,095.74 | /// Assessments |
| 03/25/2015 | Check | CHECK #2151 | -897.06 | | 171,607.96 * | Staw Prine |
| 03/25/2015 | Misc. Debit | Transfer to SAV XXXXXXX5061 | -1,006.56 | | 172,505.02 | |
| 03/24/2015 | Check | CHECK # 2164 | -30,000.00 | | 173,511.58 * | Natel M. |
| 03/24/2015 | Check | CHECK # 2163 | -440.00 | | 203,511.58 | Stevev G |
| 03/24/2015 | Check | CHECK # 2162 | -7,200.00 | | 203,951.58 | Stevev G |
| 03/24/2015 | Check | CHECK # 2161 | -16,000.00 | | 211,151.58 | Stevev G |
| 03/24/2015 | Check | CHECK # 2160 | -53,000.00 | | 227,151.58 | Stevev G |
| 03/20/2015 | Misc. Debit | Transfer to SAV XXXXXXX5061 | -90,000.00 | | 280,151.58 * | DAT |

Older

| Date Posted | Type | Description | Debit(s) | Credit(s) | Balance |
|---|---|---|---|---|---|
| | | INTEREST PAYMENT | | | 270,080.92 * |
| | | Transfer from SAV XXXXXX5061 | | 60,000.00 | 203,929.99 * |
| | Check | CHECK # 2152 AT&T Service | -97.23 | | 153,029.99 * |
| | Check | CHECK # 2156 | -1,865.16 | | 153,127.13 |
| | Check | CHECK # 2157 | -2,788.28 | | 154,992.29 |
| | Check | CHECK # 2154 OCWEN LOCKBO | -2,949.02 | | 157,780.57 |
| | Check | CHECK # 2153 | -869.09 | | 160,729.59 * |
| | Check | CHECK # 2155 | -1,061.00 | | 161,598.68 |
| | Check | CHECK # 2158 | -3,436.06 | | 162,659.68 |
| | Check | CHECK # 2159 | -5,512.22 | | 166,095.74 |
| | Check | CHECK # 2151 | -897.06 | | 171,607.96 * |
| | Check | CHECK # 2160 | -1,006.56 | | 172,505.02 |
| | Misc. Debit | Transfer to SAV XXXXXX5061 | -30,000.00 | | 173,511.58 * |
| | Check | CHECK # 2164 | -440.00 | | 203,511.58 |
| | Check | CHECK # 2163 | -7,200.00 | | 203,951.58 |
| | Check | CHECK # 2162 | | | 203,951.58 |
| | | | | | Older |

OT 0116

Case: 1:18-cv-00349 Document #: 1-1 Filed: 01/17/18 Page 43 of 100 PageID #:75

| Date Posted | Type | Description | Debit(s) | Balance |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | -4,167.06 — Flest Service/Asc | 152,922.65 * |
| | | | -125.10 — Amar | 157,089.71 * |
| | Check | CHECK # 2360 SPECIALIZED | | |
| | Check | CHECK # 2361 AT&T Service | -1,639.82 — ComEd | 157,214.81 |
| | Check | CHECK # 2409 | -2,634.74 — Del PC Asses | 158,854.63 |
| | Check | CHECK # 2358 OGWEN LOCKBO | -4,299.75 — Mortgage | 161,489.37 |
| | Check | CHECK # 2413 | -22,474.24 — Allstar | 165,789.12 |
| | Check | CHECK # 2362 | -65.00 City of Chgo | 188,263.36 * |
| | Check | CHECK # 2412 | -230.00 Liberation funds | 188,328.36 * |
| 04/13/2015 | Check | CHECK # 2369 GREENTREE SE | -1,391.55 — Greentree Serv | 188,558.36 |
| 04/03/2015 | Check | CHECK # 2365 | -3,581.01 — C11 citesult | 189,949.91 * |
| 04/03/2015 | Wire Transfer | WIRE TRANSFER VIA: MONT CNTY B | -10,000.00 LOKLDer Managment LLC | 193,530.92 * |
| 04/01/2015 | Misc Credit | TRANSFER FROM CHK XXXXX4044 | 500.00 | 203,530.92 * |
| | | | Newer | Older |

Pg 007

| Date Posted | Item Type | Description | Debit (-) | Deposits and Other Credits (+) | Balance |
|---|---|---|---|---|---|
| | | CHECK # 2971 | -10,000.00 — Ceeee Spanos | | 76,422.07 * |
| | Check | CHECK # 2972 | -13,000.00 — Natel | | 86,422.07 |
| | Interest | INTEREST PAYMENT | | 1.24 | 99,422.07 * |
| 04/30/2015 | Check | CHECK # 419172 | -2,000.00 | | 99,420.83 |
| 04/30/2015 | Misc. Debit | Payment to credit card VIS XXX | -499.00 | | 101,420.83 |
| 04/29/2015 | Check | CHECK # 2970 | -200.00 — Chase | | 101,919.83 |
| 04/29/2015 | Check | CHECK # 2416 | -1,500.00 — GK Church | | 102,119.83 |
| 04/29/2015 | Check | CHECK # 2417 | -3,500.00 — Annuciation GK | | 103,619.83 |
| 04/28/2015 | Check | CHECK # 2364 | -1,628.10 — Ill Chestnut | | 107,119.83 |
| 04/27/2015 | Check | CHECK # 2414 | -10,000.00 — Karen Troeton | | 108,747.93 * |
| 04/23/2015 | Check | CHECK # 2363 | -662.25 | | 118,747.93 |
| 04/22/2015 | Check | CHECK # 952038 | -19.99 | | 119,410.18 |

Newer     Older

| Date Posted | Transaction Type | Description | Amount(s) | Debit(s) | Credit(s) | Balance |
|---|---|---|---|---|---|---|
| 05/01/2015 | | | | | -200.00 | 153,482.87 * |
| 05/04/2015 | | American Express Epay Pmt | | | -9.66 | 153,482.87 * |
| 05/07/2015 | ACH Debit | American Express Agent Pmt | | | -536.96 | 153,482.87 * |
| 05/12/2015 | Check | CHECK # 3968904 | | -1,000.00 | | 157,789.41 |
| 05/14/2015 | Check | CHECK # 2850 | | -6,178.31 | | 16,266.16 |
| 05/18/2015 | Check | CHECK # 2566 | | -2,171.10 | Jeff CHESNUT | 17,266.16 |
| 06/01/2015 | Transfer | Payment to Chase card ending i | | -10,000.00 | Vivien | 19,437.26 * |
| 06/08/2015 | Check | CHECK # 2849 | | -6,178.31 | | 29,437.26 * |
| 05/23/2015 | Check | CHECK # 2847 | | -6,500.00 | HATELS CARD | 35,615.02 * |
| 05/29/2015 | Interest | INTEREST PAYMENT | | -900.00 | NICKS CARD | 35,615.57 * |
| 05/29/2015 | Check | CHECK # 776472 | | | 0.55 | 42,115.02 |
| 05/29/2015 | Online | Payment to Chase card ending i | | -5,000.00 | | 43,015.02 * |
| 05/28/2015 | Transfer | WITHDRAWAL # 571813332 | | -5,000.00 | | 48,015.02 |
| 05/28/2015 | Withdrawal | WITHDRAWAL # 571813333 | | -10,000.00 | | 53,015.02 |
| 05/28/2015 | Withdrawal | Transfer to SAV XXXXXX5061 | | -2,712.05 | | 63,015.02 * |
| 06/26/2015 | Misc. Debit | Transfer to CHK XXXXX2557 | | | | 65,015.02 |
| 03/26/2015 | Misc. Debit | DEPOSIT ID NUMBER 183053 # 14 | | | 1,000.00 | 65,727.07 |
| 03/26/2015 | Deposit | | | | | Older |

bt 019

| Date posted | Type | Description | Debit(-) | Credit(+) | * denotes out of their natural Balance |
|---|---|---|---|---|---|
| 07/06/2015 | Online Transfer | Payment to Chase card ending i | -1,662.60 | | 3,588.01 * |
| 07/06/2015 | Online Transfer | American Express ACH PMT | -658.57 | | 4,246.58 |
| 07/02/2015 | Online Transfer | Payment to Chase card ending i | -177.60 | | |
| 07/02/2015 | Online Transfer | Payment to Chase card ending i | -800.00 | | 4,424.18 |
| 07/02/2015 | Withdrawal | WITHDRAWAL # 571813430 | -2,000.00 | | |
| 06/30/2015 | Interest | INTEREST PAYMENT | | 0.15 | 7,224.18 * |
| 05/30/2015 | Check | CHECK # 798 | -600.00 | | 7,224.03 * |
| 05/25/2015 | ACH Debit | STATE FARM RO 08 CPC-CLIENT 01 | -997.68 | | 7,824.03 * |
| 06/24/2015 | Check | CHECK # 796429 | -5,000.00 | | 5,224.18 * |
| 06/24/2015 | Online Transfer | Payment to Chase card ending i | -1,000.00 | | 13,821.71 |
| 06/18/2015 | Check | COMED - WALLET A BILL PAY 15 | -665.34 | | 14,824.21 |
| 06/18/2015 | Online Transfer | BILLMATRIX BILLPAYFEE 15 | -2.50 | | 14,821.71 * |
| 06/15/2015 | ACH Debit | American Express ACH PMT | -200.00 | | 15,489.55 * |
| 05/09/2015 | ACH Debit | American Express ACH PMT | -39.66 | | 15,689.55 * |
| 05/20/2015 | Check | CHECK # 392904 | -536.95 | | 15,729.21 |

Older

DT 6020

Case: 1:18-cv-00349 Document #: 1-1 Filed: 01/17/18 Page 46 of 100 PageID #:79

| Date Posted | Type | Description | Debit(s) | Balance |
|---|---|---|---|---|
| 07/06/2015 | ACH Debit | American Express ACH PMT — *GK ISLANDS R.* | -658.57 | 3,588.01 * |
| 07/05/2015 | Online Transfer | Payment to Chase card ending i — *DEBIT AIRLINES* | -177.60 | 4,246.58 |
| 07/05/2015 | Online Transfer | Payment to Chase card ending i — *AI CREDIT CARD* | -800.00 | 4,424.18 |
| 07/03/2015 | Withdrawal | WITHDRAWAL #571813430 — *CASH TO NICK FOR NP 7/4* | -2,000.00 | 5,224.18 * |
| 06/30/2015 | Interest | INTEREST PAYMENT | 0.15 | 7,224.18 * |
| 06/30/2015 | Check | CHECK #798 — *GK ISLANDS* | -600.00 | 7,224.03 |
| 06/25/2015 | ACH Debit | STATE FARM RO 08 CPC-CLIENT 01 | -997.68 | 7,824.03 * |
| 06/24/2015 | Check | CHECK #796429 | -5,000.00 | 8,821.71 * |
| 06/24/2015 | Online Transfer | Payment to Chase card ending i | -1,000.00 | 13,821.71 |
| 06/19/2015 | ACH Debit | BILLMATRIX BILLPAYFEE 15 | -2.50 | 14,821.71 * |

Older

*3 TICKETS TO ATLANTA*

DT-021

# Px 13

 **Ameritrade**

# Outbound Wire Request
## (Domestic)

PO Box 2209 ■ Omaha, NE 68103-2209
Fax: 800-875-5485

Please be aware that processing of this Letter of Instruction can take up to one business day from receipt. Domestic wires (within the U.S.) can take up to one business day to reach the receiving account. If there are any issues processing the wire, we will contact you via the secured Message Center, inside your TD Ameritrade account.

## 1. DELIVERING ACCOUNT AND WIRE INFORMATION (See section 6 & 7 for clarification)

a. TD Ameritrade Account Number:
nsg031438

b. Title on TD Ameritrade Account:
Nicholas S. Gouletas

c. Name(s) of Sender(s):
Nicholas S. Gouletas

| d. Amount of Wire: | e. Date to Send Wire: |
|---|---|
| $51,323.29 | 09/05/2014 |

## 2. STANDARD AND TWO-BANK WIRE INFORMATION (See section 6 & 7 for clarification)

a. Corresponding Bank:
(if applicable)     None

b. Corresponding Bank ABA/Routing Number:

c. Receiving Bank:
The Private Bank, 120 South LaSalle Street, Chicago, Illinois ph: 312-564-2000

d. ABA/Routing Number:
071006486

e. Name(s) on Receiving Bank Account:
(no initials or abbreviations)     Natel Matschulat

f. Receiving Bank Account Number:
1279157

## 3. ESCROW OR BROKERAGE WIRE INFORMATION (See section 6 & 7 for clarification)

a. Receiving Bank:

b. ABA/Routing Number:

c. Mortgage/Escrow Firm or Brokerage Firm Name:

d. Mortgage/Escrow Firm's or Brokerage Firm's Account Number at Bank:

e. Name(s) on Receiving Mortgage/Escrow or Brokerage Firm Account:
(no initials or abbreviations)

f. Receiving Escrow File/Reference/Loan Number or Brokerage Account or Order Number:

## 4. ADDITIONAL INFORMATION

Please use this section to note any additional reference information provided by the receiving financial institution, such as addresses for Escrow Wires, reference numbers, order or invoice numbers, etc.

## 5. SIGNATURES

We, the account owners, jointly and severally indemnify and hold harmless TD Ameritrade, Inc. and TD Ameritrade Clearing, Inc. and the divisions thereof, from any claim, suit, demand, loss, or liability as a result of the clearing firm having effected transactions pursuant to instructions given by the individuals listed on this account, except as may be clearly and convincingly proven to have resulted from gross negligence.

| Primary Account Holder's Signature: | Printed Name: | Date: |
|---|---|---|
| | Nicholas S.Gouletas | 0—8—0—4—2—0—1—4 |
| Additional Account Holder's Signature: | Printed Name: | Date: |
| | | |
| Additional Account Holder's Signature: | Printed Name: | Date: |
| | | |

*Original signature required; electronic signatures and/or signature fonts are not authorized.*



Page 1 of 2


PLAINTIFF'S
EXHIBIT
NO. 13

# Px 14

Nov 22 2011

American Invsco Liquidity Action Plan Update.

To date the following actions have taken place:

1. 200 North Dearborn

   Because of the slow progress of sales, in conjunction with a strong rental market, we decided to change direction and refinance the remaining 90 unit inventory, to take out the Private Bank loan, as well as the seller, with a term loan. In a parallel path, we will be marketin the remaining inventory to a rental bulk purchaser. Because of the low taxes ($1400/unit), and the fact that the units are renting significantly below market ($1.5/sf), we believe that the bulk sale will be better achieved after we prove that we can rent at market, which is approx $2.3psf. We engaged Draper and Kramer for the financing and we expect to close within. We do not expect any significant cash out of the refinancing; the loan will be approximately $11,000,000, which pays outstanding debt and purchase price, as well as association reserves and some cash out. The major liquidity event will happen with the sellout which should take place in Q2 of 2012. At that time we anticipate netting $5,000,000 approximately depending on market conditions.

2. Lake and Wells

   We interviewed brokers and conclude on hiring CBRE to market the first floor and second floors of the commercial space. We should have a broker opnion of value from CBRE in by the second week of December. Please note that a sale of the second floor may result in AI needing to move offices, we are evaluating a contingency plan for this event which will be driven by the company's remaining headcount in place next year. Our internal estimate of value for the two floors is $3,000,000 and we expect to net $2,500,000 with a market time of 180 days. We are also actively marketing the remaining 8 residential units for sale

3. 1212 LaSalle

   CBRE will also be the listing broker of 1212 LaSalle. We do not have value indications yet, but it should be north of $2,500,000. Our debt is 400K.

4. 800 S Wells Parking

   This site has the most potential but will also require the longest time in order to provide liquidity. Our debt at the land is $2,500,000. The last appraisal had a value of $14,880,000. CBRE indicates that due to the sites favorite zoning the market value for the land could be around $12,000,000. We have indicated the urgency to them, and we are going to list it for $13,000,000, anticipating accepting a price around $12,000,000 in the next nine months, again subject to market conditions. Therefore, the net proceeds to the company should be around $9,000,000. We will make an attempt to finance the land in the mean time.



PLAINTIFF'S EXHIBIT NO. 14
PENGAD 800-631-6989

Conclusion

Although timing is hard to anticipate, we are looking at a total liquidity between $15,000,000 and $19,000,000 in the next 12 months, depending on market conditions. We anticipate that the smaller pieces will trade sooner, and we also estimate that we would have new financing in place in the next four to six months, that should alleviate the current liquidity needs.

# Px 15

**American Invsco Companies**
Consoldidated Balance Sheet
December 31, 2012

## ASSETS

| | | |
|---|---|---:|
| River City land parcel | $ | 9,500,000 |
| 200 N Dearborn units | | 5,000,000 |
| 182 W Lake commercial space | | 2,000,000 |
| 203 N Wells condominium units | | 1,750,000 |
| 1212 N LaSalle commercial space | | 1,600,000 |

**TOTAL ASSETS** $ **19,850,000**

## LIABILITIES AND SHAREHOLDER EQUITY

Mortgages on real estate:

| | | | | |
|---|---|---:|---|---:|
| River City labd parcel - Detroit | $ | 2,000,000 | | |
| Republic Bank - 182 W Lake and 203 N Wells | | 850,000 | | |
| Parkway Bank - 1212 N LaSalle | | 470,000 | | |
| Second mortgage - 182 W Lake and 203 N Wells | | 539,000 | | |
| Total mortgages on real estate | | | $ | 3,859,000 |

Other liabillties:

| | | |
|---|---:|---:|
| Noteholders' unsettled claims | 2,000,000 | |
| Real estate taxes | 1,205,000 | |
| Accounts payable | 950,000 | |
| Federal and municipal taxes | 590,000 | |
| Outstanding legal bills | 485,000 | |
| Assesments owed to Homeowner Associations | 366,000 | |
| Litigation settlements | 393,000 | |
| Total other liabilities | | 5,989,000 |

**TOTAL LIABILITIES** 9,848,000

**SHAREHOLDER EQUITY** 10,002,000

**TOTAL LIABILITIES AND SHAREHOLDER EQUITY** $ **19,850,000**



PLAINTIFF'S
EXHIBIT
NO. 15
PENGAD 800-631-6989

# Px 16

2/28/14

**Nicholas S Gouletas**
Balance Sheet
February 28, 2014

## ASSETS

| | | |
|---|---|---|
| Garvey Court | 20,739 sq ft of retail space (food court) | $ 7,000,000 |
| 1212 N LaSalle Commercial | 16,188 sq ft of vacant office space and 26 parking spaces | 2,818,000 |
| 200 N Dearborn Unsold Condominium Units | Unit 701 - 1,535 sq ft | 483,525 |
| | Unit 702 - 1,475 sq ft | 442,500 |
| | Unit 4602 - 1,165 sq ft | 512,600 |
| | Unit 4701 - 2,875 sq ft | 1,149,500 |
| | 4 parking spaces | 140,000 |
| | Less: Unit refurbishment allowance | (450,000) |
| Net value of 200 N Dearborn condominium units | | 2,278,125 |
| 182 W Lake Commercial | 2nd floor office space - 8,006 sq ft | 1,125,000 |
| Century Tower Condominiums | 4 residential units at $125,000 each | 500,000 |
| Value of 182 W Lake property | | 1,625,000 |
| 440 N Wabash Commercial LLC | 7 E Illinois - 2,900 sq ft | 875,000 |
| River City Land | 1.77 acres vacant land | 6,500,000 |
| **TOTAL ASSETS** | | **$ 21,096,125** |

## LIABILITIES

### SECURED DEBT

| | | |
|---|---|---|
| Garvey Court | First mortgage - Private Bank (includes estimated legal fees) | $ 2,525,000 |
| Garvey Court | Second mortgage - Affordable Lawless | 1,250,000 |
| CSV lien | Agreed amount for settlement | 2,200,000 |
| Lake Dearborn LLC | Claims filed with Bankruptcy | 200,841 |
| LaSalle Commercial LLC | Claims filed with Bankruptcy | 255,709 |
| 182 W Lake | Unpaid assessments and legal fees | 350,000 |
| 440 N Wabash Commercial LLC | Unpaid assessments and legal fees | 10,000 |
| River City | First mortgage | 3,300,000 |
| **TOTAL SECURED DEBT** | | 10,091,550 |

### UNSECURED DEBT

| | | |
|---|---|---|
| Lake Dearborn LLC | Claims filed with Bankruptcy | 16,602 |
| Dearborn Retail LLC | Claims filed with Bankruptcy | 25,826 |
| Dearborn Residential LLC | Claims filed with Bankruptcy | 164,141 |
| DR Dearborn Investment LLC | Claims filed with Bankruptcy | 5,362 |
| LaSalle Commercial LLC | Claims filed with Bankruptcy | 5,243 |
| Cook County Assessor | Unpaid real estate taxes | 150,000 |
| Invsco Employee Services, Inc. | | |
| Employees | Claims filed with Bankruptcy | 219,976 |
| Employees | Unpaid employee wages from bankruptcy | 175,570 |
| General creditors | Claims filed with Bankruptcy | 149,501 |
| Unpaid bankruptcy legal fees | | 200,000 |
| Acquest Group LLC | | |
| Notes payable | Notes issued for ST Residential transaction | 6,000,000 |
| DLA Piper | Legal fees incurred for ST Residential transaction | 350,000 |
| Other liabilities | Due diligence costs for ST Residential transaction | 125,000 |
| **TOTAL UNSECURED DEBT** | | 7,587,220 |

### JUDGEMENT CREDITOR

| | | |
|---|---|---|
| 800 S Wells Commercial LLC | Judgement lien from River City commercial property | 15,550,000 |
| **TOTAL JUDGEMENT CREDITOR** | | 15,550,000 |

| | | |
|---|---|---|
| **TOTAL LIABILITIES** | | 33,228,771 |

**TOTAL NET WORTH AS OF FEBRUARY 28, 2014**    $ (12,132,646)


PLAINTIFF'S EXHIBIT NO. 16
PENGAD 800-631-6989

# Px 17

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

D.A.N. JOINT VENTURE III, L.P.　　　　)
　　　　　　　　Plaintiff,　　　　　　　)
　　　　v.　　　　　　　　　　　　　　)　　Case No. 06 L 012698
　　　　　　　　　　　　　　　　　　　)
NICHOLAS S. GOULETAS,　　　　　　　)
and 800 S. WELLS COMMERCIAL LLC　　)
　　　　　　　　Defendants.　　　　　　)

**EMERGENCY VERIFIED MOTION
FOR STAY OF ENFORCEMENT OF JUDGMENT AND OTHER RELIEF**

Defendant, Nicholas S. Gouletas ("Gouletas"), by and through his attorneys, pursuant to

Illinois Supreme Court Rule 305(a) respectfully moves the court to approve the security

proposed by Gouletas and stay enforcement of the judgment entered on June 16, 2010 and

effective June 25, 2010. In support Gouletas states as follows:

1.　　　On June 16, 2010 this Court entered judgment against Gouletas in the amount of

$1,000,000 (the "Judgment"). The Judgment provided that the judgment would not be effective

until June 25, 2010. A true and correct copy of the Judgment is attached hereto as Exhibit A.

The parties further agreed that Plaintiff would take no action to enforce its judgment until

Wednesday, June 30, 2010.

2.　　　Gouletas intends to file a timely notice of appeal as to the Judgment. In

connection therewith, Gouletas seeks to stay enforcement of the Judgment by presenting security

for the judgment pursuant to Illinois Supreme Court Rule 305(a).

3.　　　The amount of judgment is not reasonably available to Gouletas. Gouletas is

without meaningful liquid assets and as such is not likely to be able to secure a bond for the

Judgment.

4.　　　Therefore, Gouletas proposes the grant of a mortgage interest in real estate

commonly known as 800 S. Wells, Chicago, Illinois, 60605, PIN 17-16-401-013-0000 and 17-



PLAINTIFF'S
EXHIBIT
NO. 17

16-401-014-0000 (the "Property") as security for the Judgment. A title commitment for the Property, which includes a legal description of the Property, is attached hereto as Exhibit B. Title to the Property is vested in 800 South Wells Phase II, LLC. Ex. B, p. A1. Gouletas is the sole member of 800 South Wells Phase II, LLC and will authorize the grant of a mortgage in the Property as security for the Judgment. Illinois courts have allowed litigants to post interest in real estate as security under Rule 305(a). *Heller v. Lee*, 130 Ill.App.3d 701, (3rd Dist. 1985).

5.    The equity in the Property available as security for the Judgment far exceeds the amount of judgment plus the anticipated interest and costs. The Property is valued at $14,880,000. Exhibit C, Appraisal dated April 26, 2010. The sole mortgage recorded against the Property is in the recorded amount of $2,000,000. Ex. B, p. B3 ¶ 6. Therefore, there is equity in the amount of $12,880,000 in the Property to serve as security for the Judgment.

WHEREFORE, Defendant Nicholas Gouletas prays for the entry of an order approving the proposed security for the Judgment entered June 16, 2010 and made effective June 25, 2010; staying enforcement of the Judgment throughout the pendency of Gouletas' appeal of the Judgment; and granting whatever other relief the Court deems equitable and just.

Dated: June 29, 2010                     Respectfully submitted,

                                         NICHOLAS S. GOULETAS

                                         By: _____
                                             One of His Attorneys

                                         Daniel Lynch
                                         Avidan J. Stern
                                         LYNCH AND STERN, LLP (#44520)
                                         150 S. Wacker Drive, Suite 2600
                                         Chicago, Illinois 60601
                                         (312) 346-1600

<u>**VERIFICATION**</u>

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned, Nicholas S. Gouletas certifies that he read and is familiar with the foregoing Emergency Verified Motion for Stay of Enforcement of Judgment and Other Relief and that the allegations contained therein are true and correct to the best of his knowledge and belief.

Nicholas S. Gouletas

# Px 18

## Howard Teplinsky

| | |
|---|---|
| **From:** | Steven Gouletas <sgouletas@nrsrentals.com> |
| **Sent:** | Thursday, January 26, 2017 11:34 AM |
| **To:** | Howard Teplinsky |
| **Subject:** | Fwd: seeking contact info for jerry zaben |

Howard,

See below email.

Thanks,
Steve



 **Steven Gouletas**

CEO, Managing Broker (IL & FL),
RMP(from NARPM), CAM(from NAA)

(312) 361-1928
sgouletas@nrsrentals.com

www.NRSrentals.com
10 E Ontario St, 7th Floor
Chicago, IL 60611-2736

How did we do?
Feedback Survey / Review

All Real Estate consumers / lessees are hereby notified that National Rental Services (NRS) is agent for and/or represents the owner(s) of NRS advertised, managed and/or serviced rentals. This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

---------- Forwarded message ----------
From: Friedgut, Elizabeth H. <Elizabeth.Friedgut@dlapiper.com>
Date: Fri, Dec 19, 2014 at 11:15 PM
Subject: seeking contact info for jerry zaben
To: "sgouletas@nrsrentals.com" <sgouletas@nrsrentals.com>

Do you have? If so, please share. I need to talk to him about your dad's tax liability for river city which we are going to be selling shortly. Thanks.

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com Thank you.

1



SEG2 000093

PLAINTIFF'S EXHIBIT NO. 18

# Px 19

## Howard Teplinsky

**From:** Steven Gouletas <sgouletas@nrsrentals.com>
**Sent:** Thursday, January 26, 2017 11:35 AM
**To:** Howard Teplinsky
**Subject:** Fwd: NS Gouletas-800 Wells

Howard,

See below email.

Thanks,
Steve



**Steven Gouletas**
CEO, Managing Broker (IL & FL),
RMP(from NARPM), CAM(from NAA)

 (312) 361-1928
sgouletas@nrsrentals.com

www.NRSrentals.com
10 E Ontario St, 7th Floor
Chicago, IL 60611-2736

How did we do?
Feedback Survey / Review

All Real Estate consumers / lessees are hereby notified that National Rental Services (NRS) is agent for and/or represents the owner(s) of NRS advertised, managed and/or serviced rentals. This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this email. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

--------- Forwarded message ----------
**From:** Gerald Zaidman <GZaidman@fgmk.net>
**Date:** Mon, Dec 22, 2014 at 2:12 PM
**Subject:** NS Gouletas-800 Wells
**To:** "Friedgut, Elizabeth H." <Elizabeth.Friedgut@dlapiper.com>
**Cc:** Steven Gouletas <sgouletas@nrsrentals.com>

Liz
I think it is important if you can defer the closing of the 800 Wells property owned by Nick personally till 2015
Please call me to discuss ASAP
I am home this afternoon and can be reached on my home phone 847-579-0828 or my cell 847-840-0409
Jerry

Gerald Zaidman,CPA,CVA,CFF,CVA,CFE



PLAINTIFF'S
EXHIBIT
NO. 19

1

SEG2 000094

Partner
FGMK,LLC
2801 Lakeside Drive, 3rd Floor
Bannockburn,IL. 60015
847-964-5118 direct
847-964-5168 direct fax
Gzaidman@fgmk.net
www.fgmk.net

This message (including any attachments) contains confidential information intended for a specific recipient and purpose. If you are not the intended recipient, you should inform the sender, delete this message and are prohibited from disclosing, copying, distributing, or taking any action based on this message or its contents. Any accounting, business, or tax advice contained or implied herein, has been prepared for a specific recipient based on the unique facts and circumstances provided. In the event these circumstances change new advice should be sought. Nothing in this message is intended to assist with the avoidance of penalties that may be imposed on the taxpayer or activities in contravention of Federal or State Law.

2

SEG2 000095

Px 20

# Master Settlement Statement

Near North National Title LLC
222 North LaSalle Street, Suite 100
Chicago, IL 60601
Phone: (312)419-3900    Fax: (312)419-0778

**12/29/14**

Date: December 29, 2014
Close of escrow: December 29, 2014
Borrower: 860 S. Wells (Chicago) LLC
Seller: 800 South Wells Phase II, LLC

Time: 5:08PM
Escrow no.: N01140770
Escrow officer: Shirley Wrightsell

Property location: 800 S. Wells Street
Chicago, IL  60607

| | Seller | | | Borrower | |
|---|---|---|---|---|---|
| **Debit** | **Credit** | | | **Debit** | **Credit** |
| | | Financial Consideration | | | |
| | 7,750,000.00 | Contract Sales Price | | 7,750,000.00 | |
| | | Prorations/Adjustments | | | |
| 164,132.19 | | 2014 Tax Proration | | | 164,132.19 |
| | | Commissions | | | |
| 232,500.00 | | Listing Agent Commission to Millennium Properties R/E, Inc.  0.00 @ 0.00% = 232,500.00 | | | |
| 155,000.00 | | Selling Agent Commission to Cushman & Wakefield  0.00 @ 0.00% = 155,000.00 | | | |
| | | Title Charges | | | |
| 5,425.00 | | Title Insurance to Near North National Title LLC  ALTA 2006 Owners Policy for 7,750,000.00  5,425.00 | | | |
| 80.00 | | Tax Payment Service (2 PINS) 2013 to Near North National Title LLC | | | |
| 100.00 | | Tax Payment Service - 2012 to Near North National Title LLC | | | |
| 1,500.00 | | Deed and Money Escrow to Near North National Title LLC | | | |
| | | Deed and Money Escrow to Near North National Title LLC | | 1,500.00 | |
| | | ALTA Endorsement 25-06 (Same As Survey) to Near North National Title LLC | | 350.00 | |
| 250.00 | | GAP - Seller to Near North National Title LLC | | | |
| | | ALTA Endorsement 28.1-06 (Encroachments - Boundaries and Easements) to Near North National Title LLC | | 225.00 | |
| 185.00 | | Later Date Examination to Near North National Title LLC | | | |
| 500.00 | | Work Done Fee to Near North National Title LLC | | | |
| 240.00 | | Water Certification (3) to Near North National Title LLC | | | |
| | | ALTA Endorsement 17-06 (Access and Entry) to Near North National Title LLC | | 225.00 | |
| | | ALTA Endorsement 35-06 (Minerals and Other Subsurface Substances - Bldgs) to Near North National Title LLC | | 175.00 | |
| | | ALTA Endorsement 17.2-06 (Utility Access) to Near North National Title LLC | | 200.00 | |
| 450.00 | | Extended Coverage Endorsement to Near North National Title LLC | | | |
| | | ALTA Endorsement 9.2-06 (Restrictions, Encroachments, Minerals - Improved Land) to Near North National Title LLC | | 200.00 | |
| | | ALTA Endorsement 3.1-06 (Zoning-Completed Structure) to Near North National Title LLC | | 1,500.00 | |
| | | ALTA Endorsement 26-06 (Subdivision) to Near North National Title LLC | | 175.00 | |
| | | ALTA Endorsement 18.1-06 (Multiple Tax Parcel) to Near North National Title LLC | | 200.00 | |
| | | IL State Policy Fee to Chicago Title Insurance Company | | 3.00 | |
| | | Later Date Examination to Near North National Title LLC | | 185.00 | |
| 70.00 | | Obtain Open Item Bills to Near North National Title LLC | | | |

PLAINTIFF'S EXHIBIT NO. 20
PENGAD 800-631-6989

## Master Settlement Statement

| Seller | | | Borrower | |
| Debit | Credit | | Debit | Credit |
|---|---|---|---|---|
| | | Strict Joint Order Escrow to Near North National Title LLC | 100.00 | |
| | | **Recording Charges** | | |
| 100.00 | | Recording Fees to Near North National Title | 100.00 | |
| 27,125.00 | | City/County Tax Stamps to Cook County Recorder of Deeds / City of Chicago | 58,125.00 | |
| 7,750.00 | | State Tax/Stamps to Cook County Recorder of Deeds | | |
| | | **Payoffs** | | |
| 4,500,000.00 | | Payoff of First Mortgage Loan | | |
| | | Total Payoff | 4,500,000.00 | |
| | | **Other Debits/Credits** | | |
| 100,000.00 | | Legal Services to Goldstein & McClintock LLLP | | |
| 100,000.00 | | Legal Services to DLA PIPER US LLP | | |
| 20,951.50 | | Survey to National Survey Service, Inc. | | |
| 8,919.00 | | Legal Services to Womble Carlyle Sandridge & Rice | | |
| 12.00 | | TPA Service Fee to Cook County Treasurer | | |
| 50.00 | | Water Certification - to Chicago Dept. of Water Management | | |
| 54,311.02 | | 2012 Taxes Parcel ending in 013 to Cook County Collector | | |
| 25,823.58 | | 2013 Taxes Parcel ending in 013 first Installment to Cook County Treasurer | | |
| 20,344.45 | | 2013 Taxes Parcel ending in 013 second Installment to Cook County Treasurer | | |
| 74,205.58 | | 2012 Taxes Parcel ending in 014 first Installment to Cook County Collector | | |
| 64,526.89 | | 2012 Taxes Parcel ending in 014 second Installment to Cook County Collector | | |
| 67,805.31 | | 2013 Taxes Parcel ending in 014 first Installment to Cook County Treasurer | | |
| 53,418.84 | | 2013 Taxes Parcel ending in 014 second Installment to Cook County Treasurer | | |
| 10,364.00 | | As directed to Datapark | | |
| 1,769.00 | | As directed to JC 's United Building Maintenance | | |
| 223.00 | | As directed to Mc Adam Landsacping, Inc | | |
| 185.00 | | As directed to Corp-Link Services, Inc | | |
| 13,000.00 | | As directed to United States Trustee | | |
| | | Buyer Legal Fees to Schain Banks | 40,000.00 | |
| 6,744,295.16 | 7,750,000.00 | **Subtotals** | 7,853,263.00 | 164,132.19 |
| | | **Balance Due FROM Borrower** | | 7,689,130.81 |
| 2,038,703.84 | | **Balance Due TO Seller** | | |
| 7,750,000.00 | 7,750,000.00 | **TOTALS** | 7,853,263.00 | 7,853,263.00 |

Seller

800 South Wells Phase II, LLC

BY: _ELIZABETH J. FERDGHT_

Near North National Title LLC
Settlement Agent
SHIRLEY WRIGHTSELL

Borrower

800 S. Wells (Chicago) LLC

BY: _____ DAVID O KEEFE

# Px 21

**Howard Teplinsky**

From: Howard Teplinsky
Sent: Monday, January 05, 2015 9:01 AM
To: 'John Arnold'
Subject: RE: 800 river city

John. Let's look at this the following way:

HBI's claim in bankruptcy: $2,177,000.00

Proceeds currently at CTT to disburse to HBI: $2,038,703.84 (-$138,296.16I)

Less: $850,000 (Stuart Adler judgment)
$15,000 (George Strey)
$30,000 (Beermann Pritikin Mirabelli Swerdlove)
$100,000 (repayment of Natel loan)
$25,000 (for engagement of accountant for HBI's

returns) $1,018,703.84 (available to HBI creditors)

Plus: 800 S Wells $137,835
-461.16 (balance after paying all HBI claims)

Plus: $164,132.19 (underfunded amount by purchaser
(closing)

$163,671.03 (funds in excess of HBI's claim)

At a minimum, 800 S. Wells Phase II LLC should retain $163,071.03 to pay any obligations it may have, including possible IRS obligations.



Howard L. Teplinsky
Partner
BEERMANN | PRITIKIN | MIRABELLI | SWERDLOVE LLP
161 North Clark Street, Suite 2600
Chicago, Illinois 60601
Telephone: 312-621-9700
Facsimile: 312-621-0909
E-Mail: hteplinsky@beermannlaw.com





PLAINTIFF'S EXHIBIT NO. 21

# Px 22

## Howard Teplinsky

**...m:**      Howard Teplinsky
**Sent:**      Wednesday, January 07, 2015 6:03 PM
**To:**      Christine M. Arcus
**Cc:**      'John Arnold'
**Subject:**      Home By Invsco Wires
**Attachments:**      image001.png

Hi. I'm going to be in Lake County tomorrow for a good part of the day. After you confirm that the wires have hit our account, I would like some of the money to be disbursed tomorrow. Please keep me posted.

1. Stuart Adler $850,000.

   **Glenview State Bank**
   **800 Waukegan Rd**
   **Glenview, IL 60025**
   **(847) 729-1900**
   **Mr Steve Tabassum- Banker Rep ext 0360**
   **ROUTING # 071920300**
   **Checking account # 730-2291**

2. Natel Matschulat $100,000

   **Citibank**
   **1 East Oak St**
   **Chicago, IL 60611**
   **Routing: 271070801**
   **Account: 0909239130**

3. George Stray $15,000

   **Wells Fargo**
   **North Carolina**
   **Routing 053000219**
   **Account 1810913457**

Howard L. Teplinsky
Partner
BEERMANN | PRITIKIN | MIRABELLI | SWERDLOVE LLP
1 North Clark Street, Suite 2600
...icago, Illinois 60601
Telephone: 312-621-9700
Facsimile: 312-621-0909
E-Mail: hteplinsky@beermannlaw.com

1


PLAINTIFF'S EXHIBIT NO. 22

# Px 23



## The PrivateBank

**WIRE REQUEST FORM**

COPY

TEMPLATE AGREEMENT

### Wire Transfer Information

| | | |
|---|---|---|
| Date: 01/06/2015 | Prepared by: LAIMA PLIOPLYS | Available Balance: 137,835.16 |
| Wire Amount: $137,535.00 | USD: ☑ | Foreign Currency: ☐ |

Client Account Name: 800 S WELLS PHASE II LLC

Client Account Address: 182 W LAKE ST. #200, CHICAGO IL 60601

Debit Account Number to be charged: 2114960

Beneficiary Bank ABA or SWIFT: ABA 021000021

Beneficiary Bank Name: CHASE BANK

Intermediary Bank ABA or SWIFT:

Beneficiary Bank Address: 10 S DEARBORN CHICAGO IL 60602

Beneficiary Account Number to be Credited: 004235850

International Payment Codes:

Beneficiary Name: BEERMAN, PRITIKIN, MIRABELLI SWERDLOVE LLP

Beneficiary Address: 161 N CLARK ST #2600, CHICAGO IL 60601

Additional Information:

CLIENT SIGNATURE (In person only): Date: 01/06/2015

The client agrees that the wire transfer is irrevocable and that it is an obligation of the institution named above to execute ordinary care in processing this wire transfer and, that it is not responsible for any losses or delays which occur as a result of any other party's involvement in processing this transfer. In addition, the processing of a wire transfer shall be made subject to terms in the account agreement.

### DODD FRANK REGULATION E – INTERNATIONAL CONSUMER PAYMENTS

If this wire is USD $15.00 or greater, by order of a consumer located in the United States, and is being sent to any person or entity located in a foreign country for personal, household or family use, you must complete the following information:

| | | |
|---|---|---|
| Does this wire fall under the regulation? (Y/N) | No | Is this wire in USD? (Y/N) |
| What is the currency of the beneficiary account? | | Is this wire in Foreign Currency? |

The Dodd Frank regulation requires a pre-disclosure form and a receipt be provided to all consumers that request wire transfers that apply to this regulation. The Bank must disclose fee and the information even if there is none. Call back must be performed for all wires that apply to the regulation. Phone waivers and future wire requests will not be accepted for Dodd Frank Regulation E –International Consumer Wire requests. Exceptions will not be permitted.

☐ In Person Pre-Disclosure Requirements:
Send the completed wire request form to the wire room. Upon receipt of the wire form the Wire Room will e-mail the pre-disclosure and receipt to you for client signature. Return the signed pre disclosure and receipt to the Wire Room. Upon receipt of the signed pre-disclosure and signed receipt the Wire Room will wait the obligatory 30 minutes before processing the payment.

☐ Phone Pre-Disclosure Requirements:
Send the completed wire request to the Wire Room. Upon receipt of the completed wire form the Wire Room will call back the client to confirm the payment and for pre-disclosure approval. The client must verbally confirm the payment instructions and approve the pre-disclosure requirements. When the wire is approved and confirmed the Wire Room will wait the obligatory 30 minutes before processing the payment.

☐ E-mail & Fax Pre-Disclosure Requirements:
Send the completed wire request to the Wire Room. Upon receipt of the completed wire form the Wire Room will e-mail the pre-disclosure to you. You must e-mail/fax the pre-disclosure to your client. The client must e-mail/fax the approval of the pre-disclosure back to the Bank. Send the client approved pre-disclosure to the Wire Room. Upon receipt of the approved pre-disclosure the Wire Room will call back the client to confirm the payment. Once the wire is approved and confirmed the Wire Room will wait the obligatory 30 minutes before processing the payment.

Right to Cancel:
The client has the right to cancel the wire within thirty minutes from signature approving or verbally approving the pre-disclosure. To cancel the wire, notify Wire Operations @ 1-866-464-6419 option 3

### BANK USE ONLY – Mandatory – Must be completed

Method / Verification completed by Banker:

☑ In Person – ID verified

☐ Phone (waiver agreement on file) – No call back required.

☐ Facsimile or Email – call back required

☐ Phone (no waiver agreement on file) – Call back required

First and Last Name of client that initiated payment: NICHOLAS S GOULETAS

AUTHORIZED BY: Refer to Wire Transfer Authorization Limits (See Credit Risk Management Approval Reference Guide)

| | | |
|---|---|---|
| Signature: | Print Name: EILEEN E KELLY | Title: AMD | Officer #: 7224 |
| Signature: Laima Plioplys | Print Name: LAIMA PLIOPLYS | Title: ABM | Officer #: 7076 |

**WIRE STAFF ONLY** Initials: Verifier: Reference: 2010

Fax Wires to: 312-564-1795

SIGNATURE VERIFIED

PLAINTIFF'S EXHIBIT NO. 23

18

# Px 24

## Howard Teplinsky

| | |
|---|---|
| m: | Howard Teplinsky |
| ent: | Tuesday, January 20, 2015 7:28 PM |
| To: | Christine M. Arcus |
| Cc: | 'John Arnold' |
| Subject: | Home By Invsco Funds |

Hi. We need to cut the following checks:

From the $1,271,218.84 remaining in escrow,

Paul Jones $690,000
Dorothea Touris $396,218.84
James Paul $110,000

Warady & Davis $35,000
George Stray $15,000

The remaining $25,000 will be paid to us. I will leave an invoice on your chair.

John Arnold from the client will pick up all of the checks *except* for the Warady & Davis check. Please let us know when he can come by. Thanks as always.

Howard L. Teplinsky
Partner
BEERMANN | PRITIKIN | MIRABELLI | SWERDLOVE LLP
161 North Clark Street, Suite 2600
Chicago, Illinois 60601
Telephone: 312-621-9700
Facsimile: 312-621-0909
E-Mail: hteplinsky@beermannlaw.com





CONFIDENTIAL E-MAIL



1

Px 25



Px 26

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

In re:                              )       Chapter 7
                                    )       Case No. 16-01335
        NICHOLAS S. GOULETAS,       )       Hon. Timothy A. Barnes
                                    )       Hearing Date:    August 16, 2017
                        Debtor.     )       Hearing Time:    10:00 a.m.

### TRUSTEE'S MOTION FOR APPROVAL OF SALE OF INTERESTS IN
### PERSONAL PROPERTY AND FOR RELATED RELIEF

Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002 and 6004, Richard

M. Fogel, not individually but as Chapter 7 trustee (the "Trustee") for the bankruptcy estate (the

"Estate") of Nicholas S. Gouletas (the "Debtor") hereby requests that this Court enter an order

that provides the Trustee with the following relief:

- Approves and authorizes the sale by the Trustee of the Estate's interest in certain
  personal property to D.A.N. Joint Venture III, L.P., or its assignee ("DJV") for the
  sum of $15,000.00, as more particularly described below;

- Authorizes the Trustee to execute certain documents to effectuate the proposed
  sale; and

- Provides the Trustee with such other and further relief as may be appropriate
  under the circumstances and to which the Trustee may be entitled.

In support of this motion, the Trustee respectfully represents as follows:

### Background

1.    On January 17, 2016 (the "Petition Date"), the Debtor filed a voluntary Chapter 7

bankruptcy case in this Court (the "Case").

2.    On the Petition Date, the Trustee was appointed as the Chapter 7 trustee to

administer the Estate.

3.    Prior to the Petition Date, the Debtor was a real estate developer and, as set forth

in his Schedule of Assets, B. 19, pp. 11-36 [Dkt. No 15] and his Statement of Financial Affairs,

(4273 MOT A0454352 DOC)

PLAINTIFF'S
EXHIBIT
NO. 26

No. 27, pp. 105-130 [Dkt. No. 15], owned and operated a multitude of business entities that owned, developed and managed real estate projects (collectively, the "Business Entities").[1]

4.       Prior to the Petition Date, the Debtor was named as a defendant in a multitude of lawsuits relating to some of the real estate projects, as set forth in his Statement of Financial Affairs, No. 9, pp. 91-93. In some of the actions, judgments were entered against the Debtor and citation liens were obtained by the judgment creditors.

5.       The bar dates for filing claims against the Estate was June 3, 2016 for general creditors and July 15, 2016 for government creditors.

6.       This Court has core subject matter jurisdiction to hear and resolve this motion pursuant to 28 U.S.C. §§ 1334(b), 1334(e), 157 (b)(2)(A), 157(b)(2)(M), 157(b)(2)(N), 157(b)(2)(O) and applicable local rules regarding the referral of cases under title 11 of the United States Code to this Court.

### The Proposed Sale of Assets

7.       Prior to the Petition Date, it appears that the Debtor transferred, or caused one or more of his business entities to transfer, certain personal property to family members, including but not limited to,:

   a.       Approximately $51,000 in cash to his wife, Natel Matschulat ("Matschulat"), on or about September 5, 2014 (the "Matschulat Transfer"); and

   b.       Membership interests in NKM Garvey LLC ("NKM") and SEG Garvey LLC ("SEG") to Matschulat, his children and other family members (collectively, the "Garvey Transfers").

8.       The Trustee received an offer from DJV[2], in the amount of $15,000.00, to purchase:

---

[1] The Trustee was authorized to abandon the Estate's interest in the Business Entities pursuant to order of Court dated November 29, 2016.

[2] DJV is the owner of 800 South Wells Commercial LLC, the Debtor's largest unsecured non-priority creditor.

a.    Any and all claims and causes of action of any nature or form whatsoever
(except for non-assignable Bankruptcy Code claims), whether common
law, statutory, equitable or otherwise in nature, that the Trustee asserted or
could have asserted for or on behalf of the Estate, including, without
limitation, claims for fraudulent transfers, breach of fiduciary duties, tort,
breach of contract, refunds, reimbursement, indemnification, contribution,
constructive trusts, equitable relief, accounting, injunctive relief, attorneys'
fees, court costs, or any other claim or cause of action of any nature or
form whatsoever, including, without limitation, the Matschulat Transfer
and the Garvey Transfers (collectively, the "Litigation Claims"), and

b.    Any and all claims and causes of action of any nature or form whatsoever
by the Estate that any corporations, LLCs, limited partnerships, trusts, and
any other entities of any nature or form whatsoever (a) are, were or have
been used for an improper purpose; (b) are, in fact, the alter-egos or
reverse alter-egos of the Debtor; or (c) are shams to thwart, deceive,
hinder, and/or delay the Debtor's creditors (collectively, the "Alter-Ego
Claims").

9.    A copy of the offer is attached to this motion as <u>Exhibit A</u>.

10.    The Trustee is of the opinion that Matschulat, the children and the other family
members may be able to assert defenses to the Litigation Claims and he is of the opinion that the
Alter-Ego Claims do not have significant value to the Estate.

### Relief Requested

11.    The Trustee asserts that the Litigation Claims and the Alter-Ego Claims are
property of the Estate in accordance with the provisions of   28 U.S.C. § 1334(e) and 11 U.S.C. §
541(a).

12.    Pursuant to the provisions of 11 U.S.C. §363(b) (1), the Trustee seeks authority to
sell the Litigation Claims and the Alter-Ego Claims for the benefit of the Estate to DJV for
$15,000.00, subject to all liens, claims and encumbrances.  In his business judgment, the offer is
fair and reasonable and is a better alternative than abandonment of the claims.  The Trustee does
not believe that he could receive a substantially higher offer for the Litigation Claims and the

Alter-Ego Claims through a public sale or any other means of disposition, given the nature of the assets.[3]

13.    Section 363(b) (1) authorizes a trustee to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing.    11 U.S.C. §363(b)(1).

14.    Courts generally approve sales outside of the ordinary course of business under § 363(b) (1) whenever such a sale is in the best interests of the estate.  *See, In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994); *In re Apex Oil Co.*, 92 B.R. 847, 866 (Bankr. E.D. Mo. 1988).  Ordinarily, this standard requires: (i) an articulated business justification for the sale; and (ii) evidence that the sale occurred in good faith.  *See, In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993), citing, *In re Met-L-Wood Corp.*, 861 F.2d 1012 (7th Cir. 1988), *cert. denied*, 490 U.S. 1006, 109 S. Ct. 1642, 104 L.Ed.2d 157 (1989)); *see also, Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (sale under §363 involves exercise of fiduciary duty and requires an "articulated business justification").

15.    In addition to seeking authority to sell the Litigation Claims and the Alter-Ego Claims, the Trustee requests authority to execute and deliver to DJV any documents necessary to transfer the Estate's interest in the assets.

## Notice

16.    The Trustee has served a copy of the motion on 21 days' notice on the Debtor, the United States Trustee, all of the creditors that have filed proofs of claim against the Estate and all counsel of record.

17.    The Trustee requests that the Court consider such notice to be adequate and sufficient under the circumstances, given the nature of the relief sought.

---

[3] The Trustee had been advised by former counsel for the Debtor that neither Matschulat nor the other family members were interested in making a higher offer for the Litigation Claims and the Alter-Ego Claims.

WHEREFORE, the Trustee respectfully requests that this Court enter the proposed order: (i) finding that notice of the hearing on the motion, as described herein, is sufficient; (ii) authorizing and approving the Trustee's proposed sale of the Litigation Claims and the Alter-Ego Claims to DJV for $15,000.00, as set forth in the motion; (iii) authorizing the Trustee to take all further actions and execute and deliver any documents necessary to consummate the transaction described herein; and (iv) providing such other and further relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

Dated:  July 24, 2017                     /s/ Richard M. Fogel, Trustee

Richard M. Fogel (#3127114)
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
(312) 276-1334

# EXHIBIT A

{4273 MOT A0454552.DOC}

# ARMSTRONG LAW FIRM

23353 S. 88th Avenue
FRANKFORT, ILLINOIS 60423

E-MAIL:
armstronglaw@sbcglobal.net

815/464-3243
(FAX) 815/464-3449

July 23, 2017

Richard M. Fogel, Trustee
Shaw Fishman
321 N Clark Street, Suite 800
Chicago IL 60654

Re:   Gouletas Bankruptcy; Offer to Purchase

Dear Rick:

As we discussed in mid-October of 2016, and in accordance with your email to me of July 20, 2017, DAN Joint Venture III, L.P. ("DJV") hereby offers to purchase from the Bankruptcy Estate of Debtor Nicholas S. Gouletas ("Gouletas") for a total cash payment of $15,000.00 the following assets of the Bankruptcy Estate:

(1)   Any and all claims and causes of action of any nature or form whatsoever (except for non-assignable Bankruptcy Code claims), whether common law, statutory, equitable or otherwise in nature, that the Trustee asserted or could have asserted for or on behalf of the Gouletas' Bankruptcy Estate, including, without limitation, claims for fraudulent transfers, breach of fiduciary duties, tort, breach of contract, refunds, reimbursement, indemnification, contribution, constructive trusts, equitable relief, accounting, injunctive relief, attorneys' fees, court costs, or any other claim or cause of action of any nature or form whatsoever, including, without limitation, (a) fraudulent transfer claims related to the transfer by Gouletas of funds to his wife, Natel Matschulat, on or about September 5, 2014; (b) fraudulent transfer claims related to the transfers by Gouletas (either directly or indirectly through any entity owned or controlled, directly or indirectly, by Gouletas) of Gouletas' 25% interest in the "Garvey Court" project at Clark and Lake Streets in Chicago, Illinois; and

(2)   Any and all claims and causes of action of any nature or form whatsoever by the Gouletas' Bankruptcy Estate that any corporations, LLCs, limited partnerships, trusts, and any other entities of any nature or form whatsoever (a) are, were or have been used for an improper purpose; (b) are, in fact, the alter-egos or reverse alter-egos of Gouletas; or (c) are shams to thwart, deceive, hinder, and/or delay Gouletas' creditors.

Please let me know if you require any further information about DJV's offers set forth above.

Very truly yours,
/s/
F. Dean Armstrong

cc:   Dan Cadle
      Vic Buente, Esq.

## UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 16-01335 |
| NICHOLAS S. GOULETAS, | ) | Hon. Timothy A. Barnes |
| | ) | Hearing Date:    August 16, 2017 |
| Debtor. | ) | Hearing Time:    10:00 a.m. |

### NOTICE OF MOTION

TO:    See attached service list

PLEASE TAKE NOTICE that on **August 16, 2017 at 10:00 a.m.** or as soon thereafter as counsel may be heard, I shall appear before the **Honorable Timothy A. Barnes** in Courtroom 744, Dirksen Federal Courthouse, 219 South Dearborn Street, Chicago, Illinois and shall present the **Trustee's Motion to Approve Sale of Interests in Personal Property and Related Relief,** a copy of which is attached and served upon you, and move for the entry of an order in conformity with the pleadings.

AT WHICH TIME AND PLACE you may appear if you so see fit.

Richard M. Fogel (#3127114)
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL 60654
(312) 276-1334

### CERTIFICATE OF SERVICE

Richard M. Fogel certifies that he caused to be served a true copy of the above and foregoing notice and attached pleadings upon the attached service list electronically or by U.S. Mail, as indicated, on July 24, 2017.

/s/ Richard M. Fogel

{4273 MOT A0454552 DOC}

### ELECTRONIC SERVICE LIST

Patrick S Layng
USTPRegion11.ES.ECF@usdoi.gov

Frederick D. Armstrong
armstronglaw@sbcglobal.net

Troy M. Sphar
tsphar@smbtrials.com

### U.S. MAIL SERVICE LIST

Nicholas S. Gouletas
111 E. Chestnut, Unit 28K
Chicago, IL 60611

800 South Wells Commercial LLC
D.A.N. Joint Venture III, L.P.
100 North Center Street
Newton Falls, OH 44444

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 7346
Philadelphia, PA 19101-7346

2625 North Clark Condominium Association
c/o Johnson & Sullivan, Ltd
11 East Hubbard, Suite 702
Chicago, IL 60611

Quantum3 Group LLC
as agent for CP Medical LLC
PO Box 788
Kirkland, WA 98083-0788

Pierce R. and Claudia B. Ennessy
296 Aspen Lane
Highland Park, IL 60035

American InfoSource LP
As agent for DIRECTV, LLC
PO Box 5008
Carol Stream, IL 60197-5008

The Private Bank
c/o Autumn L. Sharp
Carlson Dash LLC
216 S. Jefferson Street, Suite 504
Chicago, IL 60661

Guaranty Solutions
c/o Mages & Price LLC
707 Lake Cook Road, Suite 314
Deerfield, IL 60015-5613

Guaranty Solutions, LLC
c/o Mages & Price LLC
1110 Lake Cook Road, Suite 385
Buffalo Grove, IL 60089

William and Edith Apostal
2537 N. Burling Street
Chicago, IL 60614

Hoogendoorn & Talbot LLP
122S. Michigan Avenue, Suite 1220
Chicago, IL 60603

Novack and Macey LLP
100 N. Riverside Plaza
Chicago, IL 60606

James A. West
606 W. 18th St., Unit 6
Chicago, IL 60616

Peter A. Apostal
340 E. Randolph Street #3606
Chicago, IL 60601

{4273 MOT A0454552.DOC}

# Px 27

Case 16-01335   Doc 96   Filed 08/18/17   Entered 08/22/17 07:19:14   Desc Main
Document   Page 1 of 2

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

In Re: )                              BK No.:   16-01335
Nicholas S. Gouletas, )
)
)                              Chapter: 7
)                              Honorable Timothy A. Barnes
)
)
Debtor(s) )

## ORDER AUTHORIZING SALE OF PERSONAL PROPERTY

This matter having come on for hearing after notice to creditors and parties in interest with reference to the motion (the "Motion") of Richard M. Fogel, the chapter 7 trustee (the "Trustee") for the estate (the "Estate") of Nicholas S. Gouletas (the "Debtor"), for authority to sell the Estate's interest in certain personal property, and the Court being fully advised in the premises,

IT IS ORDERED THAT:

1. The Trustee is hereby authorized to sell the Estate's interests in A) any and all claims and causes of action of any nature or form whatsoever (except for non-assignable claims arising under a provision of the United States Bankruptcy Code), whether common law, statutory, equitable or otherwise in nature, that the Trustee asserted or could have asserted for or on behalf of the Estate, including, without limitation, claims for fraudulent transfers, breach of fiduciary duties, tort, breach of contract, refunds, reimbursement, indemnification, contribution, constructive trusts, equitable relief, accounting, injunctive relief, attorneys' fees, court costs, or any other claim or cause of action of any nature or form whatsoever and B) any and all claims and causes of action of any nature or form whatsoever by the Estate that any corporations, limited liability companies, limited partnerships, trusts, and any other entities of any nature or form whatsoever (a) are, were or have been used for an improper purpose; (b) are, in fact, the alter-egos or reverse alter-egos of the Debtor; or (c) are shams to thwart, deceive, hinder, and/or delay the Debtor's creditors to DAN Joint Venture III, L.P., subject to all liens, claims and encumbrances, for $15,000.00.

2. The Trustee is hereby authorized to take all further actions and execute any documents necessary to consummate the transaction.

3. Notice of the Motion is deemed to be adequate under the circumstances and further notice is hereby waived.

Enter:

United States Bankruptcy Judge

Dated:   AUG   18 2017

Prepared by:
Richard M. Fogel (#3127114)

PLAINTIFF'S EXHIBIT
NO. 27

Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL 60654
(312) 276-1334

Px 28

## ASSIGNMENT OF CLAIMS AND CAUSES OF ACTION

This Assignment of Claims and Causes of Action (the "Assignment") is made and executed as of this 13TH day of September, 2017 by and between Richard M. Fogel, not individually but solely as chapter 7 trustee (the "Trustee") of the bankruptcy estate of Nicholas S. Gouletas (the "Debtor"), located in Chicago, Illinois, to and for the benefit of D.A.N. Joint Venture III, L.P. (the "Assignee"), located in Newton Falls, Ohio.

WHEREAS, on January 17, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of the United States Bankruptcy Code and thus initiated the case styled In re Nicholas S. Gouletas, Case No. 16-01335 (the "Case"), currently pending before the United States Bankruptcy Court for the Northern District of Illinois ("Bankruptcy Court");

WHEREAS, on the Petition Date, the Trustee was appointed to administer the Debtor's chapter 7 bankruptcy estate (the "Estate");

WHEREAS, on the Petition Date, the Estate acquired the right to assert claims and causes of action, including, without limitation, claims for fraudulent transfers, breach of fiduciary duties, tort, breach of contract, refunds, reimbursement, indemnification, contribution, constructive trusts, equitable relief, accounting, injunctive relief, attorneys' fees and court costs (the "Litigation Claims");

WHEREAS, on the Petition Date, the Estate acquired the right to assert claims and causes of action that any of the Debtor's corporations, limited liability companies, limited partnerships, trusts, and any other entities of any nature or form whatsoever (a) are, were or have been used for an improper purpose; (b) are, in fact, the alter-egos or reverse alter-egos of the Debtor; or (c) are shams to thwart, deceive, hinder, and/or delay the Debtor's creditors (the "Alter Ego Claims");

WHEREAS, the Bankruptcy Court has entered an order in the Case authorizing the Trustee to assign the Estate's interest in the Litigation Claims and the Alter Ego Claims to the

(4273 AGR A0484161.DOC)

PLAINTIFF'S
EXHIBIT
NO. 28

Assignee, subject to all liens, claims and encumbrances, for the sum of $15,000.00 (the "Sale Order").

NOW, THEREFORE, pursuant to the terms of the Sale Order and in exchange for the good and valuable consideration and obligations set forth in this Assignment, the receipt and sufficiency of which is hereby acknowledged, the Trustee and the Assignee hereby agree as follows:

1.      The Trustee hereby assigns to the Assignee any and all claims and causes of action of any nature or form whatsoever (except for non-assignable claims arising under a provision of the United States Bankruptcy Code), whether common law, statutory, equitable or otherwise in nature, that the Trustee asserted or could have asserted for or on behalf of the Estate, including, without limitation, claims for fraudulent transfers, breach of fiduciary duties, tort, breach of contract, refunds, reimbursement, indemnification, contribution, constructive trusts, equitable relief, accounting, injunctive relief, attorneys' fees, court costs, or any other claim or cause of action of any nature or form whatsoever.

2.      The Trustee hereby assigns to the Assignee any and all claims and causes of action of any nature or form whatsoever by the Estate that any corporations, limited liability companies, limited partnerships, trusts, and any other entities of any nature or form whatsoever (a) are, were or have been used for an improper purpose; (b) are, in fact, the alter-egos or reverse alter-egos of the Debtor; or (c) are shams to thwart, deceive, hinder, and/or delay the Debtor's creditors

3.      The Trustee makes no representations or warranties of any kind with respect to the Litigation Claims or the Alter Ego Claims.

4.      This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, legal representatives and assigns.

{4273 AGR A0484161.DOC}

IN WITNESS WHEREOF, the Trustee and the Assignee have caused this Assignment

to be executed as of the day and year first written above.

RICHARD M. FOGEL, not individually, but
as chapter 7 trustee of the bankruptcy estate
of Nicholas S. Gouletas

D.A.N. Joint Venture III, L.P.
By: The Cadle Company, its General Partner

By: _Richard D Persinger_

Richard G. Persinger, President

{427J AGR A0484161.DOC}

Px 29

## RELEASE AND SETTLEMENT AGREEMENT

This Release and Settlement Agreement (this "Release and Settlement Agreement") is made and entered into, as of December 30, 2014, by and among Stuart T. Adler, as Trustee of the Stuart T. Adler Revocable Family Trust dated January 31, 1992 ("Adler") and Nicholas S. Gouletas ("Gouletas") and Homes By Invsco, Inc. ("Invsco," with Gouletas, "Borrowers").

### RECITALS

The following recitals form the basis for and are a material part of this Release and Settlement Agreement:

A.     On April 2, 2012, Borrowers executed and delivered to Adler, for value received, a Promissory Note ("Note") in the sum of $1,020,000 in which Borrowers promised to pay Adler the principal amount of $1,020,000, plus accrued interest.

B.     On or about August 4, 2014, Adler brought suit against Borrowers for breach of the Note in the Circuit Court of Cook County, Case No. 2014 L 050584 (the "Litigation").

C.     On September 17, 2014, a final judgment in the amount of $900,500.00 plus accruing interest, attorneys' fees, and costs of suit was entered against Borrowers in the Litigation. The judgment remains outstanding.

D.     On or about November 11, 2014, Borrowers were served with a citation to discover assets in the Litigation.

E.     In response to the citation and in an effort to fully and finally resolve any issues relating to the Note and the pending Litigation, each of the parties desires to finally and completely settle and compromise their disputes and differences subject to the terms set forth herein.

NOW, THEREFORE, in consideration of the premises, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### AGREEMENT

1.     <u>Affirmation of Recitals</u>.  Each of the parties acknowledges and agrees that the foregoing recitals are true and correct and agrees that the recitals are a part of this Release and Settlement Agreement.

2.     <u>Settlement Payment</u>.  On or before December 30, 2014, Invsco will pay to Adler $850,000.00 in cash ("Payment"), by wire transfer of same day funds to the following account upon execution of this Release and Settlement Agreement:

> Glenview State Bank
> 800 Waukegan Rd
> Glenview, IL 60025
> (847) 729-1900



PLAINTIFF'S EXHIBIT NO. 29

Mr Steve Tabassum- Banker Rep ext 0360
ROUTING # 071920300
Checking account # 730-2291
RE: Homes By Invsco Settlement

Borrowers represent that the Settlement Payment will be made by Invsco from its readily available funds not subject to any lien. If for any reason Adler is ordered to return or disgorge the Payment or any portion thereof, any obligation of Adler hereunder shall be null, void and of no effect, including, without limitation, with regard to Borrowers' continuing obligations under the Note.

3.      No Bankruptcy.  In the event Invsco files a voluntary bankruptcy petition or is named in an involuntary petition, that filing shall constitute a breach of this Agreement.

4.      Release by Adler.  Effective ninety-one (91) days after the payment of the Settlement Payment, and only in the event Borrowers have complied with their obligations under this Agreement, Adler, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, hereby fully forever, irrevocably and unconditionally releases, remises, acquits and discharges all and each of the Borrowers and their respective agents, employees, officers, directors, partners, managers, members, trustees, parents, subsidiaries, predecessors, successors, affiliates, representatives, heirs, beneficiaries, executors, administrators and assigns from any and all claims, charges, complaints, demands, actions, causes of action, suits, rights, appeals and rights of appeal, debts, dues, sums of money, costs, losses, accounts, reckonings, covenants, contracts, controversies, agreements, promises, damages, executions, obligations, liabilities and expenses (including attorneys' fees and costs) of every kind, nature and description whatsoever, existing or contingent, ascertained or unascertained, asserted or unasserted, suspected or unsuspected, known or unknown, in law, equity or mixed, arising out of or relating to the Note or the Litigation other than those arising out of this Agreement.  In addition, in the event Borrowers have complied with their obligations under this Agreement, Adler shall deem the judgment in the Litigation satisfied in full, but shall preserve all claims relating to the breach of this Agreement.

5.      Release by Borrowers.   Each of the Borrowers, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, hereby fully forever, irrevocably and unconditionally releases, remises, acquits and discharges Adler and his respective agents, employees, officers, directors, trustees, partners, managers, members, parents, subsidiaries, predecessors, successors, affiliates, representatives, heirs, beneficiaries, executors, administrators and assigns from any and all claims, charges, complaints, demands, actions, causes of action, suits, rights, appeals and rights of appeal, debts, dues, sums of money, costs, losses, accounts, reckonings, covenants, contracts, controversies, agreements, promises, damages, executions, obligations, liabilities and expenses (including attorneys' fees and costs) of every kind, nature and description whatsoever, existing or contingent, ascertained or unascertained, asserted or unasserted, suspected or unsuspected, known or unknown, in law, equity or mixed, arising out of or relating to the Note or the Litigation other than those obligations arising out of this Agreement.

6.      Confidentiality.  This Release and Settlement Agreement and all matters relating to the terms and negotiation of the Release and Settlement Agreement, shall be confidential and

2

are not to be disclosed except by order of the court, an agreement in writing by the parties hereto or in the context of a privileged communication, except that (i) the Release and Settlement Agreement may be disclosed where required by law following notice to the other Party; and (ii) the Release and Settlement Agreement may be disclosed as necessary or required in enforcing the terms of this Release and Settlement Agreement.

7.     Non-Disparagement.    The parties hereto shall not without legal privilege, justification or excuse, publish or communicate false and/or disparaging words about each another's business dealings, the relationships between the parties or this Release and Settlement Agreement.

8.     Representations and Warranties.

(a)     Each of the parties hereto represents and warrants that the concepts embodied in this Release and Settlement Agreement have been voluntarily and independently negotiated by and between the parties hereto, and each such party has had the opportunity to consult with legal counsel of such party's choosing, this Release and Settlement Agreement is satisfactory to each of the parties to this Release and Settlement Agreement, and each such party has the mental capacity to enter into this Release and Settlement Agreement, understands the terms of this Release and Settlement Agreement and intends to fully perform and be bound by this Release and Settlement Agreement.

(b)     Each of the parties represents and warrants that it is duly created, validly existing and in good standing under the laws of the state of its organization and that the party signing on behalf of it is authorized on its behalf to execute and deliver this Release and Settlement Agreement, and any other instrument executed and delivered in connection herewith, and upon such execution and delivery each such entity shall be bound by all such instruments.

(c)     Each of the parties hereto represents and warrants that such party has the legal right, power, capacity and authority to enter into and perform such party's covenants, obligations and agreements under this Release and Settlement Agreement and the other instruments referenced herein and delivered pursuant hereto, all corporate, company, partnership and other actions required in connection with the authorization, execution, delivery and performance of this Release and Settlement Agreement by such party have been duly taken and, when executed and delivered by such party, this Release and Settlement Agreement shall constitute the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, subject only to the satisfaction of the conditions contained in paragraph 5 hereof.

(d)     Each of the parties hereto represents and warrants that neither the execution and delivery of this Release and Settlement Agreement, nor consummation of any of the transactions contemplated herein, nor compliance with the terms and provisions hereof, will contravene any provision of law, statute, rule or regulation to which such party is subject or any judgment, decree, license, order or permit applicable to such party, or will conflict or will be inconsistent with, or will result in any breach of any of the terms of the covenants, conditions or provisions of, or constitute a delay under any other obligation of such party.

(e)     Each of the parties hereto represents and warrants that no consent, approval, authorization or order of any court or governmental authority or third party is required in connection with the execution, delivery and performance by any party to this Release and Settlement Agreement.

(f)     Each of the parties hereto represents and warrants that it has neither sold nor assigned any of the claims to be released pursuant to the terms of this Release and Settlement Agreement.

MISCELLANEOUS

9.     <u>Descriptive Headings</u>.   The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Release and Settlement Agreement.

10.     <u>Parties in Interest</u>.  This Release and Settlement Agreement shall be binding upon and inure to the benefit of each party hereto and each of their respective successors and assigns, and nothing in this Release and Settlement Agreement is intended to confer upon any other person, whether or not named herein, any rights or remedies of any nature whatsoever under or by reason of this Release and Settlement Agreement.

11.     <u>Counterparts</u>.  This Release and Settlement Agreement may be executed in any number of counterparts, by original or facsimile signature, each of which when executed and delivered shall be deemed an original, and such counterparts together shall constitute one instrument.

12.     <u>Further Actions</u>.  The parties hereto hereby agree to execute and deliver all such documents and instruments and do all such other reasonable acts and things as may be necessary and appropriate to carry out the provisions of this Release and Settlement Agreement.

13.     <u>Amendment</u>.  This Release and Settlement Agreement may not be amended except by an instrument in writing signed by all of the parties hereto.

14.     <u>Entire Agreement, Severability.</u>   This Release and Settlement Agreement constitutes the entire understanding and agreement between the parties hereto respecting the subject matter hereof and supercedes all prior written and oral agreements between the parties respecting the subject matter of this Release and Settlement Agreement.  If any term or provision of this Release and Settlement Agreement or the application thereof to any party or circumstance shall be held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, the validity, legality and enforceability of the remaining terms and provisions of this Release and Settlement Agreement shall not in any way be affected or impaired thereby, and the affected term or provision shall be modified to the minimum extent permitted by law so as to achieve most fully the intention of this Release and Settlement Agreement.

15.     <u>Governing Law; Submission to Jurisdiction; Jury Trial Waiver.   Waiver of Punitive and Consequential Damages</u>.   This Release and Settlement Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws.  EACH

4

PARTY HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF ILLINOIS AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS RELEASE AND SETTLEMENT AGREEMENT SHALL BE LITIGATED IN SUCH COURTS. EACH PARTY WAIVES ITS RIGHT TO HAVE ANY MATTER ARISING FROM OR RELATED TO THIS RELEASE AND SETTLEMENT AGREEMENT TRIED BEFORE A JURY. BORROWERS EACH WAIVE ANY RIGHT TO ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION HEREWITH OR DIRECTLY OR INDIRECTLY RELATED HERETO OR TO THE LOAN DOCUMENTS.

IN WITNESS WHEREOF, the parties hereto have caused this Release and Settlement Agreement to be duly executed as of the day and year first set forth above.

Stuart T. Adler, as Trustee of the Stuart T. Adler Revocable Family Trust dated January 31, 1992

Nicholas S. Gouletas

HOMES BY INVSCO, INC.

By: _____
Name: _____
Its: _____

101984212

5

Px 30

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

AIGL REAL ESTATE COMPANY
*182 West Lake Street, Suite 200*
*(312) 595-4800*

*[handwritten: +$50,000]*

*[handwritten: Total $700,000.00 Investment + take on SCHD is 5T c/c]*

## PROMISSORY NOTE

*[handwritten: NSG President]*

$ _500,000.00_   *[handwritten: +$150,000 ARC]*   Issue Date: _7-25-2013_

Chicago, Illinois

FOR VALUE RECEIVED, the undersigned, **AIGL Real Estate Company,** an Illinois corporation, with an address of 182 West Lake St., Suite 200, Chicago, Illinois 60601 ("AIGL"), promises to pay to the order of _Paul A. Jones_, an individual with an address of _#5 Ashley Oaks Lane, Flossmoor, Illinois_ ("Payee"), the principal sum of $ _500,000.00_ within ninety (90) days of the Issue Date, at such place as Payee may designate.

The undersigned further promises to pay to the order of Payee interest for the ninety (90) day term in the amount of Fifty Cents ($.50) for every One Dollar ($1.00) of principal. Therefore, the Payee will receive interest in the amount of $ _250,000.00_ on the aggregate unpaid principal amount outstanding for the ninety (90) day period. AIGL may prepay the principal balance and accrued inte

rest

due under this Promissory Note, in whole or in part at any time without penalty.

Payments received from AIGL in payment of this Promissory Note shall be applied, as follows: first, to any unpaid costs and collections of this Promissory Note including, without limitation, reasonable attorney fees and court costs; second, to the accrued interest due hereunder; and third, to the unpaid principal balance of this Promissory Note.

At the option of Payee, any or all of the obligations of AIGL hereunder shall become immediately due and payable without notice or demand, upon the occurrence of any of the following events of default: (a) failure in payment of any obligations of AIGL hereunder to the Payee; (b) a filing of a proceeding under the any bankruptcy, insolvency or similar law by or against AIGL; or (c) an assignment by AIGL for the benefit of creditors.

The undersigned waives presentment, protest and demand and notice of presentment, protest of nonpayment of Promissory Note.

No delay on the part of the Payee in the exercise of any right or remedy hereunder shall operate as a waiver hereof, and no single or partial exercise by the Payee of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

This Promissory Note has been delivered at Payee's address and shall be governed by and construed in accordance with the internal laws, and not the choice of laws, of the State of Illinois. Whenever possible, each provision of this Promissory Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Promissory Note shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision, or of the remaining provisions of this Promissory Note.

This note has been delivered prior to the receipt of funds from Payee and is conditioned on the receipt by AIGL of $ _500,000.00 +/150_  *[handwritten: Total 650 - 150 Beach]*

*[handwritten: Px 30]*

Jones 000072

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

AIGL REAL ESTATE COMPANY

*182 West Lake Street, Suite 200*
*(312) 595-4800*

AIGL Real Estate Company,
an Illinois corporation

By /Nicholas S. Gouletas, President

Px 31

**AIGL REAL ESTATE COMPANY**
*182 West Lake Street, Suite 200*
*(312) 595-4800*

## PROMISSORY NOTE

$250,000                                                                              Issue Date:May 8, 2013
                                                                                               Chicago, Illinois

FOR VALUE RECEIVED, the undersigned, AIGL Real Estate Company, an Illinois corporation, with an address of 182 West Lake St., Suite 200, Chicago, Illinois 60601 ("AIGL"), promises to pay to the order of James and Linda Paul, an individual with an address of 2640 14th Avenue Carmel, CA 93923-9222 ("Payee"), the principal sum of $250,000 (Two Hundred and Fifty U.S. Dollars) within ninety (90) days of the Issue Date, at such place as Payee may designate ("Payment Date").

The undersigned further promises to pay to the order of Payee interest for the ninety (90) day term in the amount of Fifty Cents ($.50) for every One Dollar ($1.00) of principal. Therefore, the Payee will receive interest on the Payment Date in the amount of $125,000 (One Hundred Twenty-Five Thousand U.S. Dollars) on the aggregate unpaid principal amount outstanding within ninety (90) days of the Issue Date, at such place as Payee may designate ("Payment Date"). AIGL may prepay the principal balance and accrued interest due under this Promissory Note, in whole or in part at any time without penalty.

AIGL shall be responsible for costs, if any, related to collection on this Note. Payments received from AIGL in payment of this Promissory Note shall be applied, as follows: first, to any unpaid principal balance of this Promissory Note, second, to the accrued interest due thereunder, and, finally, to any unpaid costs of collections related to this Promissory Note including, without limitation, reasonable attorney fees and court costs.

At the option of Payee, any or all of the obligations of AIGL hereunder shall become immediately due and payable without notice or demand, upon the occurrence of any of the following events of default: (a) failure in payment of any obligations of AIGL hereunder to the Payee; (b) a filing of a proceeding under the any bankruptcy, insolvency or similar law by or against AIGL; or (c) an assignment by AIGL for the benefit of creditors.

The undersigned waives presentment, protest and demand and notice of presentment, protest of nonpayment of Promissory Note.

No delay on the part of the Payee in the exercise of any right or remedy hereunder shall operate as a waiver hereof, and no single or partial exercise by the Payee of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

This Promissory Note has been delivered at Payee's address and shall be governed by and construed in accordance with the internal laws, and not the choice of laws, of the State of Illinois. Whenever possible, each provision of this Promissory Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Promissory Note shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision, or of the remaining provisions of this Promissory Note.

This note has been delivered prior to the receipt of funds from Payee and is conditioned on the receipt by AIGL of $250,000 (Two Hundred and Fifty thousand U.S. Dollars).

LENDER                                             BORROWER
                                                            AIGL Real Estate Company,
                                                            an Illinois corporation

_____  _____  By: Nicholas S. Gouletas, President   _____
              Date                                                                                           Date

Px 31

Blumberg No. 5137

Px 32

*182 West Lake Street, Suite 200*
*(312) 595-4800*

~Copy

## PROMISSORY NOTE

$250,000.00

Issue Date: April 28, 2013
Chicago, Illinois

FOR VALUE RECEIVED, the undersigned, AIGL Real Estate Company, an Illinois corporation, with an address of 182 West Lake St., Suite 200, Chicago, Illinois 60601 ("AIGL"), promises to pay to the order of George Spanos, an individual, with an address of 250 N Washtenaw Avenue ("Payee"), the principal sum of $250,000.00 (Two Hundred and Fifty Thousand U.S. Dollars) within ninety (90) days of the Issue Date, at such place as Payee may designate ("Payment Date").

The undersigned further promises to pay to the order of Payee interest for the ninety (90) day term in the amount of Fifty Cents ($.50) for every One Dollar ($1.00) of principal. Therefore, the Payee will receive interest on the Payment Date in the amount of $125,000.00 (One Hundred Twenty Five Thousand U.S. Dollars) on the aggregate unpaid principal amount outstanding within ninety (90) days of the Issue Date, at such place as Payee may designate ("Payment Date"). AIGL may prepay the principal balance and accrued interest due under this Promissory Note, in whole or in part at any time without penalty.

AIGL shall be responsible for costs, if any, related to collection on this Note. Payments received from AIGL in payment of this Promissory Note shall be applied, as follows: first, to any unpaid principal balance of this Promissory Note, second, to the accrued interest due thereunder, and, finally, to any unpaid costs of collections related to this Promissory Note including, without limitation, reasonable attorney fees and court costs.

At the option of Payee, any or all of the obligations of AIGL hereunder shall become immediately due and payable without notice or demand, upon the occurrence of any of the following events of default: (a) failure in payment of any obligations of AIGL hereunder to the Payee; (b) a filing of a proceeding under the any bankruptcy, insolvency or similar law by or against AIGL; or (c) an assignment by AIGL for the benefit of creditors.

The undersigned waives presentment, protest and demand and notice of presentment, protest of nonpayment of Promissory Note.

No delay on the part of the Payee in the exercise of any right or remedy hereunder shall operate as a waiver hereof, and no single or partial exercise by the Payee of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

This Promissory Note has been delivered at Payee's address and shall be governed by and construed in accordance with the internal laws, and not the choice of laws, of the State of Illinois. Whenever possible, each provision of this Promissory Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Promissory Note shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision, or of the remaining provisions of this Promissory Note.

This note has been delivered prior to the receipt of funds from Payee and is conditioned on the receipt by AIGL of $250,000 (Two Hundred Fifty Thousand U.S. Dollars).

LENDER
George Spanos

_George Spanos_  4-28-2013
George Spanos  Date

BORROWER
AIGL Real Estate Company,
an Illinois corporation

By: Nicholas S. Gouletas, President  4-28-2013
Date

Px 32

Px 33

*MLR→PLCM*
MAR 1 3 2017



**Warady & Davis LLP**
*Certified Public Accountants & Consultants*

1717 Deerfield Road, Suite 300 South
Deerfield, Illinois 60015-3977
847-267-9600   Fax 847-267-9696
www.waradydavis.com

Home by Invsco
Howard Teplinsky
c/o Beerman Pritikin Mirabelli Swerdlove LLP
161 N Clark St Ste 2600
Chicago, IL 60601

| | |
|---|---|
| **Invoice Date:** | Tuesday, November 01, 2016 |
| **Invoice Number:** | 73018 |
| **Client Number:** | 0001052.0000 |

Services rendered

| | | |
|---|---|---:|
| | $ | 12,404.65 |
| Progress Applied | | (3,120.00) |
| Current Amount Due | $ | 9,284.65 |

| 0 - 30 | 31- 60 | 61 - 90 | 91 - 120 | Over 120 | Balance |
|---|---|---|---|---|---|
| 9,284.65 | 0.00 | 0.00 | 3,120.00 | (25,000.00) | (12,595.35) |

INVOICES ARE PAYABLE UPON RECEIPT - THANK YOU

*Px 33*

W&D000001

Px 34

## ASSIGNMENT OF FRAUDULENT TRANSFER CLAIMS

1.      On June 16, 2010, D.A.N. Joint Venture III, L.P. ("DJV") obtained a final judgment against 800 South Wells Commercial, LLC ("800 SWC") in the amount of $11,550,040.12 (the "DJV Judgment") in No. 2006 L 012698, Circuit Court of Cook County, Illinois.

2.      On January 23, 2014, 800 SWC obtained a final judgment against Nicholas S. Gouletas ("Gouletas") in the amount of $11,550,040.12 (the "800 SWC Judgment") in No. 2011-L-2895, Circuit Court of Cook County, Illinois.

3.      On January 17, 2016, Gouletas filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois, No. 16-01335, with Richard M. Fogel, Trustee, appointed as the Bankruptcy Trustee (the "Trustee") for Gouletas' Chapter 7 bankruptcy case.

4.      Upon Gouletas' filing of bankruptcy on January 17, 2016, all fraudulent transfer claims that a creditor held against Gouletas became the exclusive property of the Trustee for the two-year period following the bankruptcy filing, with the creditors (including 800 SWC) divested of the ability to prosecute any such fraudulent transfer claims during the two-year period of exclusivity accorded to the Trustee.

5.      Pursuant to 11 U.S.C. §546(a)(1)(A), when the two-year limitation on the Trustee's fraudulent transfer claims expired on January 17, 2018, those state-law fraudulent transfer claims, without effective sale and assignment of those claims by the Trustee, automatically revert back to the creditors, including 800 SWC, which held the fraudulent transfer claims prior to Gouletas' bankruptcy filing.

6.      On July 23, 2017, the Trustee received an offer from DJV to purchase the Trustee's fraudulent transfer claims, litigation claims and alter-ego claims for $15,000.



7.     On July 24, 2017, the Trustee filed in the Bankruptcy Court the Trustee's Motion for Approval of Sale of Interests in Personal Property and for Related Relief, which specifically included the state-law fraudulent transfer claims that were the exclusive property of the Trustee for the two-year period following Gouletas' bankruptcy filing. No one offered a higher bid for those claims, and neither Gouletas, nor any creditor, objected to the Trustee's Motion or the proposed sale by the Trustee.

8.     After due notice to all interested parties, and after hearing before the Bankruptcy Court, on August 18, 2017, the Bankruptcy Court presiding over the Gouletas Bankruptcy entered its Order Authorizing Sale of Personal Property. Neither Gouletas, nor any creditor, objected to the order of sale, or appealed the order of sale. Thereafter, on September 13, 2017, the Trustee and the representative of DJV executed an Assignment of Claims and Causes of Action, thereby transferring the Trustee's fraudulent transfer claims to DJV.

9.     In the event that such fraudulent transfer claims were not effectively assigned by the Trustee to DJV, on January 17, 2018, the state-law fraudulent transfer claims previously held by 800 SWC automatically reverted to 800 SWC.

10.     Accordingly, in consideration of a $5,000,000 reduction in the amount that 800 SWC owes to DJV in connection with the DJV Judgment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, 800 SWC hereby assigns, transfers and conveys to DJV (a) a 50% interest in the 800 SWC Judgment; and (b) all of 800 SWC's fraudulent transfer claims, and any related tort or statutory claims, pertaining to the 800 SWC Judgment.

Dated: April __, 2019.

D.A.N. JOINT VENTURE III, L.P.

By: The Cadle Company,
its General Partner

By: _____

Daniel C. Cadle,
Chairman

800 SOUTH WELLS COMMERCIAL, LLC

By: its Manager,
D.A.N. Joint Venture III, L.P.

By: The Cadle Company,
its General Partner

By: _____

Daniel C. Cadle
Chairman

3

Px 35

JPMorgan Chase

1/12/2016 11:15:50 AM   PAGE   1/002   Fax Server

Page 1 of 1

JPMORGAN CHASE & CO.   i-ARC!

i-ARC!

View Image Screen

PAUL A. JONES
DEWIZAR D. HOWARD-JONES

3694

Dorothea Touris

Four Hundred Fifteen Thousand 00/100 dollars

$ 415,000.00

Posting Date: 03/17/2015
Sequence Number: 3170113360
Amount: 415,000.00
Account: 1536222
Routing Transit Number: 071000015
Check/Serial Number: 0000000003694
Bank Number: 111
IRD: 0
Image Type: P
BOFD: 074909582
Cost Center: 775200
Teller Number: 10
Teller Sequence Number: 24
Capture Source: BY
Entry Number: 00520035431
UDK: 1111503170031170113260

Px 35