# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

D.A.N. JOINT VENTURE III, L.P., )
as Assignee of Bankruptcy Trustee )
Richard M. Fogel, the Chapter 7 Trustee )
for the Bankruptcy Estate of Debtor )
Nicholas S. Gouletas; and D.A.N. JOINT )
VENTURE III, L.P., as Assignee of )
Judgment Creditor 800 South Wells )
Commercial, LLC, )
                                   )
          **Plaintiffs,** )
                                   )
vs. )     **Case No. 1:18-cv-349**
                                   )     **Judge Robert M. Dow, Jr.**
DOROTHEA TOURIS; STEVEN E. )
GOULETAS; NATEL MATSCHULAT; )
PAUL JONES; JAMES PAUL; )
STUART T. ADLER, Individually and as )
Trustee of the Stuart T. Adler Revocable )
Family Trust; GEORGE STRAY; )
GEORGE SPANOS; BEERMANN )
PRITIKIN MIRABELLI SWERDLOVE )
LLP; IRENE GOULETAS; DESIREE )
WITTE; VICTORIA M. GOULETAS; )
ROSALIE GOULETAS; LOUIS )
GOULETAS; MICHAEL GOULETAS; )
and BRITTANY GOULETAS, )
                                   )
          **Defendants.** )

## THIRD AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs (i) D.A.N. Joint Venture III, L.P. ("DJV"), as Assignee of Bankruptcy Trustee

Richard M. Fogel; and (ii) DJV, as Assignee of Judgment Creditor 800 South Wells Commercial,

LLC ("800 SWC"), complain of Defendants as follows:

## Summary Of The Suit

1.    In this fraudulent transfer suit, the Debtor, Nicholas S. Gouletas ("Gouletas"), with the knowing and substantial assistance of a number of the Defendants named herein, engaged in a series of complicated schemes to hide, transfer and otherwise shield his assets from the claims of certain of his disfavored judgment creditors. And while Gouletas was implementing his fraudulent transfer schemes, Gouletas, with the knowing substantial assistance of his attorney, Howard Teplinsky ("Teplinsky") (who, at the time of the fraudulent transfers, was a partner at Defendant Beermann Pritikin Miroballi Swerdlove LLP ("BPMS")), selectively transferred over $2,250,000 in cash, as well as his 25% equity interest in a mixed-use high rise commercial development in downtown Chicago, to Gouletas's relatives, friends, and a select group of preferred creditors, all in violation of state court citation liens which prohibited Gouletas from transferring his assets. On the eve of being held in contempt for violation of one such citation lien entered in favor of 800 SWC, Gouletas, after implementation of Teplinsky's plan to shed Gouletas of his non-exempt assets, sought the sanctuary of bankruptcy through a Chapter 7 bankruptcy filing.

2.    Not only was Teplinsky the architect of the fraudulent transfer schemes set forth herein, he was the chief steward in the systematic shedding of assets out of Gouletas's name and out of the coffers of Gouletas's companies for the strategic planning leading up to Gouletas's eventual Chapter 7 bankruptcy filing.

3.    This is an action by (a) Plaintiff DJV, as Assignee of Chapter 7 Bankruptcy Trustee Richard M. Fogel, and (b) Plaintiff DJV, as Assignee of Judgment Creditor 800 SWC, to void Gouletas's fraudulent transfers pursuant to the provisions of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* (the "IUFTA"), and an action by Plaintiff DJV, as Assignee

of Judgment Creditor 800 SWC, to recover damages from those who conspired with Gouletas and Teplinsky in the design, implementation and execution of their fraudulent transfer schemes.

## Jurisdiction And Venue

4.       This Court has diversity jurisdiction under 28 U.S.C. §1332(a)(1) because (a) this is an action between citizens of different States with the amount in controversy exceeding $75,000, and (b) the assignments of the claims to the Plaintiffs as asserted herein were not made collusively for the purpose of conferring diversity jurisdiction upon this Court.

5.       Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this Judicial District.

## Parties

6.       **Plaintiffs.** D.A.N. Joint Venture III, L.P. ("DJV") is an Ohio limited partnership with its principal place of business in Newton Falls, Ohio. The general partner of DJV is The Cadle Company, an Ohio corporation with its principal place of business in Newton Falls, Ohio. The limited partners of DJV are Daniel C. Cadle and his wife, Ruth Cadle, both of whom are citizens of the State of Ohio. Plaintiffs, as assignees, hereby bring suit against the Defendants as set forth herein.

6.1.       **Plaintiff DJV As Assignee Of The Bankruptcy Trustee.**  As to the claims asserted in Counts I, II, III, IV and VII, DJV brings suit as the assignee of Bankruptcy Trustee Richard M. Fogel, who was the Chapter 7 Trustee for the bankruptcy estate of Debtor Nicholas S. Gouletas, which was pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, under Case No. 16-1335, the Hon. Timothy A. Barnes, presiding.

6.2.       **Plaintiff DJV As Assignee Of Judgment Creditor 800 SWC**. As to the claims asserted in Counts V and VI, and the alternative claims set forth in Counts I, II, III and IV, DJV brings suit as the assignee of Judgment Creditor 800 SWC which, on January 23, 2014,

obtained a non-dischargeable Final Judgment against Gouletas in the amount of $11,550,040.12 (the "800 SWC Judgment").

7. **Defendants.**

7.1.    Defendant Dorothea Touris ("Touris") is a citizen of the State of Illinois and a close personal friend of Gouletas who conspired with Gouletas to place $826,218.84 of his funds in her checking accounts for the purpose of allowing Gouletas to continue his lavish lifestyle, but all the while evading the state court citation liens prohibiting Gouletas from transferring his assets.

7.2.    Defendant Steven E. Gouletas is a citizen of the State of Illinois and the son of Gouletas.

7.3.    Defendant Natel Matschulat is a citizen of the State of Illinois and the wife of Gouletas.

7.4.    Defendant Paul Jones is a citizen of the State of Illinois.

7.5.    Defendant James Paul is a citizen of the State of California who engaged in the wrongful conduct alleged herein within the State of Illinois.

7.6.    Defendant Stuart T. Adler is a citizen of the State of Illinois and the Trustee of the Stuart T. Adler Revocable Family Trust, an Illinois trust (collectively, "Adler").

7.7.    Defendant George Stray is a citizen of the State of North Carolina who engaged in the wrongful conduct alleged herein within the State of Illinois.

7.8.    Defendant George Spanos is a citizen of the State of Illinois.

7.9.    Defendant Beermann Pritikin Mirabelli Swerdlove LLP ("BPMS") is an Illinois limited liability partnership engaged in the practice of law with its principal place of business in Chicago, Illinois. None of the partners of BPMS is a citizen of the State of Ohio.

7.10.    Defendant Irene Gouletas is a citizen of Illinois and the sister of Gouletas.

7.11.    Defendant Desiree Witte is a citizen of Illinois and the daughter of Gouletas.

7.12.    Defendant Victoria M. Gouletas is a citizen of Connecticut and the daughter of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

7.13.    Defendant Rosalie Gouletas is a citizen of New Mexico and the daughter of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

7.14.    Defendant Louis Gouletas is a citizen of Illinois and the grandson of Gouletas.

7.15.    Defendant Michael Gouletas is a citizen of California and the grandson of Gouletas who engaged in the wrongful conduct alleged herein within the State of Illinois.

7.16.    Defendant Brittany Gouletas is a citizen of Illinois and the granddaughter of Gouletas.

## Facts

**A.    Background.**

8.    The Debtor, Nicholas S. Gouletas ("Gouletas") (now deceased), was the owner and control person of a large group of companies generally referred to as "American Invsco" which, for over 50 years, were involved in condominium conversions and various other real estate developments in more than 40 cities throughout the United States.  As part of Gouletas's "American Invsco" empire, Gouletas was the owner of Home By Invsco, Inc. ("HBI") and 800 South Wells Phase II, LLC ("800 SWP").  At all times relevant to this suit, Gouletas was the president and sole shareholder of HBI, and the sole member and manager of 800 SWP, and both HBI and 800 SWP were controlled, operated and conducted by Gouletas as his alter egos.

9.	In a financial statement signed by Gouletas in the Spring of 2013, Gouletas represented that, as of March 31, 2013, he had a net worth of $25,287,560, with "cash" in the amount of $240,000. (Px 1.)

10.	Even though Gouletas represented in his financial statements that he had a substantial net worth, Gouletas, at all times relevant to this suit, was, in fact, insolvent. And as part of juggling his precarious financial condition, Gouletas would routinely pay only a select group of his creditors, while doing everything within his power to stiff the remainder of his disfavored creditors. Indeed, from mid-2013 to the time of his death in January of 2021, Gouletas was generally not paying all of his debts as they became due, and was thereby forcing his disfavored creditors to either abandon their claims, or seek collection of those debts through the judicial system.

### B.	Numerous Judgments Are Entered Against Gouletas

11.	Gouletas was the manager of 800 SWC, which owned certain commercial space at the River City Complex located at 800 South Wells Street in Chicago. Gouletas hired one of his companies, Invsco Management Company ("Invsco"), to manage the River City Complex commercial space in exchange for management fees paid by 800 SWC to Gouletas's company, Invsco. After 800 SWC and Gouletas defaulted on a $5,000,000 loan obligation that was owed to DJV, in November of 2006, DJV exercised its contractual right to take over as the manager of 800 SWC.

12.	On March 17, 2011, 800 SWC filed suit against Gouletas in the Circuit Court of Cook County, Illinois, No. 2011-L-2895, for self-dealing and breaching fiduciary duties owed to 800 SWC (the "800 SWC Suit"). Gouletas was represented by counsel in connection with the 800 SWC Suit, and actively participated in pretrial proceedings.

13.     On August 9, 2013, Gouletas was sued by Karl T. Muth ("Muth"), one of the investors in a Gouletas condominium conversion project, in the Circuit Court of Cook County, Illinois, No. 2013-L-8995, for sums owed by Gouletas in connection with the investment (the "Muth Suit"). Thereafter, on December 11, 2013, a final judgment was entered in favor of Muth against Gouletas in the amount of $761,352.27 (the "Muth Judgment").

14.     On August 20, 2013, Gouletas was sued by Humberto Alfonso ("Alfonso"), another investor in a Gouletas condominium conversion project, in the Circuit Court of Cook County, Illinois, No. 2013-L-9345, for sums owed by Gouletas in connection with the investment (the "Alfonso Suit"). Thereafter, on December 11, 2013, a final judgment was entered in favor of Alfonso against Gouletas in the amount of $454,037.93 (the "Alfonso Judgment").

15.     In addition, in both the Muth and Alfonso Suits, charging orders were entered against Gouletas which provided that any proceeds available to Gouletas from any of his LLCs, including 800 SWP, could not be received by Gouletas, but rather had to be paid towards satisfaction of the underlying judgments.

16.     In the 800 SWC Suit, Gouletas steadfastly refused to sit for his deposition. Because of Gouletas's pattern of discovery abuse, on December 5, 2013, 800 SWC filed a Motion for Sanctions against Gouletas, which was granted by the Circuit Court on December 11, 2013. After Gouletas, once again, failed to sit for his deposition, on January 23, 2014 Judge Margaret A. Brennen entered a final judgment against Gouletas in the amount of $11,550,040.12 (the "800 SWC Judgment").

17.     Although Gouletas, through counsel at BPMS, appealed the 800 SWC Judgment, filed a Petition under Section 2-1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1401)

to set aside the 800 SWC Judgment, and then appealed the trial court's denial of Gouletas's 2-1401 Petition, Gouletas was not successful in setting aside the 800 SWC Judgment.

### C. Citation Liens Are Entered Against Gouletas Prohibiting Gouletas From Transferring His Assets

18.     On December 19, 2013, Citations to Discover Assets were issued against Gouletas in the Muth and  Alfonso Suits, which were served upon Gouletas shortly thereafter. Gouletas was represented by Howard Teplinsky, Esq. ("Teplinsky") from BPMS in connection with the Muth and Alfonso citation proceedings.  Further, a Charging Order was entered against Gouletas in the Muth and Alfonso Suits, which limited the ability of Gouletas to receive any distributions of cash from Gouletas's single member limited liability company, 800 SWP. Accordingly, as of the end of December, 2013, Teplinsky knew that Gouletas was prohibited from transferring his assets by virtue of the Citations and Charging Orders issued in the Muth and Alfonso Suits. *See* 735 ILCS 5/2-1402(m); *Marcus-Rehtmeyer v. Jacobs*, 784 F.3d 430, 438-39 (7th Cir. 2015).

19.     Due to  Gouletas's failure to pay the amount owed under the 800 SWC Judgment, on June 5, 2014, 800 SWC filed a Citation to Discover Assets against Gouletas (Px 3) (the "Citation") in connection with the 800 SWC Suit (the "Citation Proceedings"). The Citation was served on Gouletas on June 9, 2014. At all times during the Citation Proceedings, Gouletas was represented by Teplinsky from BPMS.

20.     In the Citation, Gouletas was specifically instructed that:

> **YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of . . . any property not exempt from execution . . . belonging to the judgment debtor [Gouletas] <u>or</u> <u>to</u> <u>which</u> <u>the</u> <u>judgment</u> <u>debtor</u> <u>may</u> <u>be</u> <u>entitled</u> or which may be acquired by or become due to the judgment debtor . . ., until further order of Court or termination of the proceedings.

(Px 3 p. 1 (underscoring added) (the "Citation Lien", and, with the Muth Citation and the Alfonso Citation, the "Citation Liens")). Gouletas and his counsel, Teplinsky, understood that when Gouletas was served with the Citation, he was not to transfer anything after receiving the Citation, and was "**PROHIBITED** from making or allowing any transfer or other disposition of . . . any [cash] to which [Gouletas] may be entitled or which may . . . become due to [Gouletas]." (*Id.*) Moreover, the Circuit Court Judge presiding over the Citation Proceedings, Judge Alexander White, specifically informed Gouletas, with Gouletas and Teplinsky present in open Court, that "[f]rom the time you received the citation [on June 9, 2014], all your assets were frozen . . .. [T]he citation language speaks for itself. It said you will not transfer any asset." Further, an Illinois citation lien extends even to assets nominally held by related parties, which are considered the property of the judgment debtor. See *Brown v. Szabo (In re Szabo)*, 353 B.R. 554, 560 (Bankr. N.D. Ill. 2006).

### D. Teplinsky Advises Gouletas On How To Hide, Transfer And Otherwise Shield His Assets From The Claims Of Gouletas's Disfavored Judgment Creditors

21.    In the later part of March, 2014, Teplinsky, while a partner at BPMS, agreed to assist Gouletas in the litigation and financial crisis that was engulfing Gouletas at that time.

22.    On March 23, 2014, Gouletas and Teplinsky signed an Engagement Agreement (Px 88) which provided for BPMS's representation of Gouletas and his company, Invsco Management Company, in connection with the defense of the 800 SWC Suit. The Engagement Agreement provided for an initial retainer of $10,000, with an additional $50,000 to be paid on or before June 1, 2014.

23.    While the initial retainer of $10,000 was paid to BPMS, the additional payment of $50,000 was not. Rather, later in 2014, Teplinsky and Gouletas entered into a contingent fee

arrangement whereby BPMS would receive an additional $30,000 if Teplinsky was successful in getting the over $2,000,000 in profits from the sale of a large parking lot (the "Parking Lot") owned by Gouletas's company, 800 SWP, out of that Gouletas company and into the coffers of another Gouletas company, HBI. And once Teplinsky was successful in moving the profits from the sale of the Parking Lot from 800 SWP to HBI, Teplinsky and Gouletas entered into a second contingent fee arrangement whereby BPMS would receive an additional $25,000 if Teplinsky was successful in getting the over $2,000,000 in sale proceeds out of HBI and into the hands of Gouletas's family, friends and his preferred creditors, all as part of "getting the ducks in a row" for Gouletas's eventual Chapter 7 bankruptcy filing.

24.     In violation of Ill. R. Prof'l Conduct (2010) R. 1.5(c), however, Teplinsky and Gouletas never reduced their contingent fee arrangements to writing. In addition, in the face of the two contingent fee arrangements, there was an actual conflict of interest in BPMS's dual representation of Gouletas, 800 SWC and HBI, in that (a) Gouletas would personally benefit from receiving funds which result in the reduction of his overall personal indebtedness; (b) 800 SWP would benefit from keeping the $2,000,000 in profits from the sale of the Parking Lot in its own coffers, which eventually would flow to the benefit of its sole member, Gouletas; and (c) HBI would benefit from claiming the $2,000,000 in profits as its own, not paying any alleged HBI note-holders who had not made a demand for payment, and whose claims were, in fact, either paid or barred by limitations, with the remaining funds eventually flowing to the benefit of HBI's sole shareholder, Gouletas. No conflict waiver letter, however, was sought or obtained by Teplinsky or BPMS.

25.     In addition to the efforts to get the 800 SWC Judgment reversed on appeal, in mid-March of 2014, Teplinsky agreed to assist in Gouletas's bankruptcy planning. Further, later in

March of 2014, Teplinsky also agreed to assist Gouletas in the structuring of a potential investment in the development of a mixed-use high rise retail, office and residential building at the corner of Clark and Lake Streets in downtown Chicago  referred to as "Garvey Court".

26.     After Teplinsky learned of the Citation Liens prohibiting Gouletas's transfer of assets, and the Charging Orders limiting Gouletas's right to receive distributions from his single member LLCs, Teplinsky instructed Gouletas that he should not be "receiving any money" in his name other than exempt payments such as Social Security and his pension from American Invsco. Further, Teplinsky instructed Gouletas that, for any future business deals, Gouletas should not take an equity position in his own name "[b]ecause his judgment creditors, like [800 SWC], would likely attach whatever equity position he had."  In other words, Teplinsky instructed Gouletas that, for any future business opportunities that would come his way, Gouletas should keep everything out of his own name, and place those equity positions in the names of his family members.

### E.     The HBI-Parking Lot Scheme

#### (1)     Gouletas Placed A Bogus Second Mortgage In The Name Of HBI On The Parking Lot To Protect His Equity In The Parking Lot From The Claims Of His Disfavored Creditors

27.     On December 5, 2006, DJV filed suit against Gouletas in the Circuit Court of Cook County, Illinois, No. 06-L-12698, for Gouletas's breach of his obligations under a limited guaranty of a $5,000,000 loan that one of Gouletas's companies, 800 SWC, owed to DJV (the "Guaranty Suit").  Thereafter, an Amended Complaint was filed in the Guaranty Suit adding 800 SWC as a defendant for its default on the underlying $5,000,000 loan.

28.     The Guaranty Suit against Gouletas and 800 SWC was called to trial before the Hon. Lee Preston on September 8, 2009, with the final day of trial held on September 15, 2009. After extensive briefing on the issue of pre-judgment interest for Gouletas's breach of his guaranty,

on June 16, 2010, a final judgment in DJV's favor was entered against Gouletas in the amount $1,000,000, and entered against 800 SWC in the amount of $11,580,040.12. (Px 82.)

29.      While Gouletas and his defense counsel, Daniel Lynch, Esq., were awaiting entry of the inevitable judgment against Gouletas for breach of guaranty, Gouletas was scrambling to come up with some way to shield the multi-million dollar equity that he had in a 1.77 acre 126-space parking lot located at 800 South Wells Street in Chicago, Illinois next to the River City Complex (the "Parking Lot"). The Parking Lot was owned by a single member LLC, 800 SWP, with Gouletas as the manager and sole member of that LLC.

30.      The plan that was worked out to attempt to shield Gouletas's equity in the Parking Lot from DJV was to have 800 SWP execute a phony promissory note to another of Gouletas's controlled entities, HBI, in the amount of $2,177,700 (Px 79), where the signature does not appear to be that of Gouletas, and which was supposedly secured by a second mortgage of the same date on the Parking Lot in favor of HBI. (Px 78.) There was not, in fact, any money loaned by 800 SWP to HBI, let alone $2,177,700. Indeed, by the date of the purported $2,177,700 loan by HBI to 800 SWP, there were over $1,338,000 in outstanding judgments entered against HBI, with citation liens in place in connection with those unpaid judgments. (Px 121.)

31.      As of November 1, 2009, there was only one mortgage indebtedness against the Parking Lot, which was in favor of River City Investors, LLC ("RCI") in the original principal amount of $2,000,000 (the "RCI Mortgage"). Since the Parking Lot was worth far in excess of the amount of the RCI Mortgage, on November 1, 2009 Gouletas had HBI place a bogus mortgage against the Parking Lot in the amount of $2,177,700 (Px 78) (the "HBI Second Mortgage") to protect the equity in the Parking Lot from the claims of Gouletas's disfavored creditors. HBI was owned and controlled by Gouletas, and was, in fact, the alter-ego of Gouletas.

### (2) The Initial Financial Documents At American Invsco Do Not Reflect Any Indebtedness Owed By 800 SWP To HBI

32. While Gouletas signed the HBI Second Mortgage on November 1, 2009, the internal financial documents of Gouletas's enterprise, American Invsco (which enterprise included 800 SWP and HBI), did not reflect any indebtedness supposedly owed to HBI on the HBI Second Mortgage:

(a) In the "American Invsco Liquidity Action Plan Update" dated November 22, 2011 (Px 14), it was represented that:

> Our debt at the land is $2,500,000. The last appraisal had a value of $14,880,000. CBRE indicates that . . . the market value for the land should be around $12,000,000. We have indicated the urgency to them, and we are going to list it for $13,000,000, anticipating accepting a price around $12,000,000 in the next nine months, again subject to market conditions. Therefore, the net proceeds to the company should be around $9,000,000.

(*Id.* p. 1 (emphasis added).) No indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(b) In an "American Invsco Companies Consolidated Balance Sheet" dated December 31, 2012 (Px 15), it was represented that the Parking Lot had a value of $9,500,000, with the sole mortgage on the Parking Lot in favor of RCI in the amount of $2,000,000. (*Id.*) This December 31, 2012 Consolidated Balance Sheet for American Invsco showed that Gouletas had "shareholder equity" in the amount of $10,002,000. (*Id.*) Again, no indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(c) In a "Balance Sheet" signed by Gouletas (Px 1), Gouletas represented that as of March 31, 2013, the Parking Lot had a value of $11,334,590 (*id.* p. 1), with the sole mortgage

owed by 800 SWP on the Parking Lot in the amount of $3,300,000. (*Id.* p. 4.) Once again, no indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

(d)     In a "Balance Sheet" dated February 28, 2014 (Px 16), Gouletas represented that the Parking Lot was worth $6,500,000, with a "first mortgage" in the amount of $3,300,000. (*Id.*) And, once again, no indebtedness was showed which was supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI.

33.     Further, in connection with Gouletas's efforts to supersede a prior judgment that DJV had obtained against Gouletas for Gouletas's failure to honor his word on a guarantee, on June 29, 2010, Gouletas represented to Illinois Circuit Court Judge Lee Preston, under oath, that:

> The Property [*i.e.*, the Parking Lot] is valued at $14,888,000. . . . <u>The sole mortgage recorded against the Property is in the recorded amount of $2,000,000.</u> Ex. B, p. D-3 ¶6. Therefore, there is equity in the amount of $12,880,000 in the Property to serve as security for the [$1,000,000] Judgment [that DJV obtained against Gouletas].

(Px 17 p. 2 ¶5 (emphasis added).) Accordingly, on June 29, 2010, Gouletas verified under oath, and represented to Judge Preston and DJV, that there was no other mortgage indebtedness owed in connection with the Parking Lot other than the RCI Mortgage.

### (3)     Teplinsky Knew That HBI Second Mortgage Was Bogus

34.     And Teplinsky knew that the HBI Second Mortgage was a sham. In addition to the other internal financial documents of American Invsco (Pxs 14, 15 & 16) which do not reflect any sums owed by 800 SWP to HBI -- which Teplinsky must have reviewed in connection with his active role in Gouletas's bankruptcy planning -- Teplinsky was in attendance at Gouletas's October 20, 2014 Citation Examination, during which Gouletas and Teplinsky were shown a copy of Px 1

(then marked as Gouletas Ex. 20), which at p. 4, evidenced an 800 SWP balance sheet as of March 31, 2013, which did not reflect any indebtedness supposedly owed by 800 SWP to HBI on the HBI Second Mortgage, or any other alleged indebtedness supposedly owed by 800 SWP to HBI. (Px 347.) Thereafter, on November 12, 2014, Teplinsky received a copy of the transcript of Gouletas's October 20, 2014 Citation Examination (*id.*), with the attached Gouletas Ex. 20 (now remarked as Px 1), which Teplinsky then promptly forwarded to Gouletas's bankruptcy attorney, William Factor, and to Ron Braver, the forensic accountant who was assisting with Gouletas's impending bankruptcy filing.

35.    On August 15, 2013, 800 SWP filed its Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code. While the first mortgage lienholder, RCI, filed a proof of claim in connection with the 800 SWP bankruptcy, at no time was a proof of claim filed by HBI. Part of Teplinsky's job in representing Gouletas was to monitor the 800 SWP bankruptcy proceedings, so he knew that on November 5, 2014, the Bankruptcy Court entered an Order which conclusively extinguished any potential claim that HBI held a mortgage on the Parking Lot. (Px 113 p. 5 ¶12.) And on the next day, November 6, 2014, Teplinsky informed 800 SWP's bankruptcy counsel, Harold Israel, that "Nick is pretty close to filing a chapter 7 with [his bankruptcy counsel] Bill Factor. Getting the ducks in a row." (Px 114.)

### (4)    Teplinsky Was Actively Involved In The Plan To Shed Gouletas Of His Assets Prior To Gouletas's Eventual Bankruptcy Filing

36.    In November of 2014, 800 SWP entered into a Purchase Agreement to sell the Parking Lot for $7,750,000. With the RCI Mortgage and the other expenses of the proposed sale totaling approximately $5,711,000, 800 SWP's bankruptcy counsel, Harold Israel, concluded that there would likely be over $2,000,000 in net profits available to Gouletas. In fact, on December

4, 2014, Attorney Israel informed Teplinsky that: "Looks like there will be money for Nick." (Px 120.)

37.     Since it was Teplinsky's master plan, however, for Gouletas to file for Chapter 7 bankruptcy, Teplinsky had to come up with a way to get the over $2,000,000 in profits from the sale of the Parking Lot out of Gouletas's sole member LLC, 800 SWP (*see* Px 20 p. 2), before any such bankruptcy filing, so Gouletas's eventual Chapter 7 Trustee would not be able to claim ownership of those funds. So shortly after Attorney Israel's email confirming that "there will be money for Nick" (Px 120), Teplinsky met with Gouletas and his personal assistant and agent, John Arnold ("Arnold"), to come up with a colorable claim that the over $2,000,000 in profits from the sale of the Parking Lot did not really belong to 800 SWP, but rather belonged to HBI, which would then be able to distribute those proceeds to Gouletas's family, friends and his preferred creditors. Moreover, as an economic incentive for Teplinsky to develop and then execute any such plan, Gouletas and Teplinsky agreed upon a contingent fee arrangement that if Teplinsky was successful in getting the over $2,000,000 in profits out of 800 SWP and into HBI, Gouletas, through HBI, would then pay Teplinsky (and thus BPMS) an additional flat fee of $30,000.

38.     But once Teplinsky earned his contingent fee by getting the over $2,000,000 in profits out of 800 SWP and into HBI, there was still the issue of getting the over $2,000,000 placed in HBI's coffers out of HBI to Gouletas's family, friends and his favored creditors before Gouletas could file for bankruptcy. Indeed, any funds left in HBI, with Gouletas as the sole shareholder, would be seized by Gouletas's eventual Chapter 7 bankruptcy trustee. And as an economic incentive for Teplinsky's efforts in concocting and then implementing any such plan, Gouletas and Teplinsky agreed upon a second contingent fee arrangement whereby Teplinsky (and thus BPMS)

would be paid an additional $25,000 flat fee for getting all of the funds out of HBI to Gouletas's family, friends and his preferred creditors before Gouletas filed for bankruptcy.

39.     By email dated December 19, 2014, Elizabeth Friedgut, Esq., the real estate attorney for Gouletas who was working with Teplinsky on the sale of the Parking Lot, inquired of Gouletas's son, Steven Gouletas, as follows: "I need to talk to [Gouletas's accountant, Gerald Zaidman] about your dad's tax liability for river city which we are going to be selling shortly." (Px 18 (emphasis added).) On December 22, 2014, Gouletas's accountant, Mr. Zaidman, responded: "I think it is important if you can defer the closing of the 800 Wells property [*i.e.*, the Parking Lot] owned by Nick personally til 2015. Please call me to discuss ASAP." (Px 19 (emphasis added).)

40.     After Attorney Friedgut prepared a draft closing statement for the upcoming sale of the Parking Lot for $7,750,000, she informed Teplinsky that "Nick is going to net $2 million." (Px 154.) Teplinsky then had to engage in a concerted effort to convince Attorney Friedgut and 800 SWP's bankruptcy counsel, Attorney Israel, that there would not, in fact, be any funds that would flow to Gouletas from the sale of the Parking Lot, but rather that HBI had a legitimate claim on a supposed loan of $2,177,700 that it supposedly made to 800 SWP on November 1, 2009, which claim supposedly was secured by a second mortgage in favor of HBI. Teplinsky knew, however, that these representations to Attorneys Friedgut and Israel were false.

41.     Thereafter, on December 22, 2014 Teplinsky informed Attorney Friedgut that:

> Liz, this is very important. Home By Invsco is going to establish an escrow at the title company. From there, Home By Invsco will pay its creditors. The way it should work (and Harold, please chime in) is that the title company will pay the attorneys, the brokers, the county, the secured creditor [RCI] and likely the IRS. The remaining funds will be paid to Home By Invsco and deposited in its [*i.e.*, the title company's] escrow.

(Px 157.)

42.     Teplinsky and Gouletas's agent, Arnold, then worked on various scenarios for sheltering all of the funds that would be placed in HBI's account for payment to Gouletas's family, friends and preferred creditors, as Teplinsky got all of Gouletas's "ducks in a row" for his eventual bankruptcy filing.  With the closing for the sale of the Parking Lot scheduled for December 29, 2014, Teplinsky informed Attorney Friedgut that:

> $1,070,500 should be wired to my client trust account. The breakdown is $900,500 to pay off the Adler judgment, $100,000 to pay off Natel's [Gouletas's wife's] loan, $25,000 for the accountant, $30,000 for my fees and $15,000 for the former HBI employee (George Str[a]y) who has been assisting with the HBI portion of all of this.
>
> The roughly $1,000,000 left after paying everyone on the closing statement should be sent to the IRS from the title company.  Let me or John Arnold know if you have any questions.

(Px 187.)

43.     The closing on the sale of the Parking Lot occurred late in the afternoon of December 29, 2014.  According to the Master Settlement Statement signed by all parties (Px 20) at the December 29th closing at Near North National Title ("NNT") in Chicago, a net of $2,038,017.84 was to be to the "Balance Due to Seller", 800 SWP.  (*Id.* p. 2.)

### (5)     The Attorney For Judgment Creditors Muth And Alfonso, Alfred Murray, Requests A Copy Of The Closing Statement For 800 SWP's Sale Of The Parking Lot

44.     The day after the closing, however, an unexpected kink occurred in Teplinsky's master plan.  On the afternoon of December 30, 2014, Alfred Murray, the attorney for judgment creditors Muth and Alfonso, emailed a letter to 800 SWP's bankruptcy attorney, Harold Israel, informing Attorney Israel that there was "a charging order against Mr. Gouletas' membership interest in any and all of his LLCs", and that Attorney Murray wanted to be provided with a copy of "any closing statement, settlement statement, disbursal records or similar documents" pertaining

to the sale of 800 SWP's property, which included, of course, the Parking Lot. (Px 199.) A copy of Attorney Murray's letter was emailed to Teplinsky at the same time it was emailed to Attorney Israel.

45. Immediately upon receipt of Attorney Murray's demand letter, Teplinsky fired off an email to Gouletas's bankruptcy counsel, William Factor, which stated:

> FYI. This is a letter [Px 199] that Harold Israel received today from an attorney representing two of Nick's judgment creditors. Nick has not and will not receive any proceeds from the sale. Rather, the majority of the proceeds are going to pay off the secured creditor [RCI], the bankruptcy attorneys, the county (back real estate taxes) and the brokers. Of the remaining balance of approximately $2,000,000, $1 million is going to the IRS to pay any estimated capital gains tax due from the debtor LLC [800 SWP]. The rest is going into my client trust account for the benefit of Home By Invsco, Inc., an affiliated company that filed a proof of claim in the [800 SWP Chapter 11] bankruptcy a long time ago. Home By Invsco also has creditors, including the $900,500 judgment by Stuart Adler that we discussed, Nick's wife Natel, who lent $100,000 for Harold's retainer, and a few others totaling less than $50,000 (including payment of some of my fees).

(Px 202.) The official, signed and final Master Settlement Statement (Px 20), however, reflected that, upon the sale of the Parking Lot on December 29, 2014, $2,038,017.84 was the "Balance Due To Seller", 800 SWP. (*Id.* p. 2.)

46. In connection with Attorney Murray's request for a copy of the closing statement for the sale of the Parking Lot, on January 3, 2015, Attorney Israel inquired of Teplinsky as follows:

> [W]ith respect to Al Murray's request, any objection to providing the closing statement? If not, please provide final copy. If so, my intended response is that I do not have a final copy and direct him to DLA. Please let me know.

(Px 217 p. 2.)

47.     With an eye toward keeping Attorney Murray off the scent, Teplinsky (who had, in fact, seen a copy of the final closing statement (Px 20)) then pressured Attorney Friedgut to get the NNT closer, Shirley Wrightsell, to amend the final closing statement to reflect that no money was due to the Seller, 800 SWP, but rather that all of the net proceeds from the sale of the Parking Lot were distributed to HBI. A disturbing trail of emails between Attorney Friedgut and Shirley Wrightsell followed:

(i)     From: Elizabeth Friedgut
        To: Shirley Wrightsell
        January 3, 2015 3:35 PM

        I am told we have to revise the closing statement so the balance goes to home by invsco since they were the holder of the second mortgage for which I gave you a release. Can you redo? Thanks.

(ii)    From: Elizabeth Friedgut
        To: Shirley Wrightsell
        January 3, 2015 6:25 PM

        We are going to have to do something to the closing statement but I am not sure just what yet.

(iii)   From: Shirley Wrightsell
        To: Elizabeth Friedgut
        January 5, 2015 11:58 AM

        Hello Liz:

        Per your request attached is a revised settlement statement which now shows the remaining proceeds as a payoff to Home By Invsco. If this is satisfactory to you and David [O'Keefe, the purchaser's attorney], please execute on behalf of your clients AND provide a payoff letter with wiring instructions. I also checked with John [Lamberts at NNT] and we did not receive a release for recording.

(iv)    From: Elizabeth Friedgut
        To: Shirley Wrightsell
        January 5, 2015 1:34 PM

        I thought I got you the release of mortgage but if not I will get you another. If you could just revise the settlement statement to show

> "as directed to home by invsco" that would be great. Wiring
> instructions are as follows. Thanks.

(Px 348.) At Teplinsky's request, the referenced wiring instructions for the $2,038,070.84 profit upon the sale of the Parking Lot were to BPMS's trust account.

48. And at the end of this torturous process, Teplinsky got what he wanted: a revised closing statement (Px 75) which recited that no sums were due to the Seller, 800 SWP, but rather, that the $2,038,017.84 profit upon the sale of the Parking Lot was "Payoff of Second Mortgage Loan". (*Id*. p. 2.) Teplinsky knew that the revised Master Settlement Statement (Px 75) was a misrepresentation, which was designed to stave off the collection efforts of Attorney Murray on behalf of his judgment creditor clients, Muth and Alfonso.

49. As directed by Teplinsky, on January 5, 2015, Attorney Israel informed Attorney Murray that his firm, Goldstein and McClintock, "did not represent 800 South in connection with the closing - DLA, our co-counsel, handled the real estate work. Please let me know if I can be of further assistance." (Px 238.) Thereafter, on January 6, 2015, Attorney Murray sent a follow-up letter to Attorney Friedgut at DLA Piper requesting a copy of the final closing statement. (Px 259.)

50. On information and belief, Teplinsky then directed Attorney Friedgut to forward to Attorney Murray the modified Master Closing Statement (Px 75) which reflected $2,038,017.84 as "Payoff of Second Mortgage Loan" (*id*. p. 2), with no sums paid to 800 SWP (*id*.), the entity for which Attorney Murray's clients held a Charging Order. Teplinsky knew that what he wanted represented to Attorney Murray in the modified Master Settlement Statement (Px 75) was, at best, misleading, and at worst, a deliberate misrepresentation.

**(6)    Teplinsky Works On Earning His Second Contingent Fee By
Getting All Of The Profits From The Sale Of The Parking
Lot Out Of BPMS's Trust Account And Into The Hands Of
Gouletas's Family, Friends And His Favored Creditors**

51.    And all the while, Teplinsky was working on various scenarios to earn his second

contingent fee of $25,000: get all of the proceeds that were transferred into BPMS's trust account

transferred out of that account and into the hands of Gouletas's family, friends and his favored

creditors, so that when Gouletas eventually filed for bankruptcy, his Chapter 7 Trustee would not

be able to claim, as property of Gouletas's bankruptcy estate, any of the proceeds from the

December 29, 2014 sale of the Parking Lot.

52.    In accordance with Teplinsky's instructions, on January 6, 2015, NNT wire

transferred $2,038,070.84 in proceeds from the sale of the Parking Lot into BPMS's trust account,

with the memo: "Payoff of Second Mortgage Loan".  In addition, Teplinsky instructed Gouletas's

agent, Arnold, to have $137,535 sitting in 800 SWP's checking account at The Private Bank wired

into BPMS's trust account as well.  (Px 23)  Accordingly, as of January 7, 2015, Teplinsky was

successful in his plan of getting all of the sums that were owned by 800 SWP (totaling in excess

of $2,175,000) out of 800 SWP (and thus earning Teplinsky's initial $30,000 contingent fee), and

into BPMS's trust account so Teplinsky could then earn his second contingent fee of $25,000 upon

the distribution of those funds from BPMS's trust account into the hands of Gouletas's family,

friends and his preferred creditors.

53.    Upon receipt of 800 SWP's funds into BPMS's trust account, Teplinsky and Arnold

then came up with various scenarios for distribution of those funds.  (Pxs 21, 22 & 24.)  Thereafter,

on January 20, 2015, Teplinsky finalized his plan to drain all of the remaining funds out of BPMS's

trust account as follows: "From the $1,271,308.94 remaining in escrow" (Px 24):

(a)    $690,000 was to be transferred to Gouletas's friend and longtime investor, Defendant Paul Jones (Px 24), even though Defendant Jones never made a demand for payment, and any claim by Teplinsky that HBI owed sums to Defendant Jones was barred by limitations;

(b)    $396,218.84 was to be transferred to Gouletas's longtime friend and employee, Defendant Dorothea Touris (Px 24), even though Defendant Touris never made a demand for payment, the alleged indebtedness that Teplinsky said was owed by HBI to Defendant Touris was, in fact, paid on that HBI promissory note years earlier, and any claim of non-payment was barred by limitations;

(c)    $110,000 was to be transferred to Defendant James Paul (Px 24), even though Defendant Paul had not made a demand for payment, and any claim of sums allegedly owed by HBI to Defendant Paul was barred by limitations;

(d)    $35,000 was to be transferred to an accounting firm, Warady & Davis ("W&D") (Px 24) as a "retainer for [W&D's] services on behalf of Home By Invsco" (Px 302), even though the amount of the retainer was excessive, there was no request by W&D for a retainer, and Teplinsky knew that no accounting services were, in fact, to be performed by W&D on behalf of HBI, but rather all such accounting services were to be performed on behalf of Gouletas;

(e)    $15,000 was to be transferred to Defendant George Stray (Px 24), even though, based on information and belief, Defendant Stray was not a legitimate creditor of HBI; and

(f)    $25,000 was to be transferred to BPMS (Px 24) as the second contingent fee for Teplinsky getting all of the remaining funds out of BPMS's trust account and into the hands of Gouletas's family, friends and his preferred creditors.

54.    Thereafter, in late January of 2015, Teplinsky met with Gouletas, Arnold and Defendant Touris at American Invsco's office in Chicago.  At that time, Gouletas presented

Defendant Touris with a check drawn on BPMS's trust account in the amount of $396,218.84, with the memo "Home By Invsco".  (Px 25.)  And at that late January, 2015 meeting, it was represented by Teplinsky and Gouletas to Defendant Touris that the BPMS check to Defendant Touris for $396,218.84 was for sums allegedly owed to Defendant Touris by HBI.  At that time, however, Touris had not made any demand for payment, any sums supposedly owed by HBI to Touris had already been repaid, and any claim for additional sums was barred by limitations.

55.     Of the $396,218.84 paid to Touris (Px 25), Gouletas then had Defendant Touris transfer $195,000 of those proceeds to his son, Steven Gouletas, and $50,000 of those proceeds to Gouletas's friend, Defendant George Spanos. Further, of the $690,000 transferred to Defendant Jones, $415,000 from those proceeds (Px 35) were then deposited by Defendant Jones into Touris's checking account (Px 11) at the request of Gouletas so he could continue to pay his expenses without those funds being subject to execution by Gouletas's judgment creditors.   Although Gouletas initially claimed that the $415,000 was a "loan" by Defendant Jones, he later admitted that the $415,000 was his money.

56.     At the direction of Teplinsky, on January 13, 2015, $30,020 of the profits from the sale of the Parking Lot were transferred to BPMS for an alleged payment on HBI's legal bills. And then on January 22, 2015, an additional $25,000 of the profits from the sale of the Parking Lot were transferred to BPMS as "finalize entity flat fee charge" for work supposedly done for and on behalf of HBI.  These "contingent legal fees" paid to BPMS reflected work by Teplinsky that was done, in reality, primarily on behalf of Gouletas, and otherwise constituted excessive fees charged by BPMS to HBI.

57.     Further, the funds that were transferred into the BPMS trust account did not belong to HBI, but rather belonged to Gouletas, as set forth below:

(a) For the "$100,000 (repayment of Natel loan)" (Px 21) that Teplinsky had wire transferred into Natel Matchulat's (*i.e.*, Gouletas's wife's) Citibank account (Ex. 137, now remarked as Px 22), Gouletas's wife testified that she did not lend any money to HBI, and had no idea why Teplinsky was having $100,000 deposited into her account at Citibank on or about January 7, 2015.

(b) For the $690,000 transferred to Defendant Jones (Px 24), $415,000 of those funds were then funneled back to Gouletas through Defendant Touris's checking account. (Pxs 35 & 178.)

(c) Although $15,000 was transferred to Defendant George Stray (Pxs 21, 22 & 24), on information and belief, HBI did not owe any funds to Defendant Stray.

58. As far as the "$25,000 (for engagement of accountant for HBI's returns)" (Px 21) (later increased to $35,000 (Px 24)), no such funds were ever intended to cover HBI's tax returns.

(a) Rather, the accountant, Richard Franklin (who was Teplinsky's relative), received a telephone call from Teplinsky advising him that "Mr. Gouletas sold a parking lot in 2014 and that there were funds available to pay a retainer for [W&D's] services and tax returns were needed to account for the sale proceeds." During Mr. Franklin's call with Teplinsky, he was advised that the services he was being retained to perform would be to prepare all tax returns as necessary to get Gouletas in compliance with IRS regulations.

(b) After Mr. Franklin received the retainer of $35,000, he received a telephone call from Teplinsky in late December of 2015 directing that $10,000 from the W&D retainer was to be diverted to Attorney William Factor. Mr. Franklin understood that Gouletas was going into bankruptcy, and that Attorney Factor would be providing legal services relating to that bankruptcy.

At the direction of Teplinsky, on January 15, 2016 Mr. Franklin's accounting firm, W&D, then forwarded a check in the amount of $10,000 to Attorney Factor. (Px 349.)

(c)     W&D's services were limited to preparing Gouletas's personal tax returns for 2013, 2014 and 2015. After the tax returns were prepared by W&D, an invoice was prepared by W&D's billing clerk for the time spent in preparing the 2013 through 2015 tax returns for Gouletas (Px 36), which invoice properly reflected that the accounting services were <u>rendered</u> <u>on</u> <u>behalf</u> <u>of</u> <u>Gouletas</u>. Teplinsky, however, then had W&D resubmit a new invoice, but this time the revised invoice was directed to "Home By Invsco" (Px 33), even though all of W&D's accounting services were, in fact, performed for Gouletas personally.

59.     The $690,000 payment by Gouletas to Defendant Jones on January 21, 2015 was without fair and adequate consideration, and was not paid by Gouletas in the ordinary course of business. Indeed, the $690,000 that supposedly was owed by HBI and Gouletas was, in fact, owed by one of Gouletas's other companies, AIGL Real Estate Company ("AIGL"), pursuant to a promissory note (Px 30) whereby Defendant Jones charged AIGL with interest at a rate in excess of 200%. Moreover, Defendant Jones has admitted that (a) he "wasn't certain what [the $415,000 check, Px 35] pertained to"; (b) the $690,000 payment to him by Gouletas was "kind of strange"; he didn't know "what it pertained to"; he didn't know "where the money came from"; and Gouletas simply said "deposit this, $690,000, but then I need you to pay [the $415,000] to Dorothea Touris; that's the only way I [Gouletas] can get my money out of this"; (c) he "had no idea" why he wrote a check to Touris for $415,000; (d) he didn't even know Touris, and never spoke with her; (e) Gouletas "never explained why he [Gouletas] didn't just write a check to Dorothea Touris himself"; and (f) while Defendant Jones supposedly "lost a ton of money investing with Gouletas", "helping him [Gouletas] out was the only way [Defendant Jones] could get some of [his] money back."

Accordingly, Defendant Jones knew not only of Gouletas's difficult financial condition, but also knew, must have known, or should have known of Gouletas's money laundering and fraudulent transfer scheme.

60.     The $110,000 payment by Gouletas to Defendant Paul on January 21, 2015 was without fair and adequate consideration, and was not paid by Gouletas in the ordinary course of business. Indeed, the $110,000 that supposedly was owed by Gouletas and HBI was, in fact, owed by one of Gouletas's other companies, AIGL, pursuant to a promissory note (Px 31) whereby Defendant Paul charged AIGL with interest at a rate of 200%.

61.     The $60,000 in payments by Gouletas to Defendant Spanos in February and May of 2015 were without fair and adequate consideration, and were not paid by Gouletas in the ordinary course of business. Indeed, the $60,000 that supposedly was owed by Gouletas and Gouletas was, in fact, owed by one of Gouletas's other companies, AIGL, pursuant to a promissory note (Px 32) whereby Defendant Spanos charged AIGL with interest at a rate of 200%.

### (7)     Teplinsky Misleads The Bankruptcy Trustee About The Over $2,000,000 In Profits From The Sale Of The Parking Lot

62.     Gouletas filed for Chapter 7 bankruptcy on January 17, 2016, and on the same date, Richard M. Fogel, Esq., was appointed as the Chapter 7 Bankruptcy Trustee for Gouletas's bankruptcy estate.  Teplinsky and BPMS served as counsel for Gouletas in connection with various aspects of Gouletas's bankruptcy. And as the attorney for Gouletas in connection with Gouletas's bankruptcy, Teplinsky owed a duty of full disclosure when making representations to the Bankruptcy Trustee.

63.     When Bankruptcy Trustee Fogel started snooping around and asking a lot of questions about 800 SWP's sale of the Parking Lot, Teplinsky engaged in a preemptive strike by forwarding a misleading summary (Px 333) and a deceptive "Accounting of Proceeds from the

Sale of 800 S. Wells Street" (Px 334), as well as providing an incomplete set of "supporting documentation" (Px 333) to the Bankruptcy Trustee.

64.     As far as the misleading summary, the enclosed 800 SWP's bankruptcy schedules listed at Schedule D (Px 333 p. BPMS 021534) a claimed second mortgage on the Parking Lot to HBI in the amount of $2,177,700.  Teplinsky failed to disclose to the Bankruptcy Trustee, however, that he knew that the HBI Second Mortgage was bogus (*see* Pxs 1, 14, 15, 16, 17 & 347), and that the Bankruptcy Court by Order dated November 5, 2014 (Px 113) had extinguished any potential claim that HBI held a mortgage on the Parking Lot.  (*Id.* p. 5 ¶12.)

65.     And as far as the misleading Accounting (Px 334), Teplinsky failed to disclose a number of material facts that the Bankruptcy Trustee was entitled to know so that the information provided by Teplinsky would not be misleading:

(a)     For the $100,000 transferred out of BPMS's trust account to Gouletas's wife as a purported "[r]epayment . . . for bankruptcy retainer paid to Goldstein & McClintock" (Px 334 n. 3), there was not, in fact, any loan by Gouletas's wife to either 800 SWP or HBI.  Moreover, the $100,000 retainer was for the bankruptcy filings of a whole host of Gouletas's entities, and not just for the bankruptcy filing of 800 SWP.

(b)     The "Home By Invsco secured claim" (Px 334) was not, in fact, a secured claim (*see* Pxs 1, 14, 15, l6, 17, 113 p. 5 ¶12, & 347), and Teplinsky knew this representation was false.

(c)     As far as the transfer of funds from BPMS's trust account to Defendants Jones, Touris and Paul (Px 334), none of those purported HBI note-holders made any demand for payment, and all of their claims were barred by limitations.  (*See* Px 333 pp. BPMS 021581-87 (Defendant Jones); BPMS 021590 (Defendant Touris); and BPMS 021592 (Defendant Paul).) Further, as to the sums allegedly owed by HBI to Defendant Touris on a claimed HBI promissory

note (Px 333 BPMS 021590), Defendant Touris was, in fact, fully paid on that note by no later than 2006, and Teplinsky knew that no sums were owed on that note to Defendant Touris.

(d)     As far as the $35,000 to W&D (Px 333 p. BPMS 021551), the "retainer" was not requested by W&D and was not really a retainer for "[W&D]'s services on behalf of Home By Invsco" (*id*.), but rather was an excessive retainer for Gouletas's personal tax matters. Further, on January 15, 2016, Teplinsky directed that $10,000 of the $35,000 "retainer" transferred to W&D was to be redirected to Gouletas's personal bankruptcy lawyer, William Factor. (Px 349.)

(e)     As far as the $15,000 to Defendant George Stray (Px 334 n. 4), upon information and belief, there was not $15,000 owed by HBI to Defendant Stray.

(f)     And as far as the $55,000 transferred out of BPMS's trust account as "[f]ees incurred on behalf of Home By Invsco and 800 S. Wells Phase II LLC" (Px 334 n. 5), Teplinsky failed to disclose that (i) the $55,000 was comprised of a $30,000 contingent fee if Teplinsky was successful in getting the $2,038,703.84 in profits from the sale of the Parking Lot out of 800 SWP, and a second $25,000 contingent fee if Teplinsky was successful in getting the over $2,000,000 out of BPMS's trust account and into the hands of Gouletas's family, friends and his preferred creditors; and (ii) Teplinsky, and thus BPMS, had an irreconcilable conflict of interest in the dual representation of Gouletas, 800 SWP and HBI, which resulted in the systematic shedding of assets out of Gouletas's companies as part of Teplinsky's assistance in Gouletas's bankruptcy planning.

66.     On April 15, 2016, Bankruptcy Trustee Fogel inquired of 800 SWP's closing attorney, Elizabeth Friedgut, why the $2,038,703.84 in net sale proceeds was paid to the "Seller", 800 SWP (Px 20), rather than the purported second mortgagee, HBI. (Px 336.) Teplinsky then quickly intervened to cut off further inquiry by contacting the Chapter 7 Trustee and representing to him that since HBI "was no longer operating and didn't have any bank accounts", "the title

company held the amount used to pay the [HBI] lien in escrow", with the $2,038,703.84 in escrowed funds eventually transferred, at Teplinsky's direction, to the BPMS trust account for the supposed purpose of paying HBI's creditors.  (Px 48.)

67.    Thereafter, in mid-May of 2016, the Bankruptcy Trustee requested further information about how and why the over $2,000,000 in profits from the sale of Parking Lot were paid over to HBI.  On May 12, 2016, Teplinsky tried to deflect attention from that issue by claiming that the 800 SWP and HBI financial records could not be located:

> Rick. I went by the office this morning. While I wasn't able to find the 2009 Consolidated Tax Return, I was able to find the actual notes that Nick signed in 2001 payable to Home By Invsco in the principal amount of $2,000,000.  In addition, I found the Note between Home By Invsco and 800 S. Wells Phase II LLC evidencing the $2.177 million debt that was the subject of the mortgage. Those documents are attached.

(Px 339.)

68.    What Teplinsky failed to disclose to the Bankruptcy Trustee, however, was that (a) the relevant financial records had all been shipped off to Gouletas's forensic accountant, Ron Braver, who was assisting with the analysis of the financial condition of Gouletas's various entities; and (b) the $2,177,700 promissory note that Teplinsky supposedly had just "found" was a sham (*see* Pxs 1, 14, 15, 16, 17 & 347), and the HBI Second Mortgage was bogus, with any such claimed mortgage previously extinguished by Order of the Bankruptcy Court on November 5, 2014.  (Px 113 p. 5 ¶12.)

69.    Since the Bankruptcy Trustee did not see any basis to disbelieve or question Teplinsky any further on the issue of the proceeds from the sale of the Parking Lot, the Bankruptcy Trustee decided to move on to other matters in Gouletas's bankruptcy, including his belief that he "ha[d] strong claims against the [Gouletas] family members that their membership interests in

NKM and SEG [*i.e.*, Garvey Court] belong to the estate." (Px 339.) That issue, however, was a worry of Teplinsky for another day.

### (8) BPMS Exercised Dominion And Control Over Gouletas's Funds, And Did Not Take And Receive Those Funds In Good Faith

70. The $2,038,074.84 that was held in NNT's general escrow account on December 29, 2014 as funds belonging to the "Seller", 800 SWP (Px 20 p. 2), represented funds that equitably belonged to Gouletas as the sole member and manager of 800 SWP, and constituted funds to which Gouletas was entitled under the terms of the Citation Lien (Px 3 p. 1) that was served upon Gouletas on June 4, 2014. See *Brown v. Szabo (In re Szabo)*, 353 B.R. 554, 560 (Bankr. N.D. Ill. 2006). When these funds were transferred at the direction of Teplinsky from NNT's general escrow account to BPMS's trust account, as well as the $137,535 that was transferred into BPMS's trust account on January 6, 2015 (Px 23), BPMS did not take and receive those funds in good faith. Further, BPMS, in essence, exercised dominion and control over those funds (Pxs 21, 22, 24, 187 & 348), and thus BPMS became the transferee of those funds within the purview of the IUFTA.

### (9) 800 SWP And HBI Are Gouletas's Alter Egos

71. 800 SWP and HBI were and are the alter-egos of Gouletas, and the $2,038,703.84 in profits from the sale of the Parking Lot legally and equitably belonged to Gouletas:

(a) In connection with the matters set forth herein, 800 SWP was used by Gouletas to perpetuate and carry out the HBI-Parking Lot Scheme. Gouletas was the sole owner of 800 SWP, and, throughout the years, Gouletas conducted the affairs of 800 SWP without observing required corporate formalities. In that connection, there was the failure to maintain adequate corporate records; a comingling of 800 SWP's funds with other Gouletas-related entities; and the failure to maintain arm's-length relationships with other Gouletas-related entities.

(b)     In connection with the matters set forth herein, HBI was used by Gouletas to perpetuate and carry out the HBI-Parking Lot Scheme. Further, Gouletas was the sole owner of HBI, and, throughout the years, Gouletas conducted the affairs of HBI without observing required corporate formalities. In that connection, there was the failure to hold regular corporate meetings; the non-functioning of other officers and directors; the failure to maintain adequate corporate records; a commingling of HBI's funds with other Gouletas-related entities; and the failure to maintain arm's-length relationships with other Gouletas-related entities. Indeed, long before the December 29, 2014 closing on the sale of the Parking Lot, HBI's corporate charter was involuntarily dissolved by the Illinois Secretary of State's Office on April 11, 2014.

72.     Pursuant to Turnover Order No. 4 entered on August 12, 2015 in connection with the Gouletas Citation Proceedings (Px 51), on August 27, 2015 Gouletas signed a replacement stock certificate for 100% of his legal and equitable ownership of any interest in HBI. (Px 52.) Gouletas's stock in HBI was then sold at public auction to 800 SWC, with 800 SWC now the owner of the stock of HBI. (Px 54.)

73.     Further, Gouletas was ordered to provide to 800 SWC "the location of all corporate books and records for HBI for 2014 and the first and second quarter of 2015" (Px 51 No. (1)(b)), and to turn over to 800 SWC "all federal and state tax returns for HBI from 2006 to the present" (*id*. No. (1)(c)), as well as "[a]ll documents [or] records . . . related to the assets of HBI." (*Id.* No. (1)(d).) At that time, Gouletas worked for "American Invsco" out of his office located at 182 West Lake Street, Suite 200, Chicago, Illinois, and both HBI and 800 SWP operated out of Gouletas's office. Apparently, both HBI and 800 SWP used the American Invsco address, phone number and office personnel for their business operations.

74.     In accordance with Turnover Order No. 4, on August 17, 2015, Gouletas's counsel, Teplinsky, directed 800 SWC's counsel, Dean Armstrong, to Gouletas's office located at Suite 200, 182 West Lake Street, Chicago, Illinois, where, supposedly, all of the corporate books and records for all of Gouletas's entities, including HBI and 800 SWP, were located. Further, Teplinsky accorded Attorney Armstrong and 800 SWC's representative, Dan Cadle, with access to a copy machine to make copies of any documents that needed to be copied. Teplinsky also had Gouletas's agent, John Arnold, watch over the review and copying process.

75.     For two days solid on August 17 and 18, 2015, 800 SWC's counsel, Attorney Armstrong, and Mr. Cadle went through every file cabinet at Gouletas's office looking for the corporate books and records and the tax returns of 800 SWP and HBI. While on the second day of their search, 800 SWC's counsel and Mr. Cadle were able to locate and copy some of Gouletas's records pertaining to Gouletas's business entities, assets and financial affairs (*see, e.g.,* Pxs 1, 2, 14, 15 & 16) that were tucked into a drawer in Gouletas's personal office (which, on the prior day was locked), there were no documents at Gouletas's office to indicate that HBI maintained any formal books or records or otherwise observed any corporate formalities. Moreover, there was no corporate minute book for HBI, and no documentation to indicate that HBI was properly capitalized. (Px 53.) In addition, although Gouletas was ordered to turn over "all federal and state tax returns for HBI from 2006 to the present", there were no such tax returns for HBI at American Invsco's office.

76.     It was later learned through a supplemental document production by BPMS in mid-February of 2021 that Teplinsky and Gouletas's agent, Arnold, had all of 800 SWP's and HBI's books and records, including financial records and tax returns, shipped to the forensic accountant that was assisting with Gouletas's impending bankruptcy filing, Ron Braver. Accordingly, it is not

surprising that there were no such financial records located at American Invsco's office when Teplinsky, in August of 2015, directed 800 SWC's counsel and representative to American Invsco's office for the purpose of complying with the August 17, 2015 Turnover Order. (Px 51.)

### F. In Violation Of The Citation Lien, Gouletas Obtained And Cashed Numerous Cashier's Checks Issued To Himself

77. In the 800 SWC Suit, the Citation was served upon Gouletas on June 9, 2014, which prohibited Gouletas from transferring any of his assets. In violation of the Citation Lien, Gouletas obtained and cashed numerous cashier's checks issued in his name:

    (a) On or about July 31, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,530.52 issued to himself (Px 4);

    (b) On or about August 1, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $10,000 issued to himself (Px 5);

    (c) On or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,500.00 issued to himself (Px 6); and

    (d) On or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $2,500.00 issued to himself (Px 7).

### G. The Touris Checking Account Scheme

78. Apparently tired of the process of obtaining cashier's checks in his name, Gouletas then turned to a close personal friend, Defendant Touris, to assist him with a money laundering scheme that would allow Gouletas to maintain his lavish lifestyle, but all the while evade paying his disfavored judgment creditors, and skirt the judicial prohibitions against his transfer of assets imposed by the Citation Liens.

79. Touris was a close personal friend of Gouletas for over 40 years. Moreover, Touris lived in the same condominium building as Gouletas at 111 East Chestnut Street in Chicago, having bought her condominium from one of Gouletas's entities after Gouletas developed that

property into condominiums. Further, Touris was the director of design for Gouletas at American Invsco over the last 20 years.

80.     In January of 2015 -- and after the Citation Liens were entered prohibiting Gouletas from transferring his assets -- Gouletas, at a meeting with Teplinksy at Gouletas's office in Chicago, requested that Touris deposit Gouletas's funds into her checking accounts for the payment of Gouletas's expenses. Pursuant to Gouletas's plan, Touris would then take the funds that he had provided to her, put that money in her checking accounts, and then pay Gouletas's bills out of her checking accounts. The funds that Gouletas deposited into Touris's checking accounts belonged to Gouletas. In essence, Touris acted as a managing agent of Gouletas for the handling and use of Gouletas's funds.

81.     At the late January of 2015 meeting at Gouletas's office, Gouletas, at the direction of Teplinsky, presented Touris with a check in the amount of $396,218.84 drawn on BPMS's trust account. (Px 25) Touris understood that those funds belonged to Gouletas. Gouletas then told Touris, in the presence of Teplinsky, that "I would like you [Touris] to deposit this [the $396,218.84 BPMS check] in your account. And I want you [Touris] to pay $195,000 to [Gouletas's son] Steven Gouletas and $50,000 to a gentleman [named George Spanos]", with the balance of $150,000 to be kept by Touris as a purported "reimbursement" on a Gouletas investment.  Based on the context of what was discussed at this meeting, Touris knew, must have known, or should have known that she was being asked to handle Gouletas's funds in this manner because Gouletas, personally, was in a difficult financial situation, and was, with the guidance and assistance of Teplinsky, trying to hide, transfer and otherwise shield Gouletas's income from the claims of his disfavored judgment creditors.

82. Thereafter, on February 6, 2015 Touris wrote a check from her MB Bank checking account in the amount of $195,000 for a payment by Gouletas to his son, Steven E. Gouletas (Px 8), and a $50,000 payment to Gouletas's friend, George Spanos. (Px 9.)

83. On February 17, 2015, Gouletas wire-transferred $15,730 into Touris's checking account at Chase Bank (the "Touris Chase Account"). (Px 10.) The $15,730 was money that belonged to Gouletas. Gouletas, however, claims to have "no idea" where the $15,730 came from.

84. And then in March of 2015, Gouletas told Touris that an additional check for $415,000 was coming to her, which she was to deposit in her account for the payment of Gouletas's expenses. Touris then deposited the $415,000 check from Defendant Jones (Px 35) into her checking account at Chase Bank. (Px 11.) According to Touris, she and Gouletas "talked about it together and he [Gouletas] wanted the bills paid, so . . . he asked me [Touris], would you deposit this [$415,000 check from Defendant Jones, Px 35] in your account and pay the bills." Although Gouletas claimed that the $415,000 was a "loan" to him from Defendant Jones (but with the check made payable to Touris), he later admitted that the $415,000 was his money. The total amount of Gouletas's funds that Gouletas deposited into the Touris Chase Account was in excess of $431,145.

85. The account summaries for the Touris Chase Account (Px 12) pertain to the requests that Gouletas made about taking funds that Gouletas had put into Touris's Chase checking account, and that Touris then withdrew from her account at Gouletas's request, all during the time that Gouletas was prohibited from transferring his cash pursuant to the Citation Liens. As acknowledged by Touris, "those [account summaries reflected by Px 12] are all of the financial transactions that [she] handled for Nick Gouletas with Nick Gouletas's money", and "[e]very single thing was done by [Gouletas] telling me [Touris] to do it."

86.     Although the Citation was served on Gouletas on June 9, 2014, and was not suspended until Gouletas filed for bankruptcy on January 17, 2016, the account summaries for the Touris Chase Account (Px 12) reflect the regular, continuous and systematic use of that account by Gouletas and Touris from February 17, 2015 when Gouletas made his initial wire transfer of $15,730 into that account, until September 14, 2015 with the payment of  Gouletas's credit card bill. (*Id.*) Some of the more significant withdrawals by Gouletas from the Touris Chase Account -- all in violation of the Citation Liens -- are listed below:

| Date | Amount | Payee/Explanation |
|---|---|---|
| 2/18/15 | $7,000 | George Stray, friend of Gouletas. (Px 12 #14) |
| 3/16/15 | $5,000 | Cash. (Px 12 #14) |
| 3/17/15 | $5,000 | Cash. (Px 12 #14) |
| 3/20/15 | $10,000 | Transfer to other checking account. (Px 12 #14) |
| 3/20/15 | $10,000 | Wire transfer at Gouletas's request to "Santander, B". (Px 12 #14) |
| 3/20/15 | $20,000 | Cash. (Px 12 #14) |
| 3/20/15 | $5,000 | Cash. (Px 12 #14) |
| 3/20/15 | $90,000 | Loan to Touris. (Px 12 #15) |
| 3/24/15 | $53,000 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $16,000 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $7,200 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $440 | Steven Gouletas. (Px 12 #15) |
| 3/24/15 | $30,000 | Natel Matschulat, Gouletas's wife. (Px 12 #15) |
| 3/26/15 | $5,512.22 | Condominium assessment. (Px 12 #15) |
| 3/26/15 | $3,436.06 | Payment for assessments on Gouletas's condominium. (Px 12 #15) |
| 3/26/15 | $1,061 | Payment to BOA for mortgage on Gouletas condominium. (Px 12 #15) |
| 3/26/15 | $869.09 | Payment of Gouletas's ComEd bill. (Px 12 #15) |
| 3/27/15 | $2,949.02 | Payment of mortgage. (Px 12 #15) |
| 3/27/15 | $2,788.28 | Payment of assessments for condominiums. (Px 12 #15) |
| 3/27/15 | $1,865.16 | Payment of assessments for condominiums. (Px 12 #15) |
| 4/7/15 | $10,000 | Wire transfer to Luxury Management LLC. (Px 12 #17) |
| 4/9/15 | $3,581.01 | Assessment for  Gouletas's condominium. (Px 12 #17) |
| 4/13/15 | $1,391.55 | Payment for Gouletas's condominium on Delaware Street. (Px 12 #17) |
| 4/13/15 | $230 | Assessment for Gouletas's condominium on Delaware Street. (Px 12 #17) |
| 4/14/15 | $22,474.24 | Mortgage for Gouletas's condominium. (Px 12 #17) |

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 4/14/15 | $4,299.75 | Mortgage for Gouletas's condominium. (Px 12 #17) |
| 4/14/15 | $2,634.74 | Payment for assessments on Gouletas's condominium at Delaware Place. (Px 12 #17) |
| 4/14/15 | $1,639.82 | Payment of Gouletas's ComEd bill. (Px 12 #17) |
| 4/14/15 | $125 | Payment of AT&T bill. (Px 12 # 17) |
| 4/15/15 | $4,167.06 | Payment of assessment on Gouletas's condominium. (Px 12 #17) |
| 4/16/15 | $15,150.29 | Unexplained. (Px 12 #17) |
| 4/16/15 | $14,268.31 | Payment of Gouletas's mortgage. (Px 12 #17) |
| 4/16/15 | $2,695.25 | Payment of Gouletas's assessment on condominium. (Px 12 #17) |
| 4/16/15 | $1,275.29 | Payment for Gouletas's parking. (Px 12 #17) |
| 4/27/15 | $10,000 | Gouletas requested payment to Karen Thorton. (Px 12 #18) |
| 4/28/15 | $1,620.10 | Payment for Gouletas's condominium. (Px 12 #18) |
| 4/29/15 | $3,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 12 #18) |
| 4/29/15 | $1,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 12 #18) |
| 4/30/15 | $2,000 | Unexplained. (Px 12 #18) |
| 5/4/15 | $13,000 | Payment to Gouletas's wife, Natel Matschulat. (Px 12 #18) |
| 5/4/15 | $10,000 | Payment to George Spanos. (Px 12 #18) |
| 5/13/15 | $5,000 | Unexplained. (Px 12 #18) |
| 5/14/15 | $10,000 | Transferred to another checking account. (Px 12 #18) |
| 5/21/15 | $1,000 | Unexplained. (Px 12 #18) |
| 5/26/15 | $2,712.05 | Transferred to checking account. (Px 12 #19) |
| 5/28/15 | $10,000 | Gouletas gave the money to Touris. (Px 12 #19) |
| 5/28/15 | $5,000 | Cash.   (Px 12 #19) |
| 5/28/15 | $5,000 | Cash. (Px 12 #19) |
| 5/29/15 | $900 | Payment on Gouletas's credit card. (Px 12 #19) |
| 5/29/15 | $6,500 | Payment on Gouletas's wife's credit card. (Px 12 #19) |
| 6/4/15 | $10,000 | Payment to Vivien. (Px 12 #19) |
| 6/8/15 | $2,171.10 | Payment on Gouletas's credit card. (Px 12 #19) |
| 6/9/15 | $6,178.31 | Payment for Gouletas's condominium. (Px 12 #19) |
| 6/9/15 | $1,000 | Payment to Heather Von Ehr. (Px 12 #19) |
| 6/24/15 | $1,000 | Payment on Gouletas's credit card. (Px 12 #20) |
| 6/24/15 | $5,000 | Unexplained. (Px 12 #20) |
| 7/2/15 | $2,000 | Cash. (Px 12 #20) |
| 7/14/15 | $1,602.60 | Payment for three plane tickets to Atlanta. (Px 12 #21) |

87. From the $826,218.40 that Gouletas deposited into Touris's checking accounts, only

$1,368 of Gouletas's funds remained in those accounts as of February 10, 2017.

## H.    The Garvey Court Scheme

88.    During the time that the Citations were issued prohibiting Gouletas from transferring his assets, Gouletas was involved in a real estate development referred to as "Garvey Court" (the "Garvey Court Project").  As planned in March of 2014, the Garvey Court Project involved the construction of a mixed use high-rise retail/office/condominium building on properties that Gouletas owned (through entities that he owned and controlled) at Clark and Lake Streets in Chicago.

89.    Basically, in April of 2014, Gouletas placed certain properties that he owned into a new entity -- Garvey Court, LLC -- which would pay off the existing debt on the properties, and then develop the new high-rise building on the Gouletas properties. Gouletas's "equity cushion" in the Garvey Court properties was in excess of $3,600,000.

90.    In the original formulation of the Garvey Court plan, Gouletas was going to retain a 25% equity interest in the Garvey Court Project.  After Teplinsky learned of the Citation Liens prohibiting Gouletas from transferring any of his assets, and the Charging Orders on Gouletas's ownership interests in his LLCs, Teplinsky instructed Gouletas that, for any future business deals, Gouletas should not take any equity positions in his own name "[b]ecause his judgment creditors, like [800 SWC], would likely attach whatever equity position he had."  Taking his cue from Teplinsky, later in May of 2014 Gouletas "gifted" his 25% interest in the Garvey Court Project to family members through two newly formed LLCs, SEG Garvey LLC (12%) and NKM Garvey LLC (13%), as follows:

      (a)    SEG Garvey LLC

           (i)    Steven E. Gouletas -- 16.66%
           (ii)    Irene Gouletas -- 16.67%
           (iii)    Desiree Witte -- 16.67%
           (iv)    Victoria M. Gouletas -- 16.67%

          (v)        Rosalie Gouletas -- 16.67%
          (vi)      Louis Gouletas -- 5.53%
          (vii)     Michael Gouletas -- 5.53%
          (viii)    Brittany Gouletas -- 5.54%

      (b)      NKM Garvey LLC

          (i)        Natel Matschulat -- 93%
          (ii)      Nicholas Gouletas --7%

91.     Accordingly, in late May of 2014, Gouletas, after conferring with Teplinsky from BPMS about the Garvey Court plan, gifted away -- in violation of the Citation Liens and in derogation of the rights of his creditors -- virtually all of his "equity cushion" in the Garvey Court Project. As of the time of the Garvey Court transfers, Gouletas's "equity cushion" in the Garvey Court Project exceeded $3,600,000. And for his Garvey Court services, on May 30, 2014, Teplinskiy billed, and BPMS received, a $10,000 flat fee payment. (Px 91.)

### I.     __The Matschulat-CIB Stock Scheme__

92.     Shortly after service of the Citation upon Gouletas on June 9, 2014, Gouletas discovered, quite by accident, that he had, in the distant past, acquired a number of shares of stock in CIB Marine BankShares (the "CIB Stock"), which Gouletas held through a stock brokerage account at TD Ameritrade (the "TDA Account").

93.     Although the Citation was served on Gouletas on June 9, 2014, and Gouletas understood that he was thereby prohibited from transferring his assets, on or about September 4, 2014, Gouletas sold his CIB Stock through his TDA Account for just over $51,000 (Px 13), and then, on or about the same date, wire-transferred $51,323.29 from that stock sale into a checking account held in the name of his wife, Natel Matschulat. (*Id*.)

94.     After depositing the $51,323.29 in his wife's checking account, Gouletas then proceeded to have his wife sign checks from that account for the payment of Gouletas's expenses,

all in violation of the judicial prohibition against Gouletas's transfer of assets imposed by the Citation Liens.

### L.     The Contempt Proceedings Against Gouletas

95.    Based on the numerous violations by Gouletas of the Citation Lien, on April 24, 2015, 800 SWC filed a Motion for Contempt against Gouletas, which was amended on October 9, 2015 (the "Contempt Motion"). The trial court (White, J.) conducted hearings in connection with the Contempt Motion on July 20, 2015, September 2, 2015, and November 24, 2015, with Teplinsky acting as Gouletas's defense counsel.

96.    In connection with the evidence which showed that Gouletas, during the Citation Proceedings, had sold his CIB Stock without obtaining permission from the Court, Judge White stated, with Gouletas still up on the witness stand, that:

> I'm a little bit confused here. We have a citation that says . . . don't transfer assets. And what I'm hearing from the testimony is that apparently [Gouletas's CIB Stock] was sold. The money was forthcoming and was used to buy food, which is a violation of the citation.

Further, Gouletas testified at the contempt hearing that he supposedly had "no idea" why he was going through a series of cashier's checks during the time from and after the Citation was served upon him on June 9, 2014.

97.    The final day of the contempt hearing was scheduled for January 19, 2016. On the eve of Judge White's decision in connection with the motion to hold Gouletas in contempt, on January 17, 2016 Gouletas filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois. The Citation Liens continued in existence at all times from the date the Muth and Alfonso Citations were served on Gouletas in December of 2013 until

the date that Gouletas filed for bankruptcy on January 17, 2016 (*see Marcus-Rehtmeyer v. Jacobs*, 784 F.3d 430, 438-39 & 443 (7th Cir. 2015)), and at all relevant times were in full force and effect.

### M. The Bankruptcy Trustee Assigns The Litigation Claims And Alter-Ego Claims To DJV

98.     Upon  Gouletas's filing of bankruptcy on January 17, 2016, all fraudulent transfer claims that a creditor held related to Gouletas's fraudulent transfers became the exclusive property of the Bankruptcy Trustee for the two-year period following the bankruptcy filing, with the creditors divested of the ability to prosecute any such fraudulent transfer claims for the two-year period of exclusivity accorded to the Bankruptcy Trustee. Pursuant to 11 U.S.C. §546(a)(1)(A), when the two-year limitation on the Bankruptcy Trustee's fraudulent transfer claims expired on January 17, 2018, those state-law fraudulent transfer claims, absent prior effective sale and assignment of those claims by the Bankruptcy Trustee, automatically reverted back to the creditors which held the fraudulent transfer claims prior to Gouletas's bankruptcy filing. *See Klingman v. Levinson*, 158 B.R. 109, 113 (N.D. Ill. 1993).

99.     The Bankruptcy Trustee attempted to obtain counsel to prosecute avoidance and fraudulent transfer claims for and on behalf of the Bankruptcy Estate on a contingent fee basis, but, despite his diligent efforts, was unable to do so. On July 23, 2017, the Bankruptcy Trustee received an offer from DJV to purchase the Bankruptcy Trustee's litigation claims and alter-ego claims for $15,000. On July 24, 2017, the Bankruptcy Trustee filed in the Bankruptcy Court the Trustee's Motion for Approval of Sale of Interests in Personal Property and for Related Relief (Px 26), which specifically included fraudulent transfer, alter-ego, and common law tort claims of the nature set forth herein. *See* 11 U.S.C. §§363(b)(1) & 544(b)(1). No one offered a higher bid for those claims, and neither the Debtor, Gouletas, nor any creditor, objected to the Bankruptcy Trustee's Motion or the proposed sale by the Bankruptcy Trustee.

100.     After due notice to all interested parties, and after a hearing before the Bankruptcy Court, on August 18, 2017, the Bankruptcy Court entered its Order Authorizing Sale of Personal Property. (Px 27) Neither the Debtor, Gouletas, nor any creditor objected to the order of sale, or appealed the order of sale. Thereafter, on September 13, 2017, the Bankruptcy Trustee and the representative of DJV executed an Assignment of Claims and Causes of Action, thereby transferring the Bankruptcy Trustee's fraudulent transfer claims, litigation claims and alter-ego claims to DJV. (Px 28)

101.     On March 28, 2019, the Bankruptcy Court presiding over Gouletas's bankruptcy filing entered its Order that the 800 SWC Judgment against Gouletas in the amount of $11,550,040.12 was a non-dischargeable debt pursuant to 11 U.S.C. §523(a)(4).

102.     On April 17, 2019, 800 SWC assigned all of its fraudulent transfer claims -- to the extent any such fraudulent transfer claims were not previously effectively assigned to DJV by the Trustee -- to DJV. (Px 34)

103.     All conditions precedent to recovery by Plaintiffs have been performed or have occurred.

104.     Plaintiffs reallege all preceding paragraphs as the basis for each of the following Counts.

### Count I
### (Avoidance Of Fraudulent Transfers
### Pursuant To 740 ILCS 160/5(a)(1))

105.     The Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq*. (the "IUFTA") at Section 160/5(a) provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . ., if the debtor made the transfer . . .: (1) with actual intent to hinder, delay or defraud any creditor of the debtor . . ..

740 ILCS 160/5(a)(1).

106. The following transfers of cash (the "Transfers") were made by or on behalf of the Debtor, Gouletas, from funds that, legally and equitably, belonged to Gouletas, with actual intent to hinder, delay or defraud Gouletas's disfavored judgment creditors in existence as of the dates of the Transfers.

107. The course of conduct set forth above shows Gouletas's actual intent to hinder, delay or defraud Gouletas's disfavored judgment creditors in existence as of the date of the Transfers. Indeed, a number of the Transfers were to insiders as defined in 740 ILCS 160/2(g)(1), (4) & (5). In that connection, (a) Touris was an "insider" within the meaning of 740 ILCS 160/2(g)(5) because Touris acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas's funds; (b) Steven Gouletas was an "insider" within the meaning of 740 ILCS 160/2(g)(1) & (5) because he is a relative of the Debtor (*i.e.*, Gouletas's son), and acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas's funds; and (c) BPMS was an "insider" within the meaning of 740 ILCS 160/2(g)(5) because BPMS acted as a "managing agent" of Gouletas for the handling, use and distribution of Gouletas's funds. Further, as to Gouletas's funds deposited into (a) the trust account at BPMS; (b) the checking account for W&D; and (c) the checking accounts of Touris, Gouletas retained control over those funds, and the transfers were concealed. In addition, before the Transfers were made, Gouletas had been sued and threatened with further suits, numerous judgments had been entered against him, and he was insolvent. Finally, in connection with the Transfers, Gouletas intended to prefer the interests of the following Defendants above the interests of judgment creditors 800 SWC, Muth and Alfonso.

108. The Transfers were made in violation of 740 ILCS 160/5(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

109.     None of the Defendants listed below took the fraudulently transferred funds in good faith because the sums allegedly owed were long overdue, and in many instances barred by limitations, and because each Defendant knew, must have known, or should have known that numerous judgments had been entered against Gouletas, with outstanding Citation Liens which prohibited Gouletas from transferring his assets. *See For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 560 F.3d 717, 722 (7th Cir. 2009). Indeed, as to Defendant Adler, he previously had filed suit against Gouletas on August 4, 2014 in the Circuit Court of Cook County, Illinois, No. 2014 L 050584, during which Adler was represented by reputable counsel who were highly experienced and very thorough litigators. Accordingly, at the time that Adler took the $850,000 from Gouletas on January 8, 2015, Adler knew, must have known, or should have known about the 800 SWC, Muth and Alfonso judgments against Gouletas and the outstanding Citation Liens that had been entered against Gouletas which prohibited Gouletas from transferring his assets. Moreover, in the December 30, 2014 Release and Settlement Agreement executed between Adler and Gouletas (Px 29), Adler acknowledged that "[i]f for any reason Adler is ordered to return or disgorge the Payment [of $850,000] or any portion thereof, any obligation of Adler hereunder shall be null, void and of no effect . . .." (*Id*. p. 2 ¶2) Since Adler, through highly experienced and very thorough counsel, knew, must have known, or should have known about the outstanding judgments against Gouletas and the Citation Liens pertaining thereto, Adler did not take the funds from Gouletas in good faith.

110.     At the time that Gouletas made the following payments to the following Defendants, Gouletas recently had come into possession of over $2,000,000 in cash, which Gouletas, through Teplinsky at BPMS, wanted to shield from Gouletas's disfavored judgment creditors. Thus, the main purpose of the following transfers was to not only favor certain of

Gouletas's friends and relatives over his disfavored judgment creditors, but also to prevent Gouletas's disfavored judgment creditors from collecting on their judgments against Gouletas.

111.   Each Defendant listed below is liable to Plaintiff in the amount of the Transfers as follows:

(a)   Defendant Dorothea Touris

    (i)     January 21, 2015 -- $396,218.84
    (ii)    February 17, 2015 -- $15,730
    (iii)   March 17, 2015 -- $415,000
    (iv)    May 28, 2015 -- $10,000

(b)   Defendant Steven E. Gouletas

    (i)     April 11, 2014 -- $90,586
    (ii)    April 11, 2014 -- $80,324
    (iii)   August 29, 2014 -- $23,200
    (iv)    February 6, 2015 -- $195,000
    (v)     February 6, 2015 -- $190,000
    (vi)    February 6, 2015 -- $5,000
    (vii)   March 24, 2015 -- $7,200
    (viii)  March 24, 2015 -- $53,000
    (ix)    March 24, 2015 -- $16,000
    (x)     March 24, 2015 -- $440

(c)   Defendant Natel Matschulat

    (i)     September 5, 2014 -- $51,323.29
    (ii)    January 8, 2015 -- $100,000
    (iii)   March 24, 2015 -- $30,000
    (iv)    May 4, 2015 -- $13,000

(d)   Defendant Paul Jones

    (i)     January 21, 2015 -- $690,000

(e)   Defendant James Paul

    (i)     January 21, 2015 -- $110,000

(f)   Defendant Adler

    (i)     January 8, 2015 -- $850,000

(g) <u>Defendant George Stray</u>

    (i)      January 21, 2015 -- $15,000
    (ii)     February 18, 2015 -- $7,000

(h) <u>Defendant George Spanos</u>

    (i)      February 6, 2015 -- $50,000
    (ii)     May 4, 2015 -- $10,000

(i) <u>Defendant BPMS</u>

    (i)      January 6, 2015 -- $137,535.00
    (ii)     January 7, 2015 -- $2,038,704.84
    (iii)    January 13, 2015 -- $30,020
    (iv)    January 22, 2015 -- $25,000
    (v)     January __, 2015 -- $74,680

112.     While not seeking a double recovery, Plaintiff DJV, as Assignee of Judgment Creditor 800 SWC, also asserts the above Count I against the Defendants named in Count I for the reasons set forth above, which Count is hereby incorporated by reference as if set forth verbatim.

**<u>Count II</u>**
**(Avoidance Of Fraudulent Transfers Pursuant To**
**740 ILCS 160/5(a)(1) -- Garvey Court Transfers)**

113.     Section 160/5(a) of the IUFTA provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . ., if the debtor made the transfer . . .: (1) with actual intent to hinder, delay or defraud any creditor of the debtor . . ..

740 ILCS 160/5(a)(1).

114.     In May of 2014, Gouletas's "equity cushion" in the Garvey Court Project was at least $3,600,000.

115.    In May of 2014, Gouletas transferred his 25% retained interest in the Garvey Court

Project to his family members through Defendants SEG Garvey (12%) and NKM Garvey (13%)

as follows:

      (a)    <u>Defendant SEG Garvey</u>

          (i)       Defendant Steven E. Gouletas -- 16.66%
          (ii)      Defendant Irene Gouletas -- 16.67%
          (iii)     Defendant Desiree Witte -- 16.67%
          (iv)     Defendant Victoria M. Gouletas -- 16.67%
          (v)      Defendant Rosalie Gouletas -- 16.67%
          (vi)     Defendant Louis Gouletas -- 5.53%
          (vii)    Defendant Michael Gouletas -- 5.53%
          (viii)   Defendant Brittany Gouletas -- 5.54%

      (b)    <u>Defendant NKM Garvey</u>

          (i)       Defendant Natel Matschulat -- 93%
          (ii)      Debtor Nicholas Gouletas --7%

(the "Garvey Court Transfers").

116.    The course of conduct set forth above shows  Gouletas's actual intent to hinder,

delay or defraud Gouletas's creditors in existence as of the date of the Garvey Court Transfers,

including 800 SWC, Muth and Alfonso. At the time of the Garvey Court Transfers, Gouletas was

insolvent, or Gouletas became insolvent as a result of the transfers. The Garvey Court Transfers

were in violation of the Citation Liens entered against Gouletas prohibiting his transfer of assets

and in derogation of the rights of Gouletas's disfavored judgment creditors in existence as of the

dates of the transfers. Moreover, the Garvey Court Transfers were made to insiders -- Gouletas's

wife, children and grandchildren. *See* 740 ILCS 160/2(g)(1).

117.    The Garvey Court Transfers were made in violation of 740 ILCS 160/5(a)(1), and

are voidable pursuant to 740 ILCS 160/8(a)(1).

118.    None of the Defendants listed above took the Garvey Court Transfers in good faith because each Defendant knew, must have known, or should have known that Gouletas was insolvent, and that numerous judgments had been entered against Gouletas, with outstanding Citation Liens which prohibited Gouletas from transferring his assets. *See For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 560 F.3d 717, 722 (7th Cir. 2009).

119.    The Garvey Court Transfers were made in violation of 740 ILCS 160/5(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

120.    The Defendants listed in this Count Two are liable to Plaintiff for their percentage of the value of Gouletas's 25% retained interest in the Garvey Court Project, as of the date of the Garvey Court Transfers, in the percentage of each Defendant's interest as set forth above.

121.    While not seeking a double recovery, Plaintiff DJV, as Assignee of Judgment Creditor 800 SWC, also asserts the above Count II against the Defendants named in Count II for the reasons set forth above, which Count is hereby incorporated by reference as if set forth verbatim.

### Count III
#### (Avoidance Of Fraudulent Transfers Pursuant To
#### 740 ILCS 160/6(a) -- Garvey Court Transfers)

122.    Section 160/6(a) of the IUFTA provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . ..

740 ILCS 160/6(a).

123.    In May of 2014, Gouletas's "equity cushion" in the Garvey Court Project was at least $3,600,000.

124.     In May of 2014, Gouletas transferred his 25% retained interest in the Garvey Court Project to his family members through Defendants SEG Garvey (12%) and NKM Garvey (13%) as follows:

     (a)    <u>Defendant SEG Garvey</u>

          (i)      Defendant Steven E. Gouletas -- 16.66%
          (ii)     Defendant Irene Gouletas -- 16.67%
          (iii)    Defendant Desiree Witte -- 16.67%
          (iv)    Defendant Victoria M. Gouletas -- 16.67%
          (v)      Defendant Rosalie Gouletas -- 16.67%
          (vi)    Defendant Louis Gouletas -- 5.53%
          (vii)   Defendant Michael Gouletas -- 5.53%
          (viii)  Defendant Brittany Gouletas -- 5.54%

     (b)    <u>Defendant NKM Garvey</u>

          (i)      Defendant Natel Matschulat -- 93%
          (ii)     Debtor Nicholas Gouletas --7%

(the "Garvey Court Transfers").

125.     At the time of the Garvey Court Transfers, Gouletas was insolvent, or Gouletas became insolvent as a result of the transfers.

126.     The Garvey Court Transfers were in violation of the Citation Liens entered against Gouletas prohibiting his transfer of assets and in derogation of the rights of Gouletas's disfavored judgment creditors in existence as of the dates of the transfers.

127.     Gouletas did not receive reasonably equivalent value in exchange for the Garvey Court Transfers. Indeed, Gouletas's 25% retained interest in the Garvey Court Project was "gifted" by Gouletas to his family members in the percentages set forth above.

128.     The Garvey Court Transfers were made in violation of 740 ILCS 160/6(a)(1), and are voidable pursuant to 740 ILCS 160/8(a)(1).

129.    The Defendants listed in this Count Three are liable to Plaintiff for their percentage of the value of Gouletas's 25% retained interest in the Garvey Court Project, as of the date of the Garvey Court Transfers, in the percentage of each Defendant's interest as set forth above.

130.    While not seeking a double recovery, Plaintiff DJV, as Assignee of Judgment Creditor 800 SWC, also asserts the above Count III against the Defendants named in Count III for the reasons set forth above, which Count is hereby incorporated by reference as if set forth verbatim.

**Count IV**
**(Avoidance Of Fraudulent Transfers Pursuant**
**to 740 ILCS 160/6(a) -- Cash Transfers)**

131.    Section 160/6(a) of IUFTA provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . ..

740 ILCS 160/6(a).

132.    The following transfers of cash (the "Cash Transfers") were made by or on behalf of the Debtor, Gouletas, from funds that, legally and equitably, belong to Gouletas.

133.    Gouletas made the Cash Transfers without receiving a reasonably equivalent value in exchange for the transfers.

134.    Gouletas was insolvent at the time of the Cash Transfers or became insolvent as a result of the Cash Transfers.

135.    The Cash Transfers were in violation of the Citation Liens entered against Gouletas prohibiting his transfer of assets and in derogation of the rights of Gouletas's disfavored judgment creditors in existence as of the dates of the Cash Transfers.

136. The Cash Transfers were made in violation of 740 ILCS 160/6(a), and are voidable pursuant to 740 ILCS 160/8(a)(1).

137. Each Defendant listed below is liable to Plaintiff in the amount of the Cash Transfers as follows:

(a) <u>Defendant Dorothea Touris</u>

    (i)     January 21, 2015 -- $396,218.84
    (ii)    February 17, 2015 -- $15,730
    (iii)   March 17, 2015 -- $415,000
    (iv)   May 28, 2015 -- $10,000

(b) <u>Defendant Steven E. Gouletas</u>

    (i)     April 11, 2014 -- $90,586
    (ii)    April 11, 2014 -- $80,324
    (iii)   August 29, 2014 -- $23,200
    (iv)   February 6, 2015 -- $195,000
    (v)    February 6, 2015 -- $190,000
    (vi)   February 6, 2015 -- $5,000
    (vii)  March 24, 2015 -- $7,200
    (viii) March 24, 2015 -- $53,000
    (ix)   March 24, 2015 -- $16,000
    (x)     March 24, 2015 -- $440

(c) <u>Defendant Natel Matschulat</u>

    (i)     September 5, 2014 -- $51,323.29
    (ii)    January 8, 2015 -- $100,000
    (iii)   March 24, 2015 -- $30,000
    (iv)   May 4, 2015 -- $13,000

(d) <u>Defendant Paul Jones</u>

    (i)     January 21, 2015 -- $690,000

(e) <u>Defendant George Stray</u>

    (i)     January 21, 2015 -- $15,000
    (ii)    February 18, 2015 -- $7,000

(f) <u>Defendant George Spanos</u>

      (i)       February 6, 2015 -- $50,000

      (ii)      May 4, 2015 -- $10,000

    (g)    <u>Defendant BPMS</u>

      (i)       January 6, 2015 -- $137, 535.00

      (ii)      January 7, 2015 -- $2,038,703.84

      (iii)    January 13, 2015 -- $30,020

      (iv)    January 22, 2015 -- $25,000

      (v)     January __, 2015 -- $74,680

138.    While not seeking a double recovery, Plaintiff DJV, as Assignee of Judgment Creditor 800 SWC, also asserts the above Count IV against the Defendants named in Count IV for the reasons set forth above, which Count is hereby incorporated by reference as if set forth verbatim.

**<u>Count V</u>**
**(Civil Conspiracy To Commit Fraud)**

139.    Defendants Touris, BPMS (through Teplinsky) and Jones knowingly and voluntarily participated in a common scheme with Gouletas to commit an unlawful act -- to assist Gouletas in delaying, hindering or defrauding Gouletas's creditors. Defendants Touris, BPMS (through Teplinsky) and Jones understood the general objectives of Gouletas's conspiratorial scheme, accepted them, and agreed (implicitly, at least) to do their part to further those objectives.

140.    As set forth in detail above, Gouletas and Defendants Touris, BPMS (through Teplinsky) and Jones entered into an agreement for the purpose of accomplishing, by concerted action, the unlawful purpose of hiding, transferring or otherwise shielding Gouletas's assets in violation of the Citation Liens that prohibited Gouletas from transferring his assets, and otherwise in derogation of the rights of Gouletas's disfavored judgment creditors, as part of the scheme to delay, hinder or defraud Gouletas's creditors, including 800 SWC.

141.    The course of conduct set forth above constitutes a civil conspiracy to commit fraud on Judgment Creditor 800 SWC, which proximately caused harm and damage to 800 SWC in the amount of Gouletas's assets that were fraudulently transferred. Accordingly, Plaintiff, in its capacity as the assignee of the claims of judgment creditor 800 SWC, and not in its capacity as the assignee of the Chapter 7 Trustee, hereby asserts civil conspiracy claims against Defendants Touris, BPMS and Jones, who are jointly and severally liable to Plaintiff for the harm and damage caused by their civil conspiracy with Gouletas in the fraud committed upon judgment creditor 800 SWC.

### Count VI
### (Aiding And Abetting Fraud)

142.    As set forth in detail above, (a) Gouletas engaged in numerous schemes to fraudulently transfer his assets in an effort to delay, hinder or defraud his creditors, which injured the ability of Gouletas's disfavored judgment creditors, including 800 SWC, to collect on the amount of indebtedness owed to them by Gouletas; (b) Defendants Touris, BPMS (through Teplinsky) and Jones were aware of their roles in  Gouletas's fraudulent transfer schemes when they provided assistance to Gouletas in the accomplishment of those schemes; and (c) Defendants Touris, BPMS (through Teplinsky) and Jones provided knowing and substantial assistance to Gouletas in the implementation and execution of Gouletas's fraudulent transfer schemes.

143.    Accordingly, Defendants Touris, BPMS (through Teplinsky) and Jones knowingly induced, participated and assisted in actively defrauding Gouletas's disfavored judgment creditors, including 800 SWC, through the implementation and execution of Gouletas's fraudulent transfer schemes in order to assist Gouletas in his efforts to delay, hinder or defraud his creditors, including 800 SWC.

144.    The course of conduct set forth above constitutes aiding and abetting a fraud on Gouletas's disfavored judgment creditors, including 800 SWC, which proximately caused harm and damage to 800 SWC in the amount of Gouletas's assets that were fraudulently transferred. Accordingly, Plaintiff, in its capacity as the assignee of the claims of judgment creditor 800 SWC, and not in its capacity as the assignee of the Chapter 7 Trustee, hereby asserts these aiding and abetting claims against Defendants Touris, BPMS and Jones, who are jointly and severally liable to Plaintiff for the harm and damage caused by their aiding and abetting Gouletas in the fraud committed upon judgment creditor 800 SWC.

**Count VII**
**(Reimbursement Of Funds Owed By Touris To Gouletas Prior**
**To The Time That Gouletas Filed For Bankruptcy)**

145.    In March of 2015, Gouletas loaned $90,000 to Touris, of which only $50,000 was repaid, leaving a balance owed by Touris on that loan in the amount of $40,000.

146.    In addition, on March 28, 2015, Gouletas loaned an additional $10,000 to Touris, which Touris never repaid.

147.    Finally, on February 10, 2015, there was $1,368 of Gouletas's funds which remained in the Touris Chase Account.

148.    Accordingly, Touris is liable to the Bankruptcy Trustee, and thus to Plaintiff, for $51,368 that she owed to Gouletas at the time that Gouletas filed for bankruptcy.

**PRAYER**

Plaintiff DJV as the Assignee of Bankruptcy Trustee Richard M. Fogel, and Plaintiff DJV as the Assignee of Judgment Creditor 800 SWC, respectfully request:

(1)    that the Court enter judgment against the Defendants for (a) Plaintiffs' actual damages as set forth in each Count above; (b) punitive damages in favor of Plaintiff DJV as

Assignee of Judgment Creditor 800 SWC in an amount not less than three times Plaintiff's actual damages for the Defendants' intentional wrongful conduct as alleged in Counts V and VI; and (c) pre- and post-judgment interest at the highest lawful rate; and

(2)     that the Court grant Plaintiffs their court costs and such other and further relief to which they may be entitled.

## JURY DEMAND

Plaintiffs request a trial by jury.

Respectfully submitted,

ARMSTRONG LAW FIRM, P.C.

DATED: March 5, 2021.                     By_____*F. Dean Armstrong*_____
                                                F. Dean Armstrong, Esq.
                                                ARDC #6199894
                                                23353 S. 88th Avenue
                                                Frankfort, IL  60423
                                                815/464-3243
                                                armstronglaw@sbcglobal.net
                                                **Attorney for Plaintiffs**
                                                **D.A.N. Joint Venture III, L.P.,**
                                                **as Assigned of Bankruptcy Trustee**
                                                **Richard M. Fogel and D.A.N. Joint**
                                                **Venture III, L.P., as Assignee of**
                                                **Judgment Creditor 800 South Wells**
                                                **Commercial, LLC**

## Certificate of Service

The undersigned certifies that a true and correct copy of the foregoing pleading was served upon all parties receiving CM/ECF noticing on this 5th day of March, 2021. Parties not part of the CM/ECF system were served via United States Mail.

_____*/s/F. Dean Armstrong*_____
F. Dean Armstrong